**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FGIC CORPORATION,[1] | ) |
| | ) Case No. 10-14215 (___) |
| Debtor. | ) |
| | ) |

### DECLARATION OF JOHN S. DUBEL PURSUANT TO
### RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR THE
### SOUTHERN DISTRICT OF NEW YORK IN SUPPORT OF FIRST DAY MOTIONS

I, John S. Dubel, hereby declare as follows under penalty of perjury:

1.      I am the Chief Executive Officer of FGIC Corporation ("FGIC Corp." or the "Debtor"), a privately held company organized under the laws of the State of Delaware and the above-captioned debtor and debtor in possession.[2]  I also serve as the Chief Executive Officer of non-debtor Financial Guaranty Insurance Company ("FGIC," and together with FGIC Corp. and its other non-debtor affiliates, the "FGIC Group"), a wholly-owned subsidiary of FGIC Corp.[3]  I serve the FGIC Group in these capacities on a temporary basis through Dubel & Associates, LLC ("Dubel & Associates"), which has an engagement letter with the non-debtor FGIC.[4]  In the capacities described above, I am familiar with the FGIC Group's day-to-day business,

---

[1]      The last four digits of the Debtor's tax identification number are 6474.  The location of the Debtor's corporate headquarters is 125 Park Avenue, New York, New York 10017.

[2]      Prior to becoming the Chief Executive Officer of FGIC Corp., I served as an Executive Vice President of FGIC Corp. and FGIC (as defined above) and Chief Risk Officer for FGIC.  In addition, I have over 25 years experience in working with distressed companies, including as a Managing Director of Gradient Partners, LP, a hedge fund specializing in distressed investing, and a Managing Director of AlixPartners LLP, a firm specializing in turnarounds and crisis management.

[3]      A chart illustrating FGIC Corp.'s complete organizational structure is attached hereto as **Exhibit A.**

[4]      As described in more detail below, Dubel & Associates holds a general unsecured claim of approximately $10,500 against the Debtor.

1

financial affairs and books and records.

2.      FGIC Corp. has authorized me to submit this declaration (the "<u>Declaration</u>") in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Bankruptcy Rules</u>").  Except as otherwise indicated, all facts set forth in this Declaration are based upon personal knowledge, information gathered from my review of relevant documents and information supplied to me by other members of FGIC Corp.'s management and FGIC Corp.'s advisors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

<b><span style="font-variant:small-caps">Preliminary Statement</span></b>

3.      FGIC Corp. has filed this chapter 11 case and its *Chapter 11 Plan of Reorganization of FGIC Corp.* (the "<u>Plan</u>") in furtherance of the FGIC Group's ongoing efforts to improve its financial position and liquidity.  The Plan provides that holders of general unsecured claims against the Debtor will receive substantially all of the Debtor's $11.5 million in cash and the common stock in reorganized FGIC Corp.  Prior to the filing, the Debtor's three largest common shareholders, representing over 90% of its common equity, agreed to the cancellation of their equity interests pursuant to the Plan and waived general unsecured claims against the estate in the aggregate amount of $7.2 million.  Upon agreement with FGIC Corp.'s key creditor constituencies, reorganized FGIC Corp. will be capitalized with no more than $400,000 to fund its business needs.

4.      As of the date hereof, FGIC Corp. has unsecured debt of approximately $391.5 million, consisting of the following:

- Approximately $46 million owing under that certain Revolving Credit Agreement, dated as of December 12, 2005 (as amended, the "<u>Revolving Credit Agreement</u>"), by and between FGIC Corp., FGIC, the lender parties

thereto and JPMorgan Chase Bank, N.A. as administrative agent (the "Administrative Agent");

- Approximately $345.5 million outstanding[5] in connection with the 6% Senior Notes Due 2034 (the "Senior Notes"), issued pursuant to that certain Indenture, dated January 12, 2004 (the "Indenture"), between FGIC Corp., as issuer, and The Bank of New York ("BNY"), as indenture trustee;[6]

- Approximately $30,000 owing to FGIC for services rendered by FGIC to the Debtor for the period of July 1, 2010 through the date hereof pursuant to that certain Space and Cost Sharing Agreement by and between FGIC Corp. and FGIC, dated as of January 1, 2004 (the "Cost Sharing Agreement"); and

- $10,500 owing to Dubel & Associates under that certain Monitoring Fee Assignment Agreement, by and between Dubel & Associates and The PMI Group, Inc., dated as of July 29, 2010 (the "Monitoring Fee Assignment Agreement").[7]

Prior to filing this case, the Debtor consulted with the Administrative Agent and MBIA Inc. ("MBIA"), the largest holder of the Senior Notes, regarding the filing and the Plan. Both the Administrative Agent (in both its capacity as a lender and as agent) and MBIA have provided letters to the Debtor documenting their support for the Debtor's restructuring efforts and the Plan. Copies of the letters of support received from the Administrative Agent and MBIA are attached hereto as **Exhibits B** and **C**, respectively.

---

[5]   In April 2009, FGIC Corp. repurchased notes in the aggregate principal amount of approximately $63.105 million. Third parties currently hold notes in the aggregate principal amount of approximately $261.895 million. Accrued but unpaid interest on the Senior Notes totals approximately $20.5 million as of the Petition Date.

[6]   Pursuant to that certain Agreement of Resignation, Appointment and Acceptance, dated as of June 3, 2010, by and between FGIC Corp., BNY and Wilmington Trust FSB ("Wilmington Trust"), Wilmington Trust became the successor trustee under the Indenture.

[7]   Pursuant to the Monitoring Fee Assignment Agreement, The PMI Group, Inc. assigned its general unsecured claim in the amount of $5.7 million. Pursuant to a letter agreement, dated August 2, 2010, between Dubel & Associates and FGIC Corp., Dubel & Associates agreed to reduce its claim under the Monitoring Fee Agreement from $5.7 million to $10,500.

