**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FGIC CORPORATION,[1] | ) |
| | ) Case No. 10-14215 (____) |
| Debtor. | ) |
| | ) |

## DISCLOSURE STATEMENT FOR THE CHAPTER 11
## PLAN OF REORGANIZATION OF FGIC CORPORATION

| | |
|---|---|
| KIRKLAND & ELLIS LLP | KIRKLAND & ELLIS LLP |
| Paul M. Basta | Patrick J. Nash, Jr. (*pro hac vice* pending) |
| Brian S. Lennon | 300 North LaSalle |
| 601 Lexington Avenue | Chicago, Illinois 60654 |
| New York, New York 10022 | Telephone: (312) 862-2000 |
| Telephone: (212) 446-4800 | Facsimile: (312) 862-2200 |
| Facsimile: (212) 446-4900 | |

*Proposed Counsel for the Debtor and Debtor in Possession*

Dated: August 3, 2010

> **PLEASE NOTE THAT THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, AND HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF VOTES WITH RESPECT TO THE DEBTOR'S PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE OR AN OFFER WITH RESPECT TO ANY SECURITIES. ANY SUCH SOLICITATION OR OFFER WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF THE DEBTOR'S PLAN MAY NOT, AND WILL NOT, BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY, THE INFORMATION CONTAINED HEREIN IS SUBJECT TO CHANGE.**

---

[1] The last four digits of the Debtor's tax identification number are 6474. The location of the Debtor's corporate headquarters is 125 Park Avenue, New York, New York 10017.

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VII HEREIN.

THE DEBTOR URGES EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTOR BELIEVES THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW. THE DEBTOR WILL INSTEAD RELY UPON (A) THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND (B) TO THE EXTENT THAT THE EXEMPTION PROVIDED BY SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER. NO LEGAL OR TAX ADVICE IS PROVIDED BY THIS DISCLOSURE STATEMENT. THE DEBTOR IS NOT CURRENTLY A REPORTING CORPORATION UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT") AND THE NEW COMMON STOCK WILL NOT BE LISTED ON ANY NATIONAL SECURITIES EXCHANGE. THE DEBTOR DOES NOT ANTICIPATE THAT THERE WILL BE A PUBLIC MARKET FOR THE SECURITIES ISSUED HEREUNDER. THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN SHOULD CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE OWNERSHIP AND TRANSFERABILITY OF ANY SUCH SECURITIES.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT, AS AMENDED. SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE,"

"ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE" OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTOR'S EXPECTATIONS WITH RESPECT TO FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS, THEREFORE, SPECULATIVE. THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY SECURITIES ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA DERIVED FROM ITS BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO IT AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS AND EXPECTED FUTURE RESULTS. WHILE THE DEBTOR BELIEVES SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF AND THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR MANAGEMENT'S ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS AND FUTURE RESULTS. THE DEBTOR EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. THE DEBTOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIMS ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS OR MASTER BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTOR SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

**TABLE OF CONTENTS**

ARTICLE I INTRODUCTION.................................................................................................................1

    A.    THE DEBTOR'S CHAPTER 11 CASE ...............................................................................1

    B.    OVERVIEW OF CHAPTER 11 .........................................................................................2

    C.    SUMMARY OF CLASSIFICATION AND TREATMENT OF
          ALLOWED CLAIMS AND INTERESTS UNDER THE PLAN ........................................3

    D.    PARTIES ENTITLED TO VOTE ON THE PLAN .............................................................3

    E.    SUMMARY OF SOLICITATION PACKAGE AND VOTING INSTRUCTIONS...............4

    F.    THE CONFIRMATION HEARING ...................................................................................5

    G.    CONFIRMING AND CONSUMMATING THE PLAN.......................................................5

    H.    RULES OF INTERPRETATION ......................................................................................5

ARTICLE II BACKGROUND...............................................................................................................6

    A.    CORPORATE HISTORY AND STRUCTURE ..................................................................6

    B.    EQUITY OWNERSHIP ....................................................................................................6

    C.    ASSETS AND LIABILITIES ............................................................................................7

    D.    REGULATORY OVERSIGHT OF FGIC'S BUSINESS ....................................................8

ARTICLE III CHAPTER 11 CASE ......................................................................................................9

    A.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE .........9
        1.    FGIC's Restructuring Efforts ................................................................................9
        2.    FGIC Corp.'s Prepetition Restructuring Efforts ...................................................11

    B.    ANTICIPATED EVENTS OF THE CHAPTER 11 CASE ...............................................11
        1.    Expected Timetable of the Chapter 11 Case.........................................................12
        2.    First Day Relief ...................................................................................................12
        3.    Motions to be Scheduled for Future Hearing ......................................................13

ARTICLE IV THE PLAN ....................................................................................................................13

    A.    ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ...................................13
        1.    Administrative Claims .........................................................................................14
        2.    Priority Tax Claims .............................................................................................15

    B.    CLASSIFICATION OF CLAIMS AND INTERESTS IN THE DEBTOR ........................15

    C.    ACCEPTANCE OR REJECTION OF THE PLAN ..........................................................18

    D.    MEANS FOR IMPLEMENTATION OF THE PLAN ......................................................19
        1.    General Settlement of Claims...............................................................................19
        2.    Reorganized FGIC Corporation...........................................................................19
        3.    Sources of Consideration for Plan Distributions ..................................................19
        4.    Corporate Existence .............................................................................................19
        5.    Vesting of Assets in the Reorganized Debtor .......................................................19
        6.    Cancellation of Securities and Agreements ..........................................................20
        7.    Surrender of Existing Securities ..........................................................................20
        8.    Corporate Action .................................................................................................20
        9.    Certificate of Incorporation and By-Laws ...........................................................20
      10.    Stock Trading Restrictions ..................................................................................20
      11.    Post-Effective Date Recoveries ...........................................................................21

| 12. | Directors and Officers of Reorganized FGIC Corporation | 21 |
| 13. | Effectuating Documents; Further Transactions | 21 |
| 14. | Section 1146 Exemption | 21 |
| 15. | Preservation of Causes of Action | 21 |

**E.    PROVISIONS GOVERNING DISTRIBUTIONS** .............................................................**22**

| 1. | Timing and Calculation of Distributions | 22 |
| 2. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 22 |
| 3. | Distributions by Distribution Agent | 23 |

**F.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS** ...............................................................**24**

| 1. | Resolution of Disputed Claims | 24 |
| 2. | Disallowance of Claims | 25 |
| 3. | Amendments to Claims | 26 |
| 4. | No Distributions Pending Allowance | 26 |
| 5. | Distributions After Allowance | 26 |

**G.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...............**26**

| 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 26 |
| 2. | Approval of Assumption and Rejection of Executory Contracts and Unexpired Leases | 26 |
| 3. | Claims on Account of the Rejection of Executory Contracts or Unexpired Leases | 26 |
| 4. | Procedures for Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan | 27 |
| 5. | Survival of Corporate Indemnification Obligations | 27 |

**H.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** .............................................**28**

| 1. | Conditions | 28 |
| 2. | Waiver of Conditions | 28 |
| 3. | Effect of Non-Occurrence of Conditions to the Effective Date | 28 |

**I.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS** ....................**28**

| 1. | Compromise and Settlement | 28 |
| 2. | Subordinated Claims | 29 |
| 3. | Discharge of Claims and Termination of Equity Interests | 29 |
| 4. | Release of Liens | 29 |
| 5. | Debtor Release | 29 |
| 6. | Releasing Party Release | 30 |
| 7. | Exculpation | 31 |
| 8. | Injunction | 31 |

**J.    BINDING NATURE OF PLAN** ...............................................................................................**31**

**K.    RETENTION OF JURISDICTION** ........................................................................................**31**

**L.    MISCELLANEOUS PROVISIONS** .......................................................................................**33**

| 1. | Modification of Plan | 33 |
| 2. | Revocation of Plan | 33 |
| 3. | Successors and Assigns | 33 |
| 4. | Reservation of Rights | 33 |
| 5. | Section 1145 Exemption | 33 |
| 6. | Payment of Statutory Fees | 33 |
| 7. | Section 1125(e) Good Faith Compliance | 33 |
| 8. | Further Assurances | 34 |
| 9. | Severability | 34 |
| 10. | Service of Documents | 34 |
| 11. | Filing of Additional Documents | 35 |
| 12. | No Stay of Confirmation Order | 35 |

**ARTICLE V SOLICITATION AND VOTING PROCEDURES** ....................................................35

    **A.**    **THE SOLICITATION PACKAGE** ......................................................................35

    **B.**    **VOTING DEADLINE**............................................................................................36

    **C.**    **VOTING INSTRUCTIONS** .................................................................................36

    **D.**    **VOTING TABULATION** ......................................................................................37

**ARTICLE VI VALUATION ANALYSIS AND FINANCIAL PROJECTIONS** .........................38

    **A.**    **VALUATION OF THE REORGANIZED DEBTOR** .........................................38

    **B.**    **FINANCIAL PROJECTIONS** ..............................................................................38

**ARTICLE VII CONFIRMATION PROCEDURES** .................................................................38

    **A.**    **THE CONFIRMATION HEARING** ...................................................................38

    **B.**    **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**.......38

        1.    Best Interests of Creditors Test/Liquidation Analysis .................................39

        2.    Feasibility ......................................................................................................40

        3.    Acceptance by Impaired Classes ...................................................................40

        4.    Confirmation Without Acceptance by All Impaired Classes .........................41

    **C.**    **RISK FACTORS** .................................................................................................42

    **D.**    **IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION** ........42

    **E.**    **DISCLAIMER** .....................................................................................................42

**ARTICLE VIII IMPLEMENTATION OF THE PLAN AND POSTPETITION GOVERNANCE OF REORGANIZED DEBTOR** ........................................................................................43

    **A.**    **BOARD OF DIRECTORS AND MANAGEMENT**..........................................43

        1.    Reorganized Debtor's Board of Directors .....................................................43

        2.    The Reorganized Debtor's Officers ...............................................................43

    **B.**    **INDEMNIFICATION OF DIRECTORS AND OFFICERS** ..............................43

**ARTICLE IX PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND CONSUMMATING THE PLAN** .........................................................43

    **A.**    **GENERAL** ...........................................................................................................43

    **B.**    **CERTAIN BANKRUPTCY LAW CONSIDERATIONS**...................................43

        1.    Parties in Interest May Object to Company's Classification of Claims and Interests .............43

        2.    Failure to Satisfy Vote Requirement..............................................................44

        3.    The Company May Not Be Able to Obtain Confirmation or Consummation of the Plan .....................44

        4.    The Company May Object to the Amount or Classification of a Claim..........44

        5.    Risk of Non-Occurrence of the Effective Date..............................................44

        6.    Contingencies Not to Affect Votes of Impaired Classes to Accept the Plan ...........44

    **C.**    **FINANCIAL INFORMATION; DISCLAIMER**.................................................45

    **D.**    **FACTORS AFFECTING THE COMPANY** ......................................................45

        1.    Risks Related to the Surplus Restoration Plan...............................................45

        2.    Risks Related to the New Common Stock .....................................................45

        3.    Legal Proceedings .........................................................................................46

    **E.**    **CERTAIN TAX MATTERS** ...............................................................................47

    **F.**    **RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE** .................................47

    **G.**    **LIQUIDATION UNDER CHAPTER 7**..............................................................47

**ARTICLE X SECURITIES LAW MATTERS** ................................................................................**47**

    **A.**    **NEW COMMON STOCK** ................................................................................**47**

    **B.**    **ISSUANCE AND RESALE OF NEW COMMON STOCK UNDER THE PLAN**..............**48**

        1.    Exemption from Registration ..............................................................48

        2.    Resales of New Common Stock; Definition of Underwriter ....................48

    **C.**    **LISTING OF NEW COMMON STOCK** ................................................................**49**

**ARTICLE XI CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** ....................**49**

    **A.**    **INTRODUCTION** ................................................................................**49**

    **B.**    **CERTAIN U.S. FEDERAL INCOME TAX**
        **CONSEQUENCES OF THE PLAN TO THE DEBTOR** ......................................**50**

        1.    Cancellation of Debt and Reduction of Tax Attributes ..........................50

        2.    Limitation of NOL Carryforwards and Other Tax Attributes..................50

    **C.**    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**
        **OF THE PLAN TO HOLDERS OF GENERAL UNSECURED CLAIMS** ...............**52**

        1.    Treatment of a Debt Instrument as a "Security"....................................53

        2.    Treatment of a Holder of an Allowed General Unsecured
            Claim If the Exchange of its Claim is Treated as a Reorganization ........53

        3.    Treatment of a Holder of an Allowed General Unsecured
            Claim If the Exchange of its Claim is not Treated as a Reorganization ...53

        4.    Accrued Interest.................................................................................54

        5.    Market Discount ...............................................................................54

        6.    Consequences to Holders of New Common Stock ................................54

    **D.**    **WITHHOLDING AND REPORTING**................................................................**55**

**ARTICLE XII CONCLUSION AND RECOMMENDATION** ..........................................**57**

**EXHIBITS**

**Exhibit A**          Chapter 11 Plan of Reorganization of FGIC Corporation

# ARTICLE I
## INTRODUCTION[2]

## A.   THE DEBTOR'S CHAPTER 11 CASE

FGIC Corporation (referred to alternatively as the "Company," the "Debtor," or "FGIC Corp.") is an insurance holding company with no employees, no operations and no assets other than its cash on hand and 100% of the common equity interests in Financial Guaranty Insurance Company ("FGIC"), a monoline financial guaranty insurance company organized under the laws of the State of New York.[3]  On August 3, 2010, FGIC Corp. filed a voluntary petition for relief with the Bankruptcy Court under chapter 11 of the Bankruptcy Code. Contemporaneously with the filing of the petition, FGIC filed its plan of reorganization (the "Plan"),[4] a copy of which is attached hereto as **Exhibit A**.

Beginning in 1983 and through 2007, FGIC and its subsidiaries guaranteed the timely payment of principal and interest on public finance and structured finance obligations by issuing insurance policies and credit default swap ("CDS") contracts.  Together with its subsidiaries, FGIC provided credit enhancement for domestic and international securities, including newly issued securities and securities trading in the secondary market.

The deterioration in the U.S housing and mortgage markets that began in 2007 and continues today has had a significant adverse impact on the financial condition of FGIC Corp., FGIC and their affiliates and subsidiaries (collectively, the "FGIC Group").  Because of a dramatic, sustained increase in the number of mortgage defaults and foreclosures in the U.S., a large number of the securities insured by FGIC have gone into default.  As a result, during the past three years, FGIC has paid claims on its insurance policies far in excess of historical levels, which has led to a significant reduction in FGIC's surplus to its policyholders.  In turn, this deterioration in FGIC's capital surplus position resulted in its inability to pay dividends to FGIC Corp. and FGIC has not made any such payments since January 2008.

Because FGIC Corp. is an insurance holding company with no operations, it depends on dividend income from FGIC to service its debt obligations.  Recognizing that it likely would be unable to service its debt in light of FGIC's inability to pay dividends, FGIC Corp. engaged its key creditor constituencies and shareholders in negotiations to significantly deleverage its balance sheet.  FGIC Corp. solicited comments from these key stakeholders on a draft plan of reorganization and after coming to a consensus with these parties on a host of significant issues, FGIC Corp. filed its Plan on the first day of its Chapter 11 Case.

The Plan negotiated between FGIC Corp. and its key creditors and shareholders will allow the FGIC Corp. to cancel debt obligations in the aggregate amount of $391.5 million.  In addition, the Plan provides that holders of general unsecured claims against FGIC Corp. will receive substantially all of its $11.5 million in cash and the common stock in Reorganized FGIC Corp.  The three largest common shareholders of FGIC Corp., representing over 90% of its common stock, have agreed to the cancellation of their equity interests pursuant to the Plan and have agreed to waive general unsecured claims against the estate in the aggregate amount of $7.2 million.  As agreed upon with FGIC Corp.'s major creditors, Reorganized FGIC Corp. will be capitalized with no more than $400,000 to fund its business needs and will continue to operate as an insurance holding company after the Effective Date of the Plan.

---

[2]     This introduction is qualified in its entirety by the more detailed information contained in FGIC Corporation's plan of reorganization and elsewhere in this disclosure statement.

[3]     FGIC Corp. is also the parent to FGIC (Australia) Pty Limited, a wholly-owned subsidiary formed under the laws of Australia that is in the process of winding down.

[4]     All capitalized terms used, but not otherwise defined, in this disclosure statement shall have the meanings ascribed to them in the Plan.

The Company is sending you this disclosure statement (the "Disclosure Statement") because the Company is asking you to vote on approval of the Plan. This Disclosure Statement describes certain aspects of the Plan, including the treatment of Holders of Claims and Interests, and also describes voting procedures and key aspects of the Plan confirmation process.

Prior to soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan.

This Disclosure Statement is being submitted in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the Debtors' corporate history, prepetition capital structure and indebtedness (Article II);

- events leading to the Chapter 11 Case, including the Debtor's prepetition restructuring efforts (Article III.A);

- significant anticipated events in the Debtor's Chapter 11 Case (Article III.B);

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Articles IV.B and V);

- significant aspects of the Plan, including how distributions under the Plan will be made and the manner in which disputed claims will be resolved (Article IV.E and IV.F);

- the statutory requirements for confirming the Plan (Article VII.B);

- certain risk factors creditors should consider before voting and information regarding alternatives to Confirmation of the Plan (Article IX); and

- certain U.S. federal income tax consequences of the Plan (Article XI).

In light of the foregoing, the Company believes that the Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Company believes the Plan is in the best interests of its estate and its creditors and strongly recommends that you vote to accept the Plan if you are entitled to vote. Assuming the requisite acceptances to the Plan are obtained, the Company will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan and all documents to be executed, delivered, assured, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date.

## B. OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest Holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a Chapter 11 Case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date (the "Petition Date"). The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a Chapter 11 Case. The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest Holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court, in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

## C. SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND INTERESTS UNDER THE PLAN

The following chart summarizes distributions to Holders of Allowed Claims and Interests under the Plan.[5] The recoveries set forth below are projected recoveries and are subject to change.

| Class | Claim | Status | Recovery |
|-------|-------|--------|----------|
| 1 | Priority Non-Tax Claims | Unimpaired | 100% |
| 2 | Secured Tax Claims | Unimpaired | 100% |
| 3 | Other Secured Claims | Unimpaired | 100% |
| 4 | Intercompany Claims | Unimpaired | 100% |
| 5 | Convenience Claims | Unimpaired | 100% |
| 6 | General Unsecured Claims | Impaired | 2% to 3% |
| 7 | Equity Interests | Impaired | 0% |
| 8 | Section 510(b) Claims | Impaired | 0% |

## D. PARTIES ENTITLED TO VOTE ON THE PLAN

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. For example, Holders of Claims and Interests not impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan. Holders of Claims or Interests Impaired by the Plan and receiving no distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

| Class | Claim | Status | Voting |
|-------|-------|--------|--------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (presumed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 4 | Intercompany Claims | Unimpaired | No (presumed to accept) |

---

[5] This chart is only a summary of the classification and treatment of Allowed Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Interests.

| 5 | Convenience Claims | Unimpaired | No (presumed to accept) |
|---|---|---|---|
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Equity Interests | Impaired | No (deemed to reject) |
| 8 | Section 510(b) Claims | Impaired | No (deemed to reject) |

For a detailed description of the Classes of Claims and Interests, as well as their respective treatment under the Plan, see Article III of the Plan.

### E.     SUMMARY OF SOLICITATION PACKAGE AND VOTING INSTRUCTIONS

The following materials constitute the solicitation package (the "Solicitation Package"):

- the Confirmation Hearing Notice;

- the appropriate Ballot and applicable Voting Instructions or a notice of non-voting status, as applicable; and

- a CD-ROM containing this Disclosure Statement with all exhibits, including the Plan.

Any party who desires paper copies of materials received in CD-ROM form or additional copies of any other solicitation materials should contact the Garden City Group, Inc. ("Garden City") by (a) emailing FGICInfo@gardencitygroup.com, (b) calling 1-800-327-3667 and/or (c) writing to:  The Garden City Group, Inc., Attn.: FGIC Corp., 5151 Blazer Pkwy, Suite A, Dublin, OH 43017.  All parties entitled to vote to accept or reject the Plan shall receive a paper copy of the appropriate Ballot.

The Company will seek the Court's permission to engage Garden City as its notice, claims and solicitation agent to assist in the balloting and tabulation process.  Garden City will, among other things, answer questions, provide additional copies of all Solicitation Package materials and generally oversee the solicitation process.

Only the Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.  To be counted, Ballots cast by Holders must be received by Garden City by 5:00 p.m. prevailing Eastern Time on **October 18, 2010** (the "Voting Deadline").  Voting instructions are attached to each Ballot.  Please see Article V, entitled "Solicitation and Voting Procedures" for additional information.

Unless the Company, in its sole discretion, decides otherwise, any Ballot received after the Voting Deadline shall not be counted.  Garden City will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") on or before **October 21, 2010**.

Parties may contact Garden City at 1-800-327-3667 with any questions related to the solicitation procedures applicable to their Claims and Interests.

The Plan Supplement will be filed by the Debtor on or before **October 14, 2010** (the "Plan Supplement Filing Date").  When filed, the Plan Supplement will be available in both electronic and hard copy form, although the Company will not serve paper or CD-ROM copies.

