**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FGIC CORPORATION,[1] | ) | |
| | ) | Case No. 10-14215 (SMB) |
| Debtor. | ) | |
| | ) | |

## CHAPTER 11 PLAN OF REORGANIZATION OF FGIC CORPORATION

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

| | |
|---|---|
| Paul M. Basta | Patrick J. Nash, Jr. (admitted *pro hac vice*) |
| Brian S. Lennon | KIRKLAND & ELLIS LLP |
| KIRKLAND & ELLIS LLP | 300 North LaSalle |
| 601 Lexington Avenue | Chicago, Illinois  60654 |
| New York, New York  10022 | Telephone:     (312) 862-2000 |
| Telephone:     (212) 446-4800 | Facsimile:     (312) 862-2200 |
| Facsimile:     (212) 446-4900 | |

*Counsel to the Debtor and Debtor in Possession*

Dated:  February 3, 2012

---

[1]    The last four digits of the Debtor's tax identification number are 6474.  The location of the Debtor's corporate headquarters is 125 Park Avenue, New York, New York 10017.

## TABLE OF CONTENTS

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS..............................................................1
    A.    Rules of Interpretation, Computation of Time, Governing Law and
        Controlling Document ...........................................................................1
    B.    Defined Terms ......................................................................................2

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ......................10
    A.    Administrative Claims .........................................................................10
    B.    Priority Tax Claims..............................................................................12

ARTICLE III. CLASSIFICATION OF CLAIMS AND INTERESTS IN THE DEBTOR ..........13
    A.    Summary .............................................................................................13
    B.    Classification and Treatment of Claims and Equity Interests................14

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ...............................................19

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN .........................................19
    A.    General Settlement of Claims ..............................................................19
    B.    Reorganized Debtor .............................................................................19
    C.    Sources of Consideration for Plan Distributions ...................................19
    D.    Issuance of Plan Sponsor Stock ...........................................................20
    E.    Corporate Existence .............................................................................20
    F.    Vesting of Assets in the Reorganized Debtor .......................................21
    G.    Cancellation of Securities and Agreements ..........................................21
    H.    Surrender of Existing Securities ..........................................................21
    I.    Corporate Action .................................................................................21
    J.    Certificate of Incorporation and By-Laws ...........................................22
    K.    Stock Trading and Ownership Restrictions ..........................................22
    L.    Reorganized Debtor Maintenance Amount ..........................................22
    M.    Directors and Officers of the Reorganized Debtors...............................23
    N.    Effectuating Documents; Further Transactions ....................................23
    O.    Section 1146 Exemption ......................................................................23
    P.    Preservation of Causes of Action..........................................................23

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...............................................24
    A.    Timing and Calculation of Distributions ..............................................24
    B.    Delivery of Distributions and Undeliverable or Unclaimed
        Distributions.......................................................................................25

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED
AND DISPUTED CLAIMS .......................................................................................28
    A.    Resolution of Disputed Claims .............................................................28
    B.    Disallowance of Claims .......................................................................29
    C.    Amendments to Claims........................................................................29
    D.    No Distributions Pending Allowance ...................................................30
    E.    Distributions After Allowance .............................................................30

ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ....................................................................................................................30
    A.    Assumption and Rejection of Executory Contracts and Unexpired
        Leases...............................................................................................30
    B.    Claims on Account of the Rejection of Executory Contracts or
        Unexpired Leases..............................................................................31
    C.    Procedures for Counterparties to Executory Contracts and
        Unexpired Leases Assumed Pursuant to the Plan................................31
    D.    Survival of Corporate Indemnification Obligations .............................32

ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE............................32
    A.    Conditions.........................................................................................32
    B.    Waiver of Conditions.........................................................................33
    C.    Effect of Non-Occurrence of Conditions to the Effective Date.............33

ARTICLE X. SETTLEMENT, RELEASE, INJUNCTION AND RELATED
PROVISIONS ...........................................................................................................34
    A.    Compromise and Settlement ...............................................................34
    B.    Subordinated Claims ..........................................................................34
    C.    Discharge of Claims and Termination of Equity Interests....................34
    D.    Release of Liens.................................................................................35
    E.    Debtor Release ..................................................................................35
    F.    Releasing Party Release .....................................................................36
    G.    Exculpation ......................................................................................37
    H.    Injunction ........................................................................................38

ARTICLE XI. BINDING NATURE OF PLAN .......................................................................40

ARTICLE XII. RETENTION OF JURISDICTION ................................................................40

ARTICLE XIII. MISCELLANEOUS PROVISIONS ...............................................................42
    A.    Modification of Plan .........................................................................42
    B.    Successors and Assigns......................................................................43
    C.    Reservation of Rights.........................................................................43
    D.    Section 1145 Exemption ....................................................................43
    E.    Payment of Statutory Fees .................................................................43
    F.    Post-Confirmation Date Reporting .....................................................43
    G.    Section 1125(e) Good Faith Compliance.............................................43
    H.    Further Assurances............................................................................44
    I.    Severability .....................................................................................44
    J.    Dissolution of the Creditors' Committee.............................................44
    K.    Service of Documents ........................................................................44
    L.    Filing of Additional Documents .........................................................45
    M.    No Stay of Confirmation Order ..........................................................46

## CHAPTER 11 PLAN OF REORGANIZATION OF FGIC CORPORATION

FGIC Corporation, as the debtor and debtor in possession in the above-captioned chapter 11 case, hereby respectfully proposes the following plan of reorganization under chapter 11 of the Bankruptcy Code.

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

A.    *Rules of Interpretation, Computation of Time, Governing Law and Controlling Document*

1.    For purposes of this document:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part, or to affect the interpretation, of the Plan; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (i) unless otherwise stated, the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation."

2.    The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

3.    Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

4.    All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into, and are a part of the Plan, as if set forth herein.

5.    In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the

Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document). The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided*, that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

B.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below:

1.    "*Administrative Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Credit Agreement.

2.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtor's estate pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date to preserve the Debtor's estate; (b) the Allowed Claims of Professionals in the Chapter 11 Case; and (c) the Indenture Trustee Administrative Claim. Any fees or charges assessed against the Debtor's estate pursuant to section 1930 of chapter 123 of title 28 of the United States Code shall be excluded from the definition of Administrative Claim and shall be paid pursuant to Article XIII.E of the Plan.

3.    "*Administrative Claims Bar Date*" means, except for Administrative Claims of Professionals, the first Business Day that is thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.

4.    "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

5.    "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is (i) scheduled by the Debtor in a liquidated amount and not marked as disputed or contingent or (ii) evidenced by a valid Proof of Claim and as to which the Debtor or a party in interest has not filed an objection by the Claims Objection Bar Date; or (b) a Claim that is Allowed pursuant to the Plan or any stipulation approved by, or order of, the Bankruptcy Court.

6.    "*Amended Tax Allocation Agreement*" means the Amended and Restated Income Tax Allocation Agreement by and among FGIC Corporation, FGIC, FGIC Credit Products LLC, a Delaware limited liability company, FGIC Credit Products II LLC, a Delaware limited liability company, Grand Central Assurance Corporation, a New York corporation, and GCAC Credit Products LLC, a Delaware limited liability company, substantially in the form attached as Exhibit A to this Plan.

7.    "*Bankruptcy Code*" means title 11 of the United States Code, as may be amended from time to time.

2

8.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Chapter 11 Case and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code and/or the General Order of the United States District Court for the Southern District of New York pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

9.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Case and the general, local and chambers rules of the Bankruptcy Court, as may be amended, modified or supplemented from time to time.

10.      "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

11.      "*By-Laws*" means the by-laws of the Reorganized Debtor, which will be included in the Plan Supplement.

12.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

13.      "*Causes of Action*" means all actions, causes of action, Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, known or unknown, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the Chapter 11 Case, including through the Effective Date.

14.      "*Certain Tax Conditions*" means the conditions to the Effective Date set forth on Exhibit B to this Plan.

15.      "*Certificate of Incorporation*" means the certificate of incorporation of the Reorganized Debtor, which will be included in the Plan Supplement.

16.      "*Chapter 11 Case*" means the chapter 11 case commenced by the Debtor and styled *In re FGIC Corporation*, Case No. 10-14215, which is pending before the Bankruptcy Court.

17.      "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

18.      "*Claims Objection Bar Date*" means the deadline for objecting to Claims, which shall be on the date that is sixty (60) days after the Effective Date, unless extended by an order of the Bankruptcy Court, upon notice and a hearing.

19.      "*Claims Register*" means the official register of Claims maintained by the claims

3

agent appointed in the Chapter 11 Case.

20.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III herein.

21.     "*Class 6 Cash Distribution Amount*" means the Debtor's Cash on hand as of the Effective Date, *plus* the Plan Sponsor Contribution Amount, *minus* (a) the aggregate amount of Cash required to fund (i) Cash distributions to Holders of Allowed Administrative Claims and Allowed Priority Tax Claims, (ii) Cash distributions to Holders of Allowed Claims in Classes 1– 5, (iii) the Professional Fee Reserve Amount, (iv) an estimate of the amount of legal, professional or other fees and expenses that will be incurred by the Reorganized Debtor to implement the Plan after the Effective Date and (v) no more than $[_____] in respect of fees and expenses to be paid to any Distribution Agent, and (b) the Reorganized Debtor Maintenance Amount.

22.     "*Common Stock*" means the common stock of FGIC Corporation.

23.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case.

24.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

25.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider the Confirmation of the Plan.

26.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

27.     "*Consummation*" means the occurrence of the Effective Date.

28.     "*Convenience Claim*" means any Claim against the Debtor that, but for being defined as a Convenience Claim, would be a General Unsecured Claim, and either (a) is in an amount of $15,000 or less or (b) is in an amount greater than $15,000, but is subject to an irrevocable election, in accordance with Article III.B.6(e) herein, by the Holder thereof to reduce the amount of the Claim to $15,000 (or less) for the purpose of rendering the Claim a Convenience Claim.

29.     "*Credit Agreement*" means that certain Revolving Credit Agreement, dated as of December 12, 2005, as may have been amended, supplemented or otherwise modified from time to time, by and among FGIC Corporation, FGIC, the lenders party thereto and JPMorgan Chase Bank, N.A. as Administrative Agent.

30.     "*Creditor New Common Stock*" means the class of common stock of the Reorganized Debtor to be issued pursuant to the Plan to Holders of Allowed Class 6 Claims.

31.     "*Creditors' Committee*" means the official committee of unsecured creditors

4

appointed by the U.S. Trustee in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

32.     "*Debtor*" means FGIC Corporation.

33.     "*Disclosure Statement*" means the disclosure statement relating to the Plan, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto.

34.     "*Disputed Claim*" means any Claim that is not Allowed.

35.     "*Distribution Agent*" means the entity or entities selected by the Debtor or the Reorganized Debtor, as applicable, to make or facilitate distributions pursuant to the Plan.

36.     "*Distribution Notification Date*" means the date that is five (5) days after the Confirmation Date.

37.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the effectiveness of this Plan set forth in Article IX hereof have been satisfied or waived in accordance with the terms thereof.

38.     "*Equity Interest*" means any share of Common Stock, preferred stock issued by the Debtor or other instrument evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in the Debtor that existed immediately prior to the Effective Date.

39.     "*Exculpated Parties*" means, collectively, the Reorganized Debtor and the Released Parties.

40.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection pursuant to section 365 or section 1123 of the Bankruptcy Code.

41.     "*Final Claims Trading Order*" means an order approving certain restrictions on trading claims entered in the Chapter 11 Case on [_____], 2012 [Docket No. __].

42.     "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the subject matter, as entered on the docket maintained by the clerk of such court, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, seek certiorari or move for a new trial, reargument or rehearing has expired, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or as to which the request for new trial, reargument, rehearing, a motion pursuant to section 502(j) of the Bankruptcy Code, under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been denied, resulted in no modification of such order or otherwise been dismissed with prejudice.

43.    "*FGIC*" means Financial Guaranty Insurance Company, the wholly-owned subsidiary of the Debtor, which is not a debtor in the Chapter 11 Case.

44.    "*FGIC Corporation Group*" means the affiliated group of corporations within the meaning of section 1504(a) of the IRC of which the Debtor is the common parent.

45.    "*General Unsecured Claim*" means a Claim against the Debtor, other than an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Tax Claim, an Other Secured Claim, the Plan Sponsor Intercompany Claim, a Convenience Claim or a Section 510(b) Claim.

46.    "*Holder*" means an entity holding a Claim or an Equity Interest.

47.    "*Impaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

48.    "*Indenture Trustee*" means Wilmington Trust National Association, successor by merger to Wilmington Trust FSB, in its capacity as successor indenture trustee under the Senior Notes Indenture.

49.    "*Indenture Trustee Administrative Claim*" means an Administrative Claim in favor of the Indenture Trustee on account of the actual, reasonable and documented fees and expenses incurred by the Indenture Trustee during the course of the Chapter 11 Case, including for its services as a member of the Creditors' Committee, *provided* that, in no event shall such Administrative Claim be Allowed in an amount that is greater than $180,000.

50.    "*Interim Compensation Procedures Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals*, dated August 24, 2010 [Docket No. 45] entered in the Chapter 11 Case.

51.    "*IRC*" means title 26 of the United States Code, as may be amended from time to time.