K&E 16272351

5.      As described in more detail below, FGIC Corp.'s primary asset is its equity interest in FGIC.  FGIC is a monoline financial guaranty insurance company organized under the laws of the State of New York that previously issued financial guaranties covering payments on public finance, structured finance and other securities and obligations.  FGIC also maintained exposure to collateralized debt obligations of asset-backed securities ("ABS CDOs") and residential mortgage-backed securities ("RMBS").

6.      As a result of the unprecedented downturn in the U.S. housing market beginning in 2007, and the subsequent deterioration in the U.S. credit markets, FGIC incurred significant losses.  In fact, during the first half of 2009, FGIC's surplus to policyholders fell below the $66.4 million minimum it is required to maintain under the New York Insurance Law (the "NY Insurance Law").  As a result of its diminished surplus, since January 2008, FGIC has failed to remit dividends to FGIC Corp.

7.      Concurrently with FGIC Corp.'s preparation of this case, FGIC has undertaken its own restructuring initiatives.[8]  Specifically, FGIC has worked closely with the New York State Insurance Department (the "NYID")—FGIC's primary regulator—to implement measures to protect FGIC's policyholders by mitigating its losses and preserving and enhancing its surplus position.  In consultation with the NYID, FGIC developed and implemented a three-part comprehensive plan (the "Surplus Restoration Plan") to restore FGIC's surplus to policyholders.

8.      *First*, on March 25, 2010, FGIC launched an exchange offer to remove FGIC insurance from a substantial portion of the RMBS and other asset-backed securities that it insured (the "Exchange Offer").  *Second*, contemporaneously with the launch of the Exchange

---

[8]    As a domestic insurer, FGIC is not eligible for relief under title 11 of the United States Code.  11 U.S.C. § 109.

Offer, FGIC and FGIC Credit Products LLC ("FGIC CP") entered into a commitment and support agreement (the "CSA") with seven counterparties to certain credit default swap ("CDS") contracts.[9] Pursuant to the CSA, FGIC, FGIC CP and the counterparties thereto agreed, subject to the closing of the Exchange Offer, to effectuate certain transactions that would enable FGIC to mitigate its potential exposure to material claims based on mark-to-market termination payments under such CDS contracts. *Third*, FGIC is working with various third-parties to complete consensual loss mitigation transactions in connection with the Exchange Offer.

9.      Although FGIC Corp. is not a direct participant in any of the transactions that comprise the Surplus Restoration Plan, as FGIC's corporate parent and the agent for the FGIC Group's consolidated tax group for the purpose of filing federal income tax returns, FGIC Corp.'s Plan and FGIC's Surplus Restoration Plan are integral to each other.  As of March 31, 2010, FGIC and FGIC Corp. maintain net operating losses ("NOLs") of approximately $4 billion and $102 million, respectively.  Because the Surplus Restoration Plan could potentially generate as much as $1.84 billion in cancellation of indebtedness income and the Debtor expects to generate approximately $381.5 million in cancellation of indebtedness income under the Plan, FGIC Corp. has structured the Plan and will seek appropriate relief to preserve the FGIC Group's ability to use these NOLs to the fullest extent available under applicable tax laws.

10.      Given the small number of creditors, the distributions contemplated under the Plan, the prepetition discussions with key stakeholders and the lack of need for any operational restructuring, FGIC Corp. hopes to minimize the costs of administration of this case (thereby

---

[9]      As set forth in **Exhibit A**, FGIC CP is a wholly-owned subsidiary of FGIC.

maximizing distributions to stakeholders) by moving swiftly toward confirmation of the Plan. Accordingly, the Debtor will request that the Court schedule a hearing to approve the disclosure statement for the Plan in early September 2010 and schedule a hearing to consider confirmation of the Plan in October 2010. In addition, to ensure the Debtor is fully aware of the universe of claims against it, the Debtor will request that the Court establish a deadline for filing proofs of claims to coincide with the hearing on the disclosure statement.

11.     To assist the Court in becoming familiar with the FGIC Group and the "first day" relief that FGIC Corp. is requesting, I have organized this Declaration as follows: Part I of this Declaration describes FGIC Corp.'s corporate history and capital structure as well as the regulatory framework within which the FGIC Group operates; Part II describes the circumstances leading to the commencement of this chapter 11 case; Part III summarizes the "first day" relief sought by the Debtor; and Part IV provides an overview of **Exhibits D, E, F, G** and **H** attached hereto, which in turn set forth certain additional information about FGIC Corp. as required by Local Bankruptcy Rules 1007-2(a) and (b).

## PART I

### GENERAL BACKGROUND

### A.      Corporate History

12.     FGIC Corp.'s wholly-owned subsidiary, FGIC, has been a leading provider of credit enhancement since its establishment in the early 1980s, when FGIC pioneered the financial guaranty insurance industry by becoming the first company to insure variable rate municipal bonds. Beginning in the late 1980s, FGIC led the development of insurance products covering home equity loans.

13.     FGIC continued its status as an industry leader throughout the 1990s. In fact, in 1990, FGIC became the first company to insure asset-backed commercial paper conduits, and,

in 1992, became the first United States financial guarantor to obtain a license to write financial guaranty insurance in the United Kingdom.  Shortly thereafter, FGIC opened an office in Paris and, in 1994, insured the first true cross-border Japanese securitization.

14.     Through 2007, FGIC continued to guarantee the timely payment of principal and interest on its public finance and structured finance obligations by issuing insurance policies and CDS contracts.  FGIC also provided credit enhancement for both newly issued securities and securities trading in the secondary market.  Together with its subsidiaries, FGIC did business in three principal areas:  U.S. Public Finance, U.S. Structured Finance and International Finance (composed of both public finance and structured finance business outside of the U.S.).

15.     Within the structured finance segment of its business, FGIC insured both RMBS and ABS CDOs.  As of March 31, 2010, FGIC had insured (a) RMBS with approximately $19.2 billion net par in force and approximately $2.63 billion of statutory loss reserves and (b) ABS CDOs with approximately $1.6 billion net par in force and approximately $393 million of statutory loss reserves.  The vast majority of FGIC's ABS CDO exposure was written in the form where FGIC insured the obligations of FGIC CP, a wholly-owned subsidiary of FGIC, under CDS contracts between FGIC CP and the counterparties thereto.