**Any Ballot that is properly executed by the Holder of a Claim, but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**Each Holder of a Class 6 Claim must vote all of its Claims within Class 6 either to accept or reject the Plan and may not split its votes.  By signing and returning a Ballot, each Holder of a Class 6 Claim will certify to the Bankruptcy Court and the Company that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such other Ballots are revoked.**

**All Ballots are accompanied by Voting Instructions. It is important to follow the specific instructions provided with each Ballot.**

**The Company is relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Laws the offer and sale of new securities in connection with the Solicitation and the Plan.**

**F.      THE CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Following commencement of the Chapter 11 Case, the Company intends to schedule promptly a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

**G.      CONFIRMING AND CONSUMMATING THE PLAN**

It is a condition to Confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtor. Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of Article X of the Plan.

Following Confirmation, the Plan will be consummated on the day that is the first Business Day after the Confirmation Date on which: (1) the Confirmation Order is a Final Order; and (2) all conditions specified in Article X of the Plan have been (a) satisfied or (b) waived pursuant to Article X.C of the Plan (the "Effective Date").

For further information, see Article X of the Plan, entitled "Conditions Precedent to Confirmation and Consummation of the Plan."

**H.      RULES OF INTERPRETATION**

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of the Plan; (2) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (3) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (4) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (5) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement or to this Disclosure Statement; (7) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (8) the words "herein," "hereof," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (10) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in Bankruptcy Code § 102 shall apply; (11) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to

time, unless otherwise stated; (13) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (14) unless otherwise specified, all references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II
## BACKGROUND

### A. CORPORATE HISTORY AND STRUCTURE

FGIC Corp.'s wholly-owned subsidiary, FGIC, has been a leading provider of credit enhancement since its establishment in the early 1980s, when FGIC pioneered the financial guaranty insurance industry by becoming the first company to insure variable rate municipal bonds. Beginning in the late 1980s, FGIC led the development of insurance products covering home equity loans.

FGIC maintained its status as an industry leader throughout the 1990s. In fact, in 1990, FGIC became the first company to insure asset-backed commercial paper conduits, and, in 1992, became the first United States financial guarantor to obtain a license to write financial guaranty insurance in the United Kingdom. Shortly thereafter, FGIC opened an office in Paris and, in 1994, insured the first true cross-border Japanese securitization.

Through 2007, FGIC continued to guarantee the timely payment of principal and interest on its public finance and structured finance obligations by issuing insurance policies and CDS contracts. FGIC also provided credit enhancement for both newly issued securities and securities trading in the secondary market. Together with its subsidiaries, FGIC did business in three principal areas: U.S. Public Finance, U.S. Structured Finance and International Finance (composed of both public finance and structured finance business outside of the U.S.).

Within the structured finance segment of its business, FGIC insured both residential mortgage-backed securities ("RMBS") and collateralized debt obligations of asset-backed securities ("ABS CDOs"). As of March 31, 2010, FGIC had insured (a) RMBS with approximately $19.2 billion net par in force and approximately $2.63 billion of statutory loss reserves and (b) ABS CDOs with approximately $1.6 billion net par in force and approximately $393 million of statutory loss reserves. The vast majority of FGIC's ABS CDO exposure was written in the form where FGIC insured the obligations of FGIC CP, a wholly-owned subsidiary of FGIC, under CDS contracts between FGIC CP and the counterparties thereto.

### B. EQUITY OWNERSHIP

General Electric Capital Corporation ("GE Capital"), an affiliate of General Electric Company, acquired FGIC Corp. in 1989. In December 2003, GE Capital sold 95.5% of its common equity interest in FGIC Corp. to a diversified group of sophisticated investors, including PMI Mortgage Insurance Co. ("PMI"), affiliates of The Blackstone Group LP (the "Blackstone Affiliates"), affiliates of The Cypress Group LLC (the "Cypress Affiliates") and affiliates of CIVC Partners LP (the "CIVC Affiliates").

Prior to the filing, in order to continue to protect the FGIC Group's net operating losses ("NOLs"), preserve the resources of both FGIC and FGIC Corp. and speed up the chapter 11 process for FGIC Corp., Dubel & Associates entered into an agreement in which it purchased 100% of PMI's equity interest in FGIC Corp. pursuant to that certain Stock Purchase Agreement, dated as of July 1, 2010, by and between PMI and Dubel & Associates (the "Dubel & Associates Purchase Agreement").[6] Dubel & Associates subsequently transferred these shares to FGIC Corp. and requested that FGIC Corp. retire these shares. Dubel & Associates did not receive any compensation in connection with its transfer of shares to FGIC Corp. As of the Petition Date, Dubel & Associates does not hold any equity interests in FGIC Corp. or any of its subsidiaries or affiliates.

---

[6] In connection with the Dubel & Associates Purchase Agreement, the Blackstone Affiliates, the Cypress Affiliates and the CIVC Affiliates entered into that certain Consent and Accession Agreement, dated as of July 29, 2010, pursuant to which these equity holders have agreed to not take any action that could in any way impair the value of FGIC Group's NOLs.

GE Funding Holdings, Inc. ("GE Funding"), an affiliate of GE Capital, continues to own the common equity interest in FGIC Corp. that it retained as part of the December 2003 sale described above. In addition to its common equity interest, GE Funding owns 100% of FGIC Corp.'s preferred stock, which carries an aggregate liquidation preference of approximately $330 million.[7]

## C.    ASSETS AND LIABILITIES

FGIC Corp.'s two main assets are (a) its ownership of 100% of the equity interests in FGIC and (b) cash in the approximate amount of $11.8 million. FGIC Corp. will use its cash to fund the administration of this case and for distributions to holders of general unsecured claims.

As of the date hereof, FGIC Corp. has unsecured debt of approximately $391.5 million, consisting of the following:

- Approximately $46 million owing under that certain Revolving Credit Agreement, dated as of December 12, 2005 (as amended, the "Revolving Credit Agreement"), by and between FGIC Corp., FGIC, the lender parties thereto and JPMorgan Chase Bank, N.A. as administrative agent (the "Administrative Agent");

- Approximately $345.5 million outstanding[8] in connection with the 6% Senior Notes Due 2034 (the "Senior Notes"), issued pursuant to that certain Indenture, dated January 12, 2004 (the "Indenture"), between FGIC Corp., as issuer, and The Bank of New York ("BNY"), as indenture trustee;[9]

- Approximately $30,000 owing to FGIC for services rendered by FGIC to the Debtor for the period of July 1, 2010 through the date hereof pursuant to that certain Space and Cost Sharing Agreement by and between FGIC Corp. and FGIC, dated as of January 1, 2004 (the "Cost Sharing Agreement"); and

- $10,500 owing to Dubel & Associates under that certain Monitoring Fee Assignment Agreement, by and between Dubel & Associates and The PMI Group, Inc., dated as of July 29, 2010 (the "Monitoring Fee Assignment Agreement").

Prior to the filing of the case, FGIC Corp. owed certain of its equity security holders approximately $7.2 million on account of services rendered to FGIC Corp. pursuant to monitoring fee agreements between FGIC Corp. and those equity security holders.[10] The equity holders agreed to waive their claims against the Debtor on account

---

[7]    FGIC Corp.'s Certificate of Incorporation, as amended through November 4, 2009, provides that the preferred stock of FGIC Corp. ranks senior to its common stock with respect to dividends and distributions upon the liquidation of FGIC Corp. *See* FGIC Corp. Cert. of Incorp., Art. Fourth, Part I, § 2 at 3. Prior to the date hereof, GE Capital and GE Funding informed the Debtor that they would not seek any recovery in this chapter 11 case.

[8]    In April 2009, FGIC Corp. repurchased notes in the aggregate principal amount of approximately $63.105 million. Third parties currently hold notes in the aggregate principal amount of approximately $261.895 million. Accrued but unpaid interest on the Senior Notes totals approximately $20.5 million as of the Petition Date.

[9]    Pursuant to that certain Agreement of Resignation, Appointment and Acceptance, dated as of June 3, 2010, by and between FGIC Corp., BNY and Wilmington Trust FSB ("Wilmington Trust"), Wilmington Trust became the successor trustee under the Indenture.

[10]   FGIC Corp. is party to (a) that certain Monitoring Fee Agreement by and between FGIC Corp. and The PMI Group, Inc., dated as of December 18, 2003 (Dubel & Associates succeeded to PMI's rights under this agreement pursuant to the Dubel & Associates Purchase Agreement); (b) that certain Monitoring Fee Agreement by and between FGIC Corp. and Blackstone Management Partners IV LLC, dated as of December 18, 2003; (c) that certain Monitoring Fee Agreement by and between FGIC Corp. and Cypress Advisors, Inc., dated as of December 18, 2003; and (d) that certain Monitoring Fee Agreement by

of the Monitoring Fee Agreements. In addition, Dubel & Associates, as assignee of the claims under PMI's Monitoring Fee Agreement, agreed to reduce its claim against FGIC Corp. from $5.7 million to $10,500. As such, by these agreements, the Debtor reduced its liabilities by $12.9 million.

Following the Effective Date, Reorganized FGIC Corporation intends to maintain a website on which it will post information relating to its financial condition, including its assets and liabilities.

## D.    REGULATORY OVERSIGHT OF FGIC'S BUSINESS

The following paragraphs provide a general summary of the New York Insurance Law (the "NY Insurance Law") and an overview of the regulatory framework within which FGIC operates. Although FGIC previously held licenses to write insurance policies in, and was subject to regulation and supervision by, each of the 50 States, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and the United Kingdom (through one of its subsidiaries), because FGIC is a New York insurance corporation, the New York State Insurance Department (the "NYID") exercises primary regulatory authority over FGIC.

Article 69 of the NY Insurance Law sets forth the requirements applicable to financial guaranty insurance companies. In pertinent part, the NY Insurance Law provides as follows:

- *Surplus to Policyholders*:  To engage in the financial guaranty insurance business under the NY Insurance Law, an insurer must maintain initial equity of $2.5 million and paid-in capital of $72.5 million. Thereafter, an insurer must maintain a surplus to policyholders of $65 million. N.Y. Ins. Law § 6902(b)(1). In addition, the NY Insurance Law requires financial guaranty insurance companies to maintain contingency reserves sufficient to protect policyholders against the effects of excessive losses that may occur during adverse economic cycles.[11] *Id.* at § 6903(a)(1).

- *Dividends*:  The NY Insurance Law limits the ability of insurance companies to pay dividends to shareholders. Under the NY Insurance Law, an insurer may only pay dividends out of "earned surplus" and may not declare or distribute shareholder dividends during any 12-month period that would exceed the lesser of (a) 10% of policyholders' surplus, as shown by the most recent statutory financial statement on file with the Superintendent of the NYID (the "Superintendent") and (b) 100% of adjusted net investment income for such 12-month period, unless the Superintendent approves a greater dividend based on a finding that the insurer will retain sufficient surplus to support its obligations and written policies. *Id.* at § 4105(a).

- *Insolvency*:  In the event an insurer becomes insolvent (*i.e.*, "is unable to pay its outstanding lawful obligations as they mature in the regular course of business, as shown by an excess of required reserves and other liabilities over admitted assets" *id.* at § 1309), the NYID may petition the New York Supreme Court for an order of rehabilitation or liquidation under Article 74 of the NY Insurance Law.[12] *Id.* §§ 7402, 7404. Effectively, the NYID can be granted control of an insolvent insurer's property and the power to conduct its business to remove the causes and conditions of the order of rehabilitation. *Id.* at § 7403(a). Additionally, if the NYID determines at any time that rehabilitation is futile, the NYID may apply for an order of liquidation. *Id.* at § 7403(c).

---

and between FGIC Corp. and CIVC Partners LP, dated as of December 18, 2003 (collectively, the "Monitoring Fee Agreements").

[11]    Total contingency reserves required are calculated as the greater of 50% of premiums written or a specified percentage applied to insured outstanding principal, net of collateral and reinsurance. *Id.* at § 6903(a)(3)(B), (4)(B). The percentage applied to insured outstanding principal varies by the type of outstanding principal guaranteed. *Id.*

[12]    A domestic insurer may not be eligible for relief under the Bankruptcy Code. 11 U.S.C. § 109(b), (d).

- *Transactions with Corporate Parent*:  The NY Insurance Law addresses the relationship between a controlled insurer and any person controlling, controlled by (in some instances) or under common control with, its corporate parent.  Under section 1505 of the NY Insurance Law, all transactions between a controlled insurer and its corporate parent are subject to the following requirements:  "(1) the terms shall be fair and equitable; (2) charges or fees for services performed shall be reasonable; and (3) expenses incurred and payments received shall be allocated to the insurer on an equitable basis in conformity with customary insurance accounting practices consistently applied."  N.Y. Ins. Law § 1505(a) (McKinney 2010).  Furthermore, "[t]he books, accounts and records of each party to all such transactions shall be so maintained as to clearly and accurately disclose the nature and details of the transactions including such accounting information as is necessary to support the reasonableness of the charges or fees to the respective parties."  *Id.* § 1505(b).

Throughout its history, the FGIC Group has worked closely with the NYID to ensure the FGIC Group complies with the NY Insurance Law.  To facilitate the FGIC Group's compliance with section 1505 of the NY Insurance Law, the Debtor and FGIC entered into that certain Amended and Restated Income Tax Allocation Agreement, dated as of December 18, 2003 (the "Tax Allocation Agreement") and the Cost Sharing Agreement (together with the Tax Allocation Agreement, the "Intercompany Agreements").  Under the Tax Allocation Agreement, the Debtor satisfies tax obligations of the FGIC Group's consolidated tax group.  FGIC then reimburses the Debtor for the portion of income tax liability allocable to FGIC.  All payments owed under the Tax Allocation Agreement are allocated to FGIC on an equitable basis in conformity with customary insurance accounting practices.

Under the Cost Sharing Agreement, FGIC provides FGIC Corp. with:  (a) office space at the companies' joint corporate headquarters; and (b) legal, loss prevention, data processing, accounting, collection, investment, technology and any other services related to the functions of an insurance holding company.  FGIC Corp. electronically tracks all fund transfers in its accounting system so that it can ascertain, trace and account for transactions in connection with the Intercompany Agreements in accordance with the requirements of the NY Insurance Law.

# ARTICLE III
# CHAPTER 11 CASE

The following is a general summary of the Chapter 11 Case, including the significant events leading to the Chapter 11 Case and the anticipated events that will take place during the Chapter 11 Case.

## A.     EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

### 1.      FGIC's Restructuring Efforts

The deterioration in the U.S housing and mortgage markets that began in 2007 and continues through today has had a significant adverse impact on the financial condition of the FGIC Group.  Because of a dramatic, sustained increase in the number of mortgage defaults and foreclosures in the U.S., a large number of the ABS CDOs and RMBS insured by FGIC have gone into default.  As a result, during 2007, 2008 and 2009, FGIC paid claims on its insurance policies far in excess of historical levels.

Concurrently with the preparation of, FGIC has been in regular contact with the NYID regarding its strategy to mitigate losses and to preserve and enhance its surplus position, thereby protecting its policyholders.  To preserve capital, in January 2008, FGIC voluntarily ceased writing financial guaranty insurance policies covering new or additional risks and, since such time, has not paid any dividends or other distributions to FGIC Corp.  Further, with the NYID's encouragement and support, FGIC has successfully completed a number of loss mitigation transactions that reduced FGIC's losses and net par in force.  FGIC has also actively sought to reduce, defray and control its expenses.

To that end, on September 30, 2008, FGIC entered into a reinsurance transaction (the "Reinsurance Transaction") with MBIA Insurance Corporation ("MBIA Insurance"), pursuant to which FGIC ceded all of its interest in and to, and the risks associated with, policies covering approximately $188 billion of outstanding U.S.

public finance obligations (the "Covered Policies"). MBIA Insurance agreed to administer and pay all claims under the Covered Policies. Among other things, as consideration for the Reinsurance Transaction, FGIC paid MBIA Insurance a reinsurance premium of $917,479,000 and MBIA Insurance paid FGIC a ceding commission of $196,721,000. NYID regulatory approval of the Reinsurance Transaction was an explicit condition to closing and the NYID issued an order granting such approval. As a result of the Reinsurance Transaction, FGIC released approximately $349 million of contingency reserves with respect to the Covered Policies, thereby improving its capital surplus position. The Debtor was not a party to the Reinsurance Transaction.

On November 20, 2009, FGIC filed with the NYID its quarterly statement for the period ending September 30, 2009, in which FGIC reported a negative surplus to policyholders of $865,834,577 and an impairment of its required minimum surplus to policyholders of $932,234,577. As a result, on November 24, 2009, the NYID issued an order pursuant to section 1310 of the NY Insurance Law (the "1310 Order") that, among other things, required FGIC to suspend payment of any and all claims effective November 24, 2009.

FGIC's financial problems continued through the remainder of 2009 and through the first half of 2010. For instance, as of March 31, 2010, FGIC had insured (a) RMBS with approximately $19.2 billion net par in force and approximately $2.63 billion of statutory loss reserves and (b) ABS CDOs with approximately $1.6 billion net par in force and approximately $393 million of statutory loss reserves. Due, however, to this level of exposure, in the quarter ending March 31, 2010, FGIC recorded significant losses, which, in large part, caused FGIC's surplus to decrease by approximately $359 million to approximately negative $1.640 billion.

Although the NYID had ample statutory authority to acquire FGIC's operations, the NYID granted FGIC the opportunity to restore its surplus to policyholders. To that end, the 1310 Order required FGIC to provide the NYID with a surplus restoration plan (the "Surplus Restoration Plan") by no later than January 5, 2010. The 1310 Order further required FGIC to take such steps as may be necessary to remove the impairment of its capital and return to compliance with the minimum surplus to policyholders requirement FGIC continues to work closely with the NYID on the Surplus Restoration Plan. To be clear, however, failure to attain the goals set forth in the 1310 Order likely would result in the NYID seeking an order of rehabilitation or liquidation of FGIC forthwith.

Recognizing the circumstances in which it was operating, FGIC began to devise a plan to remove the impairment of its capital and return to compliance with the minimum surplus to policyholders requirement prior to receiving the 1310 Order. As a result of this initiative, FGIC submitted an initial Surplus Restoration Plan to the NYID on December 22, 2009. After reviewing the initial plan with the NYID and making necessary revisions, FGIC submitted an amended and restated Surplus Restoration Plan on March 24, 2010. The primary goals of the Surplus Restoration Plan are to improve FGIC's financial position and liquidity and to restore its surplus position to the statutorily-mandated amount as soon as practicable, in each case in a manner that protects the interests of its existing policyholders and is otherwise consistent with the NY Insurance Law.

As described in detail below, the Surplus Restoration Plan comprises three key loss mitigation components:

- Exchange Offer: Pursuant to the Exchange Offer, which launched on March 25, 2010, FGIC has offered to buy out the remaining obligations under most of its outstanding policies covering RMBS and certain ABS that FGIC insured in the primary market and for which it has established statutory loss reserves. As of the date hereof, Sharps SP I LLC, a special purpose vehicle created to implement the Exchange Offer, is offering current holders of FGIC-insured bonds (i) an uninsured cash flow trust certificate (a "UCF Certificate") entitling the holder to receive distributions of an amount equal to the principal and interest distributions made on the underlying eligible insured securities tendered and accepted in the Exchange Offer, (ii) a cash payment (the "Cash Consent Fee") and (iii) surplus notes (the "Consideration Surplus Notes") in exchange for releasing the right to receive future payments from FGIC under the insurance policy on RMBS and certain ABS that they own. FGIC expects that holders of FGIC-insured bonds will participate in the Exchange Offer if they believe that receiving a UCF Certificate, a known Cash Consent Fee and Consideration Surplus Notes (or such other consideration that may be offered to such holders pursuant to one or more supplements to the Exchange Offer document) today is a better option than waiting to receive an unknown payment at an undetermined point in the future.

- CDS Counterparty Agreement: FGIC is working to mitigate its existing exposure for claims based on mark-to-market termination payments under CDS contracts insured by FGIC through consensual transactions with counterparties to such CDS contracts. To that end, on March 24, 2010, FGIC and FGIC CP entered into a commitment and support agreement with nine CDS counterparties, pursuant to which the CDS counterparties have agreed to forbear from exercising certain acceleration, termination and assessment rights under their CDS contracts until the earlier of July 31, 2010 or the occurrence of certain specified events (as may be amended or supplemented from time to time, the "CDS Counterparty Agreement"). In exchange, FGIC has formed a new wholly-owned subsidiary licensed as a New York financial guaranty insurance corporation, Grand Central Assurance Corporation ("GCAC"), which will assume all of FGIC's rights, obligations and liabilities under the FGIC policies covering specified CDS contracts. FGIC anticipates that the bulk of GCAC's exposure under the policies covered by the CDS Counterparty Agreement will run off over the next four to seven years, and FGIC does not presently anticipate that GCAC will incur any losses under these policies.[13] In addition, FGIC entered into a separate commitment and support agreement with an individual CDS counterparty that is designed to mitigate FGIC's existing exposure for mark-to-market termination payments under a CDS contract that FGIC has insured.

- Other Mitigation Transactions: FGIC seeks to complete certain consensual loss mitigation transactions, pursuant to which FGIC will commute, terminate, restructure or reinsure a substantial portion of its remaining exposure to ABS CDOs and certain other obligations for which it has established statutory loss reserves, including RMBS insured by FGIC in the secondary market.

The FGIC Group is confident that, if the transactions described above succeed, the Surplus Restoration Plan will attain the approval of the NYID and, ultimately, remediate FGIC's capital impairment, thereby placing FGIC in compliance with the minimum surplus requirement under the NY Insurance Law. In the event the Surplus Restoration Plan is unsuccessful, however, the NYID may seek a court order authorizing it to liquidate or rehabilitate FGIC.