52.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

53.    "*Monitoring Fee Agreements*" means, collectively:  (a) that certain Monitoring Fee Agreement by and between the Debtor and The PMI Group, Inc., dated as of December 18, 2003, which has been assigned to Dubel & Associates, LLC; (b) that certain Monitoring Fee Agreement by and between the Debtor and Blackstone Management Partners IV LLC, dated as of December 18, 2003; (c) that certain Monitoring Fee Agreement by and between the Debtor and Cypress Advisors, Inc., dated as of December 18, 2003; and (d) that certain Monitoring Fee Agreement by and between the Debtor and CIVC Partners LP, dated as of December 18, 2003.

54.    "*New FGIC Corporation Board*" means the initial board of directors of the Reorganized Debtor.

55.    "*NYSDFS*" means the New York State Department of Financial Services.

6

56.     "*Other Secured Claim*" means any secured claim other than a Secured Tax Claim.

57.     "*Petition Date*" means August 3, 2010, the date on which the Debtor filed the voluntary petition commencing the Chapter 11 Case.

58.     "*Plan*" means this plan of reorganization under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified or supplemented from time to time in accordance with the terms hereof.

59.     "*Plan Sponsor*" means FGIC, together with any successor thereto.

60.     "*Plan Sponsor Agreement*" means that certain Plan Sponsor Agreement, dated as of February 3, 2012, between the Plan Sponsor and the Debtor, which is attached as Exhibit C to the Disclosure Statement.

61.     "*Plan Sponsor Contribution Amount*" means the Cash contribution to be made by the Plan Sponsor in the amount of $11,000,000 on the terms and subject to the conditions set forth in the Plan Sponsor Agreement.

62.     "*Plan Sponsor Intercompany Claim*" means the Claim held by the Plan Sponsor against the Debtor in the amount of $24,125.

63.      "*Plan Sponsor Stock*" means the class of stock of the Reorganized Debtor, which consists entirely of one authorized share, to be issued to the Plan Sponsor or its designee in accordance with the terms of Article V.D hereof.

64.     "*Plan Supplement*" means the supplement(s) to the Plan containing, among other things, the Certificate of Incorporation, the By-Laws, the schedule of assumed Executory Contracts and Unexpired Leases, the schedule of Causes of Action to be retained by the Reorganized Debtor, the composition of the New FGIC Corporation Board and officers of the Reorganized Debtor, and certain other documents relevant to the implementation of the Plan.

65.     "*Preferred Stock*" means the preferred stock of FGIC Corporation.

66.     "*Prepetition Lenders*" means the entities that hold the unsecured debt issued under the Credit Agreement.

67.     "*Prepetition Lenders' Claim*" means the Claim of the Administrative Agent, on behalf of itself and the Prepetition Lenders, derived from and based upon the Credit Agreement and related documents.

68.     "*Prepetition Tax Allocation Agreement*" means that certain Amended and Restated Income Tax Allocation Agreement, dated as of December 18, 2003, by and between FGIC Corporation and FGIC.

69.     "*Priority Non-Tax Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

70.    "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

71.    "*Professional*" means an entity (a) retained in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

72.    "*Professional Claims*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by all Professionals in connection with the Chapter 11 Case, including services rendered after the Effective Date with respect to a Professional's final fee application.  To the extent there is a Final Order denying any amount of a Professional's fees or expenses, then such Professional's Claim shall be reduced by the amount such fees or expenses are reduced or denied.

73.    "*Professional Fee Reserve Account*" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtor on or before the Effective Date.

74.    "*Professional Fee Reserve Amount*" means the amount necessary to satisfy Professional Claims as estimated in accordance with Article II.A.2(c) herein.

75.    "*Proof of Claim*" means a proof of Claim filed against the Debtor in the Chapter 11 Case.

76.    "*Pro Rata*" means, with respect to any Class, the ratio of a Claim in such Class, including principal and accrued interest through the Petition Date, to the aggregate amount of all Claims in such Class, including principal and accrued interest, as of the Petition Date.

77.    "*Record Date*" means [_____], 2012, which is the date set forth in the order approving the Disclosure Statement for determining the Holders of Claims entitled to vote to accept or reject the Plan.

78.    "*Related Parties*" means an entity's directors and officers who served in any such capacity at any time from the Petition Date through the Effective Date, employees, agents, subsidiaries and such subsidiaries' directors and officers who served in any such capacity at any time from the Petition Date through the Effective Date, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, accountants and other professionals or representatives when acting in any such capacities at any time.

79.    "*Released Parties*" means, collectively:  (a) the Debtor; (b) the Plan Sponsor; (c) Dubel & Associates, LLC; (d) Blackstone Management Partners IV LLC, in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (e) Cypress Advisors, Inc., in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (f) CIVC LP, in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (g) the Creditors' Committee and its members as of February 3, 2012, each solely in its respective capacity as

8

such, and including the Indenture Trustee, but only in its capacities as a member of the Creditors' Committee and as Indenture Trustee (and not on behalf of any other person); and (h) with respect to each of the persons named in (a)–(g) above, such entity's Related Parties.

80.     "*Releasing Parties*" means, collectively:  (a) the Plan Sponsor; (b) Dubel & Associates, LLC; (c) Blackstone Management Partners IV LLC, in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (d) Cypress Advisors, Inc., in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (e) CIVC LP, in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (f) the Creditors' Committee and its members as of February 3, 2012, each solely in its respective capacity as such, and including the Indenture Trustee, but only in its capacities as a member of the Creditors' Committee and as Indenture Trustee (and not on behalf of any other person); and (g) with respect to each of the persons named in (a)–(f) above, such entity's Related Parties.

81.     "*Reorganized Debtor*" means FGIC Corporation on or after the Effective Date.

82.     "*Reorganized Debtor Maintenance Amount*" means $400,000 in Cash, which shall be used exclusively to fund the Reorganized Debtor's anticipated reasonable operating expenses after the Effective Date.

83.     "*Schedules*" means the schedules of assets and liabilities and statement of financial affairs filed by the Debtor on the Petition Date [Docket Nos. 2 and 3] pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

84.     "*Section 510(b) Claim*" means any Claim against the Debtor arising from rescission of a purchase or sale of a security of the Debtor or an Affiliate of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

85.     "*Secured Tax Claim*" means any secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related secured Claim for penalties.

86.     "*Senior Noteholders*" means the Holders of the Senior Notes.

87.     "*Senior Notes*" means the 6% Senior Notes due 2034 issued pursuant to the Senior Notes Indenture.

88.     "*Senior Notes Claim*" means the Claim held by the Indenture Trustee derived from and based upon the Senior Notes Indenture and held on behalf of the Senior Noteholders.

89.     "*Senior Notes Indenture*" means that certain Indenture, dated January 12, 2004, between FGIC Corporation, as issuer, and The Bank of New York Mellon, as indenture trustee.

90.     "*Tax Attributes*" means any credits, losses, deductions (including foreign tax credits, alternative minimum credits, net operating losses, or net capital losses), deferred

deductions, tax basis in assets or any other tax attribute of the FGIC Corporation Group or any of its members (including FGIC).

91.     "*Tax Escrow Account*" means the escrow account established by the Reorganized Debtor and the Plan Sponsor pursuant to the Amended Tax Allocation Agreement for the purpose of segregating and protecting funds transferred by, for the benefit of, or owing to the Plan Sponsor pursuant to the Amended Tax Allocation Agreement.

92.     "*Treasury Regulations*" means title 26 of the Code of Federal Regulations, as may be amended from time to time.

93.     "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

94.     "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

95.     "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

96.     "*Voting Deadline*" means [_____], 2012 at 5:00 p.m. Eastern Time, which is the deadline for voting to accept or reject the Plan.

## ARTICLE II.

### ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

*A.     Administrative Claims*

1.     <u>Payment of Administrative Claims</u>

Unless otherwise agreed to by the Holder of an Administrative Claim and the Debtor or the Reorganized Debtor, as applicable, each Holder of an Allowed Administrative Claim (other than any Professional Claim and the Indenture Trustee Administrative Claim) will receive, in full and final satisfaction, settlement and release of its Administrative Claim, Cash in an amount equal to the amount of such Allowed Administrative Claim either:  (a) on the Effective Date; (b) if the Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim and without any further notice to or action, order or approval of the Bankruptcy Court.

Except for Professional Claims, the Indenture Trustee Administrative Claim and the Allowed Administrative Claims described in clause (c) above, unless previously filed, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtor no

later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtor, the Reorganized Debtor or the property of the Reorganized Debtor and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be filed and served on the requesting party by the later of (a) 180 days after the Effective Date and (b) 180 days after the filing of the applicable request for payment of Administrative Claims, if applicable.

        2.     <u>Professional Claims</u>

        (a)     Final Fee Applications

All final requests for payment of Professional Claims must be filed with the Bankruptcy Court and served on the Reorganized Debtor no later than sixty (60) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Case, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

        (b)     Payment of Professional Claims

The amount of Professional Claims owing to the Professionals for period prior to the Confirmation Date shall be paid in Cash to such Professionals from funds held in the Professional Fee Reserve Account when such Claims are Allowed by a Final Order. When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Fee Reserve Account, if any, shall revert to the Distribution Agent and shall be distributed on a Pro Rata basis to Holders of Allowed Class 6 Claims. To the extent that funds held in the Professional Fee Reserve Account are unable to satisfy the amount of Allowed Professional Claims owing to the Professionals as of the Confirmation Date, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash from Cash on hand or the Professional Fee Reserve Account the reasonable legal, professional or other fees and expenses incurred after the Confirmation Date and related to: (a) implementation and Consummation of the Plan incurred by the Reorganized Debtor and (b) the Professionals' final fee applications. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Procedures Order in seeking retention or compensation for services rendered after the Confirmation Date shall terminate and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

(c)    Professional Fee Reserve Amount

The Professionals shall provide the Debtor with estimates of (a) their unpaid Professional Claims no later than five (5) days after the Confirmation Date.  Such estimates shall not be considered an admission with respect to the fees and expenses of such Professional, and such Professionals shall not be bound to any extent by such estimates. If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional. The total amount of estimated Professional Claims shall comprise the Professional Fee Reserve Amount. To the extent the Professional Fee Reserve Amount is less than the amount needed to satisfy any Allowed Professional Claim, any affected Professional shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A.

(d)    Release of Previously Held Back Amounts

On the Confirmation Date, the Debtor shall be authorized to release to Professionals any amount of Allowed Professional Claims previously held back pursuant to the provisions set forth in the Interim Compensation Procedures Order.

3.    <u>Indenture Trustee Administrative Fee</u>

The Indenture Trustee shall provide the Debtor with detailed invoices and other necessary documentation to support the Indenture Trustee Administrative Claim on or before the Confirmation Date.  To the extent the Debtor agrees with the amount asserted in the Indenture Trustee Administrative Claim, the Indenture Trustee Administrative Claim shall be deemed Allowed and paid on the Effective Date of the Plan.  To the extent the Debtor disputes any part of the Indenture Trustee Administrative Claim, the amount subject to such dispute shall not be deemed Allowed unless and until there is a consensual resolution to the dispute between the Debtor or Reorganized Debtor, as applicable, and the Indenture Trustee or a Final Order by the Bankruptcy Court approving the payment of such disputed amount to the Indenture Trustee as an Allowed Administrative Claim.

B.    *Priority Tax Claims*

To the best of the Debtor's knowledge, there are no Priority Tax Claims against the Debtor.  The Debtor has included a treatment for such Claims in this Plan out of an abundance of caution.  To the extent such Claims exist, such Claims shall be treated as follows:

In accordance with section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the election of the Debtor or Reorganized Debtor (which election is subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion), one of the following treatments in exchange for full and final satisfaction, settlement, release and compromise of such Claim:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Holder of an Allowed Priority Tax Claim and the Debtor or Reorganized Debtor, as applicable, or (c) commencing on the Effective Date and continuing over a period not exceeding five (5) years from the Petition Date, equal semi-annual Cash payments in

an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under non-bankruptcy law; *provided*, that the Reorganized Debtor shall have the option to prepay the entire amount of the Allowed Priority Tax Claim, subject to the consent of the Plan Sponsor, which consent may be withheld in the Plan Sponsor's sole discretion.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Reorganized Debtor shall commence payment as described herein within thirty (30) days after the Allowed Priority Tax Claim becomes due and owing, or as soon thereafter as reasonably practicable.  To the extent that a Priority Tax Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall commence payment as described herein within thirty (30) days after the date on which an order Allowing such Priority Tax Claim becomes a Final Order, or as soon thereafter as reasonably practicable.

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND INTERESTS IN THE DEBTOR

A.    *Summary*

    1.    Except for the claims addressed in Article II above (or as otherwise set forth herein), all Claims against the Debtor are placed in Classes.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims or Priority Tax Claims.

    2.    Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against, and Equity Interests in, the Debtor.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

    3.    Summary of Classification and Treatment of Claims and Equity Interests

| Class | Claim | Status | Voting |
|-------|-------|--------|--------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (presumed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 4 | Plan Sponsor Intercompany Claim | Impaired | Yes |
| 5 | Convenience Claims | Unimpaired | No (presumed to accept) |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Equity Interests | Impaired | No (deemed to reject) |

| 8 | Section 510(b) Claims | Impaired | No (deemed to reject) |

B.    *Classification and Treatment of Claims and Equity Interests*

1.    Class 1—Priority Non-Tax Claims

(a)    *Classification*:  Class 1 consists of Priority Non-Tax Claims.  To the best of the Debtor's knowledge, there are no Priority Non-Tax Claims against the Debtor.  The Debtor has included a class for such Claims in the Plan out of an abundance of caution.