## B.     Equity Ownership

16.     General Electric Capital Corporation ("GE Capital"), an affiliate of General Electric Company, acquired FGIC Corp. in 1989.  In December 2003, GE Capital sold 95.5% of its common equity interest in FGIC Corp. to a diversified group of sophisticated investors, including PMI Mortgage Insurance Co. ("PMI"), affiliates of The Blackstone Group LP (the "Blackstone Affiliates"), affiliates of The Cypress Group LLC (the "Cypress Affiliates") and affiliates of CIVC Partners LP (the "CIVC Affiliates").

17.     Prior to the filing, in order to continue to protect the FGIC Group's NOLs,

preserve the resources of both FGIC and FGIC Corp. and ensure a smooth and efficient restructuring for FGIC Corp., Dubel & Associates entered into an agreement pursuant to which it purchased 100% of PMI's equity interest in FGIC Corp. pursuant to that certain Stock Purchase Agreement, dated as of July 1, 2010, by and between PMI and Dubel & Associates (the "Dubel & Associates Purchase Agreement").[10]  Dubel & Associates subsequently transferred these shares to FGIC Corp. and requested that FGIC Corp. retire these shares.  FGIC Corp. retired these shares and Dubel & Associates did not receive any compensation in connection with its transfer of shares to FGIC Corp.  As of the Petition Date, Dubel & Associates does not hold any equity interests in FGIC Corp. or any of its subsidiaries or affiliates.

18.    GE Funding Holdings, Inc. ("GE Funding"), an affiliate of GE Capital, continues to own the common equity interest in FGIC Corp. that it retained as part of the December 2003 sale described above.  In addition to its common equity interest, GE Funding owns 100% of FGIC Corp.'s preferred stock, which carries an aggregate liquidation preference of approximately $330 million.[11]

---

[10]    In connection with the Dubel & Associates Purchase Agreement, the Blackstone Affiliates, the Cypress Affiliates and the CIVC Affiliates entered into that certain Consent and Accession Agreement, dated as of July 29, 2010, pursuant to which these equity holders have agreed to not take any action that could in any way impair the value of FGIC Group's NOLs.

[11]    FGIC Corp.'s Certificate of Incorporation, as amended through November 4, 2009, provides that the preferred stock of FGIC Corp. ranks senior to its common stock with respect to dividends and distributions upon the liquidation of FGIC Corp.  *See* FGIC Corp. Cert. of Incorp., Art. Fourth, Part I, § 2 at 3.  Prior to the date hereof, GE Capital and GE Funding informed the Debtor that they would not seek any recovery in this chapter 11 case.

C.      **Assets and Liabilities**

19.     FGIC Corp.'s two main assets are (a) its ownership of 100% of the equity interests in FGIC and (b) cash in the approximate amount of $11.5 million.[12]  FGIC Corp. will use its cash to fund the administration of this case and for distributions to holders of general unsecured claims.   As described above, general unsecured creditors include holders of borrowings under the Revolving Credit Agreement, holders of the Senior Notes and Dubel & Associates.

20.     Prior to the filing of the case, FGIC Corp. owed certain of its equity security holders approximately $7.2 million on account of services rendered to FGIC Corp. pursuant to monitoring fee agreements between FGIC Corp. and those equity security holders.[13]   As described above, the equity holders agreed to waive their claims against the Debtor on account of the Monitoring Fee Agreements.  In addition, Dubel & Associates, as assignee of the claims under PMI's Monitoring Fee Agreement, agreed to reduce its claim against FGIC Corp. from $5.7 million to $10,500.  As such, by these agreements, the Debtor reduced its liabilities by approximately $12.9 million.

---

[12]     As set forth in **Exhibit A**, FGIC Corp. is also the parent to FGIC (Australia) Pty Limited, a wholly-owned subsidiary formed under the laws of Australia.

[13]     FGIC Corp. is party to (a) that certain Monitoring Fee Agreement by and between FGIC Corp. and The PMI Group, Inc., dated as of December 18, 2003 (Dubel & Associates succeeded to PMI's rights under this agreement pursuant to the Dubel & Associates Purchase Agreement); (b) that certain Monitoring Fee Agreement by and between FGIC Corp. and Blackstone Management Partners IV LLC, dated as of December 18, 2003; (c) that certain Monitoring Fee Agreement by and between FGIC Corp. and Cypress Advisors, Inc., dated as of December 18, 2003; and (d) that certain Monitoring Fee Agreement by and between FGIC Corp. and CIVC Partners LP, dated as of December 18, 2003 (collectively, the "Monitoring Fee Agreements").

K&E 16272351

21.     Finally, FGIC Corp. owes FGIC approximately $30,000 for services rendered by FGIC for the period of July 1, 2010 through the date hereof pursuant to the Cost Sharing Agreement.

**D.     Regulatory Oversight of FGIC's Business**

22.     The following paragraphs provide a general summary of NY Insurance Law and an overview of the regulatory framework within which FGIC operates.   Although FGIC previously held licenses to write insurance policies in, and was subject to regulation and supervision by, each of the 50 States, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and the United Kingdom (through one of its subsidiaries), because FGIC is a New York insurance corporation, the NYID exercises primary regulatory authority over FGIC.

23.     Article 69 of the NY Insurance Law sets forth the requirements applicable to financial guaranty insurance companies.   In pertinent part, the NY Insurance Law provides as follows:

- Surplus to Policyholders:   To engage in the financial guaranty insurance business under the NY Insurance Law, an insurer must maintain initial equity of $2.5 million and paid-in capital of $72.5 million.   Thereafter, an insurer must maintain a surplus to policyholders of $65 million.  N.Y. Ins. Law § 6902(b)(1) (McKinney 2010).   In addition, the NY Insurance Law requires financial guaranty insurance companies to maintain contingency reserves sufficient to protect policyholders against the effects of excessive losses that may occur during adverse economic cycles.[14]  *Id.* § 6903(a)(1).