### 2. FGIC Corp.'s Prepetition Restructuring Efforts

As a result of FGIC's inability to pay dividends to FGIC Corp. since January 2008, FGIC Corp. is unable to satisfy its obligations under the Revolving Credit Agreement and on account of the Senior Notes. Recognizing the need to restructure its balance sheet, FGIC Corp. engaged the Administrative Agent, MBIA and the equity holders in discussions regarding the Plan. In light of these discussions, the Debtor developed the Plan and its related disclosure statement.

The Administrative Agent and MBIA also agreed to support the Plan and the distributions contemplated thereby. Prior to the filing of this case, three of the Debtor's largest common shareholders, representing over 90% of its common equity, agreed to the cancellation of their equity interests under the Plan and waived their unsecured claims.

## B. ANTICIPATED EVENTS OF THE CHAPTER 11 CASE

In order to facilitate the Chapter 11 Case and minimize disruption to the Company's operations, the Company will seek certain relief, including but not limited to, the relief summarized below. The relief sought will facilitate the administration of the Chapter 11 Case; however, there is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.

---

[13] FGIC may also enter into consensual transactions with other CDS counterparties in order to mitigate FGIC's existing or potential exposure for claims based on mark-to-market termination payments or other amounts under FGIC-insured CDS held by such counterparties.

1. **Expected Timetable of the Chapter 11 Case**

The Company expects the Chapter 11 Case to proceed quickly. The Company cannot assure you, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Company. On the Petition Date, the Company will promptly request the Bankruptcy Court to set a hearing date to approve this Disclosure Statement and to confirm the Plan. If the Plan is confirmed, the Effective Date of the Plan is projected to be as soon as practicable after the date the Bankruptcy Court enters the Confirmation Order. Should these projected timelines prove accurate, the Company could emerge from protection under chapter 11 within approximately 90 days of the Petition Date.

2. **First Day Relief**

The Company will request a hearing on the following motions on the first day of the Chapter 11 Case.

    a. **Motion Permitting Debtor to Maintain Existing Cash Management System**

This motion seeks authority for the Company to maintain its prepetition cash management system after commencement of the Chapter 11 Case, including inter-company transfers and use of bank accounts. Such relief will facilitate the Company's efficient operation by avoiding artificial adjustments within its cash management system.

    b. **Motions to Establish Claims Trading Procedures**

As of March 31, 2010, the FGIC Group had NOLs of approximately $4.0 billion, including $3.9 billion of NOLs attributable to FGIC and $102 million of NOLs attributable to FGIC Corp. These NOLs are extremely valuable assets of the Debtor's estate whose availability will facilitate the successful reorganization of the FGIC Group. The Company will file a motion to establish procedures for trading in Claims against the Company's estate to protect and preserve the FGIC Group's valuable tax attributes.

    c. **Bar Date Motion**

On the first day of the Chapter 11 Case, the Debtor will seek entry of an order (a) establishing deadlines for filing proofs of Claim (the "Bar Dates"); (b) approving procedures for filing proofs of Claim in this Chapter 11 Case; and (c) approving the form and manner of service of the notices of the Bar Dates. The Debtor filed its plan of reorganization and disclosure statement contemporaneously with its chapter 11 petition and anticipates moving through chapter 11 as quickly and efficiently as possible to preserve estate resources for the benefit of its creditors. Accordingly, the Debtor intends to establish the Bar Dates at the outset of the Chapter 11 Case to enable the Debtor to achieve a swift exit from chapter 11.

    d. **Garden City Group Retention Application**

The Debtor seeks to retain Garden City as its notice and claims agent. Garden City has developed efficient and cost-effective methods with respect to noticing and claims administration in chapter 11 cases and is fully equipped to handle such tasks for the Debtor.

    e. **Motion to Establish Case Management Procedures
       and Schedule the Hearing to Approve the Disclosure Statement**

This motion provides for service on all parties by electronic mail, which will be efficient and save the estate significant time and expense, and proposes special hearing procedures, including the creation of regularly scheduled omnibus hearings which will allow the Company and other parties in interest to address several motions at once, thereby avoiding the substantial time and expense of scheduling separate hearings regarding each discrete matter that arises in the Chapter 11 Case. In addition, this motion seeks an immediate order setting the date for the hearing to approve this Disclosure Statement and approving the notice thereof.

### 3. Motions to be Scheduled for Future Hearing

The Company plans to file several motions on the first day of the Chapter 11 Case that the Court likely will schedule for hearing at a later date.

#### a. Kirkland & Ellis Retention Application

The Company seeks to retain Kirkland & Ellis LLP ("K&E") as its restructuring counsel. K&E has extensive experience in, and an excellent reputation for, providing high-quality legal services in the field of debtor protections, creditor rights and business reorganizations under chapter 11 of the Bankruptcy Code. K&E is familiar with the business and legal issues that may arise during this Chapter 11 Case and is well-qualified and uniquely able to represent the Company in the Chapter 11 Case.

#### b. Interim Compensation Motion

The Company will request that the Court establish procedures for the interim compensation and reimbursement of expenses for professionals retained by the Company and any statutorily-appointed committee in the Chapter 11 Case. Establishing orderly procedures for addressing issues related to payment of professionals will streamline the administration of the Chapter 11 Case and otherwise promote efficiency for the Court, the United States Trustee and all parties in interest.

#### c. Motion to Approve Disclosure Statement and Procedures for Soliciting Votes on the Plan

The Company will file a motion seeking an order (i) approving the adequacy of this Disclosure Statement, (ii) approving the procedures for the solicitation of votes on the Plan and (iii) establishing a timeline for confirmation of the Plan. The Company will seek confirmation of the Plan on the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar.

## ARTICLE IV
## THE PLAN

**This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).**

**The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.**

**The Plan itself and the documents therein control the actual treatment of Claims against, and Interests in, the Company under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Company, the Debtor's estate, the Reorganized Debtor, all parties receiving property under the Plan and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.**

### A. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1. **Administrative Claims**

Unless otherwise agreed to by the Holder of an Administrative Claim and the Debtor or the Reorganized Debtor, as applicable, each Holder of an Allowed Administrative Claim (other than any Professional Claim) will receive, in full and final satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either: (a) on the Effective Date; (b) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim.

a. **Final Fee Applications**

All final requests for payment of Professional Claims, including any amounts held back pursuant to the Interim Compensation Procedures Order, must be filed with the Bankruptcy Court and served on the Reorganized Debtor no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Case, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court and paid by the Reorganized Debtor.

b. **Professional Fee Escrow Account**

In accordance with Article II.A.2(c) of the Plan, on the Confirmation Date, the Debtor shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the estates of the Debtor or Reorganized Debtor, as applicable. The amount of Professional Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtor from the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Distribution Agent and shall be distributed on a Pro Rata basis to Holders of Allowed Class 6 Claims.

c. **Professional Fee Reserve Amount**

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall estimate their Professional Compensation prior to and as of the Confirmation Date and shall deliver such estimate to the Debtor no later than 10 days prior to the Confirmation Date, *provided*, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional. The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

d. **Post-Effective Date Professional Fees and Expenses**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtor. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

## 2. Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by the Holder of such Claim and the Debtor or Reorganized Debtor, as applicable, *provided*, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtor, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtor and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## B. CLASSIFICATION OF CLAIMS AND INTERESTS IN THE DEBTOR

Except for the claims addressed in Article II above (or as otherwise set forth herein), all Claims against the Debtor are placed in Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims or Priority Tax Claims.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against, and Equity Interests in, the Debtor. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

| Class | Claim | Status | Voting |
|-------|-------|--------|--------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (presumed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 4 | Intercompany Claims | Unimpaired | No (presumed to accept) |
| 5 | Convenience Claims | Unimpaired | No (presumed to accept) |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Equity Interests | Impaired | No (deemed to reject) |
| 8 | Section 510(b) Claims | Impaired | No (deemed to reject) |

1.      Class 1—Priority Non-Tax Claims

        a.      *Classification*:  Class 1 consists of Priority Non-Tax Claims.

        b.      *Voting*:  Class 1 is Unimpaired and Holders of Class 1 Claims are conclusively presumed
                to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore,
                the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

        c.      *Treatment*:   Except to the extent that a Holder of an Allowed Priority Non-Tax Claim
                agrees to a less favorable treatment, in full and final satisfaction and discharge of and in
                exchange for each Allowed Priority Non-Tax Claim, each Holder of such Allowed
                Priority Non-Tax Claim shall receive, at the sole option of the Debtor or the Reorganized
                Debtor:  (i) Cash on the Effective Date in an amount equal to such Allowed Priority Non-
                Tax Claim; or (ii) commencing on the Effective Date and continuing over a period not
                exceeding five years from the Petition Date, equal semi-annual Cash payments in an
                aggregate amount equal to such Allowed Priority Non-Tax Claim, together with interest
                at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtor
                or the Reorganized Debtor to prepay the entire amount of the Allowed Priority Non-Tax
                Claim.

2.      Class 2—Secured Tax Claims

        a.      *Classification*:  Class 2 consists of Secured Tax Claims.

        b.      *Voting*:  Class 2 is Unimpaired and Holders of Class 2 Claims are conclusively presumed
                to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore,
                the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

        c.      *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees
                to a less favorable treatment, in full and final satisfaction and discharge of and in
                exchange for each Allowed Secured Tax Claim, each Holder of such Allowed Secured
                Tax Claim shall receive, at the sole option of the Debtor or the Reorganized Debtor:  (i)
                Cash on the Effective Date in an amount equal to such Allowed Secured Tax Claim; or
                (ii) commencing on the Effective Date and continuing over a period not exceeding five
                years from the Petition Date, equal semi-annual Cash payments in an aggregate amount
                equal to such Allowed Secured Tax Claim, together with interest at the applicable rate
                under non-bankruptcy law, subject to the sole option of the Debtor or the Reorganized
                Debtor to prepay the entire amount of the Allowed Secured Tax Claim.

3.      Class 3—Other Secured Claims

        a.      *Classification*:  Class 3 consists of Other Secured Claims.

        b.      *Voting*:  Class 3 is Unimpaired and Holders of Class 3 Claims are conclusively presumed
                to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore,
                the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

c.      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the sole option of the Debtor or the Reorganized Debtor: (i) Cash on the Effective Date in an amount equal to such Allowed Other Secured Claim; or (ii) commencing on the Effective Date and continuing over a period not exceeding five years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Other Secured Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtor or the Reorganized Debtor to prepay the entire amount of the Allowed Other Secured Claim.

4.      Class 4—Intercompany Claims

a.      *Classification*:  Class 4 consists of Intercompany Claims.

b.      *Voting*:  Class 4 is Unimpaired and the Holders of Class 4 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

c.      *Treatment*:  All or a portion of the Intercompany Claims may be reinstated, capitalized or otherwise discharged in any manner as of the Effective Date at the Debtor's or the Reorganized Debtor's sole discretion.

5.      Class 5—Convenience Claims

a.      *Classification*:  Class 5 consists of Convenience Claims.

b.      *Voting*:  Class 5 is Unimpaired and the Holders of Class 5 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Convenience Claims are not entitled to vote to accept or reject the Plan.

c.      *Treatment*:  Each Holder of a Convenience Claim shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

6.      Class 6—General Unsecured Claims

a.      *Classification*:  Class 6 consists of General Unsecured Claims.

b.      *Allowance of Certain Claims*:

(i)      On the Effective Date, the Prepetition Lenders' Claim shall be Allowed in the aggregate amount of $46,000,000 plus accrued interest and any reasonable fees and expenses owing as of the Petition Date with respect to the obligations under the Credit Agreement.

(ii)      On the Effective Date, the Senior Notes Claim will be Allowed in the aggregate amount of $261,895,000 plus accrued interest and any reasonable fees and expenses owing as of the Petition Date with respect to the obligations under the Senior Notes Indenture.  For the purpose of clarity, the Allowed Senior Notes Claim shall not include the $63,105,000 of Senior Notes held by the Debtor and shall not include accrued interest on account of such Senior Notes held by the Debtor.

c.      *Voting*:  Class 6 is Impaired and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

d.      *Treatment*:  On the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (i) the Cash Distribution Amount and (ii) 100% of the Outstanding New Common Stock.

e.      *Convenience Claim Election Rights*:  Each Holder of an Allowed General Unsecured Claim may elect to be treated as a Holder of a Convenience Claim in Class 5 by electing to reduce its Allowed General Unsecured Claim to the amount of $25,000 or less in full and final satisfaction, release and discharge of such Allowed General Unsecured Claim. For the avoidance of doubt, the Indenture Trustee shall be deemed to be the Holder of any and all Claims arising under the Senior Notes Indenture for the purpose of exercising Convenience Claim election rights with respect to such Claims.  Likewise, the Administrative Agent shall be deemed to be the Holder of any and all Claims arising under the Credit Agreement for the purpose of exercising convenience claim election rights with respect to such Claims.  Any election must be made on the Ballot, and except as may be agreed to by the Debtor or the Reorganized Debtor, no Holder of a General Unsecured Claim can elect treatment as a Convenience Claim after the Voting Deadline. Upon any such valid and irrevocable election, the General Unsecured Claim of such Holder shall be automatically reduced to $25,000 (or such lower amount that the Holder elects) and shall no longer be entitled to any other distribution as contemplated by this Plan.

7.      <u>Class 7—Equity Interests</u>

a.      *Classification*:  Class 7 consists of all Equity Interests in FGIC Corporation.

b.      *Voting*:  Class 7 is Impaired and Holders of Class 7 Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

c.      *Treatment*:  On the Effective Date, all Equity Interests in FGIC Corporation shall be cancelled and Holders of such interests shall not receive any distribution under the Plan on account of such interests.

8.      <u>Class 8—Section 510(b) Claims</u>

a.      *Classification*:  Class 8 consists of Section 510(b) Claims.

b.      *Voting*:  Class 8 is Impaired and Holders of Class 8 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

c.      *Treatment:*  Holders of Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims.  On the Effective Date, all Section 510(b) Claims shall be discharged.

## C.      ACCEPTANCE OR REJECTION OF THE PLAN

The Debtor requests Confirmation under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtor reserves the right to modify Article III of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## D. MEANS FOR IMPLEMENTATION OF THE PLAN

### 1. General Settlement of Claims

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. Subject to Article VI, all distributions made to Holders of Allowed Claims in any Class are intended to, and shall, be final.

### 2. Reorganized FGIC Corporation

On the Effective Date, the New FGIC Corporation Board shall be established. Reorganized FGIC Corporation shall be authorized to adopt any agreements, documents and instruments and to take any other actions contemplated by the Plan as necessary or desirable to consummate the Plan.

### 3. Sources of Consideration for Plan Distributions

#### a. Cash on Hand

The Reorganized Debtor shall fund Cash distributions under the Plan with the Cash Distribution Amount.

#### b. New Common Stock

The issuance of the New Common Stock is authorized without the need for any further action by the Debtor or Reorganized Debtor. On the Effective Date, Reorganized FGIC Corporation will issue and distribute 100% of the shares of Outstanding New Common Stock to the Distribution Agent for the benefit of Holders of General Unsecured Claims.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. The distribution and issuance referred to in Article III of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each entity receiving such distribution or issuance.

Upon the Effective Date, in the event the Debtor determines that a shareholders agreement is advisable, Reorganized FGIC Corporation shall enter into such an agreement with each entity that is to be a counterparty thereto and such agreement shall be deemed to be valid, binding and enforceable in accordance with its terms. Each Holder of New Common Stock shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized FGIC Corporation. Notwithstanding the foregoing, Holders of New Common Stock may be permitted to be signatories to the shareholders agreement (if any), if they so desire.

### 4. Corporate Existence

Except as otherwise provided in the Plan, the Debtor shall continue to exist after the Effective Date as a corporate entity, with all the powers of a corporation, pursuant to applicable law in the jurisdiction in which the Debtor is incorporated and pursuant to the certificate of incorporation and by-laws in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law).

### 5. Vesting of Assets in the Reorganized Debtor

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, all property of the Debtor's estate, all Causes of Action and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized

Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Equity Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 6. Cancellation of Securities and Agreements

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan, except as otherwise specifically provided for in the Plan: (a) the obligations of the Debtor under the Credit Agreement, the Senior Notes Indenture and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant or other instrument or document that directly or indirectly evidences or creates any indebtedness, obligation of, or ownership interest in, the Debtor that gives rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents that evidence indebtedness, obligations of, or ownership interests in, the Debtor that are reinstated pursuant to the Plan), shall be cancelled as to the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder; and (b) the obligations of the Debtor pursuant, relating or pertaining to any agreements, indentures, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options or other instruments or documents that evidence or create any indebtedness, obligations of, or ownership interests in, the Debtor (except such agreements, certificates, notes or other instruments that evidence indebtedness, obligations of, or ownership interests in, the Debtor that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided,* that, notwithstanding Confirmation or Consummation of the Plan, any such indenture or agreement that governs the rights of the Holder of a Claim shall, to the extent necessary, continue in effect solely for purposes of allowing the Holders of General Unsecured Claims to receive their distributions under the Plan; *provided, further,* that the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan and shall not result in any expense or liability to the Reorganized Debtor.

### 7. Surrender of Existing Securities

On the Effective Date, the Senior Notes and all securities evidencing an Equity Interest in the Debtor shall be surrendered and shall be deemed extinguished.

### 8. Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (a) selection of the directors and officers for Reorganized FGIC Corporation; (b) the distribution of the New Common Stock; and (c) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date).

All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors or officers of the Debtor or the Reorganized Debtor. On or prior to the Effective Date, as applicable, the appropriate officers of the Debtor or the Reorganized Debtor shall be authorized and, as applicable, directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor. The authorizations and approvals contemplated by this Article V.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 9. Certificate of Incorporation and By-Laws

Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtor's Certificate of Incorporation will be amended to prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend and restate its Certificate of Incorporation and By-Laws as permitted by the laws of its state of incorporation and by its Certificate of Incorporation and By-Laws.

### 10. Stock Trading Restrictions

The Reorganized Debtor's Certificate of Incorporation shall contain restrictions on the transfer of New Common Stock to minimize the likelihood of any potential adverse U.S. federal income tax consequences resulting

from an ownership change (as defined in section 382 of the Internal Revenue Code) in the Reorganized Debtor. Pursuant to the Certificate of Incorporation, no person or entity shall be permitted to acquire additional New Common Stock unless such acquisition has been approved by the New FGIC Corporation Board. No person or entity that is a 5% shareholder (as defined in section 382 of the Internal Revenue Code) shall be entitled to dispose of New Common Stock unless such disposal has been approved by the New FGIC Corporation Board.

### 11.    Post-Effective Date Recoveries

To the extent the Reorganized Debtor receives any Cash payment in excess of $25,000 after the Effective Date on account of a tax refund, a dividend from a subsidiary or affiliate, on account of any other pre-petition liability owing to the Debtor or otherwise, the Reorganized Debtor shall take necessary corporate action to cause such Cash to be promptly distributed to holders of the New Common Stock.

### 12.    Directors and Officers of Reorganized FGIC Corporation

As of the Effective Date, the term of the current members of the board of directors of the Debtor shall expire. The board of directors of Reorganized FGIC Corporation shall consist of seven (7) members, the composition of which shall be the chief executive officer of the Debtor and six (6) members to be chosen by the Debtor, in consultation with the Administrative Agent and MBIA, which directors shall be reasonably acceptable to the New York Insurance Department.

FGIC Corporation's officers immediately prior to the Effective Date shall serve as the initial officers of Reorganized FGIC Corporation on and after the Effective Date.

### 13.    Effectuating Documents; Further Transactions

On and after the Effective Date, Reorganized FGIC Corporation and the officers and members of the board of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of Reorganized FGIC Corporation, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

### 14.    Section 1146 Exemption

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, sales and use tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment. Furthermore, upon entry of the Confirmation Order, the appropriate state and local governmental officials and administrative agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.

### 15.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to the releases set forth in Article X.E of the Plan, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date and the Reorganized Debtor's rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them. The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action for, later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue

preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Subject to the releases set forth in Article X.E of the Plan, the Reorganized Debtor reserves and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

## E. PROVISIONS GOVERNING DISTRIBUTIONS

### 1. Timing and Calculation of Distributions

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, then on the date that such Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions provided in the Plan for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding any provisions in the Plan to the contrary, and except as otherwise agreed to by the relevant parties, no partial payments or distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event there are Disputed Claims requiring adjudication and resolution, Reorganized FGIC Corporation shall establish appropriate reserves for potential payment of such Claims.

### 2. Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### a. Delivery of Distributions in General

Except as otherwise provided herein, the Debtor or the Reorganized Debtor, as applicable, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution; *provided*, that the manner of such distributions shall be determined at the discretion of the Debtor or the Reorganized Debtor, as applicable; *provided*, *further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by such Holder.

#### b. Delivery of Distributions to Prepetition Lenders

The Administrative Agent shall be deemed to be the Holder of the Allowed Prepetition Lenders' Claim for purposes of the initial distribution to be made pursuant to this Plan. The Distribution Agent shall make the initial distribution of cash and New Common Stock on account of such Claim to, or on behalf of, the Administrative Agent and the Administrative Agent shall hold or direct such distributions for the benefit of the Prepetition Lenders, as applicable. The Administrative Agent shall be permitted to rely on the Register maintained by it on behalf of the Debtor pursuant to the Credit Agreement as of the Record Date and shall not incur any liability as a result of such reliance. As soon as practicable, the Administrative Agent shall arrange to deliver such distributions to, or on behalf of, such Prepetition Lenders pursuant to the Credit Agreement; *provided*, that the Administrative Agent shall retain all rights as Administrative Agent under the Credit Agreement in connection with delivery of distributions to the Prepetition Lenders. To the extent any subsequent distributions are required to be made on account of the

Prepetition Lender Claims or the New Common Stock received on account of such Claims, the Distribution Agent shall make any such subsequent distributions directly to each Prepetition Lender and the Administrative Agent shall provide a copy of such Register to facilitate such distributions. For purposes of subsequent distributions, it will be the responsibility of each individual Prepetition Lender to apprise the Distribution Agent of any change in its holdings after the Record Date.