(b)    *Voting*:  Class 1 is Unimpaired and Holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, discharge and compromise of each and every Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall receive, at the election of the Debtor or Reorganized Debtor, as applicable (which election is subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion):  (i) Cash on the Effective Date in an amount equal to such Allowed Priority Non-Tax Claim; or (ii) subject to the Holder's consent, commencing on the Effective Date and continuing over a period not exceeding five (5) years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Non-Tax Claim, together with interest at the applicable rate under non-bankruptcy law; *provided*, that the Reorganized Debtor shall have the option to prepay the entire amount of the Allowed Priority Non-Tax Claim, subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion.  If a Priority Non-Tax Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall commence payment as described herein within thirty (30) days after the date on which an order Allowing such Priority Non-Tax Claim becomes a Final Order, or as soon thereafter as reasonably practicable.

2.    Class 2—Secured Tax Claims

(a)    *Classification*:  Class 2 consists of Secured Tax Claims.  To the best of the Debtor's knowledge, there are no Secured Tax Claims against the Debtor.  The Debtor has included a class for such Claims in the Plan out of an abundance of caution.

(b)    *Voting*:  Class 2 is Unimpaired and Holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section

14

1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, discharge and compromise of each and every Allowed Secured Tax Claim, each Holder of such Allowed Secured Tax Claim shall receive, at the election of the Debtor or Reorganized Debtor (which election is subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion):  (i) Cash on the Effective Date in an amount equal to the amount of such Allowed Secured Tax Claim; or (ii) commencing on the Effective Date and continuing over a period not exceeding five (5) years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law; *provided*, that the Reorganized Debtor shall have the option to prepay the entire amount of the Allowed Secured Tax Claim, subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion.  If a Secured Tax Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall commence payment as described herein within thirty (30) days after the date on which an order Allowing such Secured Tax Claim becomes a Final Order, or as soon thereafter as reasonably practicable.

3.    Class 3—Other Secured Claims

(a)    *Classification*:  Class 3 consists of Other Secured Claims.  To the best of the Debtor's knowledge, there are no Other Secured Claims against the Debtor.  The Debtor has included a class for such Claims in the Plan out of an abundance of caution.

(b)    *Voting*:  Class 3 is Unimpaired and Holders of Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, discharge and compromise of each and every Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive Cash on the Effective Date in an amount equal to such Allowed Other Secured Claim.  If an Other Secured Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall pay such Other Secured Claim within thirty (30) days after the date on which an order Allowing such Other Secured Claim becomes a Final Order, or as soon thereafter as reasonably practicable.

4.    Class 4—Plan Sponsor Intercompany Claim

(a)    *Classification*:  Class 4 consists solely of the Plan Sponsor Intercompany Claim.

(b)    *Allowance of Plan Sponsor Intercompany Claim*:  The Plan Sponsor Intercompany Claim shall be Allowed in the amount of $24,125.

(c)    *Voting*:  Class 4 is Impaired and the Holder of the Plan Sponsor Intercompany Claim is entitled to vote to accept or reject the Plan.

(d)    *Treatment*:  On the Effective Date, in full and final satisfaction and discharge of and in exchange for its Allowed Plan Sponsor Intercompany Claim, the Plan Sponsor shall receive the Plan Sponsor Stock.

5.    Class 5—Convenience Claims

(a)    *Classification*:  Class 5 consists of Convenience Claims.

(b)    *Allowance of Dubel & Associates, LLC Claim*:  Dubel & Associates, LLC holds a Convenience Claim against the Debtor in the amount of $10,500.  Such Claim shall be Allowed in the amount of $10,500.  To the best of the Debtor's knowledge, there are no other Convenience Claims against the Debtor.

(c)     *Voting*:  Class 5 is Unimpaired and the Holders of Class 5 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Convenience Claims are not entitled to vote to accept or reject the Plan.

(d)     *Treatment*:   In exchange for full and final satisfaction, settlement, discharge and compromise of each and every Convenience Claim, each Holder of an Allowed Convenience Claim shall be paid in full in Cash on the Effective Date or as soon thereafter as is practicable.  If a Convenience Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall pay such Claim in full in Cash within thirty (30) days after the date on which an order Allowing such Convenience Claim becomes a Final Order, or as soon thereafter as reasonably practicable.

6.     <u>Class 6—General Unsecured Claims</u>

(a)     *Classification*:  Class 6 consists of General Unsecured Claims.  To the best of the Debtor's knowledge, there are no General Unsecured Claims other than the Prepetition Lenders' Claim and the Senior Notes Claim.

(b)     *Allowance of Prepetition Lenders' Claim and Senior Notes Claim*:

(i)     On the Effective Date, the Prepetition Lenders' Claim shall be Allowed in the aggregate amount of $46,000,000 plus accrued interest and any reasonable fees and expenses owing as of the Petition Date with respect to the obligations under the Credit Agreement.

(ii)    On the Effective Date, the Senior Notes Claim will be Allowed in the aggregate amount of $345,000,000 (which amount includes the $63,105,000 of Senior Notes held by the Debtor) plus accrued interest and any reasonable fees and expenses owing as of the Petition Date with respect to the obligations under the Senior Notes Indenture.  The Debtor agrees to release, discharge and waive any Claim for the Senior Notes it holds in the aggregate amount of $63,105,000 plus accrued interest and all fees and expenses with respect to the obligations under he Senior Notes Indenture, and no distribution shall be made to the Debtor on account of such Senior Notes or any accrued interest or fees and expenses owing thereon as of the Petition Date.

(c)     *Voting*:  Class 6 is Impaired and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

(d)     *Treatment*:   On the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro

17

Rata share of (i) the Class 6 Cash Distribution Amount and (ii) 100% of the Creditor New Common Stock.

(e)  *Convenience Claim Election Rights*:  Each Holder of an Allowed General Unsecured Claim may elect to be treated as a Holder of a Convenience Claim in Class 5 by electing to reduce its Allowed General Unsecured Claim to the amount of $15,000 or less in full and final satisfaction, release and discharge of such Allowed General Unsecured Claim.  For the avoidance of doubt, the Indenture Trustee shall be deemed to be the Holder of any and all Claims arising under the Senior Notes Indenture for the purpose of exercising Convenience Claim election rights with respect to such Claims.  Likewise, the Administrative Agent shall be deemed to be the Holder of any and all Claims arising under the Credit Agreement for the purpose of exercising Convenience Claim election rights with respect to such Claims.  Individual Holders of the Senior Notes and/or the debt owing under the Credit Agreement shall not be eligible to exercise Convenience Claim election rights on account of such holdings.  Any election must be made on the Ballot, and except as may be agreed to by the Debtor or the Reorganized Debtor, no Holder of a General Unsecured Claim can elect treatment as a Convenience Claim after the Voting Deadline.  Upon any such valid and irrevocable election, the General Unsecured Claim of such Holder shall be automatically reduced to $15,000 (or such lower amount that the Holder elects) and shall no longer be entitled to any other distribution as contemplated by this Plan.

7.   Class 7—Equity Interests

(a)  *Classification*:    Class 7 consists of all Equity Interests in FGIC Corporation.

(b)  *Voting*:  Class 7 is Impaired and Holders of Class 7 Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

(c)  *Treatment*:    On the Effective Date, all Equity Interests in FGIC Corporation shall be cancelled and Holders of such Equity Interests shall not receive any distribution under the Plan on account of such Equity Interests.

8.   Class 8—Section 510(b) Claims

(a)  *Classification*:  Class 8 consists of Section 510(b) Claims.  To the best of the Debtor's knowledge, there are no Section 510(b) Claims against the Debtor.  The Debtor has included a Class for such Claims in the Plan out of an abundance of caution.

(b)     *Voting*:    Class 8 is Impaired and Holders of Class 8 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

(c)     *Treatment:*  Holders of Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims.  On the Effective Date, all Section 510(b) Claims shall be discharged.

# ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

The Debtor requests Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtor reserves the right to modify the Plan to the extent Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

# ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *General Settlement of Claims*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  Subject to Article VI, all distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final.

B.     *Reorganized Debtor*

On the Effective Date, the New FGIC Corporation Board shall be established.  The Reorganized Debtor shall be authorized to adopt any agreements, documents and instruments and to take any other actions contemplated by the Plan as necessary or desirable to consummate the Plan; *provided*, *however*, that all such agreements, documents, instruments, and actions be acceptable to the Plan Sponsor in its sole discretion.

C.     *Sources of Consideration for Plan Distributions*

1.     Plan Sponsor Contribution and Cash on Hand

The Reorganized Debtor shall fund any Cash distributions to Holders of Allowed Administrative Claims, Professional Claims, Priority Tax Claims, and Claims in Classes 1–6 with the Debtor's existing Cash on hand as of the Effective Date, *plus* the Plan Sponsor Contribution Amount, *minus* the Reorganized Debtor Maintenance Amount.

19

2.     Creditor New Common Stock

The issuance of Creditor New Common Stock is authorized without the need for any further action by the Debtor or Reorganized Debtor. On the Effective Date, the Reorganized Debtor shall issue and distribute 100% of the shares of Creditor New Common Stock to the Distribution Agent for the benefit of Holders of Class 6 Claims, subject to the reserve for Disputed Claims provided for in Article VI.B.8 herein.

All of the shares of Creditor New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. The distribution and issuance referred to herein shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each entity receiving such distribution or issuance.

D.     *Issuance of Plan Sponsor Stock*

The issuance of Plan Sponsor Stock is authorized without the need for any further action by the Debtor or Reorganized Debtor. On the Effective Date, the Reorganized Debtor shall issue and distribute all of the authorized shares of Plan Sponsor Stock, which shall only be one share, to the Plan Sponsor or its designee. The Plan Sponsor Stock shall not entitle its holder to receive any distribution from the Reorganized Debtor, but shall entitle its holder to consent rights, which consent may be withheld in its sole discretion, with respect to the commencement of any subsequent insolvency or restructuring proceeding of the Reorganized Debtor.

All of the shares of Plan Sponsor Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. The distribution and issuance referred to herein shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each entity receiving such distribution or issuance.

E.     *Corporate Existence*

Except as otherwise provided in the Plan, the Debtor shall continue to exist after the Effective Date as a corporate entity, with all the powers of a corporation, pursuant to applicable law in the jurisdiction in which the Debtor is incorporated and pursuant to the certificate of incorporation and by-laws in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law).

F.      *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, all property of the Debtor's estate, all Causes of Action and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Equity Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Cancellation of Securities and Agreements*

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan, except as otherwise specifically provided for in the Plan:  (a) the obligations of the Debtor under the Credit Agreement, the Senior Notes Indenture and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant or other instrument or document that directly or indirectly evidences or creates any indebtedness, obligation of, or ownership interest in the Debtor that gives rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents that evidence indebtedness, obligations of, or ownership interests in the Debtor that are reinstated pursuant to the Plan), shall be cancelled as to the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder; and (b) the obligations of the Debtor pursuant, relating or pertaining to any agreements, indentures, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options or other instruments or documents that evidence or create any indebtedness, obligations of, or ownership interests in, the Debtor (except such agreements, certificates, notes or other instruments that evidence indebtedness, obligations of, or ownership interests in, the Debtor that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided*, that, notwithstanding Confirmation or Consummation of the Plan, any such indenture or agreement that governs the rights of the Holder of a Claim shall, to the extent necessary, continue in effect solely for purposes of allowing the Holders of General Unsecured Claims to receive their distributions hereunder; *provided*, *further*, that the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan and shall not result in any expense or liability to the Reorganized Debtor.

H.      *Surrender of Existing Securities*

On the Effective Date, the Senior Notes, instruments evidencing a Claim against the Debtor arising under the Credit Agreement, and all securities evidencing an Equity Interest in the Debtor shall be deemed surrendered and extinguished.

I.      *Corporate Action*

As of the date that the Confirmation Order becomes a Final Order, the Debtor and Reorganized Debtor shall be authorized and directed to assume the Amended Tax Allocation Agreement.  Upon the Effective Date, all other actions contemplated by the Plan shall be deemed

21

authorized and approved in all respects, including: (a) distribution of Cash as provided for under the Plan; (b) adoption of the Certificate of Incorporation and By-Laws; (c) selection of the directors and officers for the Reorganized Debtor; and (d) the issuance and distribution of the Creditor New Common Stock and the Plan Sponsor Stock.

All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors or officers of the Debtor or the Reorganized Debtor. On or prior to the Effective Date, as applicable, the appropriate officers of the Debtor or the Reorganized Debtor shall be authorized and, as applicable, directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor. The authorizations and approvals contemplated by this Article V.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.    *Certificate of Incorporation and By-Laws*

Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtor's Certificate of Incorporation and By-Laws shall be amended to prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtor, subject to the consent of the holder of the Plan Sponsor Stock as set forth is the next paragraph of this Article V.J, may amend and restate its Certificate of Incorporation and By-Laws as permitted by the laws of its state of incorporation and by its Certificate of Incorporation and By-Laws.