- Dividends:   The NY Insurance Law limits the ability of insurance companies to pay dividends to shareholders.   Under the NY Insurance Law, an insurer may only pay dividends out of "earned surplus" and may not declare or distribute shareholder dividends during any 12-month

---

[14]  Total contingency reserves required are calculated as the greater of 50% of premiums written or a specified percentage applied to insured outstanding principal, net of collateral and reinsurance. *Id.* § 6903(a)(3)(B), (4)(B).  The percentage applied to insured outstanding principal varies by the type of outstanding principal guaranteed. *Id.*

period that would exceed the lesser of (a) 10% of policyholders' surplus, as shown by the most recent statutory financial statement on file with the Superintendent of the NYID (the "Superintendent") and (b) 100% of adjusted net investment income for such 12-month period, unless the Superintendent approves a greater dividend based on a finding that the insurer will retain sufficient surplus to support its obligations and written policies. *Id.* § 4105(a).

- Insolvency: In the event an insurer becomes insolvent (*i.e.*, "is unable to pay its outstanding lawful obligations as they mature in the regular course of business, as shown by an excess of required reserves and other liabilities over admitted assets," *id.* § 1309), the NYID may petition the New York Supreme Court for an order of rehabilitation or liquidation under Article 74 of the NY Insurance Law. *Id.* §§ 7402, 7404. Effectively, the NYID can be granted control of an insolvent insurer's property and the power to conduct its business to remove the causes and conditions of the order of rehabilitation. *Id.* § 7403(a). Additionally, if the NYID determines at any time that rehabilitation is futile, the NYID may apply for an order of liquidation. *Id.* § 7403(c).

- Transactions with Corporate Parent: The NY Insurance Law addresses the relationship between a controlled insurer and any person controlling, controlled by (in some instances) or under common control with, its corporate parent. Under section 1505 of the NY Insurance Law, all transactions between a controlled insurer and its corporate parent are subject to the following requirements: "(1) the terms shall be fair and equitable; (2) charges or fees for services performed shall be reasonable; and (3) expenses incurred and payments received shall be allocated to the insurer on an equitable basis in conformity with customary insurance accounting practices consistently applied." *Id.* § 1505(a). Furthermore, "[t]he books, accounts and records of each party to all such transactions shall be so maintained as to clearly and accurately disclose the nature and details of the transactions including such accounting information as is necessary to support the reasonableness of the charges or fees to the respective parties." *Id.* § 1505(b).

24.     Throughout its history, the FGIC Group has worked closely with the NYID to ensure the FGIC Group complies with the NY Insurance Law. To facilitate the FGIC Group's compliance with section 1505 of the NY Insurance Law, the Debtor and FGIC entered into that certain Amended and Restated Income Tax Allocation Agreement, dated as of December 18, 2003 (the "Tax Allocation Agreement") and the Cost Sharing Agreement (together with the Tax Allocation Agreement, the "Intercompany Agreements"). Under the Tax Allocation Agreement,

the Debtor satisfies tax obligations of the FGIC Group's consolidated tax group.  FGIC then reimburses the Debtor for the portion of income tax liability allocable to FGIC.  All payments owed under the Tax Allocation Agreement are allocated to FGIC on an equitable basis in conformity with customary insurance accounting practices.

25.     Under the Cost Sharing Agreement, FGIC provides FGIC Corp. with:  (a) office space at the companies' joint corporate headquarters; and (b) legal, loss prevention, data processing, accounting, collection, investment, technology and any other services related to the functions of an insurance holding company.  FGIC Corp. electronically tracks all fund transfers in its accounting system so that it can ascertain, trace and account for transactions in connection with the Intercompany Agreements in accordance with the requirements of the NY Insurance Law.

<h2 align="center">PART II</h2>

<h3 align="center">EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE</h3>

**A.     FGIC's Restructuring Efforts**

26.     The deterioration in the U.S housing and mortgage markets that began in 2007 and continues through today has had a significant adverse impact on the financial condition of the FGIC Group.  Because of a dramatic, sustained increase in the number of U.S. mortgage defaults and foreclosures, a large number of the FGIC-insured ABS CDOs and RMBS have defaulted.  As a result, during 2007, 2008 and 2009, FGIC paid claims on its insurance policies far in excess of historical levels.

27.     Since January 2008, FGIC has been in regular contact with the NYID regarding its strategy to mitigate losses and preserve and enhance its surplus position, thereby protecting its policyholders.  To preserve capital, in January 2008, FGIC voluntarily ceased writing financial guaranty insurance policies covering new or additional risks and, since such time, has

12

not paid any dividends or other distributions to FGIC Corp. Further, with the NYID's encouragement and support, FGIC has successfully completed a number of loss mitigation transactions that reduced FGIC's losses and net par in force. FGIC has also actively sought to reduce, defray and control its expenses.

28.     To that end, on September 30, 2008, FGIC entered into a reinsurance transaction (the "Reinsurance Transaction") with MBIA Insurance Corporation ("MBIA Insurance"), pursuant to which FGIC ceded all of its interest in and to, and the risks associated with, policies covering approximately $188 billion of outstanding U.S. public finance obligations (the "Covered Policies"). MBIA Insurance agreed to administer and pay all claims under the Covered Policies. Among other things, as consideration for the Reinsurance Transaction, FGIC paid MBIA Insurance a reinsurance premium of $917,479,000 and MBIA Insurance paid FGIC a ceding commission of $196,721,000. NYID regulatory approval of the Reinsurance Transaction was an explicit condition to closing and the NYID issued an order granting such approval. As a result of the Reinsurance Transaction, FGIC released approximately $349 million of contingency reserves with respect to the Covered Policies, thereby improving its capital surplus position. The Debtor was not a party to the Reinsurance Transaction.

29.     On November 20, 2009, FGIC filed with the NYID its quarterly statement for the period ending September 30, 2009, in which FGIC reported a negative surplus to policyholders of $865,834,577 and an impairment of its required minimum surplus to policyholders of $932,234,577. As a result, on November 24, 2009, the NYID issued an order pursuant to section 1310 of the NY Insurance Law (the "1310 Order") that, among other things, required FGIC to suspend payment of any and all claims effective November 24, 2009.