### c. Delivery of Distributions to Senior Noteholders

#### (1) Distributions to Senior Noteholders

The Indenture Trustee shall be deemed to be the Holder of all Claims of the Senior Noteholders for purposes of distributions to be made hereunder. The Distribution Agent shall make all distributions on account of such Claims to, or on behalf of, the Indenture Trustee and the Indenture Trustee shall hold or direct such distributions for the benefit of the Senior Noteholders, as applicable. Notwithstanding any provision contained in this Plan to the contrary, the distribution provisions contained in the Senior Notes Indenture shall continue in effect to the extent necessary to make distributions pursuant to this Plan on account of the Senior Notes and shall terminate in full upon completion of all such distributions. All payments to Senior Noteholders shall only be made to such Holders after the surrender by each such Holder of the certificates representing such Senior Notes, or in the event that such certificate is lost, stolen, mutilated or destroyed, upon the Holder's compliance with the requirements set forth above. Upon surrender of such Senior Notes certificates, the Senior Notes shall be cancelled and destroyed. As soon as practicable after surrender of the Senior Notes certificates, the Indenture Trustee shall distribute to the Holder thereof such Holder's Pro Rata share of the distribution; *provided*, that the Indenture Trustee shall retain all rights as Indenture Trustee under the Senior Notes Indenture in connection with delivery of distributions to the Senior Noteholders; *provided*, *further*, that the Debtor's obligations to make distributions in accordance with Article III of the Plan shall be deemed satisfied upon delivery of distributions to the Indenture Trustee.

#### (2) Holders as of the Distribution Notification Date

As of the close of business on the Distribution Notification Date: (1) the Claims Register will be closed; (2) the transfer books and records of the Senior Notes as maintained by the Indenture Trustee or its agent shall be closed; and (3) any transfer of any Claim based on the Senior Notes or any interest therein shall be prohibited. The Debtor, the Reorganized Debtor and the Indenture Trustee shall have no obligation to recognize any transfer of any Claim based on the Senior Notes occurring after the close of business on the Distribution Notification Date and shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record as of the close of business on the Distribution Notification Date.

### 3. Distributions by Distribution Agent

The Debtor or the Reorganized Debtor, as applicable, shall have the authority, in its sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan. As a condition to serving as a Distribution Agent, a Distribution Agent must: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required hereunder; and (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required hereunder to be distributed by such Distribution Agent. The Debtor or the Reorganized Debtor, as applicable, may pay to the Distribution Agent all reasonable and documented fees and expenses of the Distribution Agent without the need for any approvals, authorizations, actions or consents.

### a. Minimum Distributions

Notwithstanding anything herein to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $25 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or a share of New Common Stock or other means of distribution under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar, share or other similar distribution item.

### b. Undeliverable Distributions

In the event that any distribution to any Holder of a Claim is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor automatically and without need for a further order of the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) and the Claim of any Holder to such property or Equity Interest in property shall be discharged and forever barred.

### c. Distributions Withheld for Disputed Claims

Until such time as all Disputed Claims are Allowed or disallowed, the Debtor shall reserve Cash or Common Stock in an amount equal to the distributions to which Holders of Disputed Claims would be entitled if all such Claims were to become Allowed Claims.

### d. Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed by any governmental unit. All distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provisions in the Plan to the contrary, the Reorganized Debtor and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.

### e. Allocations

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

### f. No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim against the Debtor and no Holder of any Claim against the Debtor shall be entitled to interest accruing on or after the Petition Date on any such Claim.

## F. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### 1. Resolution of Disputed Claims

### a. Allowance of Claims

After the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Case allowing such Claim. All settled claims approved prior to the Effective Date by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019, or otherwise, shall be binding on all parties.

### b. Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date until the applicable Claims Objection Bar Date, the Reorganized Debtor, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without any further notice to, or action, order or approval of, the Bankruptcy Court. The Reorganized Debtor shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order or approval of, the Bankruptcy Court.

### c. Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date, the Reorganized Debtor, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### d. Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged from the Claims Register by the Reorganized Debtor and any Claim that has been amended may be adjusted thereon by the Reorganized Debtor. The Reorganized Debtor may expunge or adjust such Claims without filing a claims objection and without any further notice to, or action, order or approval of, the Bankruptcy Court.

### e. Deadline to File Objections to Claims

Any objections to Claims shall be filed no later than the applicable Claims Objection Bar Date.

### 2. Disallowance of Claims

All Claims of any entity from which property is sought by the Debtor under sections 542, 543, 550 or 553 of the Bankruptcy Code, or that the Debtor or the Reorganized Debtor alleges is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be disallowed if (1) the entity, on the one hand, and the Debtor or the Reorganized Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER OR APPROVAL OF, THE BANKRUPTCY COURT. HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT ON OR BEFORE THE LATER OF (1) THE CONFIRMATION HEARING AND (2) 45 DAYS AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM.**

### 3. Amendments to Claims

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor and, to the extent such prior authorization is not received, any such new or amended Claim shall be deemed disallowed and expunged without any further notice to, or action, order or approval of, the Bankruptcy Court.

### 4. No Distributions Pending Allowance

If an objection to a Claim or portion thereof is filed prior to the Effective Date, such Claim shall be deemed a Disputed Claim and no payment or distribution provided under the Plan shall be made on account of such Disputed Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

### 5. Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions, if any, shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim the distribution, if any, to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law. After the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Chapter 11 Case, including the Confirmation Order, allowing such Claim. All settled claims approved prior to the Effective Date by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019, or otherwise, shall be binding on all parties.

After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had with respect to any Claim or Equity Interest immediately prior to the Effective Date.

## G. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

Each Executory Contract or Unexpired Lease shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease: (a) has been previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (b) is the subject of a motion to assume or reject pending as of the Effective Date; or (c) is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement.

### 2. Approval of Assumption and Rejection of Executory Contracts and Unexpired Leases

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions or rejections of Executory Contracts or Unexpired Leases described in Article VIII.A.1 of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or rejection of such Executory Contract or Unexpired Lease, including objecting to the cure amount designated by the Debtor as payable in connection with an assumption, will be deemed to have consented to such assumption or rejection and agreed to the specified cure amount.

### 3. Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Debtor or the Reorganized Debtor, as applicable, no later than thirty (30) days after the earlier of (a) entry of an order approving the rejection of such Executory Contract or Unexpired Lease or (b) the Effective Date.

Any entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtor or the Reorganized Debtor or their estates and property and the Debtor and the Reorganized Debtor, their estates and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. As of the Effective Date, all such Claims shall be subject to the permanent injunction set forth in Article X.D of the Plan.

### 4. Procedures for Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan

A notice of the Effective Date, including notice regarding the assumption or rejection of Executory Contracts or Unexpired Leases, will be sent to all known Holders of a Claim. For known non-Debtor parties to Executory Contracts and Unexpired Leases assumed pursuant to the Plan, such notice or separate notices will be sent on or as soon as practicable after the Effective Date notifying such counterparties that such Executory Contracts and Unexpired Leases have been assumed pursuant to the Plan.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least twenty (20) days prior to the Confirmation Hearing, where applicable, the Debtor shall provide counterparties to Executory Contracts and Unexpired Leases with notices of proposed assumptions and cure amounts as well as procedures for objecting thereto and resolution of such disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract to a proposed assumption or related cure amount must be filed, served and **actually received** by the Debtor at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters.

In the event of a dispute regarding: (a) the amount of any payments to cure such a default; (b) the ability of the Debtor or Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract to be assumed; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving any such dispute and approving the assumption. If an objection to cure is sustained by the Bankruptcy Court, the Debtor, at its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

### 5. Survival of Corporate Indemnification Obligations

The Debtor's indemnification obligations set forth in Article VIII of its by-laws existing as of the Petition Date shall be included in the Bylaws of the Reorganized Debtor.

All Claims of the Debtor's officers and directors for indemnity arising under the Debtor's certificate of incorporation or by-laws, applicable state law, specific agreement or any combination of the foregoing arising in respect of actions or omissions that occurred (a) prior to the Petition Date shall be discharged upon the Effective Date and shall be satisfied solely from the Debtor's and/or Reorganized Debtor's available directors and officers' insurance coverage and (b) after the Petition Date, but prior to the Effective Date (excluding Excluded Indemnification Claims) shall be Administrative Claims hereunder. Excluded Indemnification Claims in respect of actions or omissions occurring after the Petition Date but prior to the Effective Date, shall be discharged upon the Effective Date and holders of Excluded Indemnification Claims shall not receive any distribution under the Plan on account of such Excluded Indemnification Claims.

After the Effective Date, the Reorganized Debtor shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect on the Petition Date, with respect to actions or omissions occurring prior to the Effective Date and all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

## H. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### 1. Conditions

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan.

- The Confirmation Order, which shall provide that, among other things, the Debtor or the Reorganized Debtor, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate the Plan, shall have been entered and such order shall have become a Final Order.

- All documents and agreements necessary to implement the Plan shall have: (a) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (b) been tendered for delivery; and (c) been effected or executed.

- All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties, and, to the extent required, filed with and approved by applicable governmental units in accordance with applicable laws.

- The Reorganized Debtor shall have received the necessary regulatory approvals, including The New York Insurance Department's approval of the change in ownership of Financial Guaranty Insurance Company resulting from the Consummation of the Plan.

- The Reorganized Debtor Funding Amount shall be no more than $400,000.

### 2. Waiver of Conditions

The conditions to the Effective Date set forth in the Plan may be waived by the Debtor, with the consent of the Administrative Agent and MBIA (which consent shall not be unreasonably withheld), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

### 3. Effect of Non-Occurrence of Conditions to the Effective Date

Unless otherwise agreed to by the Debtor, if the Effective Date does not occur prior to the one year anniversary of the Confirmation Date, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any claims by, or Claims against or Equity Interests in, the Debtor; (b) prejudice in any manner the rights of the Debtor or any Holders of Claims against or Equity Interests in the Debtor; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtor or any Holders of Claims against or Equity Interests in the Debtor in any respect.

## I. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1. Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its estate and Holders of Claims and Equity Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to, or action, order or approval of, the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against it and Causes of Action against other entities.

## 2. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Equity Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise; *provided*, that notwithstanding anything to the contrary contained in that certain Monitoring Fee Agreement by and between FGIC Corp. and The PMI Group, Inc., dated as of December 18, 2003, Dubel & Associates, LLC, as successor to The PMI Group, Inc., shall be entitled to an Allowed General Unsecured Claim in the amount of $10,500, which Claim shall be paid in full in Cash as a member of Class 5. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

## 3. Discharge of Claims and Termination of Equity Interests

Pursuant to, and to the fullest extent permitted by, section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Equity Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against or Equity Interests in the Debtor, the Reorganized Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such Claim or Equity Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtor with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to occurrence of the Effective Date.

## 4. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection therewith, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan, and, in the case of a Secured Tax Claim or Other Secured Claim, concurrently with satisfaction in full of the portion of the Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtor's estate shall be fully released and discharged and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

## 5. Debtor Release

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtor, the Reorganized Debtor and any person seeking to exercise the rights of the Debtor's estate, including any successor to the Debtor or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including those that the Debtor, the Reorganized Debtor, the Debtor's estate or the Debtor's Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or**

relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's estate, the conduct of the Debtor's business, the Chapter 11 Case, the purchase, sale or rescission of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, Plan Supplement, Disclosure Statement and related agreements, instruments or other documents or upon any other act or omission, transaction or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.

Notwithstanding anything herein to the contrary, the foregoing "Debtor Release" shall not operate to waive or release any Causes of Action of the Debtor:  (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan; (b) expressly set forth in and preserved by the Plan or related documents; or (c) arising under the Cost Sharing Agreement or the Tax Allocation Agreement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes, by reference, each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the Debtor Release; (c) in the best interests of the Debtor and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after reasonable investigation by the Debtor and after notice and opportunity for hearing; and (f) a bar to the Debtor or the Reorganized Debtor asserting any claim released by the Debtor Release against any of the Released Parties.

6.      Releasing Party Release

Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including those that the Debtor, the Reorganized Debtor, the Debtor's estate or the Debtor's Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's estate, the conduct of the Debtor's businesses, the Chapter 11 Case, the purchase, sale or rescission of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, Plan Supplement, Disclosure Statement and related agreements, instruments or other documents or upon any other act or omission, transaction or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.

Notwithstanding anything herein to the contrary, the foregoing "Releasing Party Release" does not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Releasing Party Release, which includes by reference each of the related

provisions and definitions contained herein and further, shall constitute the Bankruptcy Court's finding that the Releasing Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the Releasing Parties; (c) in the best interests of the Debtor and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim against any of the Released Parties that has been released by the Releasing Party Release.

### 7. Exculpation

Upon and effective as of the Effective Date, the Debtor and its directors, officers, attorneys, financial advisors and other professional advisors and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code.

Except with respect to any acts or omissions expressly set forth in and preserved by the Plan or related documents, the Exculpated Parties shall neither have nor incur any liability to any entity for any prepetition or postpetition act taken or omitted to be taken in connection with, arising from or relating in any way to, the Chapter 11 Case, including: (a) the operation of the Debtor's business during the pendency of this Chapter 11 Case; (b) formulating, negotiating, preparing, disseminating, implementing and/or effecting the Disclosure Statement and the Plan (including the Plan Supplement and any related contract, instrument, release or other agreement or document created or entered into in connection therewith); (c) the solicitation of votes for the Plan and the pursuit of Confirmation of the Plan; (d) the administration of the Plan and/or the property to be distributed under the Plan; (e) the offer and issuance of any securities under the Plan; and/or (f) any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtor. In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its respective duties under, pursuant to or in connection with, the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing exculpation provisions shall (a) exculpate any person or entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages or ultra vires acts as determined by a Final Order or (b) limit the liability of the professionals of the Exculpated Parties to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

### 8. Injunction

The satisfaction, release and discharge pursuant to Article X of the Plan shall also act as an injunction against any person commencing or continuing any action, employment of process or act to collect, offset or recover any claim or Cause of Action satisfied, released or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including sections 524 and 1141 thereof.

## J. BINDING NATURE OF PLAN

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER: (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN; (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR; (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## K. RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain the maximum legally permissible jurisdiction over the

Chapter 11 Case and all entities with respect to all matters related to the Chapter 11 Case, the Debtor and the Plan, including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract to which the Debtor is party or with respect to which the Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add Executory Contracts to the list of Rejected Contracts;

- ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Confirmation Date or that may be commenced in the future and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date, provided that the Reorganized Debtor shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

- hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

- resolve any cases, controversies, suits or disputes with respect to the releases by the Debtor, the exculpation and other provisions contained in Article X of the Plan and enter such orders or take such other actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

- enter an order concluding the Chapter 11 Case.

## L.    MISCELLANEOUS PROVISIONS

### 1.    Modification of Plan

Effective as of the date of the Plan and subject to the limitations and rights contained in the Plan:  (1) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before entry of the Confirmation Order; (2) after entry of the Confirmation Order, the Debtor or the Reorganized Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission, or reconcile any inconsistency in the Plan in such a manner as may be necessary to carry out the purpose and intent of the Plan; and (3) the Debtor reserves the right to modify the Plan to implement the sale of all or substantially all of the assets of the Debtor pursuant to sections 363 and 1123 of the Bankruptcy Code, *provided*, the Debtors shall not amend or modify the Plan to extent that such amendment or modification affects the economic distributions provided for herein without the consent of the Administrative Agent and MBIA.

### 2.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtor revokes or withdraws the Plan, or if Confirmation Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor; (b) prejudice in any manner the rights of the Debtor or the Holders of Claims or Equity Interests; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or the Holders of Claims or Equity Interests.

### 3.    Successors and Assigns

The rights, benefits and obligations of any entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### 4.    Reservation of Rights

Except as expressly set forth herein, including with respect to votes cast to accept or reject the Plan, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein nor the taking of any action by the Debtor or any other entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor with respect to the Holders of Claims or Equity Interests or other entities; or (2) any Holder of a Claim or an Equity Interest or other entity before the Effective Date.

### 5.    Section 1145 Exemption

The offering, issuance and distribution of the New Common Stock, and any subsequent sales, resales, transfers or other distributions of any such securities, shall be exempt from any federal or state securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

### 6.    Payment of Statutory Fees

The Reorganized Debtor shall pay all fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed or closed, whichever occurs first.

### 7.    Section 1125(e) Good Faith Compliance

The Debtor, the Reorganized Debtor, the Administrative Agent, the Indenture Trustee and each of their respective advisors and representatives shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### 8. Further Assurances

The Debtor or the Reorganized Debtor, as applicable, all Holders of Claims receiving distributions hereunder and all other entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 9. Severability

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable. Such term or provision then will be applicable as altered or interpreted; *provided*, that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtor; *provided*, *further*, that the Debtor may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing. Notwithstanding any such order, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect. The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 10. Service of Documents

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by overnight mail to:

| Debtor | Proposed Counsel to the Debtor |
|---|---|
| FGIC Corporation<br>125 Park Avenue<br>New York, New York 10017<br>Attn.:   John S. Dubel<br>          A. Edward Turi, III | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Phone:  (212) 446 4800<br>Fax:     (212) 446-4900<br>Attn.:   Paul M. Basta<br>        Brian S. Lennon<br><br>    -and-<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Phone:  (312) 862-2000<br>Fax:     (312) 862-2200<br>Attn.:   Patrick J. Nash, Jr. |
| **Clerk of the Bankruptcy Court** | **United States Trustee** |
| United States Bankruptcy Court<br>for the Southern District of New York<br>Alexander Hamilton Custom House<br>One Bowling Green<br>New York, New York 10004 | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn.:   Andrea B. Schwartz |

| Counsel for the Administrative Agent | Indenture Trustee |
|---|---|
| Morgan Lewis & Bockius LLP<br>101 Park Avenue<br>New York, New York 10178<br>Phone:  (212) 309-6000<br>Fax:      (212) 309-6001<br>Attn.:    Richard S. Toder<br>            Michael A. Chapnick | Wilmington Trust FSB<br>166 Mercer Street, Suite 2-R<br>New York, New York 10012<br>Phone:  (212) 941-4415<br>Fax:      (212) 343-1079<br>Attn.:    Adam Berman |
| **Counsel for MBIA Inc.** | **Counsel for the New York<br>State Insurance Department** |
| DLA Piper LLP<br>1251 Avenue of the Americas<br>New York, New York, 10020<br>Phone:  (212) 335-4500<br>Fax:      (212) 335-4501<br>Attn.:    H. Jeffrey Schwartz<br>            Bennett Silverberg | Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, New York 10004<br>Phone:  (212) 859-8000<br>Fax:      (212) 859-4000<br>Attn.:    Bonnie Steingart |

### 11.        Filing of Additional Documents

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 12.        No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

## ARTICLE V
## SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Plan.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

### A.        THE SOLICITATION PACKAGE

The following materials constitute the Solicitation Package:

- the Confirmation Hearing Notice;

- the appropriate Ballot and applicable Voting Instructions or a notice of non-voting status, as applicable; and

- a CD-ROM containing this Disclosure Statement with all exhibits, including the Plan.

Any party who desires paper copies of materials received in CD-ROM form or additional copies of any other solicitation materials should contact Garden City by (a) emailing FGICInfo@gardencitygroup.com, (b) calling 1-800-327-3667 and/or (c) writing to:  The Garden City Group, Inc., Attn.:  FGIC Corp., 5151 Blazer Pkwy, Suite A, Dublin, OH 43017.  All parties entitled to vote to accept or reject the Plan shall receive a paper copy of the appropriate Ballot.

The Plan Supplement will be filed no later than 14 days prior to the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court.  The Plan Supplement will include the following:  (1) to the extent known, the identity of the members of the New FGIC Corporation Board and the nature and compensation for any member of the New FGIC Corporation Board who is an "insider" under section 101(31) of the Bankruptcy Code; (2) a list of Executory Contracts and Unexpired Leases to be rejected; (3) a schedule of Causes of Action to be retained by the Reorganized Debtor; and (4) the form of the Shareholders Agreement, if any.  The Company may subsequently amend, supplement, modify or add additional items to the Plan Supplement, which also will be filed.

## B.        VOTING DEADLINE

The period during which Ballots with respect to the Plan will be accepted by the Company will terminate at 4:00 p.m. prevailing Eastern Time on **October 18, 2010**, unless the Company, in its sole discretion, extends the date until which ballots will be accepted.  Except to the extent the Company so determines or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Company in connection with the Company's request for Confirmation of the Plan (or any permitted modification thereof).

The Company reserves the absolute right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day following the previously announced Voting Deadline.  The Company will give notice of any such extension in a manner deemed reasonable to the Company in its discretion.  There can be no assurance that the Company will exercise its right to extend the Voting Deadline.

## C.        VOTING INSTRUCTIONS

Only the Holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them by facsimile, email, first class mail, overnight courier, hand delivery or in the envelope provided.  The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan, and such abstentions will not be counted as votes for or against the Plan.  Voting Instructions are attached to each Ballot.

With respect to the Senior Notes, voting nominees (the "Voting Nominees") should deliver the ballot and other documents  relating to the Plan, including this Disclosure Statement, to each beneficial holder  of the Senior Notes for which they serve as Voting Nominee (the "Beneficial Holders").