In addition, the Certificate of Incorporation, By-Laws, and other organizational documents, as appropriate, shall provide that the dissolution or commencement of any subsequent insolvency or restructuring proceeding of the Reorganized Debtor may not occur without the consent of the holder of the Plan Sponsor Stock, which consent may be withheld in its sole discretion.

The Certificate of Incorporation and By-Laws, as amended, shall be filed in the Plan Supplement.

K.    *Stock Trading and Ownership Restrictions*

The transfer of Creditor New Common Stock shall be subject to certain transfer and ownership restrictions under the Certificate of Incorporation that are designed to protect the availability of the Tax Attributes, including net operating losses.

L.    *Reorganized Debtor Maintenance Amount*

On and after the Effective Date, the Reorganized Debtor shall use the Reorganized Debtor Maintenance Amount to fund the Reorganized Debtor's anticipated reasonable operating expenses for such a period of time as the Plan Sponsor deems appropriate in its sole discretion and may not use any such retained funds for any purpose other than its reasonable ordinary and necessary operating expenses; *provided*, *however*, that once such funds are used up by the Reorganized Debtor in its operations, the Plan Sponsor may (at its option) from time to time

contribute additional funds to the Reorganized Debtor for such additional periods of time as the Plan Sponsor may request in its sole discretion, and the Reorganized Debtor shall continue to exist and operate for such periods; *provided*, that such additional funds may only be contributed with prior approval from the NYSDFS for each contribution of additional funds.

M.    *Directors and Officers of the Reorganized Debtors*

The composition of the New FGIC Corporation Board and officers of the Reorganized Debtor shall be disclosed at or prior to the Confirmation Hearing and shall be acceptable to the Plan Sponsor in its sole discretion.

N.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtor and the officers and members of the board of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

O.    *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, sales and use tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.  Furthermore, upon entry of the Confirmation Order, the appropriate state and local governmental officials and administrative agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.

P.    *Preservation of Causes of Action*

Pursuant to section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article X.E below), the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.   The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor.   No person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them.   The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any person, except as otherwise expressly provided in the Plan.   Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised or settled in the

23

Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article X.E below), the Reorganized Debtor reserves and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtor shall not retain any Claims or Causes of Action against the Plan Sponsor or any of its Related Parties except as otherwise provided in Article X.E hereof.

A schedule listing the Causes of Action to be retained by the Reorganized Debtor shall be filed in the Plan Supplement.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Distributions*

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, then on the date that such Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions provided in the Plan for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding any provisions in the Plan to the contrary, and except as otherwise agreed to by the relevant parties, no partial payments or distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been

resolved by settlement or Final Order.   In the event there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor shall establish appropriate reserves for potential payment of such Claims.

B.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Delivery of Distributions in General

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution; *provided*, that the manner of such distributions shall be determined at the discretion of the Debtor or the Reorganized Debtor, as applicable; *provided*, *further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by such Holder.

2.      Delivery of Distributions to Prepetition Lenders

The Administrative Agent shall be deemed to be the Holder of the Allowed Prepetition Lenders' Claim for purposes of the initial distribution to be made pursuant to this Plan.   The Distribution Agent shall make the initial distribution of cash and Creditor New Common Stock on account of such Claim to, or on behalf of, the Administrative Agent and the Administrative Agent shall hold or direct such distributions for the benefit of the Prepetition Lenders, as applicable.   The Administrative Agent shall be permitted to rely on the register maintained by it on behalf of the Debtor pursuant to the Credit Agreement as of the Record Date and shall be entitled to any limitation of liability to which it is entitled under the Credit Agreement with respect to such reliance.   As soon as practicable, the Administrative Agent shall arrange to deliver such distributions to, or on behalf of, such Prepetition Lenders pursuant to the Credit Agreement; *provided*, that the Administrative Agent shall retain all rights as Administrative Agent under the Credit Agreement in connection with delivery of distributions to the Prepetition Lenders.   To the extent any subsequent distributions are required to be made on account of the Prepetition Lender Claims or the Creditor New Common Stock received on account of such Claims, the Distribution Agent shall make any such subsequent distributions directly to each Prepetition Lender and the Administrative Agent shall provide a copy of such Register to facilitate such distributions.   For purposes of subsequent distributions, it will be the responsibility of each individual Prepetition Lender to apprise the Distribution Agent of any change in its holdings after the Record Date.

3.      Delivery of Distributions to Senior Noteholders

(a)     Distributions to Senior Noteholders

The Indenture Trustee shall be deemed to be the Holder of all Claims derived from and based on the Senior Notes Indenture for purposes of distributions to be made hereunder.   The Distribution Agent shall make all distributions on account of such Claims to, or on behalf of, the Indenture Trustee and the Indenture Trustee shall hold or direct such distributions for the benefit of the Senior Noteholders, as applicable.   Notwithstanding any provision contained in this Plan to the contrary, the distribution provisions contained in the Senior Notes Indenture shall continue in effect to the extent necessary to make distributions pursuant to this Plan on account of the

Senior Notes and shall terminate in full upon completion of all such distributions.  All payments to Senior Noteholders shall only be made to such Holders after the surrender by each such Holder of the certificates representing such Senior Notes, or in the event that such certificate is lost, stolen, mutilated or destroyed, upon the Holder's compliance with the requirements set forth above.  Upon surrender of such Senior Notes certificates, the Senior Notes shall be cancelled and destroyed.  As soon as practicable after surrender of the Senior Notes certificates, the Indenture Trustee shall distribute to the Holder thereof such Holder's Pro Rata share of the distribution; *provided*, that the Indenture Trustee shall retain all rights as Indenture Trustee under the Senior Notes Indenture in connection with delivery of distributions to the Senior Noteholders; *provided*, *further*, that the Debtor's obligations to make distributions in accordance with Article III shall be deemed satisfied upon delivery of distributions to the Indenture Trustee.

(b)    Holders as of the Distribution Notification Date

As of the close of business on the Distribution Notification Date:  (1) the Claims Register will be closed; (2) the transfer books and records of the Senior Notes as maintained by the Indenture Trustee or its agent shall be closed; and (3) any transfer of any Claim based on the Senior Notes or any interest therein shall be prohibited.  The Debtor, the Reorganized Debtor and the Indenture Trustee shall have no obligation to recognize any transfer of any Claim based on the Senior Notes occurring after the close of business on the Distribution Notification Date and shall instead be entitled to recognize and deal for all purposes under this Plan with only those Holders of record as of the close of business on the Distribution Notification Date.

4.    Distributions by Distribution Agent

The Debtor or the Reorganized Debtor, as applicable, shall have the authority, in its sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  As a condition to serving as a Distribution Agent, a Distribution Agent must:  (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required hereunder; and (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required hereunder to be distributed by such Distribution Agent.

The Debtor or the Reorganized Debtor, as applicable, shall pay to the Distribution Agent reasonable and documented fees and expenses of the Distribution Agent in an amount not to exceed $[_____], without the need for any approvals, authorizations, actions or consents; *provided*, *however*, that if the reasonable and documented fees and expenses of the Distribution Agent exceed $[_____], then no additional amounts may be paid by the Reorganized Debtor to the Distribution Agent without the prior written consent of the Plan Sponsor, which consent may be withheld in its sole discretion.

5.    Minimum Distributions

Notwithstanding anything herein to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $25 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars.  Whenever any

26

payment or distribution of a fraction of a dollar or a share of Creditor New Common Stock or other means of distribution under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar, share or other similar distribution item.

6.    Fractional Shares

No fractional shares of Creditor New Common Stock shall be distributed under the Plan. When any distribution pursuant to the Plan on account of Allowed Class 6 Claims would otherwise result in the issuance of a number of shares of Creditor New Common Stock that is not a whole number, the actual distribution of shares of Creditor New Common Stock shall be rounded to the next lower whole number with no further payment or other distribution therefor. The total number of authorized shares of Creditor New Common Stock to be distributed shall be adjusted as necessary to account for the rounding provided for in this Article VI.B.6.

7.    Undeliverable Distributions

In the event that any distribution to any Holder of a Claim is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor automatically and without need for a further order of the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) and the Claim of any Holder to such property or Equity Interest in property shall be discharged and forever barred.

8.    Distributions Withheld for Disputed Claims

On the Effective Date, the Debtor shall reserve Cash and/or Creditor New Common Stock, as appropriate, in an amount equal to the distributions to which Holders of Disputed Claims would be entitled if all such Claims were to become Allowed Claims.  In the event a Disputed Claim is disallowed or Allowed and satisfied in accordance with the terms hereof pursuant to a Final Order, the Reorganized Debtor may reduce the amount of Cash and/or Creditor New Common Stock held in reserve accordingly.

9.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed by any governmental unit. All distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provisions in the Plan to the contrary, the Reorganized Debtor and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  To avoid the need to take any such

actions, the Debtor plans to reserve $[___] to satisfy its obligations on account of tax withholding and reporting requirements.

10.     Allocations

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

11.     No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim against the Debtor and no Holder of any Claim against the Debtor shall be entitled to interest accruing on or after the Petition Date on any such Claim.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.     *Resolution of Disputed Claims*

1.     Allowance of Claims

On and after the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Case allowing such Claim. All settled Claims approved prior to the Effective Date by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019, or otherwise, shall be binding on all parties.

2.     Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date until the applicable Claims Objection Bar Date, the Reorganized Debtor, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without any further notice to, or action, order or approval of, the Bankruptcy Court. The Reorganized Debtor shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order or approval of, the Bankruptcy Court.

3.       Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date, the Reorganized Debtor, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

4.       Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged from the Claims Register by the Reorganized Debtor and any Claim that has been amended may be adjusted thereon by the Reorganized Debtor. The Reorganized Debtor may expunge or adjust such Claims without filing a Claims objection and without any further notice to, or action, order or approval of, the Bankruptcy Court.

5.       Deadline to File Objections to Claims

Any objections to Claims shall be filed no later than the applicable Claims Objection Bar Date.

B.       *Disallowance of Claims*

All Claims of any entity from which property is sought by the Debtor under sections 542, 543, 550 or 553 of the Bankruptcy Code, or that the Debtor or the Reorganized Debtor alleges is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be disallowed if (a) the entity, on the one hand, and the Debtor or the Reorganized Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

C.       *Amendments to Claims*

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor and, to the extent such prior authorization is not received, any such new or amended

Claim shall be deemed disallowed and expunged without any further notice to, or action, order or approval of, the Bankruptcy Court.

D.    *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is filed prior to the Effective Date, such Claim shall be deemed a Disputed Claim and no payment or distribution provided under the Plan shall be made on account of such Disputed Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

E.    *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions, if any, shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court making any Disputed Claim an Allowed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim the distribution, if any, to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.  After the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim that is deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order in the Chapter 11 Case, including the Confirmation Order, allowing such Claim.  All settled Claims approved prior to the Effective Date by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019, or otherwise, shall be binding on all parties.

## ARTICLE VIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.    Assumption and Rejection of
Executory Contracts and Unexpired Leases

The Amended Tax Allocation Agreement shall be assumed as of the Effective Date.  All other Executory Contracts and Unexpired Leases shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease: (a) has been previously assumed by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (b) is the subject of a motion to assume pending as of the Effective Date; or (c) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement.

2.      Approval of Assumption and Rejection of
        <u>Executory Contracts and Unexpired Leases</u>

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection of Executory Contracts or Unexpired Leases described in Article VIII.A.1 pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or rejection of such Executory Contract or Unexpired Lease, including objecting to the cure amount designated by the Debtor as payable in connection with an assumption, shall be deemed to have consented to such assumption or rejection and agreed to the specified cure amount.

B.      *Claims on Account of the Rejection of*
        *Executory Contracts or Unexpired Leases*

All Proofs of Claim arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Debtor or the Reorganized Debtor, as applicable, no later than thirty (30) days after the Effective Date.

Any entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtor or the Reorganized Debtor or their estates and property and the Debtor and the Reorganized Debtor, their estates and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. As of the Effective Date, all such Claims shall be subject to the permanent injunction set forth in Article X.H hereof.

C.      *Procedures for Counterparties to Executory Contracts*
        *and Unexpired Leases Assumed Pursuant to the Plan*

A notice of the Effective Date, including notice regarding the assumption or rejection of Executory Contracts or Unexpired Leases, shall be sent to all known Holders of a Claim. For known non-Debtor parties to Executory Contracts and Unexpired Leases assumed or rejected pursuant to the Plan, such notice or separate notices will be sent on or as soon as practicable after the Effective Date notifying such counterparties that such Executory Contracts and Unexpired Leases have been assumed or rejected pursuant to the Plan.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least twenty (20) days prior to the Confirmation Hearing, where applicable, the Debtor shall provide counterparties to Executory Contracts and Unexpired Leases with notices of proposed assumptions and cure amounts as well as procedures for objecting thereto and resolution of such disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract to a proposed assumption or related cure amount must be filed, served and **actually received** by the

Debtor at least five (5) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters.

In the event of a dispute regarding:  (a) the amount of any payments to cure such a default; (b) the ability of the Debtor or Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract to be assumed; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving any such dispute and approving the assumption.  If an objection to cure is sustained by the Bankruptcy Court, the Debtor, at its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

D.    *Survival of Corporate Indemnification Obligations*

All Claims of the Debtor's officers and directors for indemnity arising under the Debtor's certificate of incorporation or by-laws, applicable state law, specific agreement or any combination of the foregoing arising in respect of actions or omissions that occurred prior to the Petition Date shall be treated as Class 6 Claims to the extent such Claims are not otherwise satisfied from the Debtor's existing directors and officers' insurance coverage.