30.     FGIC's financial problems continued through the remainder of 2009 and through

13

the first half of 2010.  For instance, as of March 31, 2010, FGIC had insured (a) RMBS with approximately $19.2 billion net par in force and approximately $2.63 billion of statutory loss reserves and (b) ABS CDOs with approximately $1.6 billion net par in force and approximately $393 million of statutory loss reserves.  Due to this level of exposure, in the quarter ending March 31, 2010, FGIC recorded significant losses, which, in large part, caused FGIC's surplus to decrease by approximately $359 million to approximately <u>negative</u> $1.640 billion.

31.     Although the NYID had ample statutory authority to seek control of FGIC's operations, the NYID granted FGIC the opportunity to restore its surplus to policyholders.  To that end, the 1310 Order required FGIC to provide the NYID with a Surplus Restoration Plan by no later than January 5, 2010.  The 1310 Order further required FGIC to take such steps as may be necessary to remove the impairment of its capital and return to compliance with the minimum surplus to policyholders' requirement.  FGIC continues to work closely with the NYID on the Surplus Restoration Plan.  To be clear, however, failure to attain the goals set forth in the 1310 Order likely would result in the NYID seeking an order of rehabilitation or liquidation of FGIC forthwith.

32.     Recognizing the circumstances in which it was operating, FGIC began to devise a plan to remove the impairment of its capital and return to compliance with the minimum surplus to policyholders requirement prior to receiving the 1310 Order.  As a result of this initiative, FGIC submitted an initial Surplus Restoration Plan to the NYID on December 22, 2009.  After reviewing the initial plan with the NYID and making necessary revisions, FGIC submitted an amended and restated Surplus Restoration Plan on March 24, 2010.  The primary goals of the Surplus Restoration Plan are to improve FGIC's financial position and liquidity and to restore its surplus position to the statutorily-mandated amount as soon as practicable, in each case in a

manner that protects the interests of its existing policyholders and is otherwise consistent with the NY Insurance Law.

33.    As described in detail below, the Surplus Restoration Plan comprises three key loss mitigation components:

- Exchange Offer:  Pursuant to the Exchange Offer, which launched on March 25, 2010, FGIC has offered to buy out the remaining obligations under most of its outstanding policies covering RMBS and certain ABS that FGIC insured in the primary market and for which it has established statutory loss reserves.  As of the date hereof, Sharps SP I LLC, a special purpose vehicle created to implement the Exchange Offer, is offering current holders of FGIC-insured bonds (i) an uninsured cash flow trust certificate (a "UCF Certificate") entitling the holder to receive distributions of an amount equal to the principal and interest distributions made on the underlying eligible insured securities tendered and accepted in the Exchange Offer, (ii) a cash payment (the "Cash Consent Fee") and (iii) surplus notes (the "Consideration Surplus Notes") in exchange for releasing the right to receive future payments from FGIC under the insurance policy on RMBS that they own.  FGIC expects that holders of FGIC-insured bonds will participate in the Exchange Offer if they believe that receiving a UCF Certificate, a known Cash Consent Fee and Consideration Surplus Notes (or such other forms of consideration that may be offered pursuant to one or more supplements to the Exchange Offer document) today is a better option than waiting to receive an unknown payment at an undetermined point in the future.

- CDS Counterparty Agreement:  FGIC is working to mitigate its existing exposure for claims based on mark-to-market termination payments under CDS contracts insured by FGIC through consensual transactions with counterparties to such CDS contracts.  To that end, on March 25, 2010, FGIC and FGIC CP entered into a commitment and support agreement with nine CDS counterparties, pursuant to which the CDS counterparties have agreed to forbear from exercising certain acceleration, termination and assessment rights under their CDS contracts until the earlier of July 31, 2010 or the occurrence of certain specified events (as may be amended from time to time, the "CDS Counterparty Agreement").  In exchange, FGIC has formed a new wholly-owned subsidiary licensed as a New York financial guaranty insurance corporation, Grand Central Assurance Corporation ("GCAC"), which will assume all of FGIC's rights, obligations and liabilities under the FGIC policies covering specified CDS contracts.  FGIC anticipates that the bulk of GCAC's exposure under the policies covered by the CDS Counterparty Agreement will run off over the next four to seven years, and FGIC does not presently anticipate that

GCAC will incur any losses under these policies.[15] In addition, FGIC has entered into a separate commitment and support agreement with an individual CDS counterparty that is designed to mitigate FGIC's existing exposure for mark-to-market termination payments under a CDS contract that FGIC has insured.

- <u>Other Mitigation Transactions</u>:  FGIC seeks to complete certain consensual loss mitigation transactions, pursuant to which FGIC will commute, terminate, restructure or reinsure a substantial portion of its remaining exposure to ABS CDOs and certain other obligations for which it has established statutory loss reserves, including RMBS insured by FGIC in the secondary market.

34.     The FGIC Group is confident that, if the transactions described above succeed, the Surplus Restoration Plan will attain the approval of the NYID and, ultimately, remediate FGIC's capital impairment, thereby placing FGIC in compliance with the minimum surplus requirement under the NY Insurance Law.  In the event the Surplus Restoration Plan is unsuccessful, however, the NYID may seek a court order authorizing it to liquidate or rehabilitate FGIC.

**B.     FGIC Corp.'s Prepetition Restructuring Efforts**

35.     As a result of FGIC's inability to pay dividends to FGIC Corp. since January 2008, FGIC Corp. is unable to satisfy its obligations under the Revolving Credit Agreement and on account of the Senior Notes.  Recognizing the need to restructure its balance sheet, FGIC Corp. engaged the Administrative Agent, MBIA and the equity holders in discussions regarding the Plan.  In light of these discussions, the Debtor developed the Plan and its related disclosure statement.

---

[15]   FGIC may also enter into consensual transactions with other CDS counterparties in order to mitigate FGIC's existing or potential exposure for claims based on mark-to-market termination payments or other amounts under FGIC-insured CDS held by such counterparties.