With respect to obligations under the Revolving Credit Agreement, the Administrative Agent should deliver the ballot and other documents  relating to the Plan, including this Disclosure Statement, to each loan participant under the Revolving Credit Agreement (the "Loan Participants").

Voting Nominees and the Administrative Agent will forward the Solicitation Package to each Beneficial Holder or Loan Participant, as applicable, and include a return envelope provided by, and addressed to, the Voting Nominee or Administrative Agent, as applicable.  Beneficial Holders and Loan Participants should return their completed Ballots to the Voting Nominees or Administrative Agent, as applicable, and upon receipt of the Ballots, the Voting Nominees and Administrative Agent will summarize the individual votes of Beneficial Holders and Loan Participants on the appropriate master ballots (the "Master Ballots") and then return the Master Ballots to Garden City so that Garden City **actually  receives** the Master Ballots before **4:00 p.m., prevailing Eastern time, on October 18, 2010**.

**Any Ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**Each Holder of a Class 6 Claim must vote all of its Claims within Class 6 either to accept or reject the Plan and may not split its votes.  By signing and returning a ballot, each Holder of a Claim entitled to vote on the Plan will certify to the Bankruptcy Court and the Company that no other Ballots with respect to such Claim**

**have been cast or, if any other Ballots have been cast with respect to such Claim, such other Ballots have been revoked.**

**All Ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot.**

By signing and returning a Ballot, each Holder of a Class 6 Claim will be certifying to the Bankruptcy Court and the Company that, among other things:

- the Holder has received a copy of the Solicitation Package and acknowledges that the Debtor's solicitation of votes is subject to the terms and conditions set forth therein;

- the Holder has cast the same vote with respect to all Claims in Class 6 held by such Holder; and

- no other Ballots with respect to the same Claim have been cast, or, if any other Ballots have been cast with respect to such Claim, then any such Ballots are thereby revoked.

## D. VOTING TABULATION

The Ballot does not constitute, and shall not be deemed to be, a proof of Claim or an assertion or admission of a Claim or Equity Interest. Only Holders of Claims in the voting class shall be entitled to vote with regard to such Claims.

Unless the Company decides otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when Garden City actually receives the original executed Ballot or Master Ballot, as applicable. Ballots sent by fax or email will not be counted. No Ballot should be sent to the Company, the Company's agents (other than Garden City), or the Company's financial or legal advisors. The Company expressly reserves the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications). The Bankruptcy Code may require the Company to disseminate additional solicitation materials if the Company makes material changes to the terms of the Plan or if the Company waives a material condition to Plan Confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last valid Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Holders must vote all of their Claims in the Voting Class either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent Holders maintain multiple Claims within the Voting Class, the Company may, in its discretion, and to the extent possible, aggregate the Claims of any particular Holder within the Voting Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

Garden City will file a Voting Report with the Bankruptcy Court on or before **October 21, 2010**. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information or damaged. The Voting Report also shall indicate the Company's intentions with regard to such Irregular Ballots. Neither the Company nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

# ARTICLE VI
## VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

### A.    VALUATION OF THE REORGANIZED DEBTOR

The value of the Reorganized Debtor will be equivalent to the cash of the Reorganized Debtor and the value of 100% of the common stock of FGIC as of the Effective Date.  The Company believes this value will be substantially below the threshold valuation that would entitle Holders of Equity Interests to a recovery under the Plan.  Given that the Debtor's three largest common shareholders, representing over 90% of its common equity, support the Plan, the Company has not conducted a formal valuation analysis.

### B.    FINANCIAL PROJECTIONS

As a condition to plan confirmation, the Bankruptcy Code requires the Bankruptcy Court to find confirmation is not likely to be followed by either a liquidation or the need to further reorganize the debtor.  Generally, debtors in chapter 11 prepare financial projections to establish the feasibility of a chapter 11 plan of reorganization.  Given that the Company will deleverage its balance sheet completely pursuant to the Plan, the Plan provides the Reorganized Debtor will retain cash sufficient to fund its activities following the Effective Date and the fact that the Debtor is a holding company, the Company has not prepared financial projections.

# ARTICLE VII
## CONFIRMATION PROCEDURES

### A.    THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.  On or about the Petition Date, the Company will promptly seek an order of the Bankruptcy Court scheduling a hearing to consider the approval of the prepetition procedures for the Solicitation, including this Disclosure Statement and confirmation of the Plan.  Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court, and will also be available on the Company's website at http://www.fgic.com.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied.  If so, the Bankruptcy Court shall enter the Confirmation Order.  The Company believes the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Company, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment:  (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- Either each Holder of an Impaired Claim or Equity Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a

value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims and Equity Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, Priority Tax Claims, and the Revolving Credit Facility Claims (to the extent any such Claims have not been indefeasibly repaid in full in Cash from the proceeds of the DIP Facilities prior to the Effective Date) will be paid in full on the Effective Date.

- At least one Class of Impaired Claims and Equity Interests will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Equity Interest of that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Company believes: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) it has complied or will have complied with all of the requirements of chapter 11; and (3) the Plan has been proposed in good faith.

## 1. Best Interests of Creditors Test/Liquidation Analysis

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Company were liquidated under chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what Holders of Allowed Claims and Interests in each Impaired Class would receive if the Chapter 11 Case were converted to liquidation cases under chapter 7 of the Bankruptcy Code, and the Bankruptcy Court appointed a chapter 7 trustee to liquidate all of the assets into Cash. The Company's "liquidation value" would consist primarily of unencumbered and unrestricted Cash held by the Company at the time of the conversion to chapter 7 cases, and the proceeds resulting from the chapter 7 trustee's sale of the Company's remaining unencumbered assets. The gross Cash available for distribution would be reduced by the costs and expenses incurred in effectuating the chapter 7 liquidation and any additional Administrative Claims incurred during the chapter 7 cases.

The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical chapter 7 liquidation of the Company (after subtracting the chapter 7-specific Claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims and Interests under the Plan. It is possible that in a chapter 7 liquidation, Claims and Interests may not be classified in the same manner as set forth in the Plan. In a hypothetical chapter 7 liquidation of the Company's assets, the rule of absolute priority of distribution would apply, i.e., no junior creditor would receive any distribution until payment in full of all senior creditors, and no Holder of an Interest would receive any distribution until all creditors have been paid in full. Further, in chapter 7 cases, unsecured creditors and interest Holders of a debtor are paid from available assets

generally in the following order: (a) Holders of secured Claims (to the extent of the value of their collateral); (b) Holder of priority Claims; (c) Holders of unsecured Claims; (d) Holders of Claims expressly subordinated by its terms or bankruptcy court order; and (e) Holders of equity interests.

Because the Bankruptcy Code requires impaired creditors either to accept the Plan or receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation, after accounting for recoveries by Secured, Administrative and Priority creditors, the impaired creditors and interest Holders will receive more or less than under the Plan. If the probable distributions to impaired creditors and interest Holders under a hypothetical chapter 7 liquidation are greater than the distributions to be received by such Holders under the Plan, then the Plan is not in the best interests of impaired creditors and interest Holders.

The Company has compared the distributions to impaired creditors and interest Holders under the Plan to the estimated recoveries of these creditors and interest Holders in a hypothetical chapter 7 liquidation and has determined the distributions these creditors and interest Holders will receive under the Plan will be greater than or equal to the distributions these creditors and interest Holders would receive in a hypothetical chapter 7 liquidation. The Company believes its assets, including its tax attributes, have significant value that would not be realized in a liquidation, either in whole or in substantial part, and the value of the Company's assets will be considerably greater if the Company operates as a going concern instead of liquidating. In addition, it is unlikely Equity Holders will waive their Monitoring Fee Claims in a chapter 7 scenario, which would dilute recoveries to shareholders. Accordingly, the Company believes the Plan is in the best interests of its estate, creditors and interest Holders.

### 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization, unless such liquidation or further reorganization is contemplated by the Plan. Pursuant to the Plan, the Company will deleverage its balance sheet completely, and the Reorganized Debtor will retain cash sufficient to fund its activities following the Effective Date. For these reasons, the Company believes the Plan satisfies the financial feasibility requirements of section 1129(a)(11).

### 3. Acceptance by Impaired Classes

The Bankruptcy Code requires as a condition to confirmation, subject to the exceptions described below, that each Class of Claims and Equity Interests that is impaired under the Plan accept the Plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such Class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the Claim or equity interest entitles the Holder of that Claim or equity interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the Holder of the Claim or equity interest receives cash equal to the allowed amount of that Claim or, with respect to any interest, any fixed liquidation preference to which the equity interest Holder is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired Claims as acceptance by Holders of at least two thirds in dollar amount and more than one half in number of Claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of Claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted the plan if Holders of such equity interests holding at least two thirds in amount actually voting have voted to accept the plan.

The Claims in Classes 1, 2, 3, 4 and 5 are not Impaired under the Plan, and as a result, the Holders of such Claims are deemed to have accepted the Plan and are not entitled to vote on the Plan.

The Claims and Interests in Classes 7 and 8 are Impaired under the Plan, and Holders of such Interests will not receive a distribution under the Plan. Therefore, Holders of Claims and Interests in Classes 7 and 8 are deemed to reject the Plan and are not entitled to vote on the Plan.

Claims in Class 6 are Impaired under the Plan, and Holders of Claims in Class 6 will receive a distribution under the Plan. Therefore, Holders of Claims in Class 6 are entitled to vote on the plan. Class 6, the Voting Class, will have accepted the Plan if the Plan is accepted by at least two thirds in amount and a majority in number of the Claims in Class 6 (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if all Impaired Classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one Impaired Class.

Section 1129(b) of the Bankruptcy Code states that, notwithstanding an Impaired Class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims and Equity Interests that is Impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to the treatment of other classes of equal rank. Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class discriminated against. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the Debtor or transferred to another entity under the plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the plan, at least equivalent to the value of the secured Claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

The Plan provides that if any Impaired Class rejects the Plan, the Debtor reserves the right to seek to confirm the Plan utilizing the "cram down" provisions of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Company will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or schedule to the

Plan, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

The Company submits that if the Company "crams down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

## C.    RISK FACTORS

Prior to deciding whether and how to vote on the Plan, each Holder of Claims in Class 6 should consider carefully all of the information in this Disclosure Statement, and should particularly consider the Risk Factors described in Article IX below, entitled "Plan-Related Risk Factors And Alternatives To Confirming And Consummating The Plan."

## D.    IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION

Any interested party desiring further information about the Plan should contact:  Counsel for the Debtor: Brian S. Lennon, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, via e-mail at blennon@kirkland.com, or by phone at (212) 446-4952.

## E.    DISCLAIMER

In formulating the Plan, the Company has relied on financial data derived from its books and records.  The Company, therefore, represents that everything stated in this Disclosure Statement is true to the best of its knowledge.  The Company nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and, therefore, does not recommend whether you should accept or reject the Plan.

The discussion in this Disclosure Statement regarding the Company may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT IS, OR SHALL BE DEEMED TO BE, AN ADMISSION OR STATEMENT AGAINST INTEREST BY THE COMPANY FOR PURPOSES OF ANY PENDING OR FUTURE LITIGATION MATTER OR PROCEEDING.**

**ALTHOUGH THE ATTORNEYS, ACCOUNTANTS, ADVISORS, AND OTHER PROFESSIONALS EMPLOYED BY THE COMPANY HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE COMPANY, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.  THE ATTORNEYS, ACCOUNTANTS, ADVISORS, AND OTHER PROFESSIONALS EMPLOYED BY THE COMPANY SHALL HAVE NO LIABILITY FOR THE INFORMATION IN THIS DISCLOSURE STATEMENT.**

**THE COMPANY AND THEIR PROFESSIONALS ALSO HAVE MADE A DILIGENT EFFORT TO IDENTIFY IN THIS DISCLOSURE STATEMENT PENDING LITIGATION CLAIMS AND PROJECTED OBJECTIONS TO CLAIMS.  HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT**

**A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO CLAIM IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT.**

**ARTICLE VIII**
**IMPLEMENTATION OF THE PLAN AND POSTPETITION**
**GOVERNANCE OF REORGANIZED DEBTOR**

**A.     BOARD OF DIRECTORS AND MANAGEMENT**

> **1.     Reorganized Debtor's Board of Directors**

On the Effective Date, the New FGIC Corporation Board shall take office. The Company will disclose the identities of the individuals comprising the New FGIC Corporation Board in an exhibit to the Plan Supplement. Each such director shall serve from and after the Effective Date pursuant to applicable law and the terms of the Reorganized Debtor's By-Laws and Certificate of Incorporaiton. The existing board of directors of FGIC Corporation will be deemed to have resigned on and as of the Effective Date.

> **2.     The Reorganized Debtor's Officers**

The Company will disclose the identities of the individuals comprising the officers of the Reorganized Debtor in an exhibit to the Plan Supplement.

**B.     INDEMNIFICATION OF DIRECTORS AND OFFICERS**

The Reorganized Debtor's articles of incorporation authorize the Reorganized Debtor to indemnify and exculpate its respective directors, officers and agents to the fullest extent permitted under applicable state law.

**ARTICLE IX**
**PLAN-RELATED RISK FACTORS AND ALTERNATIVES**
**TO CONFIRMING AND CONSUMMATING THE PLAN**

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL IMPAIRED HOLDERS OF CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**A.     GENERAL**

The following provides a summary of various important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of Claims entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement, including the various risks and other factors described in the Company's various SEC filings, all of which are incorporated herein.

**B.     CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

> **1.     Parties in Interest May Object to Company's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a class or an interest in a particular class only if such Claim or interest is substantially similar to the other Claims and interests in such class. The Company believes the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Company created seven Classes of Claims and Interests, each encompassing Claims or Interests that are substantially similar to the other Claims or Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Company intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. If the Plan does not receive the required support from the Voting Classes, the Company may elect to amend the Plan or pursue a liquidation under chapter 7 of the Bankruptcy Code.

### 3. The Company May Not Be Able to Obtain Confirmation or Consummation of the Plan

The Company cannot ensure that they will receive the requisite acceptances to confirm the Plan. Even if the Company receives the requisite acceptances, the Company cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or Interest Holder might challenge the adequacy of this Disclosure Statement or the Solicitation Procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. As discussed in further detail above in Article VII, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things: a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; confirmation is not likely to be followed by a liquidation or a need for further financial reorganization; and the value of distributions to non-accepting Holders of Claims and interests within a particular class under the plan will not be less than the value of distributions such Holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. While the Company believes the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that these requirements will be met.

The Confirmation of the Plan is also subject to certain conditions as described in Article X of the Plan. If the Plan is not confirmed, it is unclear what distributions Holders of Claims and Interests ultimately would receive with respect to their Claims and Interests.

The Company, subject to the terms and conditions of the Plan, reserve the right to modify the terms of the Plan as necessary for Confirmation. Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4. The Company May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Company reserves the right to object to the amount or classification of any Claim or Interest deemed Allowed under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim or Interest may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### 5. Risk of Non-Occurrence of the Effective Date

Although the Company believes the Effective Date will occur very quickly after the Confirmation Date, there can be no assurance as to such timing.

### 6. Contingencies Not to Affect Votes of Impaired Classes to Accept the Plan

The distributions available to Holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims. The occurrence of any and all such contingencies which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

## C.    FINANCIAL INFORMATION; DISCLAIMER

Although the Company has used its reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement. While the Company believes such financial information fairly reflects the financial condition of the Company, the Company is unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

## D.    FACTORS AFFECTING THE COMPANY

The Company is exposed to various factors and risks which include but are not limited to the following.

### 1.    Risks Related to the Surplus Restoration Plan

In the absence of a successful effectuation of the Exchange Offer that achieves remediation of RMBS and other exposures of the magnitude contemplated by the Surplus Restoration Plan and the successful completion of the other remediation transactions and measures as described in the Surplus Restoration Plan, FGIC will continue to report a deficit in policyholders' surplus and (a) the Superintendent could seek court appointment as rehabilitator or liquidator of FGIC or (b) in the exercise of its fiduciary duties, the FGIC Board of Directors may request the Superintendent to seek, and in such event it is likely that the Superintendent would seek, such court appointment. If the Superintendent were to rehabilitate or liquidate FGIC, it would have a material adverse impact on FGIC's business, results of operations and financial condition as well as the value of the New Common Stock issued pursuant to the Plan.

The principal factors that may affect FGIC's ability to continue as a going concern are: (a) the uncertainties associated with implementing and successfully achieving the goals of its Surplus Restoration Plan, by the date required by the NYID or otherwise and successfully consummating the Exchange Offer and the other transactions described in the Surplus Restoration Plan, as well as the effect of the consummation of such Exchange Offer and such other transactions on FGIC's financial position, and (b) the risk of rehabilitation or liquidation at any time by the Superintendent given FGIC's policyholders' surplus deficit. The Superintendent could seek court appointment as rehabilitator or liquidator of FGIC at any time because FGIC is out of compliance with the minimum policyholders' surplus requirement under the NY Insurance Law. Moreover, there can be no assurance that FGIC will successfully effectuate the Surplus Restoration Plan. Consummation of the Exchange Offer is subject to various conditions, including satisfactory mitigation of the risk of termination of CDS transactions guaranteed by FGIC and its subsidiaries as a result of events that have occurred prior to such consummation and the approval or non-objection by the NYID, among other conditions. There can be no assurance that the NYID will approve the completion of the Exchange Offer or the consummation of the transactions contemplated by certain agreements with the counterparties to certain FGIC-insured CDS transactions and related transactions described in the Surplus Restoration Plan intended to mitigate the CDS transaction termination risk, or that the other conditions to closing the Exchange Offer and the consummation of such transactions will be satisfied. If the Surplus Restoration Plan is not successfully effectuated, FGIC may be unable to remediate its policyholders' surplus deficit, which likely would result in the NYID's intervention and FGIC's inability to continue as a going concern. FGIC's inability to continue as a going concern would have a material adverse impact on the value of the New Common Stock issued pursuant to the Plan.

### 2.    Risks Related to the New Common Stock

#### a.    Transfer of the New Common Stock will be restricted.

The New Common Stock has not been registered under the Securities Act or any state or foreign securities laws. Until Holders of New Common Stock are able to freely transfer the new common stock pursuant to Rule 144 under the Securities Act, such Holders may not offer or sell the New Common Stock in the United States or to, or for the account or benefit of, a U.S. person, as defined in Regulation S, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. It is the obligation of the Holder of New Common Stock to ensure that its offers and sales of New Common Stock comply with applicable securities laws.

In addition, as described above, the Reorganized Debtor's Certificate of Incorporation will contain restrictions on the transfer of New Common Stock to minimize the likelihood of any potential adverse U.S. federal income tax consequences resulting from an ownership change (as defined in section 382 of the Internal Revenue Code) in the Reorganized Debtor. Pursuant to the Certificate of Incorporation, no person or entity shall be permitted to acquire additional New Common Stock unless such acquisition has been approved by the New FGIC Corporation Board. No person or entity that is a 5% shareholder (as defined in section 382 of the Internal Revenue Code) shall be entitled to dispose of New Common Stock unless such disposal has been approved by the New FGIC Corporation Board. There is currently no trading market for the shares of New Common Stock, and an active liquid trading market for the New Common Stock may not develop.

There is currently no existing trading market for the shares of New Common Stock. The Company does not currently intend to apply for listing of the shares of New Common Stock on any securities exchange or for quotation of such securities on any automated dealer quotation system. An active public trading market may not develop for the shares of New Common Stock and, even if one develops, such public trading market may not be maintained. If an active public trading market for the shares of New Common Stock does not develop or is not maintained, the market price and liquidity of such securities is likely to be adversely affected and Holders may not be able to sell such securities at desired times and prices or at all. If any shares of New Common Stock are traded after their issuance, they may trade at a discount from the price at which such securities were acquired.

The liquidity of the trading market, if any, and future trading prices of the shares of New Common Stock will depend on and may be adversely affected by unfavorable changes in many factors, including, without limitation:

- prevailing interest rates, increases in which may have an adverse effect on the share price of the New Common Stock;

- the Company's business, financial condition, prospects and credit quality;

- the market for similar securities and the overall securities market; and

- general economic and financial market conditions.

Many of these factors are beyond the Company's control. Historically, the market for equity securities has been volatile. Market volatility could materially and adversely affect the shares of New Common Stock, regardless of the Company's business, financial condition, results of operations, prospects or credit quality.

The shares of New Common Stock have not been registered under the Securities Act, which could effect the liquidity and price of the New Common Stock. The shares of New Common Stock may be transferred by Holders of such shares to the extent that there is an available exemption from the registration requirements of the Securities Act and to the extent permitted by the Shareholders Agreement. This could substantially adversely impact both the liquidity and the share price of the New Common Stock.

**3.      Legal Proceedings**

In the normal course of business, the Company is subject to various legal proceedings and Claims. Accordingly, although the Company is not currently party to any such legal proceedings, the Company may in the future become involved in legal disputes arising from the conduct of its business. Such legal disputes could result in large settlements and/or judgments which could materially impair the Company's financial condition. In addition, the defense of such proceedings could result in significant expense and the diversion of management's time and attention from the operation of the business, which could impede the Company's ability to achieve its business objectives. Some or all of the amount the Company may be required to pay to defend or to satisfy a judgment or settlement of any or all of these proceedings may not be covered by insurance.

## E. CERTAIN TAX MATTERS

For a summary of certain U.S. federal income tax consequences of the Plan to certain Holders of Claims and to the Company, see Article XI below, entitled "Certain U.S. Federal Income Tax Consequences."