After the Effective Date, the Reorganized Debtor shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect on the Petition Date, with respect to actions or omissions occurring prior to the Effective Date and all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.    *Conditions*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.    A Final Order shall have been entered providing that the Plan Sponsor Agreement is approved and the Debtor and the Reorganized Debtor are directed to perform all obligations thereunder;

2.    The Confirmation Order shall provide, among other things, that (a) assumption of the Amended Tax Allocation Agreement is approved, (b) the assets that may be deposited into the Tax Escrow Account, if any, shall not be deemed property of the Debtor or the Reorganized Debtor, and (c) the Debtor and the Reorganized Debtor are authorized and directed to take all actions necessary or appropriate to consummate the Plan;

3.      The Confirmation Order shall have been entered and have become a Final Order and shall be acceptable to the Plan Sponsor in its sole discretion;

4.      All documents and agreements necessary to implement the Plan, including the Plan Sponsor Agreement, the Amended Tax Allocation Agreement, and all documents in the Plan Supplement shall (a) be acceptable to the Plan Sponsor in its sole discretion, and (b) have (i) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) been tendered for delivery; and (iii) been effected or executed;

5.      All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties, and, to the extent required, filed with and approved by applicable governmental units in accordance with applicable laws;

6.      All governmental, judicial, and third party approvals and consents, including approval (or non-disapproval, as the case may be) of the NYSDFS and the Bankruptcy Court, that are necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transaction;

7.      The Bankruptcy Court shall have entered the Final Claims Trading Order, which shall be in form and substance acceptable to the Plan Sponsor in its sole discretion, on or before entry of an order approving the adequacy of the Disclosure Statement, and the Final Claims Trading Order shall be a Final Order;

8.      The Plan qualifies under section 382(l)(5) of the IRC and the Plan Sponsor is satisfied with such qualification in its sole discretion; and

9.      The Certain Tax Conditions are satisfied.

B.      *Waiver of Conditions*

The conditions to the Effective Date set forth in this Article may be waived only by the Plan Sponsor, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

C.      *Effect of Non-Occurrence of Conditions to the Effective Date*

Unless otherwise agreed to by the Plan Sponsor, if the Effective Date does not occur within 180 days after the Confirmation Date, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by, or Claims against or Equity Interests in, the Debtor; (b) constitute the assumption or rejection of any Executory Contract or Unexpired Lease affected by the Plan; (c) prejudice in any manner the rights of the Debtor or any Holders of Claims against or Equity

Interests in the Debtor; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtor or any Holders of Claims against or Equity Interests in the Debtor in any respect.

# ARTICLE X.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### A.    *Compromise and Settlement*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, distributions, releases and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Equity Interests and controversies resolved pursuant to the Plan relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest or any distribution to be made on account of such Allowed Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its estate and Holders of Claims and Equity Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan and pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to, or action, order or approval of, the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against it and its estate and Causes of Action against other entities.

### B.    *Subordinated Claims*

The allowance, classification, and treatment of all Claims and Equity Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise; *provided*, that notwithstanding anything to the contrary contained in that certain Monitoring Fee Agreement by and between the Debtor and The PMI Group, Inc., dated as of December 18, 2003, Dubel & Associates, LLC, as successor to The PMI Group, Inc., shall be entitled to an Allowed Convenience Claim in the amount of $10,500, which Claim shall be paid in full in Cash as a Class 5 Convenience Claim.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.  As provided in Article III.B of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such section 510(b) Claim.  As of the filing of this Plan, the Debtor is not aware of any Claims that merit subordination.

### C.    *Discharge of Claims and Termination of Equity Interests*

Pursuant to, and to the fullest extent permitted by, section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and

treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Equity Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against or Equity Interests in the Debtor, the Reorganized Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such Claim or Equity Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtor with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to occurrence of the Effective Date.

D.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection therewith, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III hereof, and, in the case of a Secured Tax Claim or Other Secured Claim, concurrently with satisfaction in full of the portion of the Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtor's estate shall be fully released and discharged and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.  The Debtor is not aware of any liens against property of the estate.

E.    *Debtor Release*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtor, the Reorganized Debtor and any person or entity seeking to exercise the rights of the Debtor's estate, including the Creditors' Committee, any successor to the Debtor or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall, to the maximum extent allowed by applicable law, discharge and release and shall be deemed to have provided a full release, waiver, and discharge to each of the Released Parties (and each of the Released Parties shall be deemed fully released and discharged by the Debtor and Reorganized Debtor and any person or entity seeking to exercise the rights of the Debtor's estate) and their respective property from any and all claims, interests, obligations, debts, rights, suits, damages, Causes of Action,**

remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereafter arising, in law, at equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's estate, the conduct of the Debtor's business, the Chapter 11 Case, the purchase, sale or rescission of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim against the Debtor or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims against the Debtor and Equity Interests prior to or in the Chapter 11 Case, or the negotiation, formulation or preparation of the Plan Sponsor Agreement, Plan, Plan Supplement, Disclosure Statement or any related agreements, instruments or other documents, other than claims or liabilities arising out of or relating to any act or omission of such Released Party that constitutes willful misconduct or gross negligence as determined by a Final Order.

Notwithstanding anything herein to the contrary, the foregoing "Debtor Release" shall not operate to waive or release (a) any post-Effective Date obligations of any party under the Plan, the Amended Tax Allocation Agreement, the Plan Sponsor Agreement, or any other document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any Causes of Action of the Debtor that are expressly set forth in and preserved by the Plan or related documents.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes, by reference, each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the Debtor Release; (c) in the best interests of the Debtor and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after reasonable investigation by the Debtor and after notice and opportunity for hearing; and (f) a bar to the Debtor or the Reorganized Debtor asserting any claim or Cause of Action released pursuant to the Debtor Release against any of the Released Parties.

F.    *Releasing Party Release*

Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party), shall, to the maximum extent allowed by applicable law, discharge and release and shall be deemed to have provided a full release, waiver, and discharge to each of the Released Parties (and each of the Released Parties shall be deemed fully released and discharged by the Releasing Parties) and their respective property from any and all claims, interests, obligations, rights, debts, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of

the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereafter arising, in law, at equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's estate, the conduct of the Debtor's businesses, the Chapter 11 Case, the purchase, sale or rescission of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim against Debtor or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims against the Debtor and Equity Interests prior to or in the Chapter 11 Case, or the negotiation, formulation or preparation of the Plan Sponsor Agreement, Plan, Plan Supplement, Disclosure Statement or any related agreements, instruments or other documents, other than claims or liabilities arising out of or relating to any act or omission of such Released Party that constitutes willful misconduct or gross negligence as determined by a Final Order.

Notwithstanding anything herein to the contrary, the foregoing "Releasing Party Release" does not release (a) any post-Effective Date obligations of any party under the Plan, the Amended Tax Allocation Agreement, the Plan Sponsor Agreement, or any other document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action that are expressly set forth in and preserved by the Plan or related documents, or (c) any obligation that the Plan Sponsor may owe to any Releasing Party (or vice versa) in connection with or relating to such Releasing Party's employment by or service for the Plan Sponsor.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Releasing Party Release, which includes by reference each of the related provisions and definitions contained herein and further, shall constitute the Bankruptcy Court's finding that the Releasing Party Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the Releasing Parties; (c) in the best interests of the Debtor and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any claim or Cause of Action against any of the Released Parties that has been released pursuant to the Releasing Party Release.

G.    *Exculpation*

Except with respect to any acts or omissions expressly set forth in and preserved by the Plan or related documents, the Exculpated Parties shall neither have nor incur any liability to any person or entity for any act taken or omitted to be taken in connection with, arising from or relating in any way to, the Chapter 11 Case, including:  (a) the operation of the Debtor's business during the pendency of this Chapter 11 Case;  (b) formulating, negotiating, preparing, disseminating, implementing and/or effecting the Plan Sponsor Agreement, the Amended Tax Allocation Agreement, the Disclosure Statement and the Plan (including the Plan Supplement and any related contract, instrument, release or other agreement or document created or entered into in connection therewith); (c) the solicitation of votes for the Plan and the pursuit of Confirmation of the Plan; (d) the administration of

37

the Plan and/or the property to be distributed under the Plan; (e) the offer and issuance of any securities under the Plan; (f) formulating, negotiating, and/or preparing the prior versions of the Debtor's plan of reorganization filed on August 3, 2010 [Docket No. 11], and/or (g) any postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtor. In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its respective duties under, pursuant to or in connection with, the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing exculpation provisions shall (a) exculpate any person or entity from any liability resulting from any act or omission constituting willful misconduct or gross negligence as determined by a Final Order, (b) exculpate any person or entity from their obligations under the Amended Tax Allocation Agreement, the Plan Sponsor Agreement or any other document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (c) limit the liability of the professionals of the Exculpated Parties to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

H.    *Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES, INCLUDING THOSE WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES, THAT (i) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (ii) HAVE BEEN RELEASED PURSUANT TO ARTICLE X.E OR ARTICLE X.F, (iii) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE X.G; OR (iv) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM:

(a)    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES;

(b)    ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH

RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES;

(c)    CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES;

(d)    ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF, SUBROGATION OR RECOUPMENT ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND

(e)    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN;

(f)    TAKING ANY ACTION OR FAILING TO TAKE ANY ACTION THAT COULD RESULT IN A BREACH OF THIS PLAN, ANY DOCUMENT IN THE PLAN SUPPLEMENT OR THE PLAN SPONSOR AGREEMENT; AND

(g)    TAKING ANY ACTION OR FAILING TO TAKE ANY ACTION THAT COULD IN ANY WAY IMPAIR THE PLAN SPONSOR'S USE OF ALL OR ANY PORTION OF THE TAX ATTRIBUTES IN ANY WAY, INCLUDING FAILING TO COMPLY WITH, TERMINATING, REJECTING OR OTHERWISE INTERFERING WITH THE AMENDED TAX ALLOCATION AGREEMENT.

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NO ENTITY SHALL BE PRECLUDED FROM OBTAINING ON ACCOUNT OF ITS ALLOWED

CLAIM THE DISTRIBUTIONS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; *PROVIDED*, THAT NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, SUBSECTION (g) ABOVE SHALL NOT APPLY TO THE PLAN SPONSOR.

## ARTICLE XI.

## BINDING NATURE OF PLAN

**THIS PLAN SHALL BIND THE DEBTOR, THE REORGANIZED DEBTOR, AND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER:  (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN; (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR; (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

## ARTICLE XII.

## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain the maximum legally permissible jurisdiction over the Chapter 11 Case and all entities with respect to all matters arising out of or related to the Chapter 11 Case, the Debtor and the Plan, including jurisdiction to:

1.	allow, disallow, determine, liquidate, classify, estimate or establish the priority of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim;

2.	grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan;

3.	resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add or remove Executory Contracts or Unexpired Leases from the schedule of Assumed Executory Contracts and Unexpired Leases;

4.	ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date; *provided*, that the Reorganized Debtor reserves the right to commence actions in all appropriate forums and jurisdictions;

6.      enter and implement such orders as may be necessary or appropriate to implement or Consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan Sponsor Agreement, the Plan, the Plan Supplement or the Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

8.      hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

9.      issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with the Effective Date or enforcement of the Plan, the Amended Tax Allocation Agreement, and the Plan Sponsor Agreement, except as otherwise provided in the Plan;

10.      resolve any cases, controversies, suits or disputes with respect to the settlements, compromises, releases, injunctions, exculpations and other provisions contained in Article X hereof and enter such orders or take such other actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

11.      enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.      resolve any other matters that may arise in connection with or relate to the Plan Sponsor Agreement, Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement;

13.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

14.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

15.      determine requests for the payment of Claims and Equity Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

16.     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

17.     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

18.     hear and determine matters concerning section 1145 of the Bankruptcy Code;

19.     hear and determine all disputes involving the existence, nature, or scope of the releases set forth in Article X hereof;

20.     hear and determine any dispute related to the Professional Fee Reserve Account or the Professional Fee Reserve Amount;

21.     enforce all orders previously entered by the Bankruptcy Court;

22.     resolve any disputes arising under the Plan Sponsor Agreement;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order concluding or closing the Chapter 11 Case; and

25.     enforce the injunction, release, and exculpation provisions set forth in this Article X.

Notwithstanding anything to the contrary in this Article XII, any claim, action or dispute that may arise as a result from, or be connected with the Amended Tax Allocation Agreement shall be subject to and governed by the jurisdictional provisions set forth in the Amended Tax Allocation Agreement.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

A.      *Modification of Plan*

Subject to the next sentence, the Plan and all documents to be executed, delivered, assured and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date, subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion.  After entry of the Confirmation Order, the Debtor or the Reorganized Debtor, as applicable, may, upon order of the Bankruptcy Court and consent of the Plan Sponsor, which consent may be withheld in its sole discretion, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission, or reconcile any inconsistency in the Plan in such a manner as may be necessary to carry out the purpose and intent of the Plan.