K&E 16272351

36.     The Administrative Agent and MBIA also agreed to support the Plan and the distributions contemplated thereby.  Prior to the filing of this case, three of the Debtor's largest common shareholders, representing over 90% of its common equity, agreed to the cancellation of their equity interests under the Plan and waived their unsecured claims.

**C.     Summary of the Plan**

37.     As noted above, subject to the Court's approval, FGIC Corp. intends to implement the Plan in a timely fashion.  Among other things, the Plan provides that:

- Holders of Administrative Claims, Priority Tax Claims, Secured Tax Claims and Other Secured Claims will be paid in full in Cash or have their Claims reinstated.  As of the date hereof, the Debtor is not aware of any such claims other than costs associated with the administration of the case, such as professional fees.

- Intercompany Claims will be reinstated, capitalized or otherwise discharged as of the Effective Date.

- Convenience Claims, which consist of Allowed General Unsecured Claims in an amount of $15,000 or less, shall be paid in full in Cash on the Effective Date.

- Holders of General Unsecured Claims will receive their Pro Rata Share of the Cash Distribution Amount and 100% of the Outstanding New Common Stock.

- Equity Interests in FGIC Corp. will be cancelled.

The Debtor believes the Plan represents the best path forward for FGIC Corp.  The Plan allocates substantially all of the Debtor's assets (with the exception of cash needed to fund this case and ongoing distributions) to holders of general unsecured claims.  By proceeding expeditiously through this process, the Debtor will ensure that it preserves as much value possible for the benefit of all unsecured creditors.

K&E 16272351

**PART III**

**RELIEF SOUGHT IN THE FIRST DAY MOTIONS**

38.     FGIC Corp. has filed certain motions (collectively, the "<u>First Day Motions</u>")

seeking relief intended to allow FGIC Corp. to effectively transition into this chapter 11 case.

The relief requested in these motions is summarized below.

**A.      Matters Requested to be Heard at the First Day Hearing**

**1.      Cash Management Motion**

**(a)      The Debtor's Bank Accounts**

39.     As of the Petition Date, the Debtor maintains the following bank accounts

(collectively, the "Bank Accounts") with five different banks—JPMorgan Asset Management

("JPAM"), JPMorgan Chase Bank, N.A., State Street Bank and Trust Company ("State Street"),

The Reserve and Wells Fargo Advantage Funds ("Wells Fargo") (collectively, the "Banks"):

- Operating Account:  The Debtor maintains an operating account with JPMorgan Chase Bank, N.A. (the "Operating Account").[16]  This account serves as the ultimate collection point for all funds moved into and through the Debtor.  The Debtor funds the Operating Account with transfers from the Investment Accounts (defined below) and infrequent transfers from FGIC on account of expenses incurred and paid by the Debtor on FGIC's behalf.  The Debtor applies funds from the Operating Account towards (i) interest payments on its funded debt, (ii) reimbursement of FGIC for expenses it incurs on behalf of the Debtor (including an allocation of employee costs and expenses), (iii) payment of expenses, (iv) transfers to the Tax Escrow Accounts (defined below) and (v) transfers to the Investment Accounts.

- Investment Accounts:  The Debtor maintains a total of four investment accounts with JPAM, State Street, The Reserve and Wells Fargo (collectively, the "Investment Accounts") for the periodic investment of funds from the Operating Account that exceed the Debtor's projected

---

[16]     As of the Petition Date, the Debtor held approximately $11.7 million in accounts with State Street.

operating requirements. The investment objectives for the Investment Accounts are described below.

- Tax Escrow Accounts: The Debtor maintains tax escrow accounts with JPAM and Wells Fargo (collectively, the "Tax Escrow Accounts"), in which it deposits funds in escrow for the satisfaction of tax liability. As of the Petition Date, the Debtor does not have any funds deposited in the Tax Escrow Accounts.

40. I believe that the Debtor's continued use of its Bank Accounts will facilitate the Debtor's smooth transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses associated with opening new bank accounts. Further, I respectfully submit that parties in interest will not be harmed by the Debtor's maintenance of the existing Bank Accounts because the Debtor has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date. In light of such protective measures, I believe that maintaining the Bank Accounts is in the best interests of all of the Debtor's stakeholders.

### (b)    The Debtor's Business Forms

41. In the ordinary course of business, FGIC Corp. uses a variety of business forms. FGIC Corp. seeks authority to continue to use all business forms as such forms were in existence immediately before the Petition Date without reference to FGIC Corp.'s status as a debtor in possession. The Debtor believes that such relief would minimize the expense and delay incurred by the estate as a result of having to order entirely new business forms as well as avoid confusion among the persons and entities with whom the Debtor conducts business. The Debtor agrees to replace its existing stock of business forms with new forms identifying its status as a debtor in possession as existing forms are depleted. I believe that the continued use of the Debtor's business forms substantially in the condition existing immediately prior to the Petition Date will avoid unnecessary administrative burdens and expenses and will not prejudice

19

any parties in interest.

### (c) The Debtor's Intercompany Claims

42.     As discussed above, FGIC provides FGIC Corp. with certain services pursuant to the Cost Sharing Agreement, the actual costs of which FGIC Corp. remits to FGIC. Additionally, FGIC Corp. remits income taxes on behalf of FGIC pursuant to the Tax Allocation Agreement, a portion of which FGIC later reimburses to FGIC Corp. FGIC Corp. electronically tracks all fund transfers in its accounting system so that it can ascertain, trace and account for all transfers under the Intercompany Agreements in accordance with the requirements of the NY Insurance Law.

43.     On an annual basis, FGIC Corp. has historically paid FGIC approximately $325,000 in connection with the Cost Sharing Agreement. FGIC Corp. expects, however, that the volume of payments owed under the Cost Sharing Agreement will decrease over the remainder of 2010 (collectively, the "Intercompany Claims"). I believe that granting administrative priority expense status to the Intercompany Claims pursuant to section 503(b)(1) of the Bankruptcy Code will help to ensure that the Debtor and FGIC remain in compliance with the NY Insurance Law.