## F. RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE

The statements contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein. The Company may subsequently update the information in this Disclosure Statement, but it has no duty to update this Disclosure Statement unless ordered to do so by the Court. Further, the performance and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited. Finally, neither the SEC nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits thereto.

## G. LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Company's Chapter 11 Case may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Equity Interests and the Debtor's liquidation analysis is set forth in Article VII above.

**THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF SECTION 21E OF THE SECURITIES EXCHANGE ACT AND ARE MADE PURSUANT THE SAFE HARBOR PROVISIONS THEREOF. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE COMPANY, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY, OR OTHER FINANCING TO FUND OPERATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE CAUTIONED THAT THE FORWARD LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD LOOKING STATEMENTS AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.**

## ARTICLE X
## SECURITIES LAW MATTERS

## A. NEW COMMON STOCK

The Plan provides for the Company to issue shares of the New Common Stock to Holders of Claims in Class 6.

The Company believes the shares of the New Common Stock constitute "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and applicable Blue Sky Laws. The Company further believes the offer and sale of the New Common Stock pursuant to the Plan are, and subsequent transfers of the New Common Stock by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

## B. ISSUANCE AND RESALE OF NEW COMMON STOCK UNDER THE PLAN

### 1. Exemption from Registration

Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering.  By virtue of section 18 of the Securities Act, section 4(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a Claim against, an interest in, or Claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a Claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

In reliance upon these exemptions, the offer and sale of the New Common Stock will not be registered under the Securities Act or any state Blue Sky Law.

To the extent that the issuance of the New Common Stock is covered by section 1145 of the Bankruptcy Code, the New Common Stock may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the New Common Stock generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Therefore, recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

If  the New Common Stock is not covered by section 1145 of the Bankruptcy Code, the shares of the New Common Stock will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act and may not be resold under the Securities Act and applicable state Blue Sky Laws absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act.  Recipients of the New Common Stock are advised to consult with their own legal advisors as to the applicability of section 1145 to the New Common Stock and the availability of any exemption from registration under the Securities Act and state Blue Sky Laws in the event that section 1145 is not applicable to the New Common Stock.

### 2. Resales of New Common Stock; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a Claim against, interest in, or Claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such Claim or interest; or (b) offers to sell securities offered or sold under a plan for the Holders of such securities; or (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock by Persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Company does not presently intend to make publicly available the requisite current information regarding the Company, and as a result, Rule 144 will not be available for resales of New Common Stock by persons deemed to be underwriters. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtor expresses no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock. In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Debtor makes no representations concerning the right of any Person to freely resell New Common Stock. Accordingly, the Company recommends that potential recipients of New Common Stock consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.

## C.     LISTING OF NEW COMMON STOCK

The Company shall not be obligated to list the New Common Stock on a national securities exchange.

## ARTICLE XI
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

## A.     INTRODUCTION

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtor and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims who are unimpaired or otherwise entitled to payment in full in cash under the Plan. This summary is based on the Internal Revenue Code of 1986 (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtor does not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or to certain Holders in light of their individual circumstances, nor does it address tax issues with respect to Holders that are not "United States persons" as such term is defined in the IRC or that are otherwise subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding, or who will hold, Claims or New Common Stock, as part of a hedge, straddle, conversion or

constructive sale transaction). Furthermore, the following summary of certain U.S. federal income tax consequences of the Plan does not purport to address any aspect of state, local, estate, gift, or non-U.S. tax law. Lastly, the following discussion assumes each Holder of a Claim holds its Claim and the New Common Stock as a "capital asset" within the meaning of Section 1221 of the IRC.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

<u>**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**</u>: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTOR**

**1.      Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("<u>COD Income</u>") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration (including New Common Stock) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to Section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) net operating losses ("<u>NOLs</u>"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC, though it has not been determined whether the Debtor would make this election. In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that Holders of certain Claims will receive a share of the New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock. The amount of such COD Income is therefore uncertain.

**2.      Limitation of NOL Carryforwards and Other Tax Attributes**

The Debtor anticipates the Reorganized Debtor will have significant tax attributes (in particular, NOLs) at emergence. The amount of such tax attributes that will be available to the Reorganized Debtor at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: (a) the amount of tax losses incurred by the Debtor in 2010; (b) the fair market value of the New Common Stock; and (c) the amount of COD Income incurred by the Debtor in connection with consummation of the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtor anticipates that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtor for these purposes, and that the Debtor's use of its Pre-Change Losses (which are anticipated to include substantial built-in losses) will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

### a. General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (approximately 4% for the month of June 2010). The Section 382 Limitation may be increased to the extent that the Debtor recognizes certain built-in gains in its assets during the five-year period following the ownership change, or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Common Stock, along with the cancellation of existing FGIC Corporation Equity Interests through the Plan, is expected to cause an ownership change with respect to the Debtor on the Effective Date. As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtor's use of any remaining Pre-Change Losses after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

### b. Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions Claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' Claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

Most of the losses of the FGIC Group were generated by FGIC, which is not under the jurisdiction of a court in a title 11 or similar case. However, because FGIC's common stock is a significant asset of the Debtor's

estate, pursuant to 28 U.S.C. § 1334, the Bankruptcy Court has jurisdiction over FGIC. For this reason, the applicability of the 382(l)(5) Exception and the 382(l)(6) Exception to FGIC's losses is unclear, but the Debtor believes either exception should apply to all of the FGIC Group's NOLs, including those generated by FGIC. The IRS may challenge this position, but the Debtor believes it will be beneficial for it to qualify for, and utilize, the 382(1)(5) Exception. However, as mentioned above, if the Debtor does utilize the 382(l)(5) Exception and another ownership change were to occur within the two-year period after consummation, then the Debtor's Pre-Change Losses would effectively be eliminated. In order to prevent such a subsequent ownership change, the Reorganized Debtor's certificate of incorporation will contain restrictions on transfers of the Reorganized Debtor's stock that are intended to prevent such a change. In general, under those restrictions, in the event that at least 30 percentage points of "owner shift" have occurred or would result from a transfer of stock in the Reorganized Debtor after emergence from bankruptcy, in certain circumstances no person would be permitted to acquire an amount of stock in the Reorganized Debtor that would cause such person to own 4.75% or more of the Reorganized Debtor's stock for purposes of Section 382 without the consent of the New FGIC Corporation Board. Also in such event, if a person already owns 4.75% or more of the Reorganized Debtor's stock, any further acquisitions and any sales would not be permitted without the consent of the New FGIC Corporation Board. These restrictions are intended to apply for a period of two years after emergence, unless extended for a longer period by a vote of the New FGIC Corporation Board.

It is possible that the Debtor will not qualify for the 382(l)(5) Exception. In that case, the Debtor expects that its use of its NOLs thereafter will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtor takes advantage of the 382(l)(5) Exception or the 382(l)(6) Exception, the Reorganized Debtor's use of its Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

### c. Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for certain alternative tax NOLs generated in taxable years beginning or ending in 2008 and 2009, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change. The Debtor believes it will have a net unrealized built-in loss in its assets immediately after the ownership change and therefore could be impacted by these AMT rules.

## C. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF GENERAL UNSECURED CLAIMS

The following discussion assumes that the obligation underlying each allowed General Unsecured Claim is properly treated as debt (rather than equity) of the Debtor. Pursuant to the Plan, each Holder of an allowed General Unsecured Claim shall receive such Holder's *pro rata* share of the New Common Stock (as further described in this Disclosure Statement above).

Whether a Holder of an allowed General Unsecured Claim recognizes gain or loss as a result of the exchange of its Claim for the New Common Stock depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the allowed General Unsecured Claim surrendered is treated as a "security" for the reorganization provisions of the IRC; (b) the Holder has previously included in income any accrued but unpaid interest with respect to the allowed General Unsecured Claim; (c) the Holder has Claimed a bad debt deduction or worthless security deduction with respect to such allowed General Unsecured Claim; and (d) the Holder uses the accrual or cash method of accounting for tax purposes.

1. **Treatment of a Debt Instrument as a "Security"**

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The Debtor intends to take the position that the Senior Notes constitute a security for U.S. federal income tax purposes. While not free from doubt, the Debtor intends to take the position that the unsecured debt under the Credit Agreement does not constitute a security for U.S. federal income tax purposes.

2. **Treatment of a Holder of an Allowed General Unsecured Claim If the Exchange If its Claim is Treated as a Reorganization**

If a debt instrument constituting a surrendered allowed General Unsecured Claim is treated as a "security" for U.S. federal income tax purposes, the exchange of a Holder's allowed General Unsecured Claim for the New Common Stock should be treated as a recapitalization, and therefore a reorganization, under the IRC. A Holder of a surrendered allowed General Unsecured Claim will recognize gain, but not loss, on the exchange. Specifically, the Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of "other property" (*i.e.*, property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) received, and (b) ordinary interest income to the extent that the New Common Stock is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the allowed General Unsecured Claim (see discussion of "Accrued Interest" below). In such case, a Holder's tax basis in its New Common Stock should be equal to the tax basis of the obligation constituting the allowed General Unsecured Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" received), and a Holder's holding period for its New Common Stock should include the holding period for the obligation constituting the surrendered allowed General Unsecured Claim; *provided* that the tax basis of any New Common Stock treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such New Common Stock should not include the holding period of the debt instrument constituting the surrendered allowed General Unsecured Claim.

3. **Treatment of a Holder of an Allowed General Unsecured Claim If the Exchange of its Claim is not Treated as a Reorganization**

If a debt instrument constituting a surrendered allowed General Unsecured Claim is not treated as a "security" for U.S. federal income tax purposes, a Holder of such a Claim should be treated as exchanging its allowed General Unsecured Claim for the New Common Stock in a fully taxable exchange. A Holder of an allowed General Unsecured Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the fair market value of the New Common Stock that is not allocable to accrued but untaxed interest, and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed General Unsecured Claim. Such gain or loss should be capital gain, subject to the "market discount" rules discussed below, and should be long-term capital gain or loss if the debts constituting the surrendered allowed General Unsecured Claim were held for more than one year. To the extent that a portion of the New Common Stock is allocable to accrued but untaxed interest, the Holder may recognize ordinary interest income (see discussion of "Accrued Interest" below). A Holder's tax basis in the New Common Stock should equal its fair market value. A Holder's holding period for New Common Stock received on the Effective Date should begin on the day following the Effective Date.

4. **Accrued Interest**

To the extent that any amount received by a Holder of a surrendered allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtor. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered allowed Claim will be attributable to accrued interest on the debts constituting the surrendered allowed Claim is unclear. Certain U.S. Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

5. **Market Discount**

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

6. **Consequences to Holders of New Common Stock**

   a. **Dividends on New Common Stock**

Any distributions made on the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized FGIC Corporation as determined under U.S. federal income tax principles. To the extent that a Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares. Any such distributions in excess of the Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain. Subject to certain exceptions, dividends received by non-corporate Holders prior to 2011 will be taxed under current law at a maximum rate of 15%, provided that certain holding period requirements and other requirements are met. The rate at which such income will be subject to

taxation in 2011 is highly uncertain, and such rate may in fact be the same as ordinary income tax rates beginning in 2011.

Dividends paid to Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

The benefit of the dividends-received deduction to a corporate shareholder may be effectively reduced or eliminated by operation of the "extraordinary dividend" provisions of Section 1059 of the IRC, which may require the corporate recipient to reduce its adjusted tax basis in its shares by the amount excluded from income as a result of the dividends-received deduction. The excess of the excluded amount over adjusted tax basis may be treated as gain. A dividend may be treated as "extraordinary" if (1) it equals or exceeds 10% of the Holder's adjusted tax basis in the stock (reduced for this purpose by the non-taxed portion of any prior extraordinary dividend), treating all dividends having ex-dividend dates within an 85-day period as one dividend, or (2) it exceeds 20% of the Holder's adjusted tax basis in the stock, treating all dividends having ex dividend dates within a 365-day period as one dividend.

### b. Sale, Redemption or Repurchase of New Common Stock

Unless a non-recognition provision applies, subject to the "market discount" rules discussed above, Holders generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of the New Common Stock.

### c. Medicare Tax

Recently enacted legislation requires certain Holders that are individuals, estates or trusts to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets for taxable years beginning after December 31, 2012. Holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this legislation on their ownership and disposition of the New Common Stock.

## D. WITHHOLDING AND REPORTING

The Debtor will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtor will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim. Backup withholding of taxes, currently at a rate of 28%, will apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's Claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE**

**RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

[*Remainder of Page Intentionally Left Blank*]

# ARTICLE XII
## CONCLUSION AND RECOMMENDATION

The Company believes the Plan is in the best interests of all creditors and urges the Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by Garden City no later than **4:00 p.m. (prevailing Eastern Time) on October 18, 2010**.

New York, York
Dated: August 3, 2010

FGIC Corporation

By: _____
Name:     John S. Dubel
Title:      Chief Executive Officer of FGIC Corporation

Prepared By:

| | |
|---|---|
| KIRKLAND & ELLIS LLP | KIRKLAND & ELLIS LLP |
| Paul M. Basta | Patrick J. Nash Jr. (*pro hac vice* pending) |
| Brian S. Lennon | 300 North LaSalle |
| 601 Lexington Avenue | Chicago, Illinois 60654 |
| New York, New York 10022 | |

Proposed Counsel for the Debtor and Debtor in Possession

**Exhibit A**

**Chapter 11 Plan of Reorganization of FGIC Corporation**

Paul M. Basta
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

   - and -

Patrick J. Nash, Jr. (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtor and Debtor in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| FGIC CORPORATION,[1] | Case No. 10-14215 (___) |
| Debtor. | |

---

### CHAPTER 11 PLAN OF REORGANIZATION OF FGIC CORPORATION

---

**THIS DRAFT PLAN OF REORGANIZATION IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

Dated:  August 3, 2010

---

[1]   The last four digits of the Debtor's tax identification number are 6474.  The location of the Debtor's corporate headquarters is 125 Park Avenue, New York, New York 10017.

# TABLE OF CONTENTS

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS..................................................................4
    A.    Rules of Interpretation, Computation of Time and Governing Law........................4
    B.    Defined Terms ...................................................................................................4

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ......................11
    A.    Administrative Claims .....................................................................................11
    B.    Priority Tax Claims..........................................................................................13

ARTICLE III. CLASSIFICATION OF CLAIMS AND INTERESTS IN THE DEBTOR ..........13
    A.    Summary.........................................................................................................13
    B.    Classification and Treatment of Claims and Equity Interests.............................14

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ...........................................18

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN .........................................18
    A.    General Settlement of Claims ...........................................................................18
    B.    Reorganized FGIC Corporation........................................................................18
    C.    Sources of Consideration for Plan Distributions ...............................................18
    D.    Corporate Existence .........................................................................................19
    E.    Vesting of Assets in the Reorganized Debtor ....................................................19
    F.    Cancellation of Securities and Agreements .......................................................19
    G.    Surrender of Existing Securities .......................................................................20
    H.    Corporate Action..............................................................................................20
    I.    Certificate of Incorporation and By-Laws .........................................................20
    J.    Stock Trading Restrictions................................................................................21
    K.    Post-Effective Date Recoveries ........................................................................21
    L.    Directors and Officers of Reorganized FGIC Corporation..................................21
    M.    Effectuating Documents; Further Transactions ..................................................21
    N.    Section 1146 Exemption ..................................................................................22
    O.    Preservation of Causes of Action......................................................................22

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................23
    A.    Timing and Calculation of Distributions ..........................................................23
    B.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ...........23

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ..........................................................................................26
    A.    Resolution of Disputed Claims .........................................................................26
    B.    Disallowance of Claims ...................................................................................28
    C.    Amendments to Claims.....................................................................................28
    D.    No Distributions Pending Allowance .................................................................28
    E.    Distributions After Allowance ..........................................................................28

K&E 16329129

ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES .................................................................................................................29
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..........29
    B.    Claims on Account of the Rejection of Executory Contracts or Unexpired
        Leases ...........................................................................................................29
    C.    Procedures for Counterparties to Executory Contracts and Unexpired
        Leases Assumed Pursuant to the Plan ...........................................................30
    D.    Survival of Corporate Indemnification Obligations ............................................31

ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .............................31
    A.    Conditions ..................................................................................................31
    B.    Waiver of Conditions ..................................................................................32
    C.    Effect of Non-Occurrence of Conditions to the Effective Date ...........................32

ARTICLE X. SETTLEMENT, RELEASE, INJUNCTION AND RELATED
PROVISIONS .........................................................................................................32
    A.    Compromise and Settlement ........................................................................32
    B.    Subordinated Claims ...................................................................................33
    C.    Discharge of Claims and Termination of Equity Interests...................................33
    D.    Release of Liens .........................................................................................33
    E.    Debtor Release ...........................................................................................34
    F.    Releasing Party Release ...............................................................................35
    G.    Exculpation ...............................................................................................36
    H.    Injunction .................................................................................................36

ARTICLE XI. BINDING NATURE OF PLAN ...................................................................36

ARTICLE XII. RETENTION OF JURISDICTION ..............................................................37

ARTICLE XIII. MISCELLANEOUS PROVISIONS ............................................................38
    A.    Modification of Plan ...................................................................................38
    B.    Revocation of Plan .....................................................................................38
    C.    Successors and Assigns ...............................................................................39
    D.    Reservation of Rights ..................................................................................39
    E.    Section 1145 Exemption ..............................................................................39
    F.    Payment of Statutory Fees ...........................................................................39
    G.    Section 1125(e) Good Faith Compliance .......................................................39
    H.    Further Assurances .....................................................................................39
    I.    Severability ...............................................................................................40
    J.    Service of Documents ..................................................................................40
    K.    Filing of Additional Documents ...................................................................41
    L.    No Stay of Confirmation Order .....................................................................41

K&E 16329129

FGIC Corporation, as the debtor and debtor in possession in the above-captioned chapter 11 case, hereby respectfully proposes the following plan of reorganization under chapter 11 of the Bankruptcy Code.

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

A.    *Rules of Interpretation, Computation of Time and Governing Law*

1.    For purposes of this document:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part, or to affect the interpretation, of the Plan; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

3.    Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

B.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below:

1.    "*Administrative Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Credit Agreement.

4

2.     *"Administrative Claim"* means a Claim for costs and expenses of administration of the Debtor's estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date to preserve the Debtor's estate; and (b) Allowed Claims of Professionals in the Chapter 11 Case.  Any fees or charges assessed against the Debtor's estate pursuant to section 1930 of chapter 123 of title 28 of the United States Code shall be excluded from the definition of Administrative Claim and shall be paid in accord with Article II.A of the Plan.

3.     *"Affiliate"* shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

4.     *"Allowed"* means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is (i) scheduled by the Debtor in a liquidated amount and not as disputed or contingent or (ii) evidenced by a valid Proof of Claim and as to which the Debtor or a party in interest has not filed an objection by the Claims Objection Bar Date; or (b) a Claim that is Allowed pursuant to the Plan or any stipulation approved by, or order of, the Bankruptcy Court.

5.     *"Bankruptcy Code"* means title 11 of the United States Code, as may be amended from time to time.

6.     *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Chapter 11 Case and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code and/or the General Order of the United States District Court for the Southern District of New York pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

7.     *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case and the general, local and chambers rules of the Bankruptcy Court, as may be amended, modified or supplemented from time to time.

8.     *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

9.     *"By-Laws"* means the by-laws of the Reorganized Debtor, which will be included in the Plan Supplement.

10.     *"Cash"* means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

11.     *"Cash Distribution Amount"* means the Cash on hand net of (a) the Chapter 11 Funding Amount and (b) the Reorganized Debtor Funding Amount.

12.     *"Causes of Action"* means all actions, Causes of Action, Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or

otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the Chapter 11 Case, including through the Effective Date.

13. "*Certificate of Incorporation*" means the certificate of incorporation of the Reorganized Debtor, which is included in the Plan Supplement.

14. "*Chapter 11 Case*" means the chapter 11 case commenced by the Debtor and styled *In re FGIC Corporation*, Case No 10-14215, which is pending before the Bankruptcy Court.

15. "*Chapter 11 Funding Amount*" means the Cash needed to fund payment of Convenience Claims and Administrative Claims, including, without limitation, Professional Compensation, both during the Chapter 11 Case and after the Effective Date.

16. "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

17. "*Claims Objection Bar Date*" means the deadline for objecting to Claims, which shall be on the date that is sixty (60) days after the Effective Date, unless extended by an order of the Bankruptcy Court, upon notice and a hearing.

18. "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

19. "*Class*" means a category of Holders of Claims or Equity Interests pursuant to section 1122(a) of the Bankruptcy Code.

20. "*Common Stock*" means the common stock of FGIC Corporation.

21. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case, subject to all conditions specified having been satisfied or waived.

22. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

23. "*Confirmation Hearing*" means the hearing before the Bankruptcy Court on the motion for entry of the Confirmation Order.

24. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

25. "*Consummation*" means the occurrence of the Effective Date.

26. "*Convenience Claim*" means: any Claim against the Debtor that, but for being defined as a Convenience Claim, would be a General Unsecured Claim, and either (a) is Allowed in an amount of $15,000 or less or (b) is Allowed in an amount greater than $15,000, but is subject to an irrevocable election by the Holder thereof to reduce the Allowed amount of the

Claim to $15,000 (or less) for the purpose of rendering the Claim a Convenience Claim.

27.     "*Cost Sharing Agreement*" means that certain Space and Cost Sharing Agreement by and between FGIC Corporation and FGIC, dated as of January 1, 2004.