B.    *Successors and Assigns*

The rights, benefits and obligations of any entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

C.    *Reservation of Rights*

Except as expressly set forth herein, including with respect to votes cast to accept or reject the Plan, the Plan shall have no force or effect unless and until all conditions to the Effective Date have either been satisfied or waived, as required by Article IX hereof.  Neither the filing of the Plan, any statement or provision contained herein nor the taking of any action by the Debtor or any other entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor with respect to the Holders of Claims or Equity Interests or other entities; or (2) any Holder of a Claim or an Equity Interest or other entity before the Effective Date.

D.    *Section 1145 Exemption*

The offering, issuance and distribution of the Creditor New Common Stock and the Plan Sponsor Stock, and any subsequent sales, resales, transfers or other distributions of any such securities, shall be exempt from any federal or state securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

E.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code due and payable through the Effective Date shall be paid by the Debtor on or before the Effective Date, and amounts due thereafter shall be paid by the Debtor in the ordinary course of business until the Bankruptcy Court enters a final decree closing the Chapter 11 Case, dismisses the Chapter 11 Case or converts the Chapter 11 Case to another chapter in bankruptcy.  Any deadline for filing Claims in the Chapter 11 Case shall not apply to fees payable by the Debtor pursuant to section 1930 of title 28 of the United States Code.

F.    *Post-Confirmation Date Reporting*

After the Effective Date, the Reorganized Debtor shall be responsible for compliance with all reporting requirements imposed by the Bankruptcy Code, Bankruptcy Rules and U.S. Trustee Guidelines.

G.    *Section 1125(e) Good Faith Compliance*

The Released Parties, the Reorganized Debtor, the Administrative Agent, and the Indenture Trustee shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code, and each is entitled to the protections afforded thereunder.

H.      *Further Assurances*

The Debtor or the Reorganized Debtor, as applicable, all Holders of Claims receiving distributions hereunder and all other entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

I.      *Severability*

If, before Confirmation, any term or provision hereof is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable.  Such term or provision then will be applicable as altered or interpreted; *provided*, that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtor and acceptable to the Plan Sponsor; *provided*, *further*, that the Debtor may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.  Notwithstanding any such order, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect.  The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

J.      *Dissolution of the Creditors' Committee*

Upon distribution of Cash to Holders of Allowed Class 6 Claims, the Creditors' Committee shall be deemed to be dissolved and its members shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to the Chapter 11 Case; *provided*, *however*, that the Creditors' Committee shall continue in existence following distribution of Cash to Holders of Allowed Class 6 Claims for the sole purpose of addressing matters concerning fees incurred in connection with the Chapter 11 Case.

K.      *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by overnight mail to:

| Debtor | Counsel to the Debtor |
|---|---|
| FGIC Corporation<br>125 Park Avenue<br>New York, New York  10017<br>Attn.:   John S. Dubel<br>            A. Edward Turi, III | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York  10022<br>Phone:  (212) 446 4800<br>Fax:       (212) 446-4900<br>Attn.:   Paul M. Basta<br>            Brian S. Lennon<br>            -and-<br>Kirkland & Ellis LLP<br>300 North LaSalle |

| | Chicago, Illinois  60654 |
| | Phone:  (312) 862-2000 |
| | Fax:      (312) 862-2200 |
| | Attn.:   Patrick J. Nash, Jr. |
| **Clerk of the Bankruptcy Court** | **United States Trustee** |
| United States Bankruptcy Court for the Southern District of New York Alexander Hamilton Custom House One Bowling Green New York, New York  10004 | Office of the United States Trustee for the Southern District of New York 33 Whitehall Street, 21st Floor New York, New York  10004 Attn.:   Andrea B. Schwartz |
| **Counsel for the Administrative Agent** | **Indenture Trustee** |
| Morgan Lewis & Bockius LLP 101 Park Avenue New York, New York  10178 Phone:  (212) 309-6000 Fax:      (212) 309-6001 Attn.:   Richard S. Toder         Michael A. Chapnick | Wilmington Trust FSB 166 Mercer Street, Suite 2-R New York, New York  10012 Phone:  (212) 941-4415 Fax:      (212) 343-1079 Attn.:   Adam Berman |
| **Counsel for Plan Sponsor** | **Counsel for the New York State Department of Financial Services** |
| Cravath, Swaine & Moore LLP 825 Eighth Avenue New York, New York,  10019 Phone:  (212) 474-1000 Fax:      (212) 474-3700 Attn.:   Richard Levin | Fried, Frank, Harris, Shriver & Jacobson LLP One New York Plaza New York, New York  10004 Phone:  (212) 859-8000 Fax:      (212) 859-4000 Attn.:   Bonnie Steingart |
| **Counsel for the Creditors' Committee** | |
| Morrison & Foerster LLP 1290 Avenue of the Americas New York, NY 10104 Phone:   (212) 468-8000 Fax:      (212) 468-7900 Attn.:   Anthony Princi         John A. Pintarelli | |

L.     *Filing of Additional Documents*

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.  The Plan Supplement shall be filed no later than five (5) Business Days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court.

*M.*        *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.


Respectfully submitted, as of the date first set forth above,


By:     _____
Name:    John S. Dubel
Title:    Chief Executive Officer,
         FGIC Corporation

**EXHIBIT A**

**AMENDED TAX ALLOCATION AGREEMENT**

# AMENDED AND RESTATED
# INCOME TAX ALLOCATION AGREEMENT

Amended and Restated Income Tax Allocation Agreement (the "Agreement"), dated as of [ • ], 2012, by and among FGIC Corporation, a Delaware corporation ("Corp"), Financial Guaranty Insurance Company, a New York corporation ("FGIC"), FGIC Credit Products LLC, a Delaware limited liability company, FGIC Credit Products II LLC, a Delaware limited liability company, Grand Central Assurance Corporation, a New York corporation, and GCAC Credit Products LLC, a Delaware limited liability company.

WHEREAS, Corp and its direct and indirect domestic subsidiaries, including FGIC, are currently members of an Affiliated Group (as defined below), of which Corp is the common parent corporation;

WHEREAS, FGIC directly and indirectly owns substantially all of the assets related to the Affiliated Group's historic financial guaranty insurance business, which provided credit enhancement to policyholders through insurance policies issued by FGIC and other members of the FGIC Group (as defined below) in respect of public finance, structured and other financial obligations, including credit default swaps;

WHEREAS, Corp and FGIC are parties to that certain Amended and Restated Income Tax Allocation Agreement dated December 18, 2003, in effect on the date hereof (the "Existing Agreement"); and

WHEREAS, the parties desire to amend and restate the Existing Agreement in the manner set forth herein to be effective on and as of the date hereof;

NOW THEREFORE, in consideration of the premises set forth above and the terms and conditions set forth below, the parties hereto agree as follows:

**Section 1.**      **Definitions.**  For purposes of this Agreement, the following definitions shall apply:

(a)      "Adjustment" shall mean any proposed or final change in the Income Tax liability of a taxpayer.

(b)      "Affiliated Group" shall mean an affiliated group of corporations within the meaning of Section 1504(a) of the Code.

(c)      "Chapter 11 Case" shall mean the voluntary case Corp commenced under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York, Case No. 10-14215 (SMB).

(d)      "Charter" shall mean [ • ], as amended from time to time.

(e)      "Code" shall mean the Internal Revenue Code of 1986, as amended.

(f)    "Corp Group" shall mean Corp and its Subsidiaries, excluding, however, any member of the FGIC Group.

(g)    "Corp Affiliated Group" shall mean the Affiliated Group of which Corp is the common parent corporation and which includes at least one member of the Corp Group and at least one member of the FGIC Group.

(h)    "Escrow Account" has the meaning set forth in Section 2(e).

(i)    "Estimated Income Tax Payments" has the meaning set forth in Section 2(a).

(j)    "Existing Agreement" has the meaning set forth in the Recitals.

(k)    "FGIC Group" shall mean FGIC and its Subsidiaries.

(l)    "FGIC-Prepared Return" has the meaning set forth in Section 3.

(m)    "FGIC Shares" shall mean any and all capital stock or equity of FGIC owned by Corp.

(n)    "Final Determination" shall mean the final resolution of any Tax matter, including a closing agreement with the IRS or the relevant state, local or foreign taxing authority, a claim for refund that has been allowed, a deficiency notice with respect to which the period for filing a petition with the Tax Court or the relevant state, local or foreign tribunal has expired, or a decision of any court of competent jurisdiction that is not subject to appeal or as to which the time for appeal has expired.

(o)    "Income Taxes" shall mean all Taxes imposed on or measured in whole or in part by income, capital or net worth or a taxable base in the nature of income, capital or net worth, and shall include any addition to Tax, additional amount, interest and penalty imposed with respect to such Taxes.

(p)    "Income Tax Return" shall mean any Tax Return with respect to Income Taxes.

(q)    "IRS" shall mean the United States Internal Revenue Service or any successor thereto, including its agents, representatives, and attorneys.

(r)    "Losses" has the meaning set forth in Section 2(c).

(s)    "person" shall mean an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

(t)    "Separate Income Tax Liability" has the meaning set forth in Section 2(b).

(u)    "Straddle Period" has the meaning set forth in Section 2(a).

2

(v)    "Subsidiary" shall mean, with respect to any person, any corporation or other organization, whether incorporated or unincorporated, of which (i) such person or any Subsidiary of such person is a general partner or (ii) at least 50% of the securities or other interests having by their terms ordinary voting power to elect a majority of the Board of Directors or others performing similar functions with respect to such corporation or other organization or at least 50% of the value of the outstanding equity is directly or indirectly owned or controlled by such person or by any one or more of its Subsidiaries, or by such person and one or more of its Subsidiaries.

(w)    "Taxes" shall mean all federal, state, local, foreign or other governmental taxes, assessments, duties, fees, levies or similar charges of any kind, including all income, profits, franchise, excise, property, use, intangibles, sales, value-added, ad valorem, payroll, employment, withholding, estimated and other taxes of any kind whatsoever whether disputed or not, and including all additions to tax, additional amounts, interest and penalties imposed with respect to such amounts.

(x)    "Tax Attribute" shall mean Losses, deferred deductions, tax basis in assets and any other tax attribute.

(y)    "Tax Benefit" shall mean a reduction in the Tax liability of a taxpayer (or of the Affiliated Group of which it is a member) for any Taxable Period (computed on a with-and-without basis).

(z)    "Tax Benefit Realization Payment" has the meaning set forth in Section 2(c).

(aa)    "Tax Controversy" shall mean any examination, audit, claim, dispute, litigation, proposed settlement, proposed Adjustment or related matter with respect to Income Taxes.

(bb)    "Taxable Period" shall mean any taxable year or portion thereof.

(cc)    "Tax Return" shall mean any return, report, form or other information filed or required to be filed with any taxing authority with respect to Taxes.

**Section 2.    Tax Payments**

(a)    Estimated Income Tax Payments.  If any member of the FGIC Group joins any member of the Corp Group in filing an Income Tax Return on a consolidated, combined or unitary basis for any Taxable Period ending after the date hereof, FGIC shall pay, or cause to be paid, to Corp the lesser of (i) the amount of estimated Income Taxes incurred and owing by the Corp Affiliated Group (or, if applicable, any comparable group for state or local Income Tax purposes) in respect of any such Tax Return, and (ii) the amount of estimated Income Taxes that would have been incurred by the FGIC Group and its members had the FGIC Group and its members not filed any such Tax Return on a consolidated, combined or unitary basis with the Corp Group during such period (such payments by FGIC, "Estimated Income Tax Payments"). For any Taxable Period that begins prior to and ends after the date hereof (a "Straddle Period"), the parties' obligations under this Section 2 shall be determined based on the assumption that this

3

Agreement was in effect for the entire Straddle Period, and payments to and from the parties shall be adjusted to account for payments made, if any, prior to the date hereof.  For purposes of determining the amount of a member of the FGIC Group's Estimated Income Tax Payments, to the extent that such member would be entitled to file an Income Tax Return on a consolidated, combined or unitary basis with any other member of the FGIC Group, Estimated Income Tax Payments are determined as though such members filed on a consolidated, combined or unitary basis.

(b)     Additional Income Tax Payments.  For each Taxable Period ending after the date hereof, if the amount of Income Taxes incurred and owing by the Corp Affiliated Group (or, if applicable, any comparable group for state or local Income Tax purposes) in respect of any Income Tax Return that the Corp Group and its members filed on a consolidated, combined or unitary basis with the FGIC Group and its members exceeds the aggregate amount of payments made by FGIC to Corp pursuant to Section 2(a), FGIC shall pay the amount of such excess to Corp; provided that, the amount paid pursuant to this Section 2(b) shall in no event exceed the amount determined by subtracting (i) the aggregate amount of payments made by FGIC to Corp pursuant to Section 2(a) for such period from (ii) the amount of Income Taxes that would have been incurred by the FGIC Group and its members for such period had the FGIC Group and its members not filed any Income Tax Return on a consolidated, combined or unitary basis with the Corp Group during all relevant periods (the liability under this clause (ii), "Separate Income Tax Liability").  For purposes of determining the amount of a member of the FGIC Group's Separate Income Tax Liability, to the extent that such member would be entitled to file an Income Tax Return on a consolidated, combined or unitary basis with any other member of the FGIC Group, the Separate Income Tax Liability is determined as though such members filed on a consolidated, combined or unitary basis.