### (d) The Debtor's Investment Practices

44.     FGIC Corp. maintains four Investment Accounts for the purpose of maintaining excess operating funds in income-producing investments. In opening the Investment Accounts, FGIC Corp.'s primary goal was to maximize the after-tax total rate of return or income, as appropriate for managing its liquidity needs. To accomplish this, the Debtor has limited its investments during the past year to solely high-grade money market accounts. This conservative practice has allowed the Debtor to remain highly liquid while earning interest income.

45.     Furthermore, the Debtor has instituted controls to ensure that funds do not leave the system of the Debtor's Bank Accounts without the consent of the Debtor's Chief Financial Officer ("CFO") or Treasurer.  Unless they obtain prior consent, individuals other than the Debtor's CFO and Treasurer can only transfer the Debtor's funds to accounts approved by the CFO or Treasurer.

46.     I believe that the Debtor's maintenance of its existing Investment Practices will avoid the significant administrative expenses involved in opening new accounts in a manner that ensures all of the Debtor's funds are fully insured or invested strictly in accordance with the restrictions established by section 345 of the Bankruptcy Code.  Moreover, because of the conservative nature of the Debtor's existing Investment Practices, I respectfully submit that parties in interest will not be harmed by the Debtor's maintenance of its existing Investment Practices.

**2.     Motion to Establish Claims Trading Procedures**

47.     As described above, as of March 31, 2010, the FGIC Group had NOLs of approximately $4.0 billion, including approximately $3.9 billion of NOLs attributable to FGIC and approximately $102 million of NOLs attributable to FGIC Corp.  Based on my consultations with FGIC Corp.'s tax consultants and other advisors, I believe that these NOLs are extremely valuable assets of the Debtor's estate, the availability of which will facilitate FGIC Corp.'s successful reorganization.  As such, I believe it is appropriate to immediately put creditors on notice that the Debtor may seek to establish sell-down procedures for trading in claims against the Debtor's estate in the future so as to protect and preserve the FGIC Group's valuable tax attributes.  I believe that failure to obtain entry of the interim order could result in unfettered trading of claims against the Debtor and unnecessarily jeopardize its NOLs.

### 3. Bar Date Motion

48.    In preparing the Plan and the schedules of assets and liabilities and statement of financial affairs that were filed contemporaneously with the Debtor's voluntary petition for relief, the Debtor undertook significant efforts to review its books and records to determine all potential claimants.  To confirm that claims against it are limited to claims under the Revolving Credit Agreement, the Indenture, the Monitoring Fee Agreements and the Cost Sharing Agreement, by the bar date motion, the Debtor seeks entry of an order (a) establishing deadlines for filing proofs of claim (the "Bar Dates"), (b) approving procedures for filing proofs of claim in this chapter 11 case and (c) approving the form and manner of service of the notices of the Bar Dates.  This motion and the relief sought therein have been vetted by the Debtor's largest creditors.

49.    Given that Debtor filed its plan of reorganization and disclosure statement contemporaneously with this Declaration, it anticipates moving through this chapter 11 case as quickly and efficiently as possible to preserve estate resources for the benefit of its creditors.  Furthermore, this motion and the relief sought therein have been vetted by the Debtor's largest creditors.  Accordingly, I believe it is appropriate to establish the Bar Dates at the outset of this chapter 11 case so as to enable the Debtor to achieve a swift exit from chapter 11.

### 4. Garden City Group Retention Application

50.    The Debtor seeks to retain The Garden City Group, Inc. ("Garden City") as its notice and claims agent.  I believe that the retention of Garden City will benefit the Debtor's estate, and particularly, its creditors.  Indeed, Garden City has developed efficient and cost-effective methods in its area of expertise and is fully equipped to handle the voluminous mailings required to properly notify creditors and other interested parties regarding actions and deadlines concerning this chapter 11 case.  Accordingly, I respectfully submit that the Court

K&E 16272351

approve the Garden City retention application.

**5.      Case Management Motion**

51.      The Debtor requests that the Court enter an order providing certain notice, case management and administrative procedures in this chapter 11 case.

52.      Requiring that service be made upon each of the parties in interest in this case would waste the Debtor's limited resources.  Thus, the Debtor believes requiring paper service of certain pleadings only upon the main parties in interest, as well as authorizing service on all parties by electronic mail, will be efficient and save the estate significant time and expense.

53.      Additionally, the Debtor has proposed special hearing procedures, including the creation of regularly scheduled omnibus hearings at which the Court, the Debtor and other parties in interest can address several motions at once, thereby avoiding the substantial time and expense of scheduling separate hearings regarding each discrete matter.

54.      I believe the relief requested in the case management motion is in the best interests of the Debtor's estate, its creditors and all parties in interest.   Accordingly, I respectfully submit that the Court approve the relief requested in the Debtor's case management motion.

**B.      Matters Requested to be Scheduled for Future Hearing**

**1.      K&E Retention Application**

55.      The Debtor seeks to retain Kirkland & Ellis LLP ("K&E") as its restructuring counsel.  K&E has extensive experience in, and an excellent reputation for, providing high-quality legal services in the field of debtor protections, creditor rights and business reorganizations under chapter 11 of the Bankruptcy Code.  In preparing for this chapter 11 case, K&E has become familiar with the Debtor's business and legal issues that may arise during this chapter 11 case.  I believe K&E is well-qualified and uniquely able to represent the Debtor in

this chapter 11 case and respectfully submit that the Court approve the K&E retention application.

### 2. Interim Compensation Procedures Motion

56.     The Debtor requests authority to establish procedures for the interim compensation and reimbursement of expenses for professionals retained by the Debtor and any statutorily-appointed committee in this chapter 11 case.  I believe that establishing orderly procedures for addressing issues related to payment of professionals will streamline the administration of this chapter 11 case and otherwise promote efficiency for the Court, the United States Trustee and all parties in interest.  I also believe that the interim compensation procedures motion will permit the Debtor to efficiently manage payments to professionals and allow all parties in interest to monitor the cost of administering this chapter 11 case.

57.     Thus, I believe the approval of the interim compensation procedures motion is in the best interests of the Debtor's estate, creditors and other parties in interest and respectfully submit that the relief requested therein should be granted.