28.     "*Credit Agreement*" means that certain Revolving Credit Agreement, dated as of December 12, 2005, as may have been amended, supplemented or otherwise modified from time to time, by and among FGIC Corporation, FGIC, the lenders party thereto and JPMorgan Chase Bank, N.A. as Administrative Agent.

29.     "*Debtor*" means FGIC Corporation.

30.     "*Disclosure Statement*" means the disclosure statement relating to the Plan, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto.

31.     "*Disputed Claim*" means any Claim that is not yet Allowed.

32.     "*Distribution Agent*" means the entity or entities selected by the Debtor or the Reorganized Debtor, as applicable, to make or facilitate distributions pursuant to the Plan.

33.     "*Distribution Notification Date*" means the date that is five days after the Confirmation Date.

34.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the Effective Date have been satisfied or waived.

35.     "*Equity Interest*" means any share of Common Stock, Preferred Stock or other instrument evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in the Debtor that existed immediately prior to the Effective Date.

36.     "*Excluded Indemnification Claims*" are indemnification and expense reimbursement claims of individuals otherwise entitled to indemnification or expense reimbursement from the Debtor, where the claim for indemnification or expense reimbursement relates to actions or omissions of such individuals that constituted criminal conduct, gross negligence or willful misconduct of such individuals.

37.     "*Exculpated Parties*" means, collectively, the Reorganized Debtor and the Released Parties.

38.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

39.     "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in the Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed,

stayed, modified or amended, and as to which the time to appeal, seek certiorari or move for a new trial, reargument or rehearing has expired, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or as to which the request for new trial, reargument or rehearing has been denied, resulted in no modification of such order or otherwise been dismissed with prejudice.

40.    "*FGIC*" means Financial Guaranty Insurance Company, the wholly-owned subsidiary of the Debtor. FGIC is not a debtor in this chapter 11 case, but the common stock of FGIC is an asset of the Debtor's estate. Accordingly, under 28 U.S.C. § 1334, the Bankruptcy Court has jurisdiction over FGIC.

41.    "*General Unsecured Claim*" means a Claim against the Debtor, other than an Administrative Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Other Secured Claim, Intercompany Claim or Section 510(b) Claim.

42.    "*Holder*" means an Entity holding a Claim or an Equity Interest.

43.    "*Impaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

44.    "*Indenture Trustee*" means Wilmington Trust FSB, in its capacity as successor indenture trustee under the Senior Notes Indenture.

45.    "*Intercompany Claim*" means any Claim held by the Debtor against an Affiliate or any claim held by an Affiliate against the Debtor.

46.    "*Interim Compensation Procedures Order*" means any order establishing procedures for interim compensation and reimbursement of expenses for Professionals.

47.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

48.    "*MBIA*" means MBIA, Inc., in its capacity as a holder of the Senior Notes.

49.    "*New Common Stock*" means common stock of Reorganized FGIC Corporation.

50.    "*New FGIC Corporation Board*" means the initial board of directors of Reorganized FGIC Corporation.

51.    "*Other Secured Claim*" means any secured claim other than a Secured Tax Claim.

52.    "*Outstanding New Common Stock*" means the shares of New Common Stock to be issued as of the Effective Date on account of the General Unsecured Claims.

53.    "*Petition Date*" means the date on which the Debtor files the Chapter 11 Case.

54.     "*Plan*" means the Debtor's chapter 11 plan of reorganization as may be altered, amended, modified or supplemented from time to time, including the Plan Supplement and all exhibits, supplements, appendices and schedules thereto.

55.     "*Plan Supplement*" means, as it may be amended prior to the Effective Date, the supplement or supplements to the Plan that contain certain documents relevant to the implementation of the Plan.

56.     "*Preferred Stock*" means the preferred stock of FGIC Corporation.

57.     "*Prepetition Lenders*" means the entities that hold the unsecured debt issued under the Credit Agreement.

58.     "*Prepetition Lenders' Claim*" means the Claim of the Administrative Agent derived from and based upon the Credit Agreement and related documents and held on behalf of the Prepetition Lenders.

59.     "*Priority Non-Tax Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

60.     "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

61.     "*Professional*" means an entity: (a) employed in this Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

62.     "*Professional Claims*" means: a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

63.     "*Professional Compensation*" means: all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Confirmation Date to the extent any such fees and expenses have not been paid and regardless of whether a fee application has been filed for such fees and expenses. To the extent there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts shall no longer be considered Professional Compensation.

64.     "*Professional Fee Escrow Account*": An interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtor on the Confirmation Date.

65.     "*Professional Fee Reserve Amount*": Professional Compensation through the Confirmation Date as estimated in accordance with Article II.A.2(c) herein.

9

66. "*Proof of Claim*" means a proof of claim filed against the Debtor in the Chapter 11 Case.

67. "*Pro Rata*" means, with respect to any Class, the ratio of a Claim in such Class, including principal and accrued interest, as of the Petition Date, to the aggregate amount of all Claims in such Class, including principal and accrued interest, as of the Petition Date.

68. "*Record Date*" means September 16, 2010, which is the date set forth in the order approving the disclosure statement related to this Plan for determining the Holders of Claims entitled to vote to accept or reject the Plan.

69. "*Released Parties*" means, collectively: (a) the Debtor and the Debtor's current and former officers and directors; (b) the Administrative Agent; (c) the Indenture Trustee; (d) the Prepetition Lenders; (e) the Senior Noteholders; (f) any and all Holders of an Equity Interest in the Debtor; (g) Dubel & Associates, LLC; (h) with respect to each of the persons named in (a)–(g) above, such entity's directors, officers, shareholders, partners, members, employees, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, accountants and other professionals or representatives when acting in any such capacities; and (i) with respect to each of the entities named in (a)–(h) above, each in their respective capacities set forth in such clause.

70. "*Releasing Parties*" means, collectively: (a) the Administrative Agent; (b) the Indenture Trustee; (c) the Prepetition Lenders; (d) the Senior Noteholders; (e) any and all Holders of an Equity Interest in the Debtor; (f) Dubel & Associates, LLC; (g) with respect to each of the persons named in (a)–(f) above, such entity's directors, officers, shareholders, partners, members, employees, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, accountants and other professionals or representatives when acting in any such capacities; and (h) with respect to each of the entities named in (a)–(g) above, each in their respective capacities set forth in such clause. None of the entities listed in (a)–(f) above shall be deemed to be a Releasing Party unless such entity affirmatively votes in favor of the Plan or abstains from voting on the Plan and does not elect to reject the Releasing Party release provisions contained herein.

71. "*Reorganized Debtor*" means Reorganized FGIC Corporation.

72. "*Reorganized Debtor Funding Amount*" means $400,000.

73. "*Reorganized FGIC Corporation*" means FGIC Corporation, including any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

74. "*Schedules*" means the schedules of assets and liabilities and statement of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

75. "*Section 510(b) Claim*" means any Claim against the Debtor arising from rescission of a purchase or sale of a security of the Debtor or an Affiliate of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or

contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

76. *"Secured Tax Claim"* means any secured claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

77. *"Senior Noteholders"* means the Holders of the Senior Notes.

78. *"Senior Notes"* means the 6% Senior Notes Due 2034 issued pursuant to the Senior Notes Indenture.

79. *"Senior Notes Claim"* means the Claim held by the Indenture Trustee derived from and based upon the Senior Notes Indenture and held on behalf of the Senior Noteholders.

80. *"Senior Notes Indenture"* means that certain Indenture, dated January 12, 2004, between FGIC Corporation, as issuer, and The Bank of New York Mellon, as indenture trustee.

81. *"Tax Allocation Agreement"* means that certain Amended and Restated Income Tax Allocation Agreement by and between FGIC and FGIC Corporation dated as of December 18, 2003.

82. *"Unexpired Lease"* means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

83. *"Unimpaired"* means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

84. *"U.S. Trustee"* means the United States Trustee for the Southern District of New York.

85. *"Voting Class"* means Class 6.

86. *"Voting Deadline"* means October 18, 2010, which is the deadline for, among other things, voting to accept or reject the Plan.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

*A. Administrative Claims*

1. <u>Payment of Administrative Claims</u>

Unless otherwise agreed to by the Holder of an Administrative Claim and the Debtor or the Reorganized Debtor, as applicable, each Holder of an Allowed Administrative Claim (other than any Professional Claim) will receive, in full and final satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either: (a) on the

Effective Date; (b) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim.

2.   <u>Professional Compensation</u>

(a)   Final Fee Applications

All final requests for payment of Professional Claims, including any amounts held back pursuant to the Interim Compensation Procedures Order, must be filed with the Bankruptcy Court and served on the Reorganized Debtor no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Case, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court and paid by the Reorganized Debtor.

(b)   Professional Fee Escrow Account

In accordance with Article II.A.2(c) hereof, on the Confirmation Date, the Debtor shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the estates of the Debtor or Reorganized Debtor, as applicable. The amount of Professional Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtor from the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Distribution Agent and shall be distributed on a Pro Rata basis to Holders of Allowed Class 6 Claims.

(c)   Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall estimate their Professional Compensation prior to and as of the Confirmation Date and shall deliver such estimate to the Debtor no later than 10 days prior to the Confirmation Date, *provided*, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional. The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

(d)   Post-Effective Date Professional Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtor shall, in the ordinary course of business and without any further

notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtor. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

B.      *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by the Holder of such Claim and the Debtor or Reorganized Debtor, as applicable, *provided*, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtor, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtor and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND INTERESTS IN THE DEBTOR

A.      *Summary*

1.      Except for the claims addressed in Article II above (or as otherwise set forth herein), all Claims against the Debtor are placed in Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims or Priority Tax Claims.

2.      Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against, and Equity Interests in, the Debtor. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

K&E 16329129

### 3. Summary of Classification and Treatment of Claims and Equity Interests

| Class | Claim | Status | Voting |
|-------|-------|--------|--------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (presumed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 4 | Intercompany Claims | Unimpaired | No (presumed to accept) |
| 5 | Convenience Claims | Unimpaired | No (presumed to accept) |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Equity Interests | Impaired | No (deemed to reject) |
| 8 | Section 510(b) Claims | Impaired | No (deemed to reject) |

**B.** *Classification and Treatment of Claims and Equity Interests*

1. Class 1—Priority Non-Tax Claims

   (a) *Classification*: Class 1 consists of Priority Non-Tax Claims.

   (b) *Voting*: Class 1 is Unimpaired and Holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

   (c) *Treatment*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall receive, at the sole option of the Debtor or the Reorganized Debtor: (i) Cash on the Effective Date in an amount equal to such Allowed Priority Non-Tax Claim; or (ii) commencing on the Effective Date and continuing over a period not exceeding five years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Non-Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtor or the Reorganized Debtor to prepay the entire amount of the Allowed Priority Non-Tax Claim.

14

2.      Class 2—Secured Tax Claims

(a)     *Classification*:  Class 2 consists of Secured Tax Claims.

(b)     *Voting*:  Class 2 is Unimpaired and Holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Secured Tax Claim, each Holder of such Allowed Secured Tax Claim shall receive, at the sole option of the Debtor or the Reorganized Debtor:  (i) Cash on the Effective Date in an amount equal to such Allowed Secured Tax Claim; or (ii) commencing on the Effective Date and continuing over a period not exceeding five years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtor or the Reorganized Debtor to prepay the entire amount of the Allowed Secured Tax Claim.

3.      Class 3—Other Secured Claims

(a)     *Classification*:  Class 3 consists of Other Secured Claims.

(b)     *Voting*:  Class 3 is Unimpaired and Holders of Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the sole option of the Debtor or the Reorganized Debtor: (i) Cash on the Effective Date in an amount equal to such Allowed Other Secured Claim; or (ii) commencing on the Effective Date and continuing over a period not exceeding five years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Other Secured Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtor or the Reorganized Debtor to prepay the entire amount of the Allowed Other Secured Claim.

K&E 16329129

4. <u>Class 4—Intercompany Claims</u>

   (a)  *Classification*:  Class 4 consists of Intercompany Claims.

   (b)  *Voting*:  Class 4 is Unimpaired and the Holders of Class 4 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

   (c)  *Treatment*:  All or a portion of the Intercompany Claims may be reinstated, capitalized or otherwise discharged in any manner as of the Effective Date at the Debtor's or the Reorganized Debtor's sole discretion.

5. <u>Class 5—Convenience Claims</u>

   (a)  *Classification*:  Class 5 consists of Convenience Claims.

   (b)  *Voting*:  Class 5 is Unimpaired and the Holders of Class 5 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Convenience Claims are not entitled to vote to accept or reject the Plan.

   (c)  *Treatment*:  Each Holder of a Convenience Claim shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

6. <u>Class 6—General Unsecured Claims</u>

   (a)  *Classification*:  Class 6 consists of General Unsecured Claims.

   (b)  *Allowance of Certain Claims*:

      (i)  On the Effective Date, the Prepetition Lenders' Claim shall be Allowed in the aggregate amount of $46,000,000 plus accrued interest and any reasonable fees and expenses owing as of the Petition Date with respect to the obligations under the Credit Agreement.

      (ii)  On the Effective Date, the Senior Notes Claim will be Allowed in the aggregate amount of $261,895,000 plus accrued interest and any reasonable fees and expenses owing as of the Petition Date with respect to the obligations under the Senior Notes Indenture. For the purpose of clarity, the Allowed Senior Notes Claim shall not include the $63,105,000 of Senior Notes held by the Debtor and shall not include accrued interest on account of such Senior Notes held by the Debtor.

   (c)  *Voting*:  Class 6 is Impaired and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

K&E 16329129

(d) *Treatment*:  On the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (i) the Cash Distribution Amount and (ii) 100% of the Outstanding New Common Stock.

(e) *Convenience Claim Election Rights*:  Each Holder of an Allowed General Unsecured Claim may elect to be treated as a Holder of a Convenience Claim in Class 5 by electing to reduce its Allowed General Unsecured Claim to the amount of $15,000 or less in full and final satisfaction, release and discharge of such Allowed General Unsecured Claim.  For the avoidance of doubt, the Indenture Trustee shall be deemed to be the Holder of any and all Claims arising under the Senior Notes Indenture for the purpose of exercising Convenience Claim election rights with respect to such Claims.  Likewise, the Administrative Agent shall be deemed to be the Holder of any and all Claims arising under the Credit Agreement for the purpose of exercising convenience claim election rights with respect to such Claims.  Any election must be made on the Ballot, and except as may be agreed to by the Debtor or the Reorganized Debtor, no Holder of a General Unsecured Claim can elect treatment as a Convenience Claim after the Voting Deadline.  Upon any such valid and irrevocable election, the General Unsecured Claim of such Holder shall be automatically reduced to $15,000 (or such lower amount that the Holder elects) and shall no longer be entitled to any other distribution as contemplated by this Plan.

7. Class 7—Equity Interests

(a) *Classification*:  Class 7 consists of all Equity Interests in FGIC Corporation.

(b) *Voting*:  Class 7 is Impaired and Holders of Class 7 Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

(c) *Treatment*:  On the Effective Date, all Equity Interests in FGIC Corporation shall be cancelled and Holders of such interests shall not receive any distribution under the Plan on account of such interests.

8. Class 8—Section 510(b) Claims

(a) *Classification*:  Class 8 consists of Section 510(b) Claims.

(b) *Voting*:  Class 8 is Impaired and Holders of Class 8 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

K&E 16329129

      (c)    *Treatment:* Holders of Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims. On the Effective Date, all Section 510(b) Claims shall be discharged.

# ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

The Debtor requests Confirmation under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtor reserves the right to modify Article III of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

# ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of Claims*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. Subject to Article VI, all distributions made to Holders of Allowed Claims in any Class are intended to, and shall, be final.

B.    *Reorganized FGIC Corporation*

On the Effective Date, the New FGIC Corporation Board shall be established. Reorganized FGIC Corporation shall be authorized to adopt any agreements, documents and instruments and to take any other actions contemplated by the Plan as necessary or desirable to consummate the Plan.

C.    *Sources of Consideration for Plan Distributions*

    1.    <u>Cash on Hand</u>

The Reorganized Debtor shall fund Cash distributions under the Plan with the Cash Distribution Amount.

    2.    <u>New Common Stock</u>

The issuance of the New Common Stock is authorized without the need for any further action by the Debtor or Reorganized Debtor. On the Effective Date, Reorganized FGIC

Corporation will issue and distribute 100% of the shares of Outstanding New Common Stock to the Distribution Agent for the benefit of Holders of General Unsecured Claims.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. The distribution and issuance referred to in Article III shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each entity receiving such distribution or issuance.

Upon the Effective Date, in the event the Debtor determines that a shareholders' agreement is advisable, Reorganized FGIC Corporation shall enter into such an agreement with each entity that is to be a counterparty thereto and such agreement shall be deemed to be valid, binding and enforceable in accordance with its terms. Each Holder of New Common Stock shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized FGIC Corporation. Notwithstanding the foregoing, Holders of New Common Stock may be permitted to be signatories to the shareholders' agreement (if any), if they so desire.

D.    *Corporate Existence*

Except as otherwise provided in the Plan, the Debtor shall continue to exist after the Effective Date as a corporate entity, with all the powers of a corporation, pursuant to applicable law in the jurisdiction in which the Debtor is incorporated and pursuant to the certificate of incorporation and by-laws in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law).

E.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, all property of the Debtor's estate, all Causes of Action and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Equity Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.    *Cancellation of Securities and Agreements*

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan, except as otherwise specifically provided for in the Plan: (a) the obligations of the Debtor under the Credit Agreement, the Senior Notes Indenture and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant or other instrument or document that directly or indirectly evidences or creates any indebtedness, obligation of, or

ownership interest in, the Debtor that gives rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents that evidence indebtedness, obligations of, or ownership interests in, the Debtor that are reinstated pursuant to the Plan), shall be cancelled as to the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder; and (b) the obligations of the Debtor pursuant, relating or pertaining to any agreements, indentures, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options or other instruments or documents that evidence or create any indebtedness, obligations of, or ownership interests in, the Debtor (except such agreements, certificates, notes or other instruments that evidence indebtedness, obligations of, or ownership interests in, the Debtor that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided*, that, notwithstanding Confirmation or Consummation of the Plan, any such indenture or agreement that governs the rights of the Holder of a Claim shall, to the extent necessary, continue in effect solely for purposes of allowing the Holders of General Unsecured Claims to receive their distributions hereunder; *provided*, *further*, that the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan and shall not result in any expense or liability to the Reorganized Debtor.

## G. Surrender of Existing Securities

On the Effective Date, the Senior Notes and all securities evidencing an Equity Interest in the Debtor shall be surrendered and shall be deemed extinguished.

## H. Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (a) selection of the directors and officers for Reorganized FGIC Corporation; (b) the distribution of the New Common Stock; and (c) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date).

All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors or officers of the Debtor or the Reorganized Debtor. On or prior to the Effective Date, as applicable, the appropriate officers of the Debtor or the Reorganized Debtor shall be authorized and, as applicable, directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor. The authorizations and approvals contemplated by this Article V.H shall be effective notwithstanding any requirements under non-bankruptcy law.

## I. Certificate of Incorporation and By-Laws

Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtor's Certificate of Incorporation will be amended to prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend and restate its

Certificate of Incorporation and By-Laws as permitted by the laws of its state of incorporation and by its Certificate of Incorporation and By-Laws.

*J.      Stock Trading Restrictions*

The Reorganized Debtor's Certificate of Incorporation shall contain restrictions on the transfer of New Common Stock to minimize the likelihood of any potential adverse U.S. federal income tax consequences resulting from an ownership change (as defined in section 382 of the Internal Revenue Code) in the Reorganized Debtor.  Pursuant to the Certificate of Incorporation, no person or entity shall be permitted to acquire additional New Common Stock unless such acquisition has been approved by the Reorganized FGIC Corp. Board.  No person or entity that is a 5% shareholder (as defined in section 382 of the Internal Revenue Code) shall be entitled to dispose of New Common Stock unless such disposal has been approved by the Reorganized FGIC Corp. Board.

*K.      Post-Effective Date Recoveries*

To the extent the Reorganized Debtor receives any Cash payment in excess of $25,000 after the Effective Date on account of a tax refund, a dividend from a subsidiary or affiliate, on account of any other pre-petition liability owing to the Debtor or otherwise, the Reorganized Debtor shall take necessary corporate action to cause such Cash to be promptly distributed to holders of the New Common Stock.

*L.      Directors and Officers of Reorganized FGIC Corporation*

As of the Effective Date, the term of the current members of the board of directors of the Debtor shall expire.  The board of directors of Reorganized FGIC Corporation shall consist of seven (7) members, the composition of which shall be the chief executive officer of the Debtor and six (6) members to be chosen by the Debtor, in consultation with the Administrative Agent and MBIA, which directors shall be reasonably acceptable to the New York State Insurance Department.

FGIC Corporation's officers immediately prior to the Effective Date shall serve as the initial officers of Reorganized FGIC Corporation on and after the Effective Date.

*M.      Effectuating Documents; Further Transactions*

On and after the Effective Date, Reorganized FGIC Corporation and the officers and members of the board of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of Reorganized FGIC Corporation, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

*N.*     *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, sales and use tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment. Furthermore, upon entry of the Confirmation Order, the appropriate state and local governmental officials and administrative agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.

*O.*     *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to the releases set forth in Article X.E below, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them. The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Subject to the releases set forth in Article X.E below, the Reorganized Debtor reserves and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

K&E 16329129

# ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

*A.      Timing and Calculation of Distributions*

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, then on the date that such Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions provided in the Plan for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding any provisions in the Plan to the contrary, and except as otherwise agreed to by the relevant parties, no partial payments or distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event there are Disputed Claims requiring adjudication and resolution, Reorganized FGIC Corporation shall establish appropriate reserves for potential payment of such Claims.