(c)     Corp Reimbursement to FGIC.  To the extent that the Corp Group utilizes for any Taxable Period any credits, losses or deductions (including foreign tax credits, alternative minimum tax credits, net operating losses or net capital losses) (collectively, "Losses") that were generated (at any time, including prior to such Taxable Period) by, derive from or are attributable to a member of the FGIC Group (other than any such Losses that are reduced under Treasury Regulation Section 1.1502-28 as a result of cancellation of indebtedness income generated as a result of the chapter 11 plan that is implemented in connection with the Chapter 11 Case), and such utilization results in a Tax Benefit being realized by the Corp Group (treating any Tax Attributes generated by, deriving from or attributable to the FGIC Group as utilized prior to the utilization of any Tax Attributes generated by, deriving from or attributable to the Corp Group), then Corp shall pay to FGIC the amount of such Tax Benefit at the time of filing of the Tax Return reflecting the realization of the Tax Benefit ("Tax Benefit Realization Payment") and such Losses for which Corp has paid FGIC shall not be treated as utilizable by any member of the FGIC Group for purposes of computing such member's Estimated Income Tax Payments or Separate Income Tax Liability.  Furthermore, to the extent that the aggregate amount of payments made by FGIC to Corp pursuant to Section 2(a) for a Taxable Period exceeds the FGIC Group's and any of its member's Separate Income Tax Liability for such period, Corp shall pay to FGIC the amount of any such excess.

(d)     Reports, Payments and Procedures.  For each Taxable Period ending after the date hereof, including any Straddle Period, FGIC shall prepare and deliver to Corp a schedule

4

showing in reasonable detail FGIC's calculation of any Estimated Income Tax Payments or Separate Income Tax Liability, as the case may be, and, subject to Section 8, (i) FGIC shall pay to Corp the amount of any Estimated Income Tax Payments shown on such schedule no later than five (5) days before the date that the corresponding estimated Income Tax payments would have been due and payable had the member of the FGIC Group with respect to which such Estimated Income Tax Payments are determined not filed an Income Tax Return on a consolidated, combined or unitary basis with any member of the Corp Group, and (ii) payments between Corp and FGIC required pursuant to Section 2(b) or (c) hereof (other than Tax Benefit Realization Payments, which are subject to Section 2(c) above) shall be made, based on such schedule, no later than five (5) days before the due date of the Income Tax Return for the Taxable Period for which such payments are due.  Except as otherwise provided herein, all indemnification or other payments to be made pursuant to this Agreement shall be made within fifteen (15) days after written notice of a request for indemnification or payment by the indemnified party, which notice shall be accompanied by evidence and a computation of the amount due.

(e)     <u>Escrow Account</u>.  Prior to the earlier of Corp's receipt of any payment from FGIC pursuant to this Agreement or Corp's receipt of any refund of Income Taxes, the parties shall establish an escrow account for the purpose of segregating and protecting funds transferred by, for the benefit of, or owing to FGIC pursuant to this Agreement (the "<u>Escrow Account</u>").  Any payment received by Corp from FGIC pursuant to this Agreement or as a refund of Income Taxes from a taxing authority shall be deposited directly into the Escrow Account.  Funds so deposited in the Escrow Account shall be held in trust for the benefit of FGIC and must remain on deposit within such account, and shall not be accessed by or available generally for use by Corp or its creditors or shareholders.  Notwithstanding the previous sentence, Corp shall use such funds to make payments (i) as required hereunder directly to such taxing authority but only to the extent necessary to satisfy an Income Tax Liability reported on an Income Tax Return of Corp that is filed on a consolidated, combined or unitary basis and that includes a member of the FGIC Group or (ii) to FGIC pursuant to Corp's obligations hereunder.

(f)     <u>Late Payments</u>.  If any payments required to be made pursuant to this Agreement (including Estimated Income Tax Payments) are not made when due, such payments shall bear interest at the prevailing federal short-term interest rate as determined under Section 6621 of the Code.

(g)     <u>Adjustments</u>.  If there is an Adjustment as a result of a Final Determination that would have the effect of increasing or decreasing a member of the FGIC Group's Separate Income Tax Liability for any Taxable Period ending after the date hereof (including a Straddle Period), then FGIC shall pay to Corp the amount of any such increase in Separate Income Tax Liability, capped however at an amount equal to the increased Income Tax Liability incurred and owing by the Corp Affiliated Group as a result of such Adjustment, and Corp shall pay to FGIC the amount of any such decrease in Separate Income Tax Liability.  If, as a result of a Final Determination, there is an Adjustment to any Loss generated by, deriving from or attributable to the FGIC Group that resulted in a payment of a Tax Benefit Realization Payment by Corp to FGIC pursuant to Section 2(c) of this Agreement, and such Adjustment, if it had been taken into account when the amount of such payment had been calculated, would have had the effect of increasing or decreasing the amount of such Tax Benefit Realization Payment

5

(as applicable), then FGIC shall pay to Corp the amount of any such decrease in such Tax Benefit Realization Payment and Corp shall pay to FGIC the amount of any such increase in such Tax Benefit Realization Payment, in each case, net of any reasonable out of pocket costs incurred by the recipient of such payment.

(h)    <u>FGIC Group Losses and Refunds</u>.  The parties acknowledge and agree that, as of the date hereof, the members of the FGIC Group have generated net operating losses for U.S. federal Income Tax purposes in the amount of $[ • ] and alternative minimum tax net operating losses for U.S. federal Income Tax purposes in the amount of $[ • ], and such losses are attributable, and properly allocable in their entirety, to the FGIC Group under the Code and applicable regulations.  Such net operating losses and any other Tax Attributes generated (whether prior to, on or after the date hereof) by, deriving from or attributable to any member of the FGIC Group shall be and will remain the sole property of such member.  Any refund of Income Tax received or receivable (or any Income Tax credit in lieu thereof) from a taxing authority by any member of the Corp Group with respect to any Income Tax Return of such member shall be the sole property of FGIC to the extent such refund (or credit) is attributable to a Tax Attribute generated by, deriving from or attributable to a member of the FGIC Group (treating any Tax Attributes generated by, deriving from or attributable to the FGIC Group as utilized prior to the utilization of any Tax Attributes generated by, deriving from or attributable to the Corp Group), and shall not be property of any member of the Corp Group (regardless of whether the FGIC Group paid the Income Tax to be refunded or whether the FGIC Group generated the income related to the Income Tax to be refunded).  Any member of the Corp Group that receives such a refund of Income Tax shall be treated as receiving such refund of Income Tax as an agent of FGIC (as principal) and shall as promptly as practicable pay such refund over to FGIC as the owner thereof, and nothing in this Agreement shall be deemed to create a debtor-creditor relationship between the parties in respect of any such refund of Income Tax.

**Section 3.    <u>Return Preparation</u>**

Without limiting the generality of Section 6(c), FGIC shall prepare or cause to be prepared, and FGIC shall file, cause to be filed or, if requested by FGIC, Corp shall file, on behalf of the Corp Group and at FGIC's expense (or at Corp's expense to the extent that such expense is attributable to the preparation and filing of a separate Income Tax Return of a member of the Corp Group), any Income Tax Return, amended Income Tax Return or request for a refund of Income Tax (in each case with respect to any Taxable Period) (i) required to be filed by any member of the Corp Group or (ii) that FGIC otherwise deems appropriate for any member of the Corp Group to file (any such return or request described in clause (i) or (ii), a "<u>FGIC-Prepared Return</u>").  As directed by FGIC, Corp shall promptly execute and file, or cause to be executed and filed, any FGIC-Prepared Return submitted by FGIC to Corp for execution and filing.  Corp shall not file any Income Tax Return or amended Income Tax Return, or request any refund of Income Tax for any Taxable Period, without FGIC's prior written consent (which consent may be withheld in its sole discretion).

6

### Section 4.    Audits

If Corp receives notice from a taxing authority of any Tax Controversy (irrespective of whether such Tax Controversy is expected to affect any member of the FGIC Group's liability for Income Taxes by operation of law or pursuant to this Agreement), Corp shall notify FGIC in writing within two (2) business days following receipt of such notice.  FGIC shall, at FGIC's expense (or at Corp's expense to the extent that such expense is attributable to a Tax Controversy regarding a separate Income Tax Return of a member of the Corp Group), have the sole right to control, conduct, compromise and settle any such Tax Controversy.

### Section 5.    Negative Covenants

(a)    Notwithstanding anything in this Agreement to the contrary, Corp shall not, without the prior written consent of FGIC (which consent may be withheld in FGIC's sole discretion), take any action that could (as determined by FGIC in its sole discretion):

- impair or otherwise interfere with the ability to utilize all or any portion of the Tax Attributes generated by, deriving from or attributable to any member of the Corp Affiliated Group to offset income or gain of FGIC or any member of the FGIC Group;
- result in the application of Treasury Regulation Section 1.1502-36 or in any reduction or reattribution of all or any portion of the Tax Attributes generated by, deriving from or attributable to any member of the Corp Affiliated Group under Treasury Regulation Section 1.1502-36;
- result in a limitation on all or any portion of the Tax Attributes generated by, deriving from or attributable to any member of the Corp Affiliated Group under Section 382 of the Code; or
- result in a deconsolidation of FGIC from the Corp Affiliated Group for U.S. federal or any state or local Income Tax purposes.

(b)    Without limiting the generality of Section 5(a), Corp shall not, directly or indirectly, without the prior written consent of FGIC (which consent may be withheld in its sole discretion), do or seek to do any of the following:

- sell, abandon or transfer legal title to, a beneficial interest in, or the voting power of any FGIC Shares or otherwise dispose of any FGIC Shares (including any "transfer" within the meaning of Treasury Regulation Section 1.1502-36(f)(10) or any "disposition" within the meaning of Treasury Regulation Section 1.382-2T(e)(1)(i)(A));
- make any election to reattribute all or any portion of the Tax Attributes generated by, deriving from or attributable to any member of the Corp Affiliated Group under Treasury Regulation Section 1.1502-36 or otherwise take any step that could reduce or impair the ability to offset taxable income or gain of the FGIC Group or any of its members with such Tax Attributes;
- claim a worthless stock loss for U.S. federal Income Tax purposes in respect of the FGIC Shares pursuant to Section 165(g) of the Code;
- issue any shares of capital stock, equity or other securities of Corp;
- issue any options or other instruments convertible into shares of capital stock or equity of Corp (including an "option" as it is defined for the purposes of Section 382 of the Code or as it is defined in Treasury Regulation Section 1.1504-4(d)(1));

7

- redeem, accept as a contribution to capital, or accept (or otherwise recognize) any abandonment of capital stock or equity of Corp;
- recapitalize the capital stock or equity of Corp, alter the rights of holders of Corp capital stock or equity or otherwise amend the Charter for any purpose;
- participate in any transaction that could be treated as an "equity structure shift" under Treasury Regulation Section 1.382-2T(e)(2), including a reorganization within the meaning of Section 368 of the Code;
- recognize any action by holders of shares of capital stock of Corp that would violate the Charter;
- effect a liquidation of Corp (including a liquidation as it is understood for U.S. federal Income Tax purposes); or
- convert, directly or indirectly, Corp into a different entity.

**Section 6.    Cooperation**

(a)    Tax Information.

(1)    Corp shall, and shall cause each member of the Corp Group to, cooperate with FGIC in the filing of any FGIC-Prepared Return or in the conduct of any Tax Controversy by maintaining its books and records and providing on a timely basis any information as may be necessary or useful in the filing of such Tax Returns or the conduct of such Tax Controversies and executing any documents (including any power of attorney or IRS Form 8302), providing any further information, and taking any actions that FGIC may request in connection therewith.

(2)    If any member of the Corp Group fails to provide any information requested pursuant to this Section 6 on a timely basis, then FGIC shall have the right to engage an independent certified public accountant of its choice to gather such information. Corp agrees to permit (and to cause the other members of the Corp Group to permit) any such independent certified public accountant full access to all Income Tax Return and other relevant information in the possession of any member of the Corp Group during reasonable business hours, and to reimburse or pay directly all reasonable costs and expenses incurred in connection with the engagement of such independent certified public accountant.

(3)    If any member of the Corp Group supplies information to a member of the FGIC Group in connection with the preparation of any FGIC-Prepared Tax Return or in connection with the conduct of any Tax Controversy and an officer of the requesting party signs a statement or other document under penalties of perjury in reliance upon the accuracy of such information, then a duly authorized officer of the party supplying such information shall certify, under penalties of perjury, the accuracy and completeness of the information so supplied. Corp shall indemnify and hold harmless each member of the FGIC Group and its respective officers and employees, and FGIC shall indemnify and hold harmless each member of the Corp Group and its respective officers and employees, against any cost, fine, penalty, or other expenses of any kind attributable to a member of the Corp Group supplying a member of the FGIC Group, or a member of the FGIC Group supplying a member of the Corp Group, as the case may be, with inaccurate or incomplete information in connection with the

8

preparation of any FGIC-Prepared Return or in connection with the conduct of any Tax Controversy.

        (b)     <u>Other Cooperation</u>.

        (1)     Whenever any member of the Corp Group or the FGIC Group learns of a breach or a violation of any obligation or provision contained in this Agreement, or receives in writing from any taxing authority notice of an Adjustment that may give rise to a payment under this Agreement, Corp shall give written notice to FGIC, or FGIC shall give written notice to Corp, as applicable, within two (2) days of becoming aware of such breach, violation, or receipt, but if a response to the IRS or any other taxing authority is required in connection with any such event described above, notice shall be given no less than ten (10) days before such response is required (if earlier than two (2) days after becoming aware).