### 3. Motion to Approve the Disclosure Statement and Procedures for Soliciting Votes on the Plan

58.     As described above, the Debtor hopes to minimize the costs of administration of this case (thereby maximizing distributions to stakeholders) by moving swiftly toward confirmation of the Plan.  To accomplish this, the Debtor has filed the Disclosure Statement and Plan contemporaneously herewith and requests approval of the Disclosure Statement and timeline, materials and procedures to solicit votes to accept the Plan.  Specifically, the Debtor requests that the Court approve the following solicitation timeline:

| Event/Deadline | Date |
|---|---|
| Disclosure Statement Hearing: | 9/16/2010 |
| Record Date: | 9/16/2010 |
| Solicitation Deadline: | 9/23/2010 |
| Deadline to Publish Confirmation Hearing Notice: | 9/23/2010 |
| Voting Resolution Event Deadline: | 10/14/2010 |
| Plan Supplement Filing Date: | 10/14/2010 |
| Voting Deadline: | 10/18/2010 |
| Plan Objection Deadline: | 10/21/2010 |
| Voting Report Deadline: | 10/21/2010 |
| Deadline to Reply to Confirmation Objections: | 10/27/2010 |
| Confirmation Hearing: | 10/28/2010 |

59.     I believe that the Disclosure Statement contains the information necessary to enable holders of claims entitled to vote to accept or reject the Plan to cast their ballots.  In addition, the procedures, timeline and materials for soliciting votes to accept or reject the Plan will allow holders of claims entitled to vote on the Plan the ability to exercise this right as well as ensure that all parties in interest are able to voice any concerns they may have with the Plan.

60.     Thus, I believe the approval of the Disclosure Statement and procedures, timeline and materials to solicit votes to accept or reject the Plan is in the best interests of the Debtor's estate, creditors and other parties in interest and respectfully submit that the relief requested therein should be granted.

## PART IV

### INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

61.     I have been advised that Local Bankruptcy Rule 1007-2 requires that certain

information related to FGIC Corp. be submitted with this Declaration. I have provided such information in the exhibits attached hereto as **Exhibits D, E, F, G** and **H**. Specifically, these exhibits contain the following information with respect to FGIC Corp.:[17]

- Local Bankruptcy Rule 1007-2(a)(3) requires a debtor to submit the following information: the name and address of the attorneys to any committee organized prior to the order for relief in the chapter 11 case, a brief description of the circumstances surrounding the formation of this committee and the approximate date of its formation. To the best of my knowledge, no such committee has been formed. For the purposes of being complete, however, DLA Piper represents MBIA, Inc., the largest holder of the Debtor's 6% Senior Notes due 2034 and Morgan Lewis & Bockius LLP represents the Administrative Agent.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Exhibit D** hereto provides, to the best of my knowledge, the following information with respect to each of the holders of FGIC Corp.'s 20 largest unsecured claims (excluding claims of insiders and affiliates): (a) the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address); (b) telephone number; (c) the name(s) of person(s) familiar with FGIC Corp.'s account; (d) the nature and approximate amount of the claim; and (e) an indication as to whether the claim is contingent, unliquidated, disputed or partially secured.

- To the best of my knowledge, FGIC Corp. does not have any secured creditors. As such, FGIC Corp. has not submitted a list of the five largest secured claims as required by Local Bankruptcy Rule 10072(a)(5).

- Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Exhibit E** hereto provides a summary of FGIC Corp.'s assets and liabilities.

- Because FGIC Corp. is a privately held corporation, FGIC Corp. does not have any publicly held securities to disclose pursuant to Local Bankruptcy Rule 1007-2(a)(7).

- Local Bankruptcy Rule 1007-2(a)(8) requires certain following information regarding any property in possession or custody of any

---

[17] The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding upon, FGIC Corp. In addition, FGIC Corp. reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.

custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditors or agent for such entities: To the best of my knowledge, none of FGIC Corp.'s property is held by any such entity, and thus, no such information will be provided pursuant to Local Bankruptcy Rule 1007-2(a)(8).

• Local Bankruptcy Rule 1007-(a)(9) requires a list of the premises owned, leased or held under other arrangement from which the debtor operates its business. FGIC leases office space at 125 Park Avenue, New York, New York 10017. The Debtor shares space with FGIC at this location pursuant to the Cost Sharing Agreement, but is not a party to the lease.

• Pursuant to Local Bankruptcy Rule 1007-2 (a)(10), **Exhibit F** hereto provides the location of FGIC Corp.'s substantial assets, the location of its books and records and the nature, location and value of any assets held by FGIC Corp. outside the territorial limits of the United States.

• Local Bankruptcy Rule 1007-2(a)(11) requires a list of the nature and present status of each action or proceeding, pending or threatened, against FGIC Corp. or its property where a judgment or seizure of its property may be imminent. To the best of my knowledge, no such action or proceeding is pending against FGIC Corp.

• Pursuant to Local Bankruptcy Rule 1007-2(a)(12), **Exhibit G** hereto sets forth a list of the names of the individuals who comprise FGIC Corp.'s existing senior management, their tenure with FGIC Corp. and a brief summary of their relevant responsibilities and experience.

• Local Bankruptcy Rule 1007-2(b)(1)-(2)(A) requires an estimate of amounts to be paid to officers, stockholders, directors and financial and business consultants retained by FGIC Corp. for the 30-day period following the filing of FGIC Corp.'s chapter 11 petition. Because the Debtor's officers and directors are paid directly by FGIC, its non-debtor subsidiary, FGIC Corp. does not anticipate remitting any payments to officers or directors during the 30-day period following the commencement of this case. Moreover, FGIC Corp. does not anticipate making any payments to its shareholders during the 30-day period following the commencement of this case.

• Pursuant to Local Bankruptcy Rule 1007-2(b)(3), **Exhibit H** hereto provides a schedule for the 30-day period following the filing of this chapter 11 case of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid (other than professional fees) and any other information relevant to an understanding of the foregoing.

K&E 16272351

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __3__ day of August 2010.

By: _____

Name:    John S. Dubel

Title:     Chief Executive Officer