*B.      Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      <u>Delivery of Distributions in General</u>

Except as otherwise provided herein, the Debtor or the Reorganized Debtor, as applicable, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution; *provided*, that the manner of such distributions shall be determined at the discretion of the Debtor or the Reorganized Debtor, as applicable; *provided*, *further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by such Holder.

2.      <u>Delivery of Distributions to Prepetition Lenders</u>

The Administrative Agent shall be deemed to be the Holder of the Allowed Prepetition Lenders' Claim for purposes of the initial distribution to be made pursuant to this Plan.  The Distribution Agent shall make the initial distribution of cash and New Common Stock on account of such Claim to, or on behalf of, the Administrative Agent and the Administrative Agent shall hold or direct such distributions for the benefit of the Prepetition Lenders, as applicable.  The Administrative Agent shall be permitted to rely on the Register maintained by it on behalf of the Debtor pursuant to the Credit Agreement as of the Record Date and shall not

incur any liability as a result of such reliance. As soon as practicable, the Administrative Agent shall arrange to deliver such distributions to, or on behalf of, such Prepetition Lenders pursuant to the Credit Agreement; *provided*, that the Administrative Agent shall retain all rights as Administrative Agent under the Credit Agreement in connection with delivery of distributions to the Prepetition Lenders. To the extent any subsequent distributions are required to be made on account of the Prepetition Lender Claims or the New Common Stock received on account of such Claims, the Distribution Agent shall make any such subsequent distributions directly to each Prepetition Lender and the Administrative Agent shall provide a copy of such Register to facilitate such distributions. For purposes of subsequent distributions, it will be the responsibility of each individual Prepetition Lender to apprise the Distribution Agent of any change in its holdings after the Record Date.

> 3. <u>Delivery of Distributions to Senior Noteholders</u>

> > (a) Distributions to Senior Noteholders

The Indenture Trustee shall be deemed to be the Holder of all Claims of the Senior Noteholders for purposes of distributions to be made hereunder. The Distribution Agent shall make all distributions on account of such Claims to, or on behalf of, the Indenture Trustee and the Indenture Trustee shall hold or direct such distributions for the benefit of the Senior Noteholders, as applicable. Notwithstanding any provision contained in this Plan to the contrary, the distribution provisions contained in the Senior Notes Indenture shall continue in effect to the extent necessary to make distributions pursuant to this Plan on account of the Senior Notes and shall terminate in full upon completion of all such distributions. All payments to Senior Noteholders shall only be made to such Holders after the surrender by each such Holder of the certificates representing such Senior Notes, or in the event that such certificate is lost, stolen, mutilated or destroyed, upon the Holder's compliance with the requirements set forth above. Upon surrender of such Senior Notes certificates, the Senior Notes shall be cancelled and destroyed. As soon as practicable after surrender of the Senior Notes certificates, the Indenture Trustee shall distribute to the Holder thereof such Holder's Pro Rata share of the distribution; *provided*, that the Indenture Trustee shall retain all rights as Indenture Trustee under the Senior Notes Indenture in connection with delivery of distributions to the Senior Noteholders; *provided*, *further*, that the Debtor's obligations to make distributions in accordance with Article III shall be deemed satisfied upon delivery of distributions to the Indenture Trustee.

K&E 16329129

(b)     Holders as of the Distribution Notification Date

As of the close of business on the Distribution Notification Date:  (1) the Claims Register will be closed; (2) the transfer books and records of the Senior Notes as maintained by the Indenture Trustee or its agent shall be closed; and (3) any transfer of any Claim based on the Senior Notes or any interest therein shall be prohibited.  The Debtor, the Reorganized Debtor and the Indenture Trustee shall have no obligation to recognize any transfer of any Claim based on the Senior Notes occurring after the close of business on the Distribution Notification Date and shall instead be entitled to recognize and deal for all purposes under this Plan with only those Holders of record as of the close of business on the Distribution Notification Date.

4.     Distributions by Distribution Agent

The Debtor or the Reorganized Debtor, as applicable, shall have the authority, in its sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  As a condition to serving as a Distribution Agent, a Distribution Agent must:  (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required hereunder; and (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required hereunder to be distributed by such Distribution Agent.  The Debtor or the Reorganized Debtor, as applicable, may pay to the Distribution Agent all reasonable and documented fees and expenses of the Distribution Agent without the need for any approvals, authorizations, actions or consents.

5.     Minimum Distributions

Notwithstanding anything herein to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $25 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fraction of a dollar or a share of New Common Stock or other means of distribution under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar, share or other similar distribution item.

6.     Undeliverable Distributions

In the event that any distribution to any Holder of a Claim is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor automatically and without need for a further order of the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) and the Claim of any Holder to such property or Equity Interest in property shall be discharged and forever barred.

K&E 16329129

7.     Distributions Withheld for Disputed Claims

Until such time as all Disputed Claims are Allowed or disallowed, the Debtor shall reserve Cash or Common Stock in an amount equal to the distributions to which Holders of Disputed Claims would be entitled if all such Claims were to become Allowed Claims.

8.     Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed by any governmental unit. All distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provisions in the Plan to the contrary, the Reorganized Debtor and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.

9.     Allocations

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

10.     No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim against the Debtor and no Holder of any Claim against the Debtor shall be entitled to interest accruing on or after the Petition Date on any such Claim.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.     *Resolution of Disputed Claims*

1.     Allowance of Claims

After the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Case allowing such Claim.  All settled claims approved

prior to the Effective Date by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019, or otherwise, shall be binding on all parties.

2.    Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date until the applicable Claims Objection Bar Date, the Reorganized Debtor, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without any further notice to, or action, order or approval of, the Bankruptcy Court. The Reorganized Debtor shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order or approval of, the Bankruptcy Court.

3.    Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date, the Reorganized Debtor, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

4.    Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged from the Claims Register by the Reorganized Debtor and any Claim that has been amended may be adjusted thereon by the Reorganized Debtor. The Reorganized Debtor may expunge or adjust such Claims without filing a claims objection and without any further notice to, or action, order or approval of, the Bankruptcy Court.

5.    Deadline to File Objections to Claims

Any objections to Claims shall be filed no later than the applicable Claims Objection Bar Date.

K&E 16329129

B.      *Disallowance of Claims*

All Claims of any entity from which property is sought by the Debtor under sections 542, 543, 550 or 553 of the Bankruptcy Code, or that the Debtor or the Reorganized Debtor alleges is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be disallowed if (1) the entity, on the one hand, and the Debtor or the Reorganized Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER OR APPROVAL OF, THE BANKRUPTCY COURT.  HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT ON OR BEFORE THE LATER OF (1) THE CONFIRMATION HEARING AND (2) 45 DAYS AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM.**

C.      *Amendments to Claims*

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor and, to the extent such prior authorization is not received, any such new or amended Claim shall be deemed disallowed and expunged without any further notice to, or action, order or approval of, the Bankruptcy Court.

D.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is filed prior to the Effective Date, such Claim shall be deemed a Disputed Claim and no payment or distribution provided under the Plan shall be made on account of such Disputed Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

E.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions, if any, shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim the distribution, if any, to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.  After the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with

28

respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Chapter 11 Case, including the Confirmation Order, allowing such Claim. All settled claims approved prior to the Effective Date by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019, or otherwise, shall be binding on all parties.

After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had with respect to any Claim or Equity Interest immediately prior to the Effective Date.

## ARTICLE VIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.      Assumption and Rejection of
Executory Contracts and Unexpired Leases

Each Executory Contract or Unexpired Lease shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease: (a) has been previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (b) is the subject of a motion to assume or reject pending as of the Effective Date; or (c) is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement.

2.      Approval of Assumption and Rejection of
Executory Contracts and Unexpired Leases

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions or rejections of Executory Contracts or Unexpired Leases described in Article VIII.A.1 pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or rejection of such Executory Contract or Unexpired Lease, including objecting to the cure amount designated by the Debtor as payable in connection with an assumption, will be deemed to have consented to such assumption or rejection and agreed to the specified cure amount.

B.      *Claims on Account of the Rejection of*
*Executory Contracts or Unexpired Leases*

All Proofs of Claim arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Debtor or the Reorganized Debtor, as applicable, no later than thirty (30) days after the earlier of

(a) entry of an order approving the rejection of such Executory Contract or Unexpired Lease or (b) the Effective Date.

Any entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtor or the Reorganized Debtor or their estates and property and the Debtor and the Reorganized Debtor, their estates and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  As of the Effective Date, all such Claims shall be subject to the permanent injunction set forth in Article X.D hereof.

C.      *Procedures for Counterparties to Executory Contracts*
        *and Unexpired Leases Assumed Pursuant to the Plan*

A notice of the Effective Date, including notice regarding the assumption or rejection of Executory Contracts or Unexpired Leases, will be sent to all known Holders of a Claim.  For known non-Debtor parties to Executory Contracts and Unexpired Leases assumed pursuant to the Plan, such notice or separate notices will be sent on or as soon as practicable after the Effective Date notifying such counterparties that such Executory Contracts and Unexpired Leases have been assumed pursuant to the Plan.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  At least twenty (20) days prior to the Confirmation Hearing, where applicable, the Debtor shall provide counterparties to Executory Contracts and Unexpired Leases with notices of proposed assumptions and cure amounts as well as procedures for objecting thereto and resolution of such disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract to a proposed assumption or related cure amount must be filed, served and **actually received** by the Debtor at least five (5) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters.

In the event of a dispute regarding:  (a) the amount of any payments to cure such a default; (b) the ability of the Debtor or Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract to be assumed; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving any such dispute and approving the assumption.  If an objection to cure is sustained by the Bankruptcy Court, the Debtor, at its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

D.       *Survival of Corporate Indemnification Obligations*

The Debtor's indemnification obligations set forth in Article VIII of its by-laws existing as of the Petition Date shall be included in the Bylaws of the Reorganized Debtor.

All Claims of the Debtor's officers and directors for indemnity arising under the Debtor's certificate of incorporation or by-laws, applicable state law, specific agreement or any combination of the foregoing arising in respect of actions or omissions that occurred (a) prior to the Petition Date shall be discharged upon the Effective Date and shall be satisfied solely from the Debtor's and/or Reorganized Debtor's available directors and officers' insurance coverage and (b) after the Petition Date, but prior to the Effective Date (excluding Excluded Indemnification Claims) shall be Administrative Claims hereunder.  Excluded Indemnification Claims in respect of actions or omissions occurring after the Petition Date but prior to the Effective Date, shall be discharged upon the Effective Date and holders of Excluded Indemnification Claims shall not receive any distribution under the Plan on account of such Excluded Indemnification Claims.

After the Effective Date, the Reorganized Debtor shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect on the Petition Date, with respect to actions or omissions occurring prior to the Effective Date and all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.       *Conditions*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof.

1.       The Confirmation Order, which shall provide that, among other things, the Debtor or the Reorganized Debtor, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate the Plan, shall have been entered and such order shall have become a Final Order.

2.       All documents and agreements necessary to implement the Plan shall have:  (a) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (b) been tendered for delivery; and (c) been effected or executed.

K&E 16329129

3.     All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties, and, to the extent required, filed with and approved by applicable governmental units in accordance with applicable laws.

4.     The Reorganized Debtor shall have received the necessary regulatory approvals, including The New York State Insurance Department's approval of the change in ownership of Financial Guaranty Insurance Company resulting from the Consummation of the Plan.

5.     The Reorganized Debtor Funding Amount shall be no more than $400,000.

B.     *Waiver of Conditions*

The conditions to the Effective Date set forth in this Article may be waived by the Debtor, with the consent of the Administrative Agent and MBIA (which consent shall not be unreasonably withheld), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

C.     *Effect of Non-Occurrence of Conditions to the Effective Date*

Unless otherwise agreed to by the Debtor, if the Effective Date does not occur prior to the one year anniversary of the Confirmation Date, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any claims by, or Claims against or Equity Interests in, the Debtor; (b) prejudice in any manner the rights of the Debtor or any Holders of Claims against or Equity Interests in the Debtor; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtor or any Holders of Claims against or Equity Interests in the Debtor in any respect.

# ARTICLE X.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.     *Compromise and Settlement*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its estate and Holders of Claims and Equity Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to, or action, order or approval of, the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against it and Causes of Action against other entities.

## B.     Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Equity Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise; *provided*, that notwithstanding anything to the contrary contained in that certain Monitoring Fee Agreement by and between FGIC Corp. and The PMI Group, Inc., dated as of December 18, 2003, Dubel & Associates, LLC, as successor to The PMI Group, Inc., shall be entitled to an Allowed General Unsecured Claim in the amount of $10,500, which Claim shall be paid in full in Cash as a member of Class 5.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

## C.     Discharge of Claims and Termination of Equity Interests

Pursuant to, and to the fullest extent permitted by, section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Equity Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against or Equity Interests in the Debtor, the Reorganized Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such Claim or Equity Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtor with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to occurrence of the Effective Date.

## D.     Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection therewith, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III hereof, and, in the case of a Secured Tax Claim or Other Secured Claim, concurrently with satisfaction in full of the portion of the Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtor's estate shall be fully released and discharged and all of the right, title and interest of any Holder of such mortgages,

deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

E.    *Debtor Release*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtor, the Reorganized Debtor and any person seeking to exercise the rights of the Debtor's estate, including any successor to the Debtor or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including those that the Debtor, the Reorganized Debtor, the Debtor's estate or the Debtor's Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's estate, the conduct of the Debtor's business, the Chapter 11 Case, the purchase, sale or rescission of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, Plan Supplement, Disclosure Statement and related agreements, instruments or other documents or upon any other act or omission, transaction or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.**

**Notwithstanding anything herein to the contrary, the foregoing "Debtor Release" shall not operate to waive or release any Causes of Action of the Debtor: (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan; (b) expressly set forth in and preserved by the Plan or related documents; or (c) arising under the Cost Sharing Agreement or the Tax Allocation Agreement.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes, by reference, each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the Debtor Release; (c) in the best interests of the Debtor and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after reasonable investigation by the Debtor and after notice and**

opportunity for hearing; and (f) a bar to the Debtor or the Reorganized Debtor asserting any claim released by the Debtor Release against any of the Released Parties.

F.    *Releasing Party Release*

Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including those that the Debtor, the Reorganized Debtor, the Debtor's estate or the Debtor's Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's estate, the conduct of the Debtor's businesses, the Chapter 11 Case, the purchase, sale or rescission of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, Plan Supplement, Disclosure Statement and related agreements, instruments or other documents or upon any other act or omission, transaction or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.

Notwithstanding anything herein to the contrary, the foregoing "Releasing Party Release" does not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Releasing Party Release, which includes by reference each of the related provisions and definitions contained herein and further, shall constitute the Bankruptcy Court's finding that the Releasing Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the Releasing Parties; (c) in the best interests of the Debtor and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim against any of the Released Parties that has been released by the Releasing Party Release.

K&E 16329129

*G.    Exculpation*

**Upon and effective as of the Effective Date, the Debtor and its directors, officers, attorneys, financial advisors and other professional advisors and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code.**

**Except with respect to any acts or omissions expressly set forth in and preserved by the Plan or related documents, the Exculpated Parties shall neither have nor incur any liability to any entity for any prepetition or postpetition act taken or omitted to be taken in connection with, arising from or relating in any way to, the Chapter 11 Case, including: (a) the operation of the Debtor's business during the pendency of this Chapter 11 Case; (b) formulating, negotiating, preparing, disseminating, implementing and/or effecting the Disclosure Statement and the Plan (including the Plan Supplement and any related contract, instrument, release or other agreement or document created or entered into in connection therewith); (c) the solicitation of votes for the Plan and the pursuit of Confirmation of the Plan; (d) the administration of the Plan and/or the property to be distributed under the Plan; (e) the offer and issuance of any securities under the Plan; and/or (f) any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtor.  In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its respective duties under, pursuant to or in connection with, the Plan.**

**Notwithstanding anything herein to the contrary, nothing in the foregoing exculpation provisions shall (a) exculpate any person or entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages or ultra vires acts as determined by a Final Order or (b) limit the liability of the professionals of the Exculpated Parties to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).**

*H.    Injunction*

The satisfaction, release and discharge pursuant to this Article X of the Plan shall also act as an injunction against any person commencing or continuing any action, employment of process or act to collect, offset or recover any claim or Cause of Action satisfied, released or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including sections 524 and 1141 thereof.

## ARTICLE XI.

## BINDING NATURE OF PLAN

**THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER:  (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN;**

**(B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR; (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

## ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain the maximum legally permissible jurisdiction over the Chapter 11 Case and all entities with respect to all matters related to the Chapter 11 Case, the Debtor and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim;

2.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.      resolve any matters related to the assumption, assignment or rejection of any Executory Contract to which the Debtor is party or with respect to which the Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add Executory Contracts to the list of Rejected Contracts;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the date hereof or that may be commenced in the future and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date, provided that the Reorganized Debtor shall reserve the right to commence actions in all appropriate forums and jurisdictions;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or the Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

8.      hear and determine all Causes of Action that are pending as of the Effective Date

37

or that may be commenced in the future;

9.  issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

10.  resolve any cases, controversies, suits or disputes with respect to the releases by the Debtor, the exculpation and other provisions contained in Article X hereof and enter such orders or take such other actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

11.  enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.  resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

13.  enter an order concluding the Chapter 11 Case.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

*A.    Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained in the Plan:  (1) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before entry of the Confirmation Order; (2) after entry of the Confirmation Order, the Debtor or the Reorganized Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission, or reconcile any inconsistency in the Plan in such a manner as may be necessary to carry out the purpose and intent of the Plan; and (3) the Debtor reserves the right to modify the Plan to implement the sale of all or substantially all of the assets of the Debtor pursuant to sections 363 and 1123 of the Bankruptcy Code, *provided*, the Debtors shall not amend or modify the Plan to extent that such amendment or modification affects the economic distributions provided for herein without the consent of the Administrative Agent and MBIA.

*B.    Revocation of Plan*

The Debtor reserves the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtor revokes or withdraws the Plan, or if Confirmation Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or

release of any Claims by or against, or any Equity Interests in, the Debtor; (b) prejudice in any manner the rights of the Debtor or the Holders of Claims or Equity Interests; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or the Holders of Claims or Equity Interests.

### C.    Successors and Assigns

The rights, benefits and obligations of any entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### D.    Reservation of Rights

Except as expressly set forth herein, including with respect to votes cast to accept or reject the Plan, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein nor the taking of any action by the Debtor or any other entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor with respect to the Holders of Claims or Equity Interests or other entities; or (2) any Holder of a Claim or an Equity Interest or other entity before the Effective Date.

### E.    Section 1145 Exemption

The offering, issuance and distribution of the New Common Stock, and any subsequent sales, resales, transfers or other distributions of any such securities, shall be exempt from any federal or state securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

### F.    Payment of Statutory Fees

The Reorganized Debtor shall pay all fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed or closed, whichever occurs first.

### G.    Section 1125(e) Good Faith Compliance

The Debtor, the Reorganized Debtor, the Administrative Agent, the Indenture Trustee and each of their respective advisors and representatives shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### H.    Further Assurances

The Debtor or the Reorganized Debtor, as applicable, all Holders of Claims receiving distributions hereunder and all other entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

## I.  Severability

If, before Confirmation, any term or provision hereof is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable.   Such term or provision then will be applicable as altered or interpreted; *provided*, that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtor; *provided*, *further*, that the Debtor may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.  Notwithstanding any such order, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect.  The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## J.  Service of Documents

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by overnight mail to:

| Debtor | Proposed Counsel to the Debtor |
|---|---|
| FGIC Corporation<br>125 Park Avenue<br>New York, New York 10017<br>Attn.:   John S. Dubel<br>            A. Edward Turi, III | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Phone:  (212) 446 4800<br>Fax:      (212) 446-4900<br>Attn.:   Paul M. Basta<br>            Brian S. Lennon<br><br>            -and-<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Phone:  (312) 862-2000<br>Fax:      (312) 862-2200<br>Attn.:   Patrick J. Nash, Jr. |
| **Clerk of the Bankruptcy Court** | **United States Trustee** |
| United States Bankruptcy Court<br>for the Southern District of New York<br>Alexander Hamilton Custom House<br>One Bowling Green<br>New York, New York 10004 | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn.:   Andrea B. Schwartz |

| Counsel for the Administrative Agent | Indenture Trustee |
|---|---|
| Morgan Lewis & Bockius LLP<br>101 Park Avenue<br>New York, New York 10178<br>Phone: (212) 309-6000<br>Fax: (212) 309-6001<br>Attn.: Richard S. Toder<br>Michael A. Chapnick | Wilmington Trust FSB<br>166 Mercer Street, Suite 2-R<br>New York, New York 10012<br>Phone: (212) 941-4415<br>Fax: (212) 343-1079<br>Attn.: Adam Berman |
| **Counsel for MBIA Inc.** | **Counsel for the New York State Insurance Department** |
| DLA Piper LLP<br>1251 Avenue of the Americas<br>New York, New York, 10020<br>Phone: (212) 335-4500<br>Fax: (212) 335-4501<br>Attn.: H. Jeffrey Schwartz<br>Bennett Silverberg | Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, New York 10004<br>Phone: (212) 859-8000<br>Fax: (212) 859-4000<br>Attn.: Bonnie Steingart |

K.     *Filing of Additional Documents*

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

L.     *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

[*Remainder of Page Intentionally Left Blank*]

K&E 16329129

Respectfully submitted, as of the date first set forth above,

By: _____
Name:   John S. Dubel
Title:    Chief Executive Officer,
            FGIC Corporation