        (2)     FGIC may consult with Corp, and Corp agrees to cooperate with FGIC in the negotiation, settlement, or litigation of any liability for Income Taxes of any member of the FGIC Group.

        (c)     <u>Agent</u>.

Each member of the Corp Group hereby appoints FGIC for any Taxable Period as its agent for the purpose of preparing and filing any Income Tax Return of such member (whether or not such Income Tax Return is filed on a consolidated, combined or unitary basis with any member of the FGIC Group), for the purpose of representing such member in the course of any Tax Controversy as set forth in Section 4, and for making any election or application or taking any action in connection with any of the foregoing on behalf of any member of the Corp Group. Each member of the Corp Group hereby consents to the preparation and filing of such FGIC-Prepared Return and to the making of any elections and applications as set forth above. Any election made by any member of the FGIC Group with respect to an Income Tax Return of such member filed on a consolidated, combined or unitary basis with any member of the Corp Group shall govern the determination of the Separate Income Tax Liability and Estimated Income Tax Payments of the relevant members of the FGIC Group.

### Section 7.    <u>Retention of Records</u>

        (a)     Corp and FGIC agree to retain, and to cause each member of the Corp Group and the FGIC Group to retain, any records that may affect the determination of the Separate Income Tax Liability of any member of the FGIC Group, or the Income Tax liability of any member of the FGIC Group that files on a consolidated, combined or unitary basis with any member of the Corp Group, until the earlier of (i) such time as there has been a Final Determination with respect thereto or (ii) the expiration of the applicable statute of limitations (taking into account any extensions or tolling thereof).

        (b)     Any member of the Corp Group or FGIC Group intending to destroy any materials, records, or documents relating to, or that could reasonably be expected to affect in any manner, Income Taxes of any member of the Corp Affiliated Group shall provide FGIC or Corp, respectively, with ninety (90) days advance notice and the opportunity to copy or take possession of such materials, records and documents.

9

Section 8.    **Resolution of Disputes**

Any dispute concerning the calculation or basis of determination of any payment provided for hereunder shall be resolved by the independent certified public accountants for FGIC, whose judgment shall be conclusive and binding upon the parties.

Section 9.    **Miscellaneous**

(a)    Term of the Agreement.  This Agreement shall become effective as of the date of its execution and shall continue in full force and effect indefinitely.

(b)    Specific Performance.  The parties hereto agree that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties hereto shall be entitled to equitable relief, including in the form of an injunction or injunctions, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in an appropriate court of competent jurisdiction, this being in addition to any other remedy to which any party is entitled at law or in equity.  The parties hereto further agree (i) to cooperate fully in any attempt by the other party in obtaining any such equitable remedy, (ii) to waive any requirement for the security or posting of any bond in connection with any such equitable remedy and (iii) not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to law or inequitable for any reason, or to assert that a remedy of monetary damages would provide an adequate remedy.  The parties hereto acknowledge and agree that the right of specific enforcement is an integral part of the transactions contemplated by this Agreement and without that right, the parties hereto would not have entered into this Agreement.

(c)    Severability.  If any term, provision, covenant, or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the terms, provisions, covenants, and restrictions set forth herein shall remain in full force and effect, and shall in no way be affected, impaired, or invalidated.  It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants, and restrictions without including any of such which may be hereafter declared invalid, void, or unenforceable.  In the event that any such term, provision, covenant, or restriction is held to be invalid, void, or unenforceable, or performance of any provision of this Agreement or any transaction contemplated hereby becomes impracticable or impossible due to a change in applicable law, its interpretation by any court of law or other governing body or otherwise, the parties hereto shall use their best efforts to find and employ an alternate means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant, restriction, or provision.

(d)    Assignment.  This Agreement shall not be assignable, in whole or in part, directly or indirectly, by any party hereto without the advance written consent of the other parties (which consent may be withheld in their respective sole discretion); and any attempt to assign any rights or obligations arising under this Agreement without such consent shall be void; provided, however, that the provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns.

10

(e)    _Further Assurances_.  Subject to the provisions hereof, the parties hereto shall make, execute, acknowledge, and deliver such other instruments and documents, and take all such other actions, as may be reasonably required in order to effectuate the purposes of this Agreement and to consummate the transactions contemplated hereby.  Subject to the provisions hereof, each of the parties shall, in connection with entering into this Agreement, performing its obligations hereunder and taking any and all actions relating hereto, comply with all applicable laws, regulations, orders, and decrees, obtain all required consents and approvals and make all required filings with any governmental agency, other regulatory or administrative agency, commission or similar authority, and promptly provide the other parties with all such information as they may reasonably request in order to be able to comply with the provisions of this sentence.

(f)    _Parties in Interest_.  Except as herein otherwise specifically provided, nothing in this Agreement expressed or implied is intended to confer any right or benefit upon any person, firm, or corporation other than the parties hereto, their respective successors and permitted assigns, and any entity that subsequently becomes a member of the Corp Group or the FGIC Group, as the case may be.

(g)    _Waivers, Etc_.  No failure or delay on the part of the parties in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  No modification or waiver of any provision of this Agreement nor consent to any departure by the parties therefrom shall in any event be effective unless the same shall be in writing, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(h)    _Setoff_.  All payments to be made by any party under this Agreement shall be made without setoff, counterclaim, or withholding, all of which are expressly waived.

(i)    _Confidentiality_.  Subject to any contrary requirement of law and the right of each party to enforce its rights hereunder in any arbitration or legal action, each party agrees that it shall keep strictly confidential, and shall cause its employees and agents to keep strictly confidential, any information that it or any of its employees or agents may acquire pursuant to, or in the course of performing its obligations under, any provision of this Agreement.

(j)    _Headings_.  Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

(k)    _Counterparts_.  For the convenience of the parties, any number of counterparts of this Agreement may be executed by the parties hereto, and each such executed counterpart shall be, and shall be deemed to be, an original instrument.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile, email or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Agreement.

(l)    _Notices_.  All notices, consents, requests, instructions, approvals, and other communications provided for herein shall be validly given, made, or served, if in writing and delivered personally, sent by registered mail, postage prepaid, or by facsimile transmission to:

11

Corp at: FGIC Corporation
[ • ]
Attn: [ • ]

FGIC at: Financial Guaranty Insurance Company
[ • ]
Attn: [ • ]

FGIC Credit Products LLC
[ • ]
Attn: [ • ]

FGIC Credit Products II LLC
[ • ]
Attn: [ • ]

Grand Central Assurance Corporation
[ • ]
Attn: [ • ]

GCAC Credit Products LLC
[ • ]
Attn: [ • ]

or to such other address as any party may, from time to time, designate in a written notice given in a like manner.  Notice given by mail as set out above shall be deemed delivered five (5) calendar days after the date the same is mailed.  Notice given by facsimile transmission shall be deemed delivered on the day of transmission provided telephone confirmation of receipt is obtained promptly after completion of transmission.

(m)    Costs and Expenses.  Except to the extent otherwise specifically provided herein, each party agrees to pay its own costs and expenses resulting from the exercise of its respective rights or the fulfillment of its respective obligations hereunder.

(n)    Rules of Construction.  Unless otherwise indicated, any reference in this Agreement to any Section or clause, shall be to the Sections and clauses of this Agreement.  The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation."  Any reference to the masculine, feminine or neuter gender shall include each other gender and any reference to the singular or plural shall include the other, in each case unless the context otherwise requires.  All references in this Agreement to amounts of money expressed in dollars are references to United States dollars, unless otherwise indicated.  The words "herein", "hereto", "hereby", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof.  In the event of an ambiguity or a question of intent or interpretation, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or

12

disfavoring any party by virtue of the authorship of any provisions of this Agreement.  Further, prior drafts of this Agreement hereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement shall not be used as an aide of construction or otherwise constitute evidence of the intent of the parties hereto; and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of such prior drafts.

(o)    Entire Agreement.  This Agreement and the Plan Sponsor Agreement, dated [      ], by and between Corp and FGIC contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter (including the Existing Agreement).

(p)    Submission to Jurisdiction.  The parties hereto hereby irrevocably submit to the exclusive jurisdiction of any federal or state court located within the State of New York that is selected by FGIC in its sole discretion to hear any dispute arising out of or relating to this Agreement, and each party hereby irrevocably agrees that all claims in respect of such dispute or any action related thereto may be heard and determined in such courts.  The parties hereto hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

### Section 10.    Applicable Law

This Agreement and all claims arising therefrom or with respect thereto shall be governed by and construed and enforced in accordance with the domestic substantive laws of the State of New York without regard to any choice or conflict of laws, rules, or provisions that would cause the application of the domestic substantive laws of any other jurisdiction.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed by their respective officers, each of whom is duly authorized, all as of the day and year first above written.


FGIC Corporation
By: _____
Title: [ • ]



Financial Guaranty Insurance Company
By:_____
Title: [ • ]

13

FGIC Credit Products LLC
By:_____
Title: [ • ]


FGIC Credit Products II LLC
By:_____
Title: [ • ]


Grand Central Assurance Corporation
By:_____
Title: [ • ]


GCAC Credit Products LLC
By:_____
Title: [ • ]

**EXHIBIT B**

**CERTAIN TAX CONDITIONS**

1.  As of and prior to the Effective Date there shall not have occurred any event that, in the sole discretion of the Plan Sponsor:

    (a)  imposed or could reasonably be expected to impose a limitation under section 382 of the IRC on the Plan Sponsor's ability to utilize all or any portion of the Tax Attributes to offset income or gain of the Plan Sponsor or any of its subsidiaries; or

    (b)  resulted or could reasonably be expected to result in a deconsolidation of the Plan Sponsor from the FGIC Corporation Group for U.S. federal or any state income tax purposes.

2.  Prior to the Effective Date, the Debtor shall not have, without the prior written consent of the Plan Sponsor, which consent may be withheld in its sole discretion, taken any action that could:

    (a)  impair or otherwise interfere with the Plan Sponsor's ability to utilize all or any portion of the Tax Attributes to offset income or gain of the Plan Sponsor or any of its subsidiaries;

    (b)  result in the application of Treasury Regulation section 1.1502-36 or in any reduction or reattribution of all or any portion of the Tax Attributes under Treasury Regulation section 1.1502-36;

    (c)  result in a limitation on the Tax Attributes under section 382 of the IRC; or

    (d)  result in a deconsolidation of the Plan Sponsor from the FGIC Corporation Group for U.S. federal or any state income tax purposes.

3.  Without limiting the generality of paragraphs 1 or 2 above, prior to the Effective Date, the Debtor shall not have, directly or indirectly, without the prior written consent of the Plan Sponsor, which consent may be withheld in its sole discretion:

    (a)  sold, abandoned or transferred legal title to, a beneficial interest in, or the voting power of any capital stock or equity of, the Plan Sponsor or otherwise disposed of any capital stock or equity of the Plan Sponsor, including any "transfer" within the meaning of Treasury Regulation section 1.1502-36(f)(10) or any "disposition" within the meaning of Treasury Regulation section 1.382-2T(e)(1)(i)(A);

    (b)  made any election to reattribute Tax Attributes under Treasury Regulation section 1.1502-36 or otherwise taken any step that is intended to or could reasonably be expected to reduce or impair the ability to offset taxable

income or gain of the FGIC Corporation Group or any of its members (including FGIC) with the Tax Attributes;

(c)      claimed a worthless stock loss for U.S. federal income tax purposes in respect of any capital stock or equity of the Plan Sponsor pursuant to section 165(g) of the IRC;

(d)      issued any shares of capital stock or equity of the Debtor, other than the issuances of capital stock of the Debtor reflected on the Debtor's stock ledger as of November 15, 2011 and issuances pursuant to the exercise of the warrant or the compensatory grants referred to in paragraph (e) below, which may occur after the date hereof;

(e)      issued any options or other instruments convertible into shares of capital stock or equity of the Debtor, including an "option" as it is defined for the purposes of section 382 of the IRC or as it is defined in Treasury Regulation section 1.1504-4(d)(1), other than compensatory grants issued prior to August 3, 2010 and the warrant to purchase common stock of the Debtor dated December 13, 2003, issued to Banc of America Securities, LLC;

(f)      redeemed, accepted as a contribution to capital, or accepted (or otherwise recognized) any abandonment of any capital stock or equity of the Debtor, other than the redemption on August 3, 2010 of capital stock of the Debtor held by Dubel & Associates, LLC;

(g)      recapitalized the capital stock or equity of the Debtor, altered the rights of holders of capital stock or equity of the Debtor or, since August 3, 2010, otherwise amended the Debtor's articles of incorporation for any purpose, except as provided by amendments or restatements of the Debtor's articles of incorporation completed prior to August 3, 2010, and except as is expressly contemplated herein, and other than stock splits effected as of or prior to November 15, 2011 that are reflected on the Debtor's stock ledger as of November 15, 2011;

(h)      participated in any transaction that would or could reasonably be expected to be treated as an "equity structure shift" under Treasury Regulation section 1.382-2T(e)(2), including a reorganization within the meaning of section 368 of the IRC;

(i)      recognized any action by holders of shares of capital stock of the Debtor that would violate the Debtor's articles of incorporation; or

(j)      planned to effect a liquidation of the Reorganized Debtor following the Effective Date.