Paul M. Basta
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

    - and -

Patrick J. Nash, Jr. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FGIC CORPORATION,[1] | Case No. 10-14215 (SMB) |
| Debtor. | |

**NOTICE OF FILING OF THE SOLICITATION VERSION OF**
**THE DISCLOSURE STATEMENT FOR CHAPTER 11**
**PLAN OF REORGANIZATION OF FGIC CORPORATION**

**PLEASE TAKE NOTICE** that FGIC Corporation, as debtor and debtor in possession

(the "Debtor"), hereby files the solicitation version of the *Disclosure Statement for the Chapter*

*11 Plan of Reorganization of FGIC Corporation*, attached hereto as Exhibit A (the "Disclosure

Statement"), which was approved by the Bankruptcy Court pursuant to the *Order (A) Approving*

*the Adequacy of the Disclosure Statement, (B) Fixing Dates and Deadlines Relating to*

---

[1]    The last four digits of the Debtor's tax identification number are 6474.  The location of the Debtor's corporate
headquarters is 125 Park Avenue, New York, New York 10017.

*Confirmation of the Plan, (C) Approving Certain Procedures for Soliciting and Tabulating the Votes on, and for Objecting to, the Plan and (D) Approving the Manner and Form of the Various Notices and Documents Relating Thereto,* dated March 15, 2012 [Docket No. 281].  A copy of the proposed *Chapter 11 Plan of Reorganization of FGIC Corporation* (the "Plan") is annexed to the Disclosure Statement.  The hearing on confirmation of the Plan is scheduled for April 19, 2012 at 2:00 p.m. (prevailing Eastern time).

Respectfully submitted,

New York, New York
Dated:  April 17, 2012

*/s/ Brian S. Lennon*
Paul M. Basta, Esq.
Brian S. Lennon, Esq.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Patrick J. Nash, Jr. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtor and Debtor in Possession*

## EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FGIC CORPORATION,[1] | |
| Debtor. | Case No. 10-14215 (SMB) |

---

### DISCLOSURE STATEMENT FOR THE CHAPTER 11
### PLAN OF REORGANIZATION OF FGIC CORPORATION

KIRKLAND & ELLIS LLP
Paul M. Basta
Brian S. Lennon
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

KIRKLAND & ELLIS LLP
Patrick J. Nash, Jr. (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel for the Debtor and Debtor in Possession*

Dated:  March 15, 2012

---

[1]    The last four digits of the Debtor's tax identification number are 6474.  The location of the Debtor's corporate headquarters is 125 Park Avenue, New York, New York 10017.

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE DEBTOR URGES EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTOR BELIEVES THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. SECTION 1145 OF THE BANKRUPTCY CODE PROVIDES THAT SECURITIES ISSUED TO CREDITORS PURSUANT TO A PLAN OF REORGANIZATION MAY BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW. TO THE EXTENT THAT THE EXEMPTION FROM REGISTRATION PROVIDED BY SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE DEBTOR INTENDS TO RELY ON THE EXEMPTION FROM REGISTRATION APPLICABLE TO THE ISSUANCE OF SECURITIES NOT INVOLVING ANY PUBLIC OFFERING SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT AND REGULATION D PROMULGATED THEREUNDER.

NO LEGAL OR TAX ADVICE IS PROVIDED BY THIS DISCLOSURE STATEMENT. THE DEBTOR IS NOT CURRENTLY A REPORTING CORPORATION UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT") AND THE SECURITIES ISSUED UNDER THE PLAN WILL NOT BE LISTED ON ANY NATIONAL SECURITIES EXCHANGE. THE DEBTOR DOES NOT ANTICIPATE THAT THERE WILL BE A PUBLIC MARKET FOR THE SECURITIES ISSUED UNDER THE PLAN. THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN SHOULD CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE OWNERSHIP AND TRANSFERABILITY OF ANY SUCH SECURITIES.

ALTHOUGH THE DEBTOR SERVED THE SECURITIES AND EXCHANGE COMMISSION WITH A COPY OF THIS DISCLOSURE STATEMENT, THE DEBTOR DID NOT FILE THIS DISCLOSURE STATEMENT WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY

HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT, AS AMENDED. SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE" OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTOR'S EXPECTATIONS WITH RESPECT TO FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS, THEREFORE, SPECULATIVE. THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY SECURITIES ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA DERIVED FROM ITS BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO IT AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS AND EXPECTED FUTURE RESULTS. WHILE THE DEBTOR BELIEVES SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF AND THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR MANAGEMENT'S ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS AND FUTURE RESULTS. THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THE DEBTOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIMS ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR EQUITY INTERESTS WHO DO NOT SUBMIT BALLOTS OR MASTER BALLOTS TO ACCEPT

OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTOR SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE CREDITORS' COMMITTEE ALSO SUPPORTS CONFIRMATION OF THE PLAN AND RECOMMENDS THAT HOLDERS OF GENERAL UNSECURED CLAIMS VOTE TO ACCEPT THE PLAN.

## TABLE OF CONTENTS

ARTICLE I INTRODUCTION..............................................................................................................1

  A.    OVERVIEW ................................................................................................................................1

  B.    WHY WE ARE SENDING YOU THIS DISCLOSURE STATEMENT..................................2

  C.    OVERVIEW OF CHAPTER 11 ..............................................................................................3

  D.    SUMMARY OF CLASSIFICATION AND TREATMENT OF  ALLOWED CLAIMS AND EQUITY
INTERESTS UNDER THE PLAN..................................................................................................3

  E.    PARTIES ENTITLED TO VOTE ON THE PLAN .................................................................4

  F.    SUMMARY OF SOLICITATION PACKAGE AND VOTING INSTRUCTIONS...................4

  G.    THE CONFIRMATION HEARING .........................................................................................6

  H.    CONFIRMING AND CONSUMMATING THE PLAN ..........................................................6

  I.    RULES OF INTERPRETATION.............................................................................................6

ARTICLE II BACKGROUND...........................................................................................................6

  A.    CORPORATE HISTORY AND STRUCTURE ......................................................................7

  B.    EQUITY OWNERSHIP ............................................................................................................7

  C.    ASSETS AND LIABILITIES...................................................................................................8

  D.    REGULATORY OVERSIGHT OF FGIC'S BUSINESS .......................................................9

ARTICLE III CHAPTER 11 CASE ...............................................................................................11

  A.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE .......11
      1.    FGIC's Restructuring Efforts ...................................................................................11
      2.    The Debtor's Prepetition Restructuring Efforts..........................................................13

  B.    EVENTS DURING THE CHAPTER 11 CASE ...................................................................13
      1.    Appointment of the Creditors' Committee .................................................................13
      2.    Relief Requested from the Bankruptcy Court..............................................................13
      3.    Discussions with Third Parties Regarding the Plan ...................................................14

ARTICLE IV THE PLAN ..............................................................................................................16
      1.    Administrative Claims...............................................................................................16
      2.    Priority Tax Claims ..................................................................................................17

  A.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS IN THE DEBTOR .........18
      1.    Summary..................................................................................................................18
      2.    Classification and Treatment of Claims and Equity Interests....................................18

  B.    ACCEPTANCE OR REJECTION OF THE PLAN ..............................................................23

  C.    MEANS FOR IMPLEMENTATION OF THE PLAN ..........................................................23
      1.    General Settlement of Claims....................................................................................23
      2.    Reorganized Debtor..................................................................................................23
      3.    Sources of Consideration for Plan Distributions .......................................................23
      4.    Corporate Existence..................................................................................................24
      5.    Vesting of Assets in the Reorganized Debtor ............................................................24
      6.    Cancellation of Securities and Agreements ...............................................................24
      7.    Surrender of Existing Securities ................................................................................25
      8.    Corporate Action......................................................................................................25
      9.    Certificate of Incorporation and By-Laws.................................................................25

v

    10.    Stock Trading and Ownership Restrictions ................................................................25
    11.    Reorganized Debtor Maintenance Amount ...............................................................25
    12.    Directors and Officers of the Reorganized Debtors .................................................26
    13.    Effectuating Documents; Further Transactions ........................................................26
    14.    Section 1146 Exemption ...........................................................................................26
    15.    Preservation of Causes of Action .............................................................................26

**D.**    **PROVISIONS GOVERNING DISTRIBUTIONS**................................................**27**
    1.    Timing and Calculation of Distributions ..................................................................27
    2.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ...............27

**E.**    **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**
    **30**
    1.    Resolution of Disputed Claims .................................................................................30
    2.    Disallowance of Claims ............................................................................................31
    3.    Amendments to Claims .............................................................................................31
    4.    No Distributions Pending Allowance ........................................................................31
    5.    Distributions After Allowance ..................................................................................31

**F.**    **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................**31**
    1.    Assumption and Rejection of Executory Contracts and Unexpired Leases ...............31
    2.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases ...............32
    3.    Procedures for Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan  32
    4.    Survival of Corporate Indemnification Obligations ................................................32

**G.**    **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** .............................**33**
    1.    Conditions ................................................................................................................33
    2.    Waiver of Conditions ...............................................................................................33
    3.    Effect of Non-Occurrence of Conditions to the Effective Date ...............................33

**H.**    **SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS** ....................................**34**
    1.    Compromise and Settlement .....................................................................................34
    2.    Subordinated Claims .................................................................................................34
    3.    Discharge of Claims and Termination of Equity Interests ........................................34
    4.    Release of Liens .......................................................................................................35
    5.    Debtor Release ..........................................................................................................35
    6.    Releasing Party Release ............................................................................................35
    7.    Exculpation ...............................................................................................................36
    8.    Injunction .................................................................................................................37

**I.**    **BINDING NATURE OF PLAN** .............................................................................**38**

**J.**    **RETENTION OF JURISDICTION** ......................................................................**38**

**ARTICLE V SOLICITATION AND VOTING PROCEDURES** ........................................**40**

    **A.**    **THE SOLICITATION PACKAGE** .....................................................................**40**

    **B.**    **VOTING DEADLINE** .........................................................................................**41**

    **C.**    **VOTING INSTRUCTIONS** .................................................................................**41**

    **D.**    **VOTING TABULATION** ......................................................................................**42**

**ARTICLE VI VALUATION ANALYSIS AND FINANCIAL PROJECTIONS** ...................**42**

    **A.**    **VALUATION OF THE REORGANIZED DEBTOR** ........................................**42**

    **B.**    **FINANCIAL PROJECTIONS** ............................................................................**43**

**ARTICLE VII CONFIRMATION PROCEDURES** ............................................................**43**

    **A.**    **THE CONFIRMATION HEARING** ...................................................................**43**

B.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ..................................... 43
  1.   Best Interests of Creditors Test/Liquidation Analysis ................................................. 44
  2.   Feasibility ................................................................................................................ 45
  3.   Acceptance by Impaired Classes .............................................................................. 45

C.   RISK FACTORS ............................................................................................................... 46

D.   IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION ................................. 46

E.   DISCLAIMER .................................................................................................................. 46

ARTICLE VIII IMPLEMENTATION OF THE PLAN AND POSTPETITION GOVERNANCE OF
REORGANIZED DEBTOR ............................................................................................................. 47

A.   BOARD OF DIRECTORS AND MANAGEMENT ................................................................ 47
  1.   The Reorganized Debtor's Board of Directors ............................................................ 47
  2.   The Reorganized Debtor's Officers .......................................................................... 47

B.   INDEMNIFICATION OF DIRECTORS AND OFFICERS ..................................................... 47

ARTICLE IX PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND
CONSUMMATING THE PLAN ...................................................................................................... 47

A.   GENERAL ....................................................................................................................... 47

B.   CERTAIN BANKRUPTCY LAW CONSIDERATIONS ......................................................... 47
  1.   Parties in Interest May Object to Debtor's Classification of Claims and Equity Interests ..................... 47
  2.   Failure to Satisfy Vote Requirement ......................................................................... 48
  3.   The Debtor May Not Be Able to Obtain Confirmation of the Plan ............................... 48
  4.   The Debtor May Object to the Amount or Classification of a Claim ............................. 48
  5.   Risk of Non-Occurrence of the Effective Date ........................................................... 48
  6.   Contingencies Not to Affect Votes of Impaired Classes to Accept the Plan ................. 49

C.   FACTORS AFFECTING THE DEBTOR ............................................................................. 49
  1.   Risks Related to the Creditor New Common Stock .................................................... 49
  2.   Legal Proceedings .................................................................................................... 50

D.   FINANCIAL INFORMATION; DISCLAIMER ...................................................................... 50

E.   CERTAIN TAX MATTERS ............................................................................................... 50

F.   RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE
INACCURATE ............................................................................................................................. 50

G.   LIQUIDATION UNDER CHAPTER 7 ................................................................................ 50

ARTICLE X SECURITIES LAW MATTERS ................................................................................... 51

A.   CREDITOR NEW COMMON STOCK AND PLAN SPONSOR STOCK .................................. 51

B.   ISSUANCE AND RESALE OF CREDITOR NEW COMMON STOCK  AND PLAN SPONSOR
STOCK UNDER THE PLAN .......................................................................................................... 51
  1.   Exemption from Registration .................................................................................... 51
  2.   Resales of Creditor New Common Stock and Plan Sponsor Stock; Definition of Underwriter ............... 52

C.   LISTING OF CREDITOR NEW COMMON STOCK AND PLAN SPONSOR STOCK ................ 53

ARTICLE XI CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ....................................... 53

A.   INTRODUCTION ............................................................................................................. 53

B.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTOR
54
  1.   Cancellation of Debt and Reduction of Tax Attributes ............................................... 54
  2.   Limitation of NOL Carryforwards and Other Tax Attributes ........................................ 54

**C.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF  THE PLAN TO HOLDERS OF GENERAL UNSECURED CLAIMS** ..................................................................................................**56**

    1.    Treatment of a Debt Instrument as a "Security" ........................................................56

    2.    Treatment of a Holder of an Allowed General Unsecured  Claim If the Exchange of its Claim is Treated as a Reorganization ................................................................................................57

    3.    Treatment of a Holder of an Allowed General Unsecured  Claim If the Exchange of its Claim is not Treated as a Reorganization ...........................................................................................57

    4.    Accrued Interest...........................................................................................................57

    5.    Market Discount ..........................................................................................................58

    6.    Consequences to Holders of Creditor New Common Stock .........................................58

**D.    WITHHOLDING AND REPORTING** .............................................................................**59**

**ARTICLE XII CONCLUSION AND RECOMMENDATION** ...........................................................**60**

**<u>EXHIBITS</u>**

| | |
|---|---|
| **Exhibit A** | Chapter 11 Plan of Reorganization of FGIC Corporation |
| **Exhibit B** | Order Approving Disclosure Statement |
| **Exhibit C** | Plan Sponsor Agreement |
| **Exhibit D** | Creditors' Committee Support Letter |

# ARTICLE I
# INTRODUCTION[2]

## A.    OVERVIEW

FGIC Corporation ("FGIC Corp." or the "Debtor"), as debtor and debtor in possession, submits this disclosure statement (the "Disclosure Statement") to Holders of Claims and Equity Interests against the Debtor in connection with the solicitation of acceptances with respect to the Chapter 11 Plan of Reorganization of FGIC Corporation (as may be amended or modified from time to time, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and incorporated by reference herein.

The Debtor is an insurance holding company with no employees, no operations and no assets other than its approximately $9.7 million in cash on hand and 100% of the common equity interests in Financial Guaranty Insurance Company ("FGIC"), a monoline financial guaranty insurance company organized under the laws of the State of New York.[3]  Because FGIC is a New York insurance corporation, the New York State Department of Financial Services (together with its predecessor, the New York State Insurance Department, the "NYSDFS") exercises primary regulatory authority over FGIC.  Throughout their history, both the Debtor and FGIC have worked with the NYSDFS to ensure their compliance with the New York Insurance Law, including section 1505 thereof, which governs transactions between an insurer and its corporate parent.

As FGIC's corporate parent, the Debtor serves as the agent for the consolidated tax group comprised of the Debtor, FGIC and the Debtor's other subsidiaries (collectively, the "FGIC Corporation Group").  As of December 31, 2011, the FGIC Corporation Group had NOLs of approximately $5.4 billion, including $5.3 billion of NOLs attributable to FGIC and $110 million of NOLs attributable to the Debtor.  These NOLs are valuable assets of the Debtor's estate.

As a result of losses FGIC suffered in the housing market collapse that began in 2007, FGIC, which is not a debtor in the Chapter 11 Case,[4] also suffered a significant set-back to its business and is engaged in its own restructuring process.  Given FGIC's financial difficulties, pursuant to Article 74 of the New York Insurance Law, the NYSDFS has statutory authority to assert control over FGIC, including by seeking an order of rehabilitation or, alternatively, an order of liquidation.  A rehabilitation or liquidation of FGIC would involve a New York state court proceeding administered by the Superintendent of Financial Services of the State of New York (the "Superintendent"), in his capacity as receiver, with the assistance of the New York Liquidation Bureau ("NYLB").  As described in more detail below, FGIC has been working with the NYSDFS, the NYLB and FGIC's stakeholders to develop an appropriate rehabilitation plan for FGIC in an effort to avoid any need to pursue liquidation.  There can be no assurance given as to whether, when and in what form such rehabilitation plan may be implemented, if at all, or as to other actions (including liquidation) that the Superintendent, the NYSDFS or the NYLB may take with respect to FGIC.

On August 3, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor filed a plan of reorganization on the Petition Date [Docket No. 11] (the "Original Plan") that provided Holders of Allowed General Unsecured Claims with pro rata distributions of (a) the Debtor's available cash and (b) new common stock in the Reorganized Debtor.  Pursuant to the Original Plan, unsecured creditors were estimated to receive Cash distributions with a value between 2% and 3% of the face value of their Claims, plus new common stock in the Reorganized Debtor.

---

[2]    This introduction is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in this Disclosure Statement.

[3]    The Debtor is also the parent to FGIC (Australia) Pty Limited ("FGIC Australia"), a wholly-owned subsidiary formed under the laws of Australia that is in the process of winding down.

[4]    Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Plan, a copy of which is attached hereto as **Exhibit A**.

On September 7, 2010, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"). Since that appointment, the Debtor has worked with the Creditors' Committee to seek out alternative restructuring proposals for the Debtor. The Debtor received three formal proposals from third parties seeking to sponsor a plan of reorganization for the Debtor. Each of these proposals, however, was contingent on FGIC's restructuring efforts and specifically on FGIC entering into favorable commercial arrangements with the potential plan sponsor. To date, no agreement has been reached with any of these potential plan sponsors.

On January 25, 2012, FGIC notified the Debtor in writing that it was in advanced discussions with the NYSDFS regarding a proposal pursuant to which FGIC, with the approval of the NYSDFS, would sponsor the Debtor's plan of reorganization and provide the Debtor with a capital contribution. Because this proposal has limited contingencies and increases the recoveries unsecured creditors would have received under the Original Plan, the Debtor has determined that it is in the best interest of the Debtor's estate to proceed with the Plan sponsored by FGIC. Since receipt of the notice, the Debtor engaged in negotiations regarding this proposal, including with FGIC and the Creditors' Committee.

On February 3, 2012, the Debtor and FGIC executed that certain Plan Sponsor Agreement, attached as **Exhibit C** hereto (the "Plan Sponsor Agreement"), pursuant to which FGIC will make a Cash contribution to the Debtor in the amount of $11 million (the "Contribution Amount") and, in exchange, the Debtor will assume the Amended and Restated Income Tax Allocation Agreement, a form of which is attached as Exhibit A to the Plan (the "Amended TAA"). The NYSDFS has authorized FGIC to enter into the Plan Sponsor Agreement. On February 28, 2012, the Bankruptcy Court entered an order authorizing the Debtor's entry into the Plan Sponsor Agreement [Docket No. 271].

Under the Plan, on the Effective Date, the Debtor will fund distributions to Holders of Allowed Claims in Classes 1–6 with its existing Cash on hand *plus* the Contribution Amount but *less* certain other amounts necessary to implement the Plan and fund the Reorganized Debtor's anticipated reasonable operating expenses after the Effective Date. In addition, Holders of Allowed General Unsecured Claims in Class 6 will also receive common stock in the Reorganized Debtor. The Debtor estimates that the Cash distributions to Holders of Allowed Class 6 Claims will represent a value between 5.5% and 6% of the face value of such Claims. Under the Original Plan, such Holders were only to receive approximately 2% to 3% of the face value of their Claims. Pursuant to the Plan, the Debtor will also cancel its debt obligations in the aggregate amount of $391.5 million.

Notably, the Creditors' Committee has agreed to support the Plan. In addition, pursuant to letter agreements, the Debtor's three largest common shareholders, representing over 90% of its common stock have reaffirmed their commitments to support the Plan and have agreed to the cancellation of their equity interests pursuant to the Plan and to waive general unsecured claims against the estate on account of monitoring fee agreements in the aggregate amount of $7.2 million.[5]

B.     **WHY WE ARE SENDING YOU THIS DISCLOSURE STATEMENT**

Prior to soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan.

This document is the Disclosure Statement for the Plan and includes information about, among other things:

- the Debtor's corporate history, prepetition capital structure and indebtedness (Article II);

- events leading to the Chapter 11 Case, including the Debtor's prepetition restructuring efforts (Article III.A);

- significant events in the Debtor's Chapter 11 Case (Article III.B);

---

[5]    For more information on these monitoring fee claims, see Article II.C, *infra*.

2

- the classification and treatment of Claims and Equity Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Articles IV.B and V);

- significant aspects of the Plan, including how distributions under the Plan will be made and the manner in which Disputed Claims will be resolved (Article IV.E and IV.F);

- the statutory requirements for confirming the Plan (Article VII.B);

- certain risk factors creditors should consider before voting and information regarding alternatives to Confirmation of the Plan (Article IX); and

- certain U.S. federal income tax consequences of the Plan (Article XI).

In light of the foregoing, the Debtor believes that the Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Debtor believes the Plan is in the best interests of its estate and its creditors and strongly recommends that you vote to accept the Plan if you are entitled to vote. Assuming the requisite acceptances to the Plan are obtained, the Debtor will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan and all documents to be executed, delivered, assured, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date, subject to certain consents of FGIC.

## C.    OVERVIEW OF CHAPTER 11

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court, in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

## D.    SUMMARY OF CLASSIFICATION AND TREATMENT OF
## ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

The following table summarizes distributions to Holders of Allowed Claims and Equity Interests under the Plan.[6] The recoveries set forth below are projected recoveries and are subject to change.

| Class | Claim | Status | Recovery |
|-------|-------|--------|----------|
| 1 | Priority Non-Tax Claims | Unimpaired | 100% |
| 2 | Secured Tax Claims | Unimpaired | 100% |
| 3 | Other Secured Claims | Unimpaired | 100% |
| 4 | Plan Sponsor Intercompany Claim | Impaired | Plan Sponsor Stock |

---

[6]    This table is only a summary of the classification and treatment of Allowed Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Interests.

| 5 | Convenience Claims | Unimpaired | 100% |
| 6 | General Unsecured Claims | Impaired | 5.5% to 6% plus Creditor New Common Stock |
| 7 | Equity Interests | Impaired | 0% |
| 8 | Section 510(b) Claims | Impaired | 0% |

## E.    PARTIES ENTITLED TO VOTE ON THE PLAN

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  For example, Holders of Claims and Equity Interests not impaired by the Plan are presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.  Holders of Claims or Equity Interests Impaired by the Plan and receiving no distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  The following table sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

| Class | Claim | Status | Voting |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (presumed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 4 | Plan Sponsor Intercompany Claim | Impaired | Yes |
| 5 | Convenience Claims | Unimpaired | No (presumed to accept) |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Equity Interests | Impaired | No (deemed to reject) |
| 8 | Section 510(b) Claims | Impaired | No (deemed to reject) |

For a detailed description of the Classes of Claims and Equity Interests, as well as their respective treatment under the Plan, see Article III of the Plan.

## F.    SUMMARY OF SOLICITATION PACKAGE AND VOTING INSTRUCTIONS

The following materials constitute the solicitation package (the "Solicitation Package"):

- Notice of the Confirmation Hearing;

- the appropriate ballot and applicable voting instructions or a notice of non-voting status, as applicable;

- a letter from the Creditors' Committee recommending that Holders of General Unsecured Claims vote to accept the Plan; and

- a CD-ROM containing this Disclosure Statement with all exhibits, including the Plan.

Any party who desires paper copies of materials received in CD-ROM form or additional copies of any other solicitation materials should contact the Garden City Group, Inc. ("Garden City") by (a) emailing

4

FGICInfo@gardencitygroup.com, (b) calling 1-800-327-3667 and/or (c) writing to: The Garden City Group, Inc., Attn.: FGIC Corp., 5151 Blazer Pkwy, Suite A, Dublin, OH 43017, and such paper copies shall be provided. All parties entitled to vote to accept or reject the Plan shall receive a paper copy of the appropriate ballot.

The Debtor has sought the Court's permission to retain Garden City as its solicitation agent to assist in the balloting and tabulation process. If retained as the Debtor's solicitation agent, Garden City will, among other things, mail the Solicitation Package to the appropriate creditors, answer questions relating to the solicitation process, provide additional copies of all Solicitation Package materials when requested, tabulate votes on the Plan and generally oversee the solicitation process.

Only the Holders of Class 4 and 6 Claims (the "Voting Classes") are entitled to vote to accept or reject the Plan. To be counted, ballots must be received by Garden City by 5:00 p.m. prevailing Eastern Time on **April 12, 2012 at 4:00 p.m. ET** (the "Voting Deadline"). Voting instructions are attached to each ballot. Please see Article V, entitled "Solicitation and Voting Procedures" for additional information.

Votes cast on any ballot (a) not received by the Voting Deadline or (b) received but not duly executed or completed in accordance with the requirements herein shall not be counted. Garden City will process and tabulate ballots for each Voting Class and will file a voting report (the "Voting Report") on or before **April 12, 2012 at 11:59 p.m. ET**.

Parties may contact Debra Wolther at Garden City at 1-800-327-3667 with any questions related to the solicitation procedures applicable to their Claims and Equity Interests.

The Debtor will file the Plan Supplement five business days prior to the Voting Deadline (the "Plan Supplement Filing Date"). When filed, the Debtor will serve a paper copy of the Plan Supplement on each party who received the Solicitation Package.

No later than twenty (20) days before the Confirmation Hearing (as defined below), the Debtor will provide to each non-Debtor counterparty to Executory Contracts and Unexpired Leases that the Debtor will assume pursuant to the Plan notices of such proposed assumption and cure amounts, as well as procedures for objecting thereto and resolution of such disputes by the Bankruptcy Court. The Debtor will also list all Executory Contracts and Unexpired Leases being assumed under the Plan in the Plan Supplement (the "Schedule of Assumed Contracts and Leases").

If your Executory Contract or Unexpired Lease is not listed on the Schedule of Assumed Contracts and Leases, your Executory Contract or Unexpired Lease will be rejected under the Plan. **The deadline to file claims arising from rejection of Executory Contracts or Unexpired Leases under the Plan is ten (10) days after the Confirmation Hearing**.

**Any ballot that is properly executed by the Holder of a Claim in a Voting Class, but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**Each Holder of a Claim in a Voting Class must vote all of its Claims within such Voting Class either to accept or reject the Plan and may not split its votes. By signing and returning a ballot, each Holder of a Claim in a Voting Class will certify to the Bankruptcy Court and the Debtor that no other ballots with respect to such Claim have been cast or, if any other ballots have been cast with respect to such Claim, such other ballots are revoked.**

**All ballots are accompanied by voting instructions. It is important to follow the specific instructions provided with each ballot.**

**The Debtor is relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Laws the offer of new securities in connection with the Solicitation and the Plan.**

## G.    THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Following approval of this Disclosure Statement, the Debtor intends to schedule promptly a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

## H.    CONFIRMING AND CONSUMMATING THE PLAN

Following Confirmation, the Plan will be consummated on the day that is the first Business Day after the Confirmation Date on which: (1) no stay of the Confirmation Order is in effect; and (2) all conditions precedent to the effectiveness of the Plan set forth in Article IX of the Plan have been satisfied or waived in accordance with the terms thereof (the "Effective Date").

For further information, see Article IX of the Plan, entitled "Conditions Precedent to the Effective Date."

## I.    RULES OF INTERPRETATION

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in Article I.B of the Plan; (2) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (3) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (4) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (5) any reference to an entity as a Holder of a Claim or Equity Interest includes that entity's successors and assigns; (6) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement or to this Disclosure Statement; (7) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (8) the words "herein," "hereof," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (10) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in Bankruptcy Code § 102 shall apply; (11) any term used in capitalized form in this Disclosure Statement or the Plan but that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (13) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (14) unless otherwise specified, all references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II
## BACKGROUND

Beginning in 1983 and through 2007, FGIC guaranteed the timely payment of principal and interest on public finance and structured finance obligations, including credit default swap ("CDS") contracts, by issuing insurance policies. FGIC provided credit enhancement for domestic and international securities, including newly issued securities and securities trading in the secondary market.

The deterioration in the U.S housing and mortgage markets that began in 2007 had a significant adverse impact on the financial condition of FGIC and its subsidiaries (the "FGIC Group"). Because of a dramatic, sustained increase in the number of mortgage defaults and foreclosures in the U.S., a large number of the securities insured by FGIC went into default. As a result, FGIC paid claims on its insurance policies far in excess of historical levels, which led to a significant reduction in FGIC's surplus to its policyholders. Nearly all these policies were issued during 2005, 2006 and the first half of 2007, a period in which the rampant fraud and misrepresentations in the U.S. mortgage market, which have subsequently come to light, made it virtually impossible for any insurer to accurately assess the risk associated with such transactions, or to predict the losses that eventually occurred and are continuing. In turn, this deterioration in FGIC's capital surplus position resulted in its inability to pay dividends to the Debtor and FGIC has not made any such payments since January 2008.

Because the Debtor is an insurance holding company with no operations, it depends on dividend income from FGIC to service its debt obligations. Recognizing that it likely would be unable to service its debt in light of FGIC's inability to pay dividends, the Debtor engaged in discussions with its key creditor constituencies and shareholders and explored a variety of options to deleverage its balance sheet.

## A.    CORPORATE HISTORY AND STRUCTURE

The Debtor's wholly-owned subsidiary, FGIC, has been a leading provider of credit enhancement since its establishment in the early 1980s, when FGIC pioneered the financial guaranty insurance industry by becoming the first company to insure variable rate municipal bonds. Beginning in the late 1980s, FGIC led the development of insurance products covering home equity loans.

FGIC maintained its status as an industry leader throughout the 1990s. In fact, in 1990, FGIC became the first company to insure asset-backed commercial paper conduits, and, in 1992, became the first United States financial guarantor to obtain a license to write financial guaranty insurance in the United Kingdom. Shortly thereafter, FGIC opened an office in Paris and, in 1994, insured the first true cross-border Japanese securitization.

Through 2007, FGIC continued to guarantee the timely payment of principal and interest on public finance and structured finance obligations, including CDS contracts, by issuing insurance policies. FGIC also provided credit enhancement for domestic and international securities, including both newly issued securities and securities trading in the secondary market. Together with its subsidiaries, FGIC did business in three principal areas: U.S. Public Finance, U.S. Structured Finance and International Finance (composed of both public finance and structured finance business outside of the U.S.).

Within the structured finance segment of its business, FGIC insured both residential mortgage-backed securities ("RMBS") and collateralized debt obligations of asset-backed securities ("ABS CDOs"). As of December 31, 2011, FGIC had insured (a) RMBS with approximately $14.7 billion net par in force and approximately $3.4 billion of statutory loss reserves and (b) ABS CDOs with approximately $5.0 billion net par in force and approximately $1.5 billion of statutory loss reserves. The vast majority of FGIC's ABS CDO exposure was written in the form where FGIC insured the obligations of FGIC CP, a wholly-owned subsidiary of FGIC, under CDS contracts between FGIC CP and the counterparties thereto.

## B.    EQUITY OWNERSHIP

General Electric Capital Corporation ("GE Capital"), an affiliate of General Electric Company, acquired FGIC Corporation in 1989. In December 2003, GE Capital sold 95.5% of its common equity interest in FGIC Corporation to a diversified group of sophisticated investors, including The PMI Group Inc., which subsequently assigned its equity interest to PMI Mortgage Insurance Co. ("PMI"), affiliates of The Blackstone Group LP (the "Blackstone Affiliates"), affiliates of The Cypress Group LLC (the "Cypress Affiliates") and affiliates of CIVC Partners LP (the "CIVC Affiliates").

Prior to the filing, in order to continue to preserve the resources of both FGIC and the Debtor and expedite the chapter 11 process for the Debtor, Dubel & Associates, LLC ("Dubel & Associates") entered into an agreement in which it purchased 100% of PMI's equity interest in the Debtor pursuant to that certain Stock Purchase Agreement, dated as of July 1, 2010, by and between PMI and Dubel & Associates (the "Dubel & Associates

7

Purchase Agreement").[7] Prior to the commencement of the Chapter 11 Case, Dubel & Associates transferred to the Debtor all of the shares it purchased from PMI and requested that the Debtor retire these shares. The Debtor retired these shares and Dubel & Associates did not receive any compensation in connection with its transfer of shares to the Debtor. As of the date hereof, Dubel & Associates does not hold any Equity Interests in the Debtor or any of its subsidiaries or affiliates.

GE Funding Holdings, Inc. ("GE Funding"), an affiliate of GE Capital, continues to own the common equity interest in the Debtor that it retained as part of the December 2003 sale described above. In addition to its common equity interest, GE Funding owns 100% of the Debtor's preferred stock, which carries an aggregate liquidation preference of approximately $330 million.[8]

The Debtor does not have any classes of stock outstanding other than the common stock and preferred stock discussed above.

## C.    ASSETS AND LIABILITIES

The Debtor's two main assets are (a) its ownership of 100% of the common equity interests in FGIC and (b) Cash in the approximate amount of $9.5 million. The Debtor will use its Cash (and the Contribution Amount) to fund the administration of this case and for distributions to holders of Allowed Claims.

As of the date hereof, the Debtor has unsecured debt of approximately $391.5 million, consisting of the following:

- Approximately $46 million owing under that certain Revolving Credit Agreement, dated as of December 12, 2005 (as amended, the "Revolving Credit Agreement"), by and between the Debtor, FGIC, the lender parties thereto and JPMorgan Chase Bank, N.A. as administrative agent (the "Administrative Agent");

- Approximately $325 million in aggregate principal amount of outstanding 6% Senior Notes Due 2034 (the "Senior Notes"),[9] issued pursuant to that certain Indenture, dated January 12, 2004 (the "Indenture"), between the Debtor, as issuer, and The Bank of New York ("BNY"), as indenture trustee,[10] as well as approximately $20.5 million of interest on the Senior Notes that had accrued but remained unpaid as of the Petition Date;

- $24,125 owing to FGIC for services rendered by FGIC to the Debtor for the period of July 1, 2010 through the Petition Date hereof pursuant to that certain Space and Cost Sharing Agreement by and between the Debtor and FGIC, dated as of January 1, 2004 (the "Cost Sharing Agreement"); and

---

[7]    In connection with the Dubel & Associates Purchase Agreement, the Blackstone Affiliates, the Cypress Affiliates and the CIVC Affiliates entered into that certain Consent and Accession Agreement, dated as of July 29, 2010, pursuant to which these equity holders have agreed to not take any action that could in any way impair the value of FGIC Group's NOLs.

[8]    FGIC Corp.'s Certificate of Incorporation, as amended through November 4, 2009, provides that the preferred stock of FGIC Corp. ranks senior to its common stock with respect to dividends and distributions upon the liquidation of FGIC Corp. *See* FGIC Corp. Cert. of Incorp., Art. Fourth, Part I, § 2 at 3. Prior to the Petition Date, GE Capital and GE Funding informed the Debtor that they would not seek any recovery in the Chapter 11 Case. Based on the implied valuation of the Debtor, it is highly unlikely that holders of preferred equity would ever receive any distribution under the Plan.

[9]    In April 2009, FGIC Corp. repurchased Senior Notes in the aggregate principal amount of approximately $63.105 million but did not retire such Senior Notes. Third parties currently hold Senior Notes in the aggregate principal amount of approximately $261.895 million.

[10]    Pursuant to that certain Agreement of Resignation, Appointment and Acceptance, dated as of June 3, 2010, by and between FGIC Corp., BNY and Wilmington Trust FSB ("Wilmington Trust"), Wilmington Trust became the successor trustee under the Indenture.

- $10,500 owing to Dubel & Associates under that certain Monitoring Fee Assignment Agreement, by and between Dubel & Associates and The PMI Group, Inc., dated as of July 29, 2010 (the "Monitoring Fee Assignment Agreement").

Prior to the filing of the case, the Debtor owed certain of its equity security holders approximately $7.2 million on account of services rendered to the Debtor pursuant to monitoring fee agreements between the Debtor and those equity security holders.[11]

Pursuant to letter agreements, the Debtor's three largest common shareholders, representing over 90% of its common stock have reaffirmed their commitments to support the Plan and have agreed to the cancellation of their equity interests pursuant to the Plan and to waive general unsecured claims against the estate on account of monitoring fee agreements in the aggregate amount of $7.2 million.

In addition, Dubel & Associates, as assignee of the claims under PMI's Monitoring Fee Agreement, agreed to reduce its claim against the Debtor from $5.7 million to $10,500. As such, by these agreements, the Debtor reduced its liabilities by $12.9 million.

## D.    REGULATORY OVERSIGHT OF FGIC'S BUSINESS

The following paragraphs provide a general summary of the New York Insurance Law and an overview of the regulatory framework within which FGIC operates. Although FGIC previously held licenses to write insurance policies in, and was subject to regulation and supervision by, each of the 50 States, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and the United Kingdom (through a branch and one of its subsidiaries), because FGIC is a New York insurance corporation, the NYSDFS exercises primary regulatory authority over FGIC.

Article 69 of the New York Insurance Law sets forth the requirements applicable to financial guaranty insurance companies. In pertinent part, the New York Insurance Law provides as follows:

- *Surplus to Policyholders*: To engage in the financial guaranty insurance business under the New York Insurance Law, an insurer must maintain initial equity of $2.5 million and paid-in capital of $72.5 million. Thereafter, an insurer must maintain a surplus to policyholders of $65 million. N.Y. Ins. Law § 6902(b)(1). In addition, the New York Insurance Law requires financial guaranty insurance companies to maintain contingency reserves sufficient to protect policyholders against the effects of excessive losses that may occur during adverse economic cycles.[12] *Id.* at § 6903(a)(1).

- *Dividends*: The New York Insurance Law limits the ability of insurance companies to pay dividends to shareholders. Under the New York Insurance Law, an insurer may only pay dividends out of "earned surplus" and may not declare or distribute shareholder dividends during any 12-month period that would exceed the lesser of (a) 10% of policyholders' surplus, as shown by the most recent statutory financial statement on file with the Superintendent and (b) 100% of adjusted net investment income for such 12-month period, unless the Superintendent approves a greater dividend based on a finding that the insurer will retain sufficient surplus to support its obligations and written policies. *Id.* at § 4105(a).

---

[11]  The Debtor is party to (a) that certain Monitoring Fee Agreement by and between the Debtor and The PMI Group, Inc., dated as of December 18, 2003 (Dubel & Associates succeeded to PMI's rights under this agreement pursuant to the Dubel & Associates Purchase Agreement); (b) that certain Monitoring Fee Agreement by and between the Debtor and Blackstone Management Partners IV LLC, dated as of December 18, 2003; (c) that certain Monitoring Fee Agreement by and between the Debtor and Cypress Advisors, Inc., dated as of December 18, 2003; and (d) that certain Monitoring Fee Agreement by and between the Debtor and CIVC Partners LP, dated as of December 18, 2003 (collectively, the "Monitoring Fee Agreements"). Pursuant to the Monitoring Fee Agreements, the equity security holders provided the Debtor with financial advisory services, including assisting it in analyzing its operations, historical performance and future prospects.

[12]  Total contingency reserves required are calculated as the greater of 50% of premiums written or a specified percentage applied to insured outstanding principal, net of collateral and reinsurance. *Id.* at § 6903(a)(3)(B), (4)(B). The percentage applied to insured outstanding principal varies by the type of outstanding principal guaranteed. *Id.*

- *Insolvency*: In the event an insurer becomes insolvent (*i.e.*, "is unable to pay its outstanding lawful obligations as they mature in the regular course of business, as shown by an excess of required reserves and other liabilities over admitted assets" *id.* at § 1309), the NYSDFS may petition the New York Supreme Court for an order of rehabilitation or liquidation under Article 74 of the New York Insurance Law.[13] *Id.* §§ 7402, 7404. Effectively, the NYSDFS can be granted control of an insolvent insurer's property and the power to conduct its business to remove the causes and conditions of the order of rehabilitation. *Id.* at § 7403(a). Additionally, if the NYSDFS determines at any time that rehabilitation is futile, the NYSDFS may apply for an order of liquidation. *Id.* at § 7403(c).

- *Transactions with Corporate Parent*: The New York Insurance Law addresses the relationship between a controlled insurer and any person controlling, controlled by (in some instances) or under common control with, its corporate parent. Under section 1505 of the New York Insurance Law, all transactions between a controlled insurer and its corporate parent are subject to the following requirements: "(1) the terms shall be fair and equitable; (2) charges or fees for services performed shall be reasonable; and (3) expenses incurred and payments received shall be allocated to the insurer on an equitable basis in conformity with customary insurance accounting practices consistently applied." N.Y. Ins. Law § 1505(a) (McKinney 2010). Furthermore, "[t]he books, accounts and records of each party to all such transactions shall be so maintained as to clearly and accurately disclose the nature and details of the transactions including such accounting information as is necessary to support the reasonableness of the charges or fees to the respective parties." *Id.* § 1505(b).

Throughout its history, the FGIC Group has worked with the NYSDFS to ensure the FGIC Group complies with the New York Insurance Law. In compliance with section 1505 of the New York Insurance Law, with the prior approval or deemed or express non-objection of the NYSDFS, the Debtor and FGIC entered into that certain Amended and Restated Income Tax Allocation Agreement, dated as of December 18, 2003 (the "Tax Allocation Agreement") and the Cost Sharing Agreement (together with the Tax Allocation Agreement, the "Intercompany Agreements"). Under the Tax Allocation Agreement, the Debtor satisfies tax obligations of the FGIC Group's consolidated tax group. FGIC then reimburses the Debtor for the portion of income tax liability allocable to FGIC. All payments owed under the Tax Allocation Agreement are allocated to FGIC on a separate return basis. The Tax Allocation Agreement expressly provides that FGIC's credits, losses and carryovers of credits or losses remain the property of FGIC.

Under the Cost Sharing Agreement, FGIC provides the Debtor with: (a) office space at the companies' joint corporate headquarters; and (b) legal, loss prevention, data processing, accounting, collection, investment, technology and any other services related to the functions of an insurance holding company. The Debtor electronically tracks all fund transfers in its accounting system so that it can ascertain, trace and account for transactions in connection with the Intercompany Agreements in accordance with the requirements of the New York Insurance Law.

As of the date hereof, the Debtor is not aware of any viable claims that it could assert against FGIC or its other subsidiaries. Even if such claims did exist, given the strict requirements of the New York Insurance Law and the regulatory oversight of the NYSDFS, the Debtor believes that any attempt to assert claims against its subsidiaries, including FGIC, would result in the NYSDFS attempting to take control of FGIC and place it into a rehabilitation or liquidation proceeding, thereby diminishing the value of this estate to the detriment of all stakeholders.

---

[13]    FGIC cannot seek relief under the Bankruptcy Code because it is a domestic insurer. 11 U.S. C. § 109(b), (d).

# ARTICLE III
## CHAPTER 11 CASE

The following is a general summary of the Chapter 11 Case, including the significant events leading to the Chapter 11 Case and the anticipated events that will take place during the Chapter 11 Case.

## A.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

### 1.    FGIC's Restructuring Efforts

The deterioration in the U.S housing and mortgage markets that began in 2007 had a significant adverse impact on the financial condition of FGIC.  Since the fourth quarter of 2007, FGIC incurred significant losses on its policies relating to certain RMBS and to certain ABS CDOs backed primarily by subprime RMBS, which have resulted in a substantial reduction of FGIC's statutory policyholders' surplus over time. Nearly all these policies were issued during 2005, 2006 and the first half of 2007, a period in which the rampant fraud and misrepresentations in the U.S. mortgage market, which have subsequently come to light, made it virtually impossible for any insurer to accurately assess the risk associated with such transactions, or to predict the losses that eventually occurred and are continuing. As a result, FGIC is in a policyholders' surplus deficit position of approximately $3,567,076 as of December 31, 2011. Under the New York Insurance Law, FGIC, as a financial guaranty insurance company also licensed to transact credit insurance and surety, must maintain policyholders' surplus of at least $66.4 million. Given such policyholders' surplus deficit, (i) the Superintendent could seek to be appointed by the New York State Supreme Court as rehabilitator or liquidator of FGIC at any time or (ii) in the exercise of its fiduciary duties, the FGIC Board of Directors (the "FGIC Board") may request the Superintendent to seek, and in such event it is likely that the Superintendent would seek, such court appointment.

Due to the adverse developments described above, FGIC voluntarily ceased writing financial guaranty policies concerning new or additional risks in January 2008.  FGIC does not have any plans to recommence writing new financial guaranty business at this time.  Since January 2008, FGIC has not paid any dividends or other distributions to the Debtor.  Further, FGIC successfully completed a number of loss mitigation transactions that reduced FGIC's losses and net par in force.  FGIC also actively sought to reduce, defray and control its expenses.

To that end, on September 30, 2008, FGIC entered into a reinsurance transaction (the "Reinsurance Transaction") with MBIA Insurance Corporation ("MBIA Insurance"), pursuant to which FGIC ceded all of its interest in and to, and the risks associated with, policies covering approximately $188 billion of outstanding U.S. public finance obligations (the "Covered Policies").  MBIA Insurance agreed to administer and pay all claims under the Covered Policies.  Among other things, as consideration for the Reinsurance Transaction, FGIC paid MBIA Insurance a reinsurance premium of $917,479,000 and MBIA Insurance paid FGIC a ceding commission of $196,721,000.  NYSDFS regulatory approval of the Reinsurance Transaction was an explicit condition to closing and the NYSDFS issued an order granting such approval.  As a result of the Reinsurance Transaction, FGIC released approximately $349 million of contingency reserves with respect to the Covered Policies, thereby improving its capital surplus position.  The Debtor was not a party to the Reinsurance Transaction.

FGIC's financial strength and credit ratings were downgraded during 2008 and 2009 and subsequently withdrawn by Moody's Investor Services Inc. (March 2009), Standard & Poor's Rating Services (April 2009) and Fitch Ratings Inc. (November 2008).

On November 20, 2009, FGIC filed with the NYSDFS its quarterly statement for the period ending September 30, 2009, in which FGIC reported a negative surplus to policyholders of $865,834,577 and an impairment of its required minimum surplus to policyholders of $932,234,577.

On November 24, 2009, the NYSDFS issued an order pursuant to Section 1310 of the Insurance Law requiring FGIC (as modified by the supplemental order dated March 25, 2010, the "1310 Order"), effective that day, to suspend paying any and all claims and prohibiting FGIC from writing any new policies. Accordingly, FGIC immediately suspended all claims payments. FGIC had previously ceased writing any new policies in January 2008. The 1310 Order also directed FGIC to submit a plan to the Superintendent to eliminate the impairment of FGIC's policyholders' surplus by January 5, 2010. The 1310 Order required FGIC to take such steps as may be necessary to

11

remove the impairment of its capital and to return to compliance with its minimum policyholders surplus' requirement by no later than June 15, 2010, or such subsequent date as the Superintendent deemed appropriate. FGIC may only operate in the ordinary course of business and as necessary to effectuate its plan to eliminate FGIC's policyholders' surplus deficit. The 1310 Order does not limit in any way the Superintendent's ability to seek rehabilitation or liquidation of FGIC at any time.

FGIC formulated a comprehensive restructuring plan to fulfill the requirements set forth in the 1310 Order and with a view to remediate its RMBS, ABS CDO and other exposures, mitigate FGIC's potential existing exposure for claims based on mark-to-market termination payments with respect to certain CDS transactions insured by FGIC, remove its capital impairment and return FGIC to compliance with the applicable minimum policyholders' surplus requirement. FGIC submitted an initial surplus restoration plan to the NYSDFS on December 22, 2009 and subsequently submitted an amended and restated surplus restoration plan (as so amended and restated, the "Surplus Restoration Plan"). The NYSDFS acknowledged that FGIC would continue its efforts to effectuate the amended and restated Surplus Restoration Plan and the transactions contemplated therein or attendant thereto on March 25, 2010.

The Surplus Restoration Plan included the following three key loss mitigation components: (i) remediating a substantial portion of FGIC's exposure to RMBS and ABS insured by FGIC in the primary market and for which it has established statutory loss reserves, including by the consensual "stripping" of FGIC insurance on all or a substantial portion of such RMBS and ABS through the offer to exchange launched by Sharps SP I LLC ("Sharps") on March 25, 2010 (as amended, amended and restated, modified, supplemented or extended from time to time, the "Offer") or through various other consensual remediation transactions; (ii) commuting, terminating, restructuring or reinsuring a substantial portion of FGIC's remaining exposure to ABS CDOs and to certain other obligations for which it has established statutory loss reserves, including RMBS insured by FGIC in the secondary market, through consensual transactions; and (iii) mitigating FGIC's existing exposure for claims based on mark-to-market termination payments under CDS insured by FGIC, pursuant to consensual transactions with the counterparties to such CDS, including pursuant to the transactions that had been contemplated by certain agreements with the counterparties to certain of such CDS and related transactions. FGIC reached definitive agreements or agreements in principle with certain CDS counterparties or other policy beneficiaries to effectuate the loss mitigation transactions described in clauses (ii) and (iii) of the preceding paragraph (the "Other Restructuring Transactions"). However, the Other Restructuring Transactions were conditioned upon, among other things, the successful closing of the Offer.

On October 25, 2010, Sharps announced that it did not receive sufficient participation from eligible holders in the Offer to satisfy the conditions necessary to complete the Offer. The Offer was not extended beyond the October 22, 2010 expiration date. Consequently, the Offer terminated in accordance with its terms, and none of the eligible FGIC-insured securities tendered under the Offer were accepted. As a result, the conditions for successfully effectuating the Surplus Restoration Plan were not satisfied. Furthermore, since the Offer did not successfully close, the agreements relating to the Other Restructuring Transactions either terminated in accordance with their terms or have conditions to closing that can not be satisfied.

FGIC is engaged in discussions with the NYSDFS. Specifically, since September 2010, as a consequence of the inability to gain the necessary level of participation in the Offer, FGIC has been engaged in discussions with the NYSDFS and starting in November 2010, the steering committee for an advisory group of policyholders regarding potential alternative surplus restoration plans to restore FGIC's statutory surplus and to restructure FGIC in a manner that is fair and equitable to its policyholders and other creditors. Recent alternative surplus restoration plan discussions have focused on, among other things, restoring FGIC to statutory solvency through a rehabilitation proceeding, and FGIC has reached out to the NYSDFS and the NYLB regarding such a potential plan (such plan and any other alternative surplus restoration plan that may be developed are referred to collectively as the "Alternative Surplus Restoration Plan"). FGIC has also been engaged in discussions with CDS counterparties to negotiate new or amended agreements regarding certain Other Restructuring Transactions, which would be included in, and would be completed as part of and subject to the successful effectuation of, the Alternative Surplus Restoration Plan. There can be no assurance given as to whether, when and in what form an Alternate Surplus Restoration Plan may be implemented, if at all, or as to other actions (including liquidation) that the Superintendent, NYSDFS or NYLB may take with respect to FGIC.

FGIC remains in regular contact with the NYSDFS regarding its strategy to mitigate losses and to preserve and enhance its surplus position, thereby protecting its policyholders.

### 2.    The Debtor's Prepetition Restructuring Efforts

As a result of FGIC's inability to pay dividends to the Debtor since January 2008, the Debtor has been unable to satisfy its obligations under the Revolving Credit Agreement and on account of the Senior Notes. Recognizing the need to restructure its balance sheet, the Debtor retained Kirkland & Ellis LLP ("K&E") in August 2009 to assist it with its restructuring efforts.

Throughout the third and fourth quarters of 2009, the Debtor, with the assistance of K&E, evaluated all available restructuring options. Specifically, the Debtor analyzed how it could distribute its assets to maximize value for all of its stakeholders. These efforts included an analysis of whether the Debtor possesses any viable causes of actions against third parties, including avoidance actions pursuant to sections 544, 547 and 548 of the Bankruptcy Code. Ultimately, the Debtor determined no such causes of action exist.

As part of this analysis, the Debtor and its advisors considered whether the Debtor could assert any causes of action against FGIC. Among other things, in January 2010, the Debtor, in its capacity as agent for the FGIC Corporation Group's consolidated tax group for purposes of filing federal tax returns, received a tax refund of approximately $25.34 million (the "2009 Tax Refund") from the Internal Revenue Service on account of the FGIC Corporation Group's election to carry back a portion of FGIC's 2008 net operating losses to offset income earned by FGIC in previous years. FGIC—not the Debtor—generated the income that gave rise to the tax, paid the tax and then generated the losses that gave rise to the 2009 Tax Refund.

Based on these facts, the Tax Allocation Agreement and applicable law, prior to receipt of the 2009 Tax Refund, the Debtor's officers and directors, after careful consideration and consultation with their tax advisors, determined that FGIC, the entity that paid the taxes at issue and generated the losses that resulted in the 2009 Tax Refund, was the rightful owner of the 2009 Tax Refund. Consistent with this analysis and with prior practice, the Debtor, in its capacity as agent for the consolidated tax group, immediately allocated the 2009 Tax Refund to FGIC upon its receipt. In developing the Plan, the Debtor determined that the allocation of the 2009 Tax Refund to FGIC is not subject to avoidance pursuant to sections 544, 547 or 548 of the Bankruptcy Code. The Plan reflects this determination and, if confirmed, would constitute a settlement of any such claims.

## B.    EVENTS DURING THE CHAPTER 11 CASE

To facilitate the administration of the Chapter 11 Case and minimize disruption to the Debtor's operations, the Debtor sought and was granted certain relief on the first day of the Chapter 11 Case and at a hearing held on August 24, 2010. Additional significant events are summarized below.

### 1.    Appointment of the Creditors' Committee

On September 7, 2010, the U.S. Trustee appointed the Creditors' Committee, which is currently comprised of Wilmington Trust, National Association, successor by merger to Wilmington Trust FSB, in its capacity as indenture trustee for the Debtor's 6% Senior Unsecured Notes (the "Notes"), and The Mangrove Partners Fund, LP.

### 2.    Relief Requested from the Bankruptcy Court

The Bankruptcy Court has granted the following relief thus far in the Chapter 11 Case.

#### a.    Motion Permitting Debtor to Maintain Existing Cash Management System

The cash management motion sought authority for the Debtor to maintain its prepetition cash management system after commencement of the Chapter 11 Case, including inter-company transfers and use of bank accounts [Docket No. 4]. The Bankruptcy granted the requested relief on an interim basis at the first day hearing [Docket No. 20].

After the first day hearing, the Debtor submitted a supplemental declaration in support of the cash management motion [Docket No. 35], in which it indicated that it would transfer all of its cash to the operating account it maintains with JPMorgan Chase Bank, N.A. ("JPMorgan Chase"). Once the Debtor transferred its cash to the JPMorgan Chase operating account, the Bankruptcy Court entered a final order granting the relief requested in the cash management motion [Docket No. 62].

### b.    Motion to Establish Claims Trading Procedures

As of December 31, 2011, the FGIC Corporation Group had NOLs of approximately $5.4 billion, including $5.3 billion of NOLs attributable to FGIC and $110 million of NOLs attributable to the Debtor. These NOLs are extremely valuable assets of the Debtor's estate that will facilitate the successful reorganization of the FGIC Corporation Group. To protect the NOLs, on the Petition Date, the Debtor filed a motion requesting the authority to establish procedures for trading in Claims against the Debtor's estate if such procedures become necessary to protect and preserve the FGIC Corporation Group's valuable tax attributes [Docket No. 5].

At the first day hearing, the Bankruptcy Court granted this relief on an interim basis [Docket No. 18]. The interim order does not establish procedures for trading in Claims against the Debtor's estate or require any creditors to sell Claims that they hold. Rather, the interim order provides notice that the Debtor may return to the Court and request the implementation of procedures requiring creditors to sell Claims they purchased after the Petition Date if such procedures are necessary to protect and preserve the FGIC Corporation Group's Tax Attributes.

The Plan Sponsor Transaction (defined below) is premised on the Debtor receiving approval of a final Claims trading order and the qualification of the Plan under section 382(l)(5) of the Internal Revenue Code.

To that end, on February 28, 2012, the Debtor received approval of the claims trading procedures on a final basis [Docket No. 270].

### c.    Bar Date Motions

The Bankruptcy Court entered an order (a) establishing September 30, 2010 at 5:00 p.m. (prevailing Eastern Time) as the deadline for filing proofs of Claim (the "Bar Date"), (b) approving procedures for filing proofs of claim in the Chapter 11 Case, and (c) approving the form and manner of service of the notices of the Bar Date [Docket No. 46].

The Bankruptcy Court also entered an order establishing April 19, 2012 at 5:00 p.m. (prevailing Eastern Time) as the deadline for filing Administrative Claims [Docket No. 280].

### d.    Exclusivity Extensions

The Debtor's exclusive periods to file a plan of reorganization and solicit acceptances thereof (collectively, the "Exclusive Periods") were originally set to expire on December 1, 2010, and January 1, 2011, respectively. The Exclusive Periods were thereafter extended from time to time. The final extension of the Exclusive Periods was to February 3, 2012 and April 3, 2012, respectively [Docket No. 218].

### 3.    Discussions with Third Parties Regarding the Plan

### a.    The Debtor's Relationship With FGIC

Since filing the Chapter 11 Case, the Debtor has had discussions with certain third parties regarding the Debtor's relationship with FGIC. Certain of those parties have inquired whether the Debtor may be able to extract value from FGIC as consideration for its efforts to preserve FGIC's valuable NOLs through the Plan. The Debtor has had various discussions with FGIC concerning the NOLs. The Debtor is not aware of any basis for unilaterally requiring FGIC to pay anything to the Debtor in exchange for taking action to preserve the value of the NOLs.

On August 17, 2010, the Debtor received a letter from a purported holder of the Senior Notes inquiring whether the allocation to FGIC of the 2009 Tax Refund received by the Debtor constitutes a preferential or fraudulent transfer. The Debtor informed this party that in the Debtor's view the 2009 Tax Refund was the property of FGIC and that the Debtor received the 2009 Tax Refund solely in its capacity as agent for the FGIC Corporation Group and thus, never acquired a property interest in the Tax Refund. The Debtor also explained that the NYSDFS would never have permitted the Debtor to lay claim to a refund of taxes previously paid by FGIC, particularly in light of the fact that such tax refund was occasioned by losses generated by FGIC.

As described above, the Debtor thoroughly considered the issues raised in the August 17, 2010 letter prior to commencing this Chapter 11 Case and determined an action under section 547 or section 548 of the Bankruptcy Code to recover the 2009 Tax Refund likely would not succeed. Given this low probability of success, the Debtor concluded pursuing such an action would be a waste of the estate's limited resources. Accordingly, the Debtor did not include the potential proceeds of such an action as a component of creditor recoveries under the Plan.

Pursuant to the Plan, the Debtor intends to release any Cause of Action related to the 2009 Tax Refund. It remains possible that a third party may seek standing to pursue direct causes of action against FGIC and other parties on account of the allocation of the 2009 Tax Refund. If such authority is sought, the Debtor will oppose the relief as it will cause an unnecessary drain on the estate's resources and could have a severe negative impact on the Debtor's relationship with FGIC and the NYSDFS, which could further impact the value of the Debtor, recoveries by the creditors, and the viability of the Reorganized Debtor.

### b.    Potential Plan Sponsor Proposals

Throughout the Chapter 11 Case, the Debtor has worked to attract plan proposals from third parties. The Debtor received three formal proposals from third parties seeking to sponsor a plan of reorganization for the Debtor. Each of these proposals, however, was contingent on FGIC's restructuring efforts and specifically on FGIC entering into favorable commercial arrangements with the potential plan sponsor. To date, no agreement has been reached with any of these potential plan sponsors.

### c.    The FGIC Proposal

Throughout the Chapter 11 Case, the Debtor has maintained contact with the NYSDFS on matters related to FGIC's restructuring. On January 25, 2012, FGIC notified the Debtor in writing that it was in advanced discussions with the NYSDFS regarding a proposal pursuant to which FGIC, with the approval of the NYSDFS, would sponsor the Debtor's plan of reorganization and provide the Debtor with a capital contribution (the "Plan Sponsor Transaction"). Following negotiations including FGIC and the Creditors' Committee and in light of the fact that this proposal has limited contingencies and increases the recoveries unsecured creditors would have received under the Original Plan by more than 125%, the Debtor has determined that it is in the best interests of the Debtor's estate to proceed with the Plan sponsored by FGIC.

On February 3, 2012, the Debtor and FGIC executed that certain Plan Sponsor Agreement pursuant to which FGIC will make a Cash contribution to the Debtor in the amount of $11 million and, in exchange, the Debtor will assume the Amended TAA. The NYSDFS has authorized FGIC to enter into the Plan Sponsor Agreement. Under the Plan, on the Effective Date, the Debtor will fund distributions to Holders of Allowed Claims in Classes 1–6 with its existing Cash on hand *plus* the Contribution Amount *less* certain other amounts necessary to fund the Reorganized Debtor's anticipated reasonable operating expenses after the Effective Date. In addition, Holders of Allowed General Unsecured Claims in Class 6 will also receive common stock in the Reorganized Debtor. The Debtor estimates that the Cash distributions to Holders of Allowed Class 6 Claims will represent a value between 5.5% and 6% of the face value of such Claims. Under the Original Plan, such Holders were only to receive approximately 2% to 3% of the face value of their claims. Pursuant to the Plan, the Debtor will also cancel debt obligations in the aggregate amount of approximately $391.5 million.

The Debtor believes that entry into the Plan Sponsor Agreement represents the best path forward in this Chapter 11 Case. On February 28, 2012, the Bankruptcy Court authorized the Debtor to enter into the Plan Sponsor Agreement [Docket No. 271].

## ARTICLE IV
## THE PLAN

**This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).**

**The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.**

**The Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, the Debtor under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Equity Interests in the Debtor, the Debtor's estate, the Reorganized Debtor, all parties receiving property under the Plan and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.**

1.    **Administrative Claims**

Pursuant to the Plan, "Administrative Claim" means a Claim for costs and expenses of administration of the Debtor's estate pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date to preserve the Debtor's estate; and (b) the Allowed Claims of Professionals in the Chapter 11 Case.

All fees payable pursuant to section 1930 of title 28 of the United States Code due and payable through the Effective Date shall be paid by the Debtor on or before the Effective Date, and amounts due thereafter shall be paid by the Reorganized Debtor in the ordinary course of business until the Bankruptcy Court enters a final decree closing the Chapter 11 Case, dismisses the Chapter 11 Case or converts the Chapter 11 Case to a case under another chapter of the Bankruptcy Code. Any deadline for filing Claims in the Chapter 11 Case shall not apply to fees payable by the Debtor or the Reorganized Debtor, as applicable, pursuant to section 1930 of title 28 of the United States Code.

a.    **Payment of Administrative Claims**

Unless otherwise agreed to by the Holder of an Administrative Claim and the Debtor or the Reorganized Debtor, as applicable, each Holder of an Allowed Administrative Claim (other than any Professional Claim) will receive, in full and final satisfaction, settlement and release of its Administrative Claim, Cash in an amount equal to the amount of such Allowed Administrative Claim either: (a) on the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after Effective Date; (b) if the Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, in each case without any further action by the Holder of such Allowed Administrative Claim and without any further notice to or action, order or approval of the Bankruptcy Court.

b.    **Professional Claims**

(1)    <u>Final Fee Applications</u>

All final requests for payment of Professional Claims must be filed with the Bankruptcy Court and served on the Reorganized Debtor no later than sixty (60) days after the Effective Date. After notice and a hearing

in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Case, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

<div align="center">(2)      <u>Payment of Professional Claims</u></div>

The amount of Professional Claims owing to the Professionals for any period prior to the Confirmation Date shall be paid in Cash to such Professionals from funds held in the Professional Fee Reserve Account when such Claims are Allowed by a Final Order. When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Fee Reserve Account, if any, shall revert to the Distribution Agent and shall be distributed on a Pro Rata basis to Holders of Allowed Class 6 Claims. To the extent that funds held in the Professional Fee Reserve Account are unable to satisfy the amount of Allowed Professional Claims owing to the Professionals as of the Confirmation Date, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash from Cash on hand or the Professional Fee Reserve Account the reasonable legal, professional and other fees and expenses incurred after the Confirmation Date and related to (a) implementation and Consummation of the Plan incurred by the Reorganized Debtor, and (b) the Professionals' final fee applications. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Procedures Order in seeking retention or compensation for services rendered after the Confirmation Date shall terminate and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

<div align="center">(3)      <u>Professional Fee Reserve Amount</u></div>

The Professionals shall provide the Debtor with estimates of (a) their unpaid Professional Claims through the Confirmation Date no later than five (5) days after the Confirmation Date. Such estimates shall not be considered an admission with respect to the fees and expenses of such Professional, and such Professionals shall not be bound to any extent by such estimates. If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional. The total amount of estimated Professional Claims shall comprise the Professional Fee Reserve Amount. To the extent the Professional Fee Reserve Amount is less than the amount needed to satisfy any Allowed Professional Claim, any affected Professional shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

<div align="center">(4)      <u>Release of Previously Held Back Amounts</u></div>

On the Confirmation Date, the Debtor shall be authorized to release to Professionals any amount of Allowed Professional Claims previously held back pursuant to the provisions set forth in the Interim Compensation Procedures Order.

**2.**    **Priority Tax Claims**

To the best of the Debtor's knowledge, there are no Priority Tax Claims against the Debtor. The Debtor has included a treatment for such Claims in this Plan out of an abundance of caution. To the extent such Claims exist, such Claims shall be treated as follows:

In accordance with section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the election of the Debtor or Reorganized Debtor (in either case, such election is subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion), one of the following treatments in exchange for full and final satisfaction, settlement, release and compromise of such Claim: (a) on the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after Effective Date, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in an amount lower than the amount of such Allowed

<div align="center">17</div>

Priority Tax Claim as may be agreed to by the Holder of such Allowed Priority Tax Claim and the Debtor or Reorganized Debtor, as applicable, or (b) commencing on the Effective Date and continuing over a period not exceeding five (5) years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under non-bankruptcy law; *provided*, that the Reorganized Debtor shall have the option to prepay the entire amount of the Allowed Priority Tax Claim, subject to the consent of the Plan Sponsor, which consent may be withheld in the Plan Sponsor's sole discretion.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Reorganized Debtor shall commence payment as described in this paragraph within thirty (30) days after the Allowed Priority Tax Claim becomes due and owing, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date.  To the extent that a Priority Tax Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall commence payment as described in this paragraph within thirty (30) days after the date on which an order Allowing such Priority Tax Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date.

## A.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS IN THE DEBTOR

### 1.    Summary

Except for the claims addressed in Article II of the Plan (or as otherwise set forth in the Plan), all Claims against and Equity Interests in the Debtor are placed in Classes.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims or Priority Tax Claims.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against, and Equity Interests in, the Debtor.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.

#### a.    Summary of Classification and Treatment of Claims and Equity Interests

| Class | Claim | Status | Voting |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (presumed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 4 | Plan Sponsor Intercompany Claim | Impaired | Yes |
| 5 | Convenience Claims | Unimpaired | No (presumed to accept) |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Equity Interests | Impaired | No (deemed to reject) |
| 8 | Section 510(b) Claims | Impaired | No (deemed to reject) |

### 2.    Classification and Treatment of Claims and Equity Interests

#### a.    Class 1—Priority Non-Tax Claims

*Classification*: Class 1 consists of Priority Non-Tax Claims.  To the best of the Debtor's knowledge, there are no Priority Non-Tax Claims against the Debtor.  The Debtor has included a class for such Claims in the Plan out of an abundance of caution.

18

*Voting*:  Class 1 is Unimpaired and Holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

*Treatment*:  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, discharge and compromise of each and every Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall receive, at the election of the Debtor or Reorganized Debtor, as applicable (in either case, such election is subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion):  (i) Cash on the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after Effective Date in an amount equal to such Allowed Priority Non-Tax Claim; or (ii) subject to the Holder's consent, commencing on the Effective Date and continuing over a period not exceeding five (5) years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Non-Tax Claim, together with interest at the applicable rate under non-bankruptcy law; *provided*, that the Reorganized Debtor shall have the option to prepay the entire amount of the Allowed Priority Non-Tax Claim, subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion.  If a Priority Non-Tax Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall commence payment as described herein within thirty (30) days after the date on which an order Allowing such Priority Non-Tax Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date.

b.    **Class 2—Secured Tax Claims**

*Classification*:  Class 2 consists of Secured Tax Claims.  To the best of the Debtor's knowledge, there are no Secured Tax Claims against the Debtor.  The Debtor has included a class for such Claims in the Plan out of an abundance of caution.

*Voting*:  Class 2 is Unimpaired and Holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

*Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, discharge and compromise of each and every Allowed Secured Tax Claim, each Holder of such Allowed Secured Tax Claim shall receive Cash in the ordinary course of business in an amount equal to the amount of such Allowed Secured Tax Claim.  If a Secured Tax Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall commence payment as described herein within thirty (30) days after the date on which an order Allowing such Secured Tax Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date.

19

c.    **Class 3—Other Secured Claims**

*Classification*:  Class 3 consists of Other Secured Claims.  To the best of the Debtor's knowledge, there are no Other Secured Claims against the Debtor.  The Debtor has included a class for such Claims in the Plan out of an abundance of caution.

*Voting*:  Class 3 is Unimpaired and Holders of Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

*Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, discharge and compromise of each and every Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive Cash in the ordinary course of business in an amount equal to such Allowed Other Secured Claim.  If an Other Secured Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall pay such Other Secured Claim within thirty (30) days after the date on which an order Allowing such Other Secured Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date.

d.    **Class 4—Plan Sponsor Intercompany Claim**

*Classification*:  Class 4 consists solely of the Plan Sponsor Intercompany Claim.

*Allowance of Plan Sponsor Intercompany Claim*:  The Plan Sponsor Intercompany Claim shall be Allowed in the amount of $24,125.

*Voting*:  Class 4 is Impaired and the Holder of the Plan Sponsor Intercompany Claim is entitled to vote to accept or reject the Plan.

*Treatment*:  On the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after Effective Date, in full and final satisfaction and discharge of and in exchange for its Allowed Plan Sponsor Intercompany Claim, the Plan Sponsor shall receive the Plan Sponsor Stock.

e.    **Class 5—Convenience Claims**

*Classification*:  Class 5 consists of Convenience Claims.

*Allowance of Dubel & Associates, LLC Claim*:  Dubel & Associates, LLC holds a Convenience Claim against the Debtor in the amount of $10,500.  Such Claim shall be Allowed in the amount of $10,500.  To the best of the Debtor's knowledge, there are no other Convenience Claims against the Debtor.

20

*Voting*:  Class 5 is Unimpaired and the Holders of Class 5 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Convenience Claims are not entitled to vote to accept or reject the Plan.

*Treatment*:  In exchange for full and final satisfaction, settlement, discharge and compromise of each and every Convenience Claim, each Holder of an Allowed Convenience Claim shall be paid in full in Cash on the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after the Effective Date.  If a Convenience Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall pay such Claim in full in Cash within thirty (30) days after the date on which an order Allowing such Convenience Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date.

f.      **Class 6—General Unsecured Claims**

*Classification*:  Class 6 consists of General Unsecured Claims.  To the best of the Debtor's knowledge, there are no General Unsecured Claims other than the Prepetition Lenders' Claim and the Senior Notes Claim.

*Allowance of Prepetition Lenders' Claim and Senior Notes Claim*:

On the Effective Date, the Prepetition Lenders' Claim shall be Allowed in the aggregate amount of $46,000,000 plus accrued interest and any reasonable fees and expenses owing as of the Petition Date with respect to the obligations under the Credit Agreement, which amount shall be included in the Confirmation Order.

On the Effective Date, the Senior Notes Claim shall be Allowed in the aggregate amount of $345,000,000 (which amount includes the $63,105,000 of Senior Notes held by the Debtor) plus accrued interest and any reasonable fees and expenses owing as of the Petition Date with respect to the obligations under the Senior Notes Indenture, which amount shall be included in the Confirmation Order.  The Debtor agrees to release, discharge and waive any Claim for the Senior Notes it holds in the aggregate amount of $63,105,000 plus accrued interest and all fees and expenses with respect to the obligations under the Senior Notes Indenture, and no distribution shall be made to the Debtor on account of such Senior Notes or any accrued interest or fees and expenses owing thereon as of the Petition Date.

*Voting*:  Class 6 is Impaired and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

21

*Treatment*:  On the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (i) the Class 6 Cash Distribution Amount and (ii) 100% of the Creditor New Common Stock.

*Convenience Claim Election Rights*:  Each Holder of an Allowed General Unsecured Claim may elect to be treated as a Holder of a Convenience Claim in Class 5 by electing to reduce its Allowed General Unsecured Claim to the amount of $15,000 or less in full and final satisfaction, release and discharge of such Allowed General Unsecured Claim.  For the avoidance of doubt, the Indenture Trustee shall be deemed to be the Holder of any and all Claims arising under the Senior Notes Indenture for the purpose of exercising Convenience Claim election rights with respect to such Claims.  Likewise, the Administrative Agent shall be deemed to be the Holder of any and all Claims arising under the Credit Agreement for the purpose of exercising Convenience Claim election rights with respect to such Claims.  Individual Holders of the Senior Notes and/or the debt owing under the Credit Agreement shall not be eligible to exercise Convenience Claim election rights on account of such holdings.  Any election must be made on the Ballot, and except as may be agreed to by the Debtor or the Reorganized Debtor, no Holder of a General Unsecured Claim can elect treatment as a Convenience Claim after the Voting Deadline.  Upon any such valid and irrevocable election, the General Unsecured Claim of such Holder shall be automatically reduced to $15,000 (or such lower amount that the Holder elects) and satisfied as a Class 5 Claim, and shall no longer be entitled to any other distribution under this Plan on account of such Claim.

g.      **Class 7—Equity Interests**

*Classification*:  Class 7 consists of all Equity Interests in the Debtor.

*Voting*:  Class 7 is Impaired and Holders of Class 7 Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

*Treatment*:  On the Effective Date, all Equity Interests in the Debtor shall be cancelled and Holders of such Equity Interests shall not receive any distribution under the Plan on account of such Equity Interests.

h.      **Class 8—Section 510(b) Claims**

*Classification*:  Class 8 consists of Section 510(b) Claims.  To the best of the Debtor's knowledge, there are no Section 510(b) Claims against the Debtor.  The Debtor has included a Class for such Claims in the Plan out of an abundance of caution.

22

*Voting*:  Class 8 is Impaired and Holders of Class 8 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

*Treatment:*  Holders of Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims.  On the Effective Date, all Section 510(b) Claims shall be discharged.

## B.    ACCEPTANCE OR REJECTION OF THE PLAN

The Debtor requests Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtor reserves the right to modify the Plan to the extent Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## C.    MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.    General Settlement of Claims

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims are intended to be, and shall be, final.

### 2.    Reorganized Debtor

On the Effective Date, the New FGIC Corporation Board shall be established.  The Reorganized Debtor shall be authorized to adopt any agreements, documents and instruments and to take any other actions contemplated by the Plan as necessary or desirable to consummate the Plan; *provided*, *however*, that all such agreements, documents, instruments, and actions shall be acceptable to the Plan Sponsor in its sole discretion.

### 3.    Sources of Consideration for Plan Distributions

#### a.    Plan Sponsor Contribution and Cash on Hand

The Reorganized Debtor shall fund any Cash distributions to Holders of Allowed Administrative Claims, Professional Claims, Priority Tax Claims, and Claims in Classes 1–6 with the Debtor's existing Cash on hand as of the Effective Date, *plus* the Plan Sponsor Contribution Amount, *minus* the Reorganized Debtor Maintenance Amount, the Professional Fee Reserve Amount, and such amounts as may be necessary, if any, to pay emergence costs in connection with implementation of the Plan after the Effective Date.

#### b.    Creditor New Common Stock

The issuance of Creditor New Common Stock is authorized without the need for any further action by the Debtor or Reorganized Debtor.  On the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after Effective Date, the Reorganized Debtor shall issue and distribute 100% of the shares of Creditor New Common Stock to the Distribution Agent for the benefit of Holders of Class 6 Claims, subject to the reserve for Disputed Claims provided for in Article VI.B.8 of the Plan.

All of the shares of Creditor New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.  The distribution and issuance referred to herein shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each entity receiving such distribution or issuance.

23

### c.    Issuance of Plan Sponsor Stock

The issuance of Plan Sponsor Stock is authorized without the need for any further action by the Debtor or Reorganized Debtor.  On the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after Effective Date, the Reorganized Debtor shall issue and distribute all of the authorized shares of Plan Sponsor Stock, which shall only be one share, to the Plan Sponsor or its designee.  The Plan Sponsor Stock shall not entitle its holder to receive any distribution from the Reorganized Debtor, but shall entitle its holder to consent rights, which consent may be withheld in its sole discretion, with respect to the commencement of any subsequent insolvency or restructuring proceeding of the Reorganized Debtor.

All of the shares of Plan Sponsor Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.  The distribution and issuance referred to herein shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each entity receiving such distribution or issuance.

### 4.    Corporate Existence

Except as otherwise provided in the Plan, the Debtor shall continue to exist after the Effective Date as a corporate entity, with all the powers of a corporation, pursuant to applicable law in the jurisdiction in which the Debtor is incorporated and pursuant to the Certificate of Incorporation and By-Laws.

### 5.    Vesting of Assets in the Reorganized Debtor

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, all property of the Debtor's estate, all Causes of Action and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Equity Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 6.    Cancellation of Securities and Agreements

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan, except as otherwise specifically provided for in the Plan:  (a) the obligations of the Debtor under the Credit Agreement, the Senior Notes Indenture and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant or other instrument or document that directly or indirectly evidences or creates any indebtedness, obligation of or ownership interest in the Debtor that gives rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents that evidence indebtedness, obligations of or ownership interests in the Debtor that are reinstated pursuant to the Plan) shall be cancelled as to the Debtor, and the Reorganized Debtor shall not have any continuing obligations thereunder; and (b) the obligations of the Debtor pursuant, relating or pertaining to any agreements, indentures, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options or other instruments or documents that evidence or create any indebtedness, obligations of or ownership interests in, the Debtor (except such agreements, certificates, notes or other instruments that evidence indebtedness, obligations of or ownership interests in the Debtor that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided*, that, notwithstanding Confirmation or Consummation of the Plan, any such indenture or agreement that governs the rights of the Holder of a Claim shall, to the extent necessary, continue in effect solely for purposes of allowing the Holders of General Unsecured Claims to receive their distributions hereunder; *provided*, *further*, that the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan and shall not result in any expense or liability to the Reorganized Debtor.

7.        **Surrender of Existing Securities**

On the Effective Date, the Senior Notes, instruments evidencing a Claim against the Debtor arising under the Credit Agreement and all securities evidencing an Equity Interest in the Debtor shall be deemed surrendered and extinguished.

8.        **Corporate Action**

As of the date that the Confirmation Order becomes a Final Order, the Debtor and Reorganized Debtor shall be authorized and directed to assume the Amended Tax Allocation Agreement.  Upon the Effective Date, all other actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (a) distribution of Cash as provided for under the Plan; (b) adoption of the Certificate of Incorporation and By-Laws; (c) selection of the directors and officers for the Reorganized Debtor; and (d) the issuance and distribution of the Creditor New Common Stock and the Plan Sponsor Stock.

All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors or officers of the Debtor or the Reorganized Debtor.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtor and the Reorganized Debtor shall be authorized and, as applicable, directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor.  The authorizations and approvals contemplated by Article V.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

9.        **Certificate of Incorporation and By-Laws**

Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtor's Certificate of Incorporation and By-Laws shall prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtor, subject to the consent of the holder of the Plan Sponsor Stock as set forth is the next paragraph of Article V.I of the Plan, may amend and restate its Certificate of Incorporation and By-Laws as permitted by the laws of its state of incorporation and by its Certificate of Incorporation and By-Laws.

In addition, the Certificate of Incorporation, By-Laws, and other organizational documents, as appropriate, shall provide that the dissolution or commencement of any subsequent insolvency or restructuring proceeding of the Reorganized Debtor may not occur without the consent of the holder of the Plan Sponsor Stock, which consent may be withheld in its sole discretion.

The Certificate of Incorporation and By-Laws shall be filed in the Plan Supplement.

10.        **Stock Trading and Ownership Restrictions**

The transfer of Creditor New Common Stock shall be subject to certain transfer and ownership restrictions under the Certificate of Incorporation that are designed to protect the availability of the Tax Attributes, including net operating losses.

11.        **Reorganized Debtor Maintenance Amount**

On and after the Effective Date, the Reorganized Debtor shall use the Reorganized Debtor Maintenance Amount to fund the Reorganized Debtor's anticipated reasonable operating expenses for such a period of time as the Plan Sponsor deems appropriate in its sole discretion and may not use any such retained funds for any purpose other than its reasonable ordinary and necessary operating expenses; *provided*, *however*, that once such funds are used up by the Reorganized Debtor in its operations, the Plan Sponsor may (at its option) from time to time contribute additional funds to the Reorganized Debtor for such additional periods of time as the Plan Sponsor may request in its sole discretion, and the Reorganized Debtor shall continue to exist and operate for such periods; *provided*, that such additional funds may only be contributed with prior approval from the NYSDFS for each contribution of additional funds.

### 12. Directors and Officers of the Reorganized Debtors

The composition of the New FGIC Corporation Board and officers of the Reorganized Debtor shall be disclosed at or prior to the Confirmation Hearing and shall be acceptable to the Plan Sponsor in its sole discretion.

### 13. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtor and the officers and members of the board of directors thereof, are authorized to and may issue, execute, deliver, file and record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

### 14. Section 1146 Exemption

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, sales and use tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.  Furthermore, upon entry of the Confirmation Order, the appropriate state and local governmental officials and administrative agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.

### 15. Preservation of Causes of Action

Pursuant to section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article X.E of the Plan), the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor.  No person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them.  The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any person, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article X.E of the Plan), the Reorganized Debtor reserves and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any person or entity shall vest in the Reorganized Debtor.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order or approval of, the Bankruptcy Court.  The Reorganized Debtor shall not retain any Claims or Causes of Action against the Plan Sponsor or any of its Related Parties except as otherwise provided in Article X.E of the Plan.

26

D.      **PROVISIONS GOVERNING DISTRIBUTIONS**

1.      **Timing and Calculation of Distributions**

Unless otherwise provided in the Plan, on the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, then on the date that such Claim becomes an Allowed Claim or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions provided for in the Plan for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding any provisions in the Plan to the contrary, and except as otherwise agreed to by the relevant parties, no partial payments or distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor shall establish appropriate reserves for potential payment of such Claims.

2.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

a.      **Delivery of Distributions in General**

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution; *provided*, that the manner of such distributions shall be determined at the discretion of the Debtor or the Reorganized Debtor, as applicable; *provided, further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by such Holder.

b.      **Delivery of Distributions to Prepetition Lenders**

The Administrative Agent shall be deemed to be the Holder of the Allowed Prepetition Lenders' Claim for purposes of the initial distribution to be made pursuant to this Plan. The Distribution Agent shall make the initial distribution of cash and Creditor New Common Stock on account of such Claim to, or on behalf of, the Administrative Agent and the Administrative Agent shall hold or direct such distributions for the benefit of the Prepetition Lenders, as applicable. The Administrative Agent shall be permitted to rely on the register maintained by it on behalf of the Debtor pursuant to the Credit Agreement as of the Record Date and shall be entitled to any limitation of liability to which it is entitled under the Credit Agreement with respect to such reliance. As soon as practicable, the Administrative Agent shall arrange to deliver such distributions to, or on behalf of, such Prepetition Lenders pursuant to the Credit Agreement; *provided*, that the Administrative Agent shall retain all rights as Administrative Agent under the Credit Agreement in connection with delivery of distributions to the Prepetition Lenders. To the extent any subsequent distributions are required to be made on account of the Prepetition Lender Claim, the Distribution Agent shall make any such subsequent distributions directly to each Prepetition Lender, and the Administrative Agent shall provide a copy of such Register to facilitate such distributions. For purposes of subsequent distributions, it will be the responsibility of each individual Prepetition Lender to apprise the Distribution Agent of any change in its holdings after the Record Date.

27

### c.      Delivery of Distributions to Senior Noteholders

#### (1)      Distributions to Senior Noteholders

The Indenture Trustee shall be deemed to be the Holder of all Claims derived from and based on the Senior Notes Indenture for purposes of distributions to be made hereunder.  The Distribution Agent shall make all distributions on account of such Claims to the Indenture Trustee and the Indenture Trustee shall hold such distributions for the benefit of the Senior Noteholders, as applicable.  Notwithstanding any provision contained in this Plan to the contrary, the distribution provisions contained in the Senior Notes Indenture shall continue in effect to the extent necessary to make distributions pursuant to this Plan on account of the Senior Notes and shall terminate in full upon completion of all such distributions.  For the avoidance of doubt, any distribution on account of the Senior Notes are subject to the Indenture Trustee's right under Section 607 of the Senior Notes Indenture to assert its charging lien against such distributions.  Nothing herein shall be deemed to impair, waive, or discharge the Indenture Trustee's charging lien.  All payments to Senior Noteholders shall only be made to such Holders after the surrender by each such Holder of the certificates representing such Senior Notes, or in the event that such certificate is lost, stolen, mutilated or destroyed, upon the deemed surrender of the certificates pursuant to Article V.G of the Plan.  Upon surrender of such Senior Notes certificates, the Senior Notes shall be cancelled and destroyed.  As soon as practicable after surrender of the Senior Notes certificates, the Indenture Trustee shall distribute to the Holder thereof such Holder's Pro Rata share of the distribution; *provided*, that the Indenture Trustee shall retain all rights as Indenture Trustee under the Senior Notes Indenture in connection with delivery of distributions to the Senior Noteholders; *provided*, *further*, that the Debtor's obligations to make distributions in accordance with Article III of the Plan shall be deemed satisfied upon delivery of distributions to the Indenture Trustee..

#### (2)      Holders as of the Distribution Notification Date

As of the close of business on the Distribution Notification Date:  (1) the Claims Register will be closed; (2) the transfer books and records of the Senior Notes as maintained by the Indenture Trustee or its agent shall be closed; and (3) any transfer of any Claim based on the Senior Notes or any interest therein shall be prohibited.  The Debtor, the Reorganized Debtor and the Indenture Trustee shall have no obligation to recognize any transfer of any Claim based on the Senior Notes occurring after the close of business on the Distribution Notification Date and shall instead be entitled to recognize and deal for all purposes under this Plan with only those Holders of record as of the close of business on the Distribution Notification Date.

### d.      Distributions by Distribution Agent

The Debtor or the Reorganized Debtor, as applicable, shall have the authority, in its sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  As a condition to serving as a Distribution Agent, a Distribution Agent must:  (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required hereunder; and (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required hereunder to be distributed by such Distribution Agent.

The Debtor or the Reorganized Debtor, as applicable, shall pay to the Distribution Agents reasonable and documented fees and expenses of the Distribution Agents, without the need for any further approvals, authorizations, actions or consents of the Bankruptcy Court.

### e.      Minimum Distributions

Notwithstanding anything herein to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $25 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fraction of a dollar would otherwise be called for under the Plan, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar.

### f.      Fractional Shares

No fractional shares of Creditor New Common Stock shall be distributed under the Plan. When any distribution pursuant to the Plan on account of Allowed Class 6 Claims would otherwise result in the issuance of a number of shares of Creditor New Common Stock that is not a whole number, the actual distribution of shares of Creditor New Common Stock shall be rounded to the next lower whole number with no further payment or other distribution therefor. The total number of authorized shares of Creditor New Common Stock to be distributed shall be adjusted as necessary to account for the rounding provided for in Article VI.B.6 of the Plan.

g.     **Undeliverable Distributions**

In the event that any distribution to any Holder of a Claim is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor automatically and without the need for a further order of the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be discharged and forever barred.

h.     **Distributions Withheld for Disputed Claims**

On the Effective Date, the Debtor shall reserve Cash and/or Creditor New Common Stock, as appropriate, in an amount equal to the distributions to which Holders of Disputed Claims would be entitled if all such Claims were to become Allowed Claims. In the event a Disputed Claim is disallowed or Allowed and satisfied in accordance with the terms hereof pursuant to a Final Order, the Reorganized Debtor may reduce the amount of Cash and/or Creditor New Common Stock held in reserve accordingly.

i.     **Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed by any governmental unit. All distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provisions in the Plan to the contrary, the Reorganized Debtor and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. To avoid the need to take any such actions, the Debtor shall reserve a reasonable amount of funds to satisfy its obligations on account of tax withholding and reporting requirements.

j.     **Allocations**

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

k.     **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim against the Debtor, and no Holder of any Claim against the Debtor shall be entitled to interest accruing on or after the Petition Date on any such Claim.

E.    **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

1.    **Resolution of Disputed Claims**

a.    **Allowance of Claims**

On and after the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Case allowing such Claim.  All settled Claims approved prior to the Effective Date by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019, or otherwise, shall be binding on all parties.

b.    **Prosecution of Objections to Claims**

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date until the applicable Claims Objection Bar Date, the Reorganized Debtor, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without any further notice to, or action, order or approval of, the Bankruptcy Court.  The Reorganized Debtor shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order or approval of, the Bankruptcy Court.

c.    **Claims Estimation**

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date, the Reorganized Debtor, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

d.    **Expungement or Adjustment to Claims Without Objection**

Any Claim that has been paid, satisfied or superseded may be expunged from the Claims Register by the Reorganized Debtor and any Claim that has been amended may be adjusted thereon by the Reorganized Debtor.  The Reorganized Debtor may expunge or adjust such Claims without filing a Claims objection and without any further notice to, or action, order or approval of, the Bankruptcy Court.

e.    **Deadline to File Objections to Claims**

Any objections to Claims shall be filed no later than the applicable Claims Objection Bar Date.

30

2. **Disallowance of Claims**

All Claims of any entity from which property is sought by the Debtor under sections 542, 543, 550 or 553 of the Bankruptcy Code, or that the Debtor or the Reorganized Debtor alleges is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be disallowed if (a) the entity, on the one hand, and the Debtor or the Reorganized Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

3. **Amendments to Claims**

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor and, to the extent such prior authorization is not received, any such new or amended Claim shall be deemed disallowed and expunged without any further notice to, or action, order or approval of, the Bankruptcy Court.

4. **No Distributions Pending Allowance**

No payment or distribution under the Plan shall be made on account of a Disputed Claim or any disputed portion thereof unless and until such Disputed Claim becomes an Allowed Claim or any disputed portion of such Disputed Claim becomes Allowed.

5. **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions, if any, shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that any Disputed Claim becomes an Allowed Claim, the Distribution Agent shall provide to the Holder of such Allowed Claim the distribution, if any, to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

F. **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1. **Assumption and Rejection of Executory Contracts and Unexpired Leases**

a. **Assumption and Rejection of Executory Contracts and Unexpired Leases**

The Amended Tax Allocation Agreement shall be assumed as of the Effective Date.  All other Executory Contracts and Unexpired Leases shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease:  (a) has been previously assumed by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (b) is the subject of a motion to assume pending as of the Effective Date; or (c) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement.

b. **Approval of Assumption and Rejection of Executory Contracts and Unexpired Leases**

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection of Executory Contracts or Unexpired Leases described in Article VIII.A.1 of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or rejection of such Executory Contract or Unexpired Lease, including objecting to the cure amount designated by the Debtor as payable in connection with an assumption, shall be deemed to have consented to such assumption or rejection and agreed to the specified cure amount.

31

2.        **Claims on Account of the Rejection of Executory Contracts or Unexpired Leases**

All Proofs of Claim arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Debtor or the Reorganized Debtor, as applicable, no later than ten (10) days after the Confirmation Date.

Any entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtor or the Reorganized Debtor or their estates and property and the Debtor and the Reorganized Debtor, their estates and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. As of the Effective Date, all such Claims shall be subject to the permanent injunction set forth in Article X.H of the Plan.

3.        **Procedures for Counterparties to Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan**

A notice of the Effective Date, including notice regarding the assumption or rejection of Executory Contracts or Unexpired Leases, shall be sent to all known Holders of Claims. For known non-Debtor parties to Executory Contracts and Unexpired Leases assumed or rejected pursuant to the Plan, such notice or separate notices will be sent on or as soon as practicable after the Effective Date notifying such counterparties that such Executory Contracts and Unexpired Leases have been assumed or rejected pursuant to the Plan.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least twenty (20) days prior to the Confirmation Hearing, where applicable, the Debtor shall provide counterparties to Executory Contracts and Unexpired Leases with notices of proposed assumptions and cure amounts as well as procedures for objecting thereto and resolution of such disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract to a proposed assumption or related cure amount must be filed, served and **actually received** by the Debtor at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters.

In the event of a dispute regarding: (a) the amount of any payments to cure a default under an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan; (b) the ability of the Debtor or Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving any such dispute and approving the assumption. If an objection to cure is sustained by the Bankruptcy Court, the Debtor, at its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

4.        **Survival of Corporate Indemnification Obligations**

All Claims of the Debtor's officers and directors for indemnity arising under the Debtor's certificate of incorporation or by-laws, applicable state law, specific agreement or any combination of the foregoing arising in respect of actions or omissions that occurred prior to the Petition Date shall be treated as Class 6 Claims to the extent such Claims are not otherwise satisfied from the Debtor's existing directors and officers' insurance coverage.

After the Effective Date, the Reorganized Debtor shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect on the Petition Date, with respect to actions or omissions occurring prior to the Effective Date and all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

32

G.    **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

1.    **Conditions**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

- A Final Order shall have been entered providing that the Plan Sponsor Agreement is approved and that the Debtor and the Reorganized Debtor are directed to perform all obligations thereunder;

- The Confirmation Order shall provide, among other things, that (a) assumption of the Amended Tax Allocation Agreement is approved, (b) the assets that may be deposited into the Tax Escrow Account, if any, shall not be deemed property of the Debtor or the Reorganized Debtor, and (c) the Debtor and the Reorganized Debtor are authorized and directed to take all actions necessary or appropriate to consummate the Plan;

- The Confirmation Order shall have been entered and have become a Final Order and shall be acceptable to the Plan Sponsor in its sole discretion;

- All documents and agreements necessary to implement the Plan, including the Plan Sponsor Agreement, the Amended Tax Allocation Agreement, and all documents in the Plan Supplement shall (a) be acceptable to the Plan Sponsor in its sole discretion, and (b) have (i) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) been tendered for delivery; and (iii) been effected or executed;

- All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with and approved by applicable governmental units in accordance with applicable laws;

- All governmental, judicial, and third party approvals and consents, including approval (or non-disapproval, as the case may be) of the NYSDFS and the Bankruptcy Court, that are necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transaction;

- The Bankruptcy Court shall have entered the Final Claims Trading Order, which shall be in form and substance acceptable to the Plan Sponsor in its sole discretion, on or before entry of an order approving the adequacy of the Disclosure Statement, and the Final Claims Trading Order shall be a Final Order;

- The Plan qualifies under section 382(l)(5) of the IRC and the Plan Sponsor is satisfied with such qualification in its sole discretion; and

- The Certain Tax Conditions are satisfied.

2.    **Waiver of Conditions**

The conditions to the Effective Date set forth in this Article may be waived only by the Plan Sponsor, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

3.    **Effect of Non-Occurrence of Conditions to the Effective Date**

Unless otherwise agreed to by the Plan Sponsor, if the Effective Date does not occur within 180 days after the Confirmation Date, the Plan shall be null and void in all respects and nothing contained in the Plan or

the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by, Claims against or Equity Interests in, the Debtor; (b) constitute the assumption or rejection of any Executory Contract or Unexpired Lease affected by the Plan; (c) prejudice in any manner the rights of the Debtor or any Holders of Claims against or Equity Interests in the Debtor; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtor or any Holders of Claims against or Equity Interests in the Debtor in any respect.

## H.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1.    Compromise and Settlement

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, distributions, releases and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Equity Interests and controversies resolved pursuant to the Plan relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest or any distribution to be made on account of such Allowed Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its estate and Holders of Claims and Equity Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan and pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to, or action, order or approval of, the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against it and its estate and Causes of Action against other entities.

### 2.    Subordinated Claims

The allowance, classification, and treatment of all Claims and Equity Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise; *provided*, that notwithstanding anything to the contrary contained in that certain Monitoring Fee Agreement by and between the Debtor and The PMI Group, Inc., dated as of December 18, 2003, Dubel & Associates, LLC, as successor to The PMI Group, Inc., shall be entitled to an Allowed Convenience Claim in the amount of $10,500, which Claim shall be paid in full in Cash as a Class 5 Convenience Claim.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to re-classify any Claim or Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto.  As provided in Article III.B of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such section 510(b) Claim.  As of the filing of this Plan, the Debtor is not aware of any Claims that merit subordination.

### 3.    Discharge of Claims and Termination of Equity Interests

Pursuant to, and to the fullest extent permitted by, section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Equity Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against or Equity Interests in the Debtor, the Reorganized Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such Claim or Equity Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to occurrence of the Effective Date.

4.       **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection therewith, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan, and, in the case of a Secured Tax Claim or Other Secured Claim, concurrently with satisfaction in full of the portion of the Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtor's estate shall be fully released and discharged and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns. The Debtor is not aware of any liens against property of the estate.

5.       **Debtor Release**

Pursuant to the Plan, "Released Parties" means, collectively: (a) the Debtor; (b) the Plan Sponsor; (c) Dubel & Associates, LLC; (d) Blackstone Management Partners IV LLC, in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (e) Cypress Advisors, Inc., in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (f) CIVC LP, in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (g) the Creditors' Committee and its members as such committee was constituted as of February 3, 2012, each solely in its respective capacity as such, and including the Indenture Trustee, but only in its capacities as a member of the Creditors' Committee and as Indenture Trustee (and not on behalf of any other person); and (h) with respect to each of the persons named in (a)–(g) above, such entity's Related Parties.

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtor, the Reorganized Debtor and any person or entity seeking to exercise the rights of the Debtor's estate, including the Creditors' Committee, any successor to the Debtor or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall, to the maximum extent allowed by applicable law, discharge and release and shall be deemed to have provided a full release, waiver and discharge to each of the Released Parties (and each of the Released Parties shall be deemed fully released and discharged by the Debtor and Reorganized Debtor and any person or entity seeking to exercise the rights of the Debtor's estate) and their respective property from any and all claims, interests, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereafter arising, in law, at equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's estate, the conduct of the Debtor's business, the Chapter 11 Case, the purchase, sale or rescission of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim against the Debtor or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims against the Debtor and Equity Interests prior to or in the Chapter 11 Case or the negotiation, formulation or preparation of the Plan Sponsor Agreement, Plan, Plan Supplement, Disclosure Statement or any related agreements, instruments or other documents, other than claims or liabilities arising out of or relating to any act or omission of such Released Party that constitutes willful misconduct or gross negligence as determined by a Final Order.**

**Notwithstanding anything herein to the contrary, the foregoing "Debtor Release" shall not operate to waive or release (a) any post-Effective Date obligations of any party under the Plan, the Amended Tax Allocation Agreement, the Plan Sponsor Agreement, or any other document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any Causes of Action of the Debtor that are expressly set forth in and preserved by the Plan or related documents.**

6.       **Releasing Party Release**

Pursuant to the Plan, "Releasing Parties" means, collectively: (a) the Plan Sponsor; (b) Dubel & Associates, LLC; (c) Blackstone Management Partners IV LLC, in its capacities as a Holder of an Equity Interest

and as a party to a Monitoring Fee Agreement with the Debtor; (d) Cypress Advisors, Inc., in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (e) CIVC LP, in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (f) the Creditors' Committee and its members as such committee was constituted as of February 3, 2012, each solely in its respective capacity as such, and including the Indenture Trustee, but only in its capacities as a member of the Creditors' Committee and as Indenture Trustee (and not on behalf of any other person); and (g) with respect to each of the persons named in (a)–(f) above, such entity's Related Parties.

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party), shall, to the maximum extent allowed by applicable law, discharge and release and shall be deemed to have provided a full release, waiver and discharge to each of the Released Parties (and each of the Released Parties shall be deemed fully released and discharged by the Releasing Parties) and their respective property from any and all claims, interests, obligations, rights, debts, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereafter arising, in law, at equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's estate, the conduct of the Debtor's businesses, the Chapter 11 Case, the purchase, sale or rescission of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim against Debtor or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims against the Debtor and Equity Interests prior to or in the Chapter 11 Case or the negotiation, formulation or preparation of the Plan Sponsor Agreement, Plan, Plan Supplement, Disclosure Statement or any related agreements, instruments or other documents, other than claims or liabilities arising out of or relating to any act or omission of such Released Party that constitutes willful misconduct or gross negligence as determined by a Final Order.**

**Notwithstanding anything herein to the contrary, the foregoing "Releasing Party Release" does not release (a) any post-Effective Date obligations of any party under the Plan, the Amended Tax Allocation Agreement, the Plan Sponsor Agreement, or any other document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action that are expressly set forth in and preserved by the Plan or related documents, or (c) any obligation that the Plan Sponsor may owe to any Releasing Party (or vice versa) in connection with or relating to such Releasing Party's employment by or service for the Plan Sponsor.**

The Debtor believes the releases contained herein satisfy the requirements of *In re Metromedia Fiber Network Inc.*, 416 F. 3d 136 (2d Cir. 2005) and *In re Johns-Manville*, 517 F. 3d 52 (2d Cir. 2008) and will file a memorandum in support of confirmation prior to the Confirmation Hearing that will contain the Debtor's analysis of the propriety of the release provisions.

7.    **Exculpation**

**Except with respect to any acts or omissions expressly set forth in and preserved by the Plan or related documents, the Exculpated Parties shall neither have nor incur any liability to any person or entity for any act taken or omitted to be taken in connection with, arising from or relating in any way to, the Chapter 11 Case, including:   (a) formulating, negotiating, preparing, disseminating, implementing and/or effecting the Plan (including the Plan Supplement and any related contract, instrument, release or other agreement or document created or entered into in connection therewith); (c) the solicitation of votes for the Plan and the pursuit of Confirmation of the Plan; (d) the administration of the Plan and/or the property to be distributed under the Plan; and/or (e) the offer and issuance of any securities under the Plan.  In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its respective duties under, pursuant to or in connection with, the Plan.**

**Notwithstanding anything herein to the contrary, nothing in the foregoing exculpation provisions shall (a) exculpate any person or entity from any liability resulting from any act or omission constituting willful misconduct or gross negligence as determined by a Final Order, (b) exculpate any person or entity from its obligations under the Amended Tax Allocation Agreement, the Plan Sponsor Agreement or any other document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (c) limit the liability of the professionals of the Exculpated Parties to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).**

**8.    Injunction**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES, INCLUDING THOSE WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES, THAT (i) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN, (ii) HAVE BEEN RELEASED PURSUANT TO ARTICLE X.E OR ARTICLE X.F OF THE PLAN, (iii) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE X.G OF THE PLAN; OR (iv) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM:

(a)    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES, INCLUDING ON ACCOUNT OF ANY CLAIMS, EQUITY INTERESTS, CAUSES OF ACTIONS OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED);

(b)    ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES;

(c)    CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES;

(d)    ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF, SUBROGATION OR RECOUPMENT ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR EQUITY INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE;

(e)    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN; AND

(f)    TAKING ANY ACTION OR FAILING TO TAKE ANY ACTION THAT COULD IN ANY WAY IMPAIR THE PLAN SPONSOR'S USE OF ALL OR ANY PORTION OF THE TAX ATTRIBUTES IN ANY WAY, INCLUDING FAILING TO COMPLY WITH, TERMINATING, REJECTING OR OTHERWISE INTERFERING WITH THE AMENDED TAX ALLOCATION AGREEMENT.

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NO ENTITY SHALL BE PRECLUDED FROM OBTAINING ON ACCOUNT OF ITS ALLOWED CLAIM THE DISTRIBUTIONS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; *PROVIDED*, THAT NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, SUBSECTION (g) ABOVE SHALL NOT APPLY TO THE PLAN SPONSOR.

## I.    BINDING NATURE OF PLAN

**THIS PLAN SHALL BIND THE DEBTOR, THE REORGANIZED DEBTOR AND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER: (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN; (B) HAS FILED A PROOF OF CLAIM OR EQUITY INTEREST IN THE CHAPTER 11 CASE OR; (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

## J.    RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain the maximum legally permissible jurisdiction over the Chapter 11 Case and all entities with respect to all matters arising out of or related to the Chapter 11 Case, the Debtor and the Plan, including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date to add or remove Executory Contracts or Unexpired Leases from the schedule of Assumed Executory Contracts and Unexpired Leases;

- ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date; *provided*, that the Reorganized Debtor reserves the right to commence actions in all appropriate forums and jurisdictions;

- enter and implement such orders as may be necessary or appropriate to implement or Consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan Sponsor Agreement, the Plan, the Plan Supplement or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

- hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with the Effective Date or enforcement of the Plan, the Amended Tax Allocation Agreement and the Plan Sponsor Agreement, except as otherwise provided in the Plan;

- resolve any cases, controversies, suits or disputes with respect to the settlements, compromises, releases, injunctions, exculpations and other provisions contained in Article X hereof and enter such orders or take such other actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to the Plan Sponsor Agreement, Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement;

- adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

- consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- determine requests for the payment of Claims and Equity Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

- hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

- hear and determine matters concerning section 1145 of the Bankruptcy Code;

39

- hear and determine all disputes involving the existence, nature or scope of the releases set forth in Article X of the Plan;

- hear and determine any dispute related to the Professional Fee Reserve Account or the Professional Fee Reserve Amount;

- enforce all orders previously entered by the Bankruptcy Court;

- resolve any disputes arising under the Plan Sponsor Agreement;

- hear any other matter not inconsistent with the Bankruptcy Code;

- enter an order concluding or closing the Chapter 11 Case; and

- enforce the injunction, release and exculpation provisions set forth in Article X of the Plan.

Notwithstanding anything to the contrary in Article XII of the Plan, any claim, action or dispute that may arise as a result from, or be connected with, the Amended Tax Allocation Agreement shall be subject to and governed by the jurisdictional provisions set forth in the Amended Tax Allocation Agreement.

## ARTICLE V
## SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Plan. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

### A.    THE SOLICITATION PACKAGE

The following materials constitute the Solicitation Package:

- Notice of the Confirmation Hearing;

- the appropriate ballot and applicable Voting Instructions or a notice of non-voting status, as applicable;

- a letter from the Creditors' Committee recommending that Holders of General Unsecured Claims vote to accept the Plan; and

- a CD-ROM containing this Disclosure Statement with all exhibits, including the Plan.

Any party who desires paper copies of materials received in CD-ROM form or additional copies of any other solicitation materials should contact Garden City by (a) emailing FGICInfo@gardencitygroup.com, (b) calling 1-800-327-3667 and/or (c) writing to: The Garden City Group, Inc., Attn.: FGIC Corp., 5151 Blazer Pkwy, Suite A, Dublin, OH 43017. All parties entitled to vote to accept or reject the Plan shall receive a paper copy of the appropriate ballot.

The Plan Supplement will be filed five Business Days before the Voting Deadline. The Plan Supplement will include the following: (a) a list of Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtor and their respective cure obligations, with notices of assumption or rejection mailed to Executory Contract and Unexpired Lease counterparties on or before twenty (20) days prior to the Confirmation Hearing; (b) the amended Certificate of Incorporation and By-Laws; and (c) to the extent known, the identity of the members of the Reorganized Debtor's initial board of directors and officers and the nature and compensation for any such individual who is an "insider" as defined in section 101(31) of the Bankruptcy Code.

40

**B.      VOTING DEADLINE**

The period during which ballots with respect to the Plan will be accepted by the Debtor will terminate at 4:00 p.m. prevailing Eastern Time on **April 12, 2012 at 4:00 p.m. ET**.

The Debtor may, subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion, extend the Voting Deadline at any time or from time to time (on a daily basis, if necessary) by making a public announcement of such extension no later than the first business day following the previously announced Voting Deadline.  The Debtor shall give notice of any such extension in a manner deemed reasonable to the Debtor in its discretion.

Votes cast on any ballot (a) not received by the Voting Deadline or (b) received but not duly executed or completed in accordance with the requirements herein shall <u>not</u> be counted.

**C.      VOTING INSTRUCTIONS**

Only the Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate ballots and returning them by first class mail, overnight courier or hand delivery.  The failure of a Holder to deliver a duly executed ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan, and such abstentions will not be counted as votes for or against the Plan.  Voting Instructions are attached to each ballot.

With respect to the Senior Notes, voting nominees (the "<u>Voting Nominees</u>") should deliver the ballot and other documents  relating to the Plan, including this Disclosure Statement, to each beneficial holder of the Senior Notes for which they serve as Voting Nominee (the "<u>Beneficial Holders</u>").

With respect to obligations under the Revolving Credit Agreement, the Administrative Agent should deliver the ballot and other documents relating to the Plan, including this Disclosure Statement, to each loan participant under the Revolving Credit Agreement (the "<u>Loan Participants</u>").

Voting Nominees and the Administrative Agent will forward the Solicitation Package to each Beneficial Holder or Loan Participant, as applicable, and include a return envelope provided by, and addressed to, the Voting Nominee or Administrative Agent, as applicable.  Beneficial Holders and Loan Participants should return their completed ballots to the Voting Nominees or Administrative Agent, as applicable, and upon receipt of the ballots, the Voting Nominees and Administrative Agent will summarize the individual votes of Beneficial Holders and Loan Participants on the appropriate master ballots (the "<u>Master Ballots</u>") and then return the Master Ballots to Garden City so that Garden City **actually  receives** the Master Ballots before the Voting Deadline.

**Any ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**Each Holder of a Claim in a Voting Class must vote all of its Claims within such Class either to accept or reject the Plan and may not split its votes.  By signing and returning a ballot, each Holder of a Claim entitled to vote on the Plan will certify to the Bankruptcy Court and the Debtor that no other ballots with respect to such Claim have been cast or, if any other ballots have been cast with respect to such Claim, such other ballots have been revoked.**

**All ballots are accompanied by return envelopes.  It is important to follow the specific instructions provided on each ballot.**

By signing and returning a ballot, each Holder of a Claim in a Voting Class will be certifying to the Bankruptcy Court and the Debtor that, among other things:

- the Holder has received a copy of the Solicitation Package and acknowledges that the Debtor's solicitation of votes is  subject to the terms and conditions set forth therein;

- the Holder has cast the same vote with respect to all Claims in its Voting Class held by such Holder; and

- no other ballots with respect to the same Claim have been cast, or, if any other ballots have been cast with respect to such Claim, then any such ballots are thereby revoked.

## D.    VOTING TABULATION

The ballot does not constitute, and shall not be deemed to be, a proof of Claim or an assertion of a Claim or Equity Interest.  Only Holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims.

Votes cast on any ballot (a) not received by the Voting Deadline or (b) received but not duly executed or completed in accordance with the requirements herein shall not be counted.  A ballot will be deemed delivered only when Garden City actually receives the original executed ballot or Master Ballot, as applicable.  Ballots sent by fax or email will not be counted.  No ballot should be sent to the Debtor, the Debtor's agents (other than Garden City), or the Debtor's financial or legal advisors.  The Debtor expressly reserves the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications).  The Bankruptcy Court may require the Debtor to disseminate additional solicitation materials if the Debtor makes material changes to the terms of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last valid ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior ballot.  Holders must vote all of their Claims in the voting Class either to accept or reject the Plan and may not split their vote.  Accordingly, a ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent Holders maintain multiple Claims within a voting Class, the Debtor may, in its discretion, and to the extent possible, aggregate the Claims of any particular Holder within such voting Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

Garden City will file a Voting Report with the Bankruptcy Court on or before **April 12, 2012**.  The Voting Report shall, among other things, delineate every ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information or damaged.  The Voting Report also shall indicate the Debtor's intentions with regard to such Irregular Ballots.  Neither the Debtor nor any other person or entity will be under any duty to provide notification of defects or irregularities with respect to delivered ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

## ARTICLE VI
## VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

## A.    VALUATION OF THE REORGANIZED DEBTOR

Throughout this Chapter 11 Case, the Debtor has worked to attract plan proposals from third parties.  The Plan incorporates the only viable offer that the Debtor received, which is the offer made by FGIC pursuant to the Plan Sponsor Transaction.  The value of the Reorganized Debtor will be derived from the Reorganized Debtor's Cash, including the Plan Sponsor Contribution, and the value of 100% of the common stock of FGIC.  The Debtor analyzed whether it possesses any viable causes of actions against third parties, including avoidance actions pursuant to sections 544, 547 and 548 of the Bankruptcy Code, and has determined no such viable causes of action exist.  Although the Debtor owns 100% of FGIC Australia, FGIC Australia is in the process of winding down and the Debtor's interest in FGIC Australia does not have any value.

The Debtor has not conducted a formal valuation analysis; however, based on the foregoing information the Debtor believes that any such analysis would result in a valuation substantially below the threshold valuation that would entitle Holders of Equity Interests to a recovery. Moreover, given that the Plan Sponsor Transaction represents the only viable offer received by the Debtor and is contingent upon confirmation of the Plan, the Holders of Claims and Equity Interests in Impaired Classes will receive a recovery under the Plan that is at least equal to and likely greater than they would if the Chapter 11 Case was converted to a liquidation case under chapter 7 of the Bankruptcy Code.

## B.    FINANCIAL PROJECTIONS

As a condition to plan confirmation, the Bankruptcy Code requires the Bankruptcy Court to find confirmation is not likely to be followed by either a liquidation of the Debtor or the need to further reorganize the debtor. Generally, debtors in chapter 11 prepare financial projections to establish the feasibility of a chapter 11 plan of reorganization. Given that the Debtor will deleverage its balance sheet completely pursuant to the Plan, the Plan provides the Reorganized Debtor will retain Cash sufficient to fund its activities following the Effective Date and the fact that the Debtor is a holding company, the Debtor has not prepared financial projections.

### ARTICLE VII
### CONFIRMATION PROCEDURES

## A.    THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing is scheduled for **April 19, 2012 at 2:00 p.m. (prevailing Eastern Time)**. Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court and will also be available on the Debtor's website at http://www.fgic.com. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

## B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied. If so, the Bankruptcy Court shall enter the Confirmation Order. The Debtor believes the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (i) made before the Confirmation of the Plan is reasonable; or (ii) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- Either each Holder of an Impaired Claim or Equity Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims and Equity Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Tax Claims will be paid in full on the Effective Date.

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class.

- Confirmation of the Plan is not likely to be followed by a liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930 and 31 U.S.C. § 3717, including the fees of the United States Trustee, will be paid as of the Effective Date and will continue to be paid until the Bankruptcy Court enters a final decree closing the Chapter 11 Case, dismisses the Chapter 11 Case or converts the Chapter 11 Case to a case under another chapter of the Bankruptcy Code.

The Debtor believes: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) it has complied or will have complied with all of the requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

### 1. Best Interests of Creditors Test/Liquidation Analysis

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Equity Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what Holders of Allowed Claims and Equity Interests in each Impaired Class would receive if the Chapter 11 Case was converted to a liquidation case under chapter 7 of the Bankruptcy Code, and the Bankruptcy Court appointed a chapter 7 trustee to liquidate all of the assets into Cash. The Debtor's "liquidation value" would consist primarily of unencumbered and unrestricted Cash held by the Debtor at the time of the conversion to chapter 7 cases, and the proceeds resulting from the chapter 7 trustee's sale of the Debtor's remaining unencumbered assets. The gross Cash available for distribution would be reduced by the costs and expenses incurred in effectuating the chapter 7 liquidation and any additional Administrative Claims incurred during the chapter 7 cases.

The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical chapter 7 liquidation of the Debtor (after subtracting the chapter 7-specific Claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims and Equity Interests under the Plan. It is possible that in a chapter 7 liquidation, Claims and Equity Interests may not be classified in the same manner as set forth in the Plan. In a hypothetical chapter 7 liquidation of the Debtor's assets, the rule of absolute priority of distribution would apply, i.e., no junior creditor would receive any distribution until payment in full of all senior creditors, and no Holder of an Equity Interest would receive any distribution until all creditors have been paid in full. Further, in chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order: (a) holders of secured Claims (to the extent of the value of their collateral); (b) holders of priority Claims; (c) holders of unsecured Claims; (d) holders of Claims expressly subordinated by its terms or bankruptcy court order; and (e) holders of Equity Interests.

44

Because the Bankruptcy Code requires impaired creditors either to accept the Plan or receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation, after accounting for recoveries by secured, administrative and priority creditors, the impaired creditors and interest holders will receive more or less than under the plan.  If the probable distributions to impaired creditors and interest holders under a hypothetical chapter 7 liquidation are greater than the distributions to be received by such holders under the plan, then the plan is not in the best interests of impaired creditors and interest holders.

The Debtor has compared the distributions under the Plan to Holders of Impaired Claims and Equity Interests to the estimated recoveries of these creditors and Equity Interest Holders in a hypothetical chapter 7 liquidation and has determined the distributions these creditors and Equity Interest Holders will receive under the Plan will be greater than the distributions these creditors and Equity Interest Holders would receive in a hypothetical chapter 7 liquidation.  As an initial matter, in chapter 7, FGIC would not provide the Contribution Amount, which would otherwise have been used in chapter 11 to fund Cash distributions to Holders of Allowed General Unsecured Claims.  Accordingly, the Debtor believes the Plan is in the best interests of its estate parties in interest.

## 2.        Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization, unless such liquidation or further reorganization is contemplated by the Plan.  Pursuant to the Plan, the Debtor will deleverage its balance sheet completely.  Accordingly, the Debtor believes the Plan satisfies the financial feasibility requirements of section 1129(a)(11).

## 3.        Acceptance by Impaired Classes

The Bankruptcy Code requires as a condition to confirmation, subject to certain exceptions, that each Class of Claims and Equity Interests that is impaired under the Plan accept the Plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of that claim or equity interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the equity interest holder is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  Under section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted the plan if holders of such equity interests holding at least two thirds in amount actually voting have voted to accept the plan.

The Claims in Classes 1, 2, 3,  and 5 are not Impaired under the Plan, and as a result, the Holders of such Claims are deemed to have accepted the Plan and are not entitled to vote on the Plan.

The Claims and Equity Interests in Classes 7 and 8 are Impaired under the Plan, and Holders of such Claims and Equity Interests will not receive a distribution under the Plan.  Therefore, Holders of Claims and Equity Interests in Classes 7 and 8 are deemed to reject the Plan and are not entitled to vote on the Plan.

Claims in Classes 4 and 6 are Impaired under the Plan, and Holders of Allowed Claims in Classes 4 and 6 will receive a distribution under the Plan.  Therefore, Holders of Claims in Classes 4 and 6 are entitled to vote on the Plan.  Classes 4 and 6, will have accepted the Plan if the Plan is accepted by at least two thirds in amount and a majority in number of the Claims in such Classes (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

45

C.      **RISK FACTORS**

Prior to deciding whether and how to vote on the Plan, each Holder of a Claim in a Voting Class should consider carefully all of the information in this Disclosure Statement, and should particularly consider the Risk Factors described in Article IX below, entitled "Plan-Related Risk Factors and Alternatives to Confirming and Consummating the Plan."

D.      **IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION**

Any interested party desiring further information about the Plan should contact: Counsel for the Debtor, Brian S. Lennon, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, via e-mail at brian.lennon@kirkland.com, or by phone at (212) 446-4800 or Counsel for the Creditors' Committee, Anthony Princi, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, via e-mail at aprinci@mofo.com, or by phone at (212) 468-8030.

E.      **DISCLAIMER**

In formulating the Plan, the Debtor has relied on financial data derived from its books and records. The Debtor, therefore, represents that everything stated in this Disclosure Statement is true to the best of its knowledge. The Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and, therefore, does not recommend whether you should accept or reject the Plan.

The discussion in this Disclosure Statement regarding the Debtor may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**ALTHOUGH THE ATTORNEYS, ACCOUNTANTS, ADVISORS, AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTOR HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTOR, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.**

**THE DEBTOR AND ITS PROFESSIONALS ALSO HAVE MADE A DILIGENT EFFORT TO IDENTIFY IN THIS DISCLOSURE STATEMENT PENDING LITIGATION CLAIMS AND PROJECTED OBJECTIONS TO CLAIMS. HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO CLAIM IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT.**

<div align="center">

**ARTICLE VIII**
**IMPLEMENTATION OF THE PLAN AND POSTPETITION**
**GOVERNANCE OF REORGANIZED DEBTOR**

</div>

**A.    BOARD OF DIRECTORS AND MANAGEMENT**

**1.    The Reorganized Debtor's Board of Directors**

On the Effective Date, the Reorganized Debtor's board of directors shall take office.  The Debtor will disclose the identities of the individuals comprising the Reorganized Debtor's board of directors, as well as the identity and compensation of any such individual constituting an "insider" (as defined in section 101(31) of the Bankruptcy Code) at or prior to the Confirmation Hearing.  Each such director shall serve from and after the Effective Date pursuant to applicable law and the terms of Reorganized Debtor's By-Laws and Certificate of Incorporation.

**2.    The Reorganized Debtor's Officers**

The Debtor will disclose the identities of the individuals comprising the officers of the Reorganized Debtor, as well as the identity and compensation of any such individual constituting an "insider" (as defined in section 101(31) of the Bankruptcy Code) at or prior to the Confirmation Hearing.

**B.    INDEMNIFICATION OF DIRECTORS AND OFFICERS**

The Reorganized Debtor's Certificate of Incorporation will authorize the Reorganized Debtor to indemnify and exculpate its respective directors, officers and agents to the extent described therein.  The Certificate of Incorporation will be included in the Plan Supplement.

<div align="center">

**ARTICLE IX**
**PLAN-RELATED RISK FACTORS AND ALTERNATIVES**
**TO CONFIRMING AND CONSUMMATING THE PLAN**

</div>

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**A.    GENERAL**

The following provides a summary of various important considerations and risk factors associated with the Plan.  However, the following summary is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Claims in a Voting Class should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement, including the various risks and other factors described in the Debtor's various public filings, all of which are incorporated herein.

**B.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

**1.    Parties in Interest May Object to Debtor's Classification of Claims and Equity Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims and equity interests in such class.  The Debtor believes the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created eight Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

<div align="center">47</div>

### 2.    Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. If the Plan does not receive the required support from the voting Classes, the Debtor may elect to amend the Plan or to liquidate under chapter 7 of the Bankruptcy Code.

### 3.    The Debtor May Not Be Able to Obtain Confirmation of the Plan

The Debtor cannot ensure that they will receive the requisite acceptances to confirm the Plan. Even if the Debtor receives the requisite acceptances, the Debtor cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting creditors or Equity Interest Holders might challenge the adequacy of this Disclosure Statement or the procedures for soliciting votes on the Plan and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were adequate and appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation have not been met. As discussed in further detail above in Article VII, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things: a finding by a bankruptcy court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; confirmation is not likely to be followed by a liquidation or a need for further financial reorganization; and the value of distributions to non-accepting Holders of Claims and Equity Interests within a particular class under the plan will not be less than the value of distributions such Holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. While the Debtor believes the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that these requirements will be met.

Specifically, Confirmation of the Plan is subject to the Reorganized Debtor and FGIC receiving all necessary regulatory approvals, including approval from the NYSDFS to the change in ownership of the Debtor resulting from the Consummation of the Plan.

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms of the Plan as necessary for Confirmation. Any such modification could result in a less favorable treatment of any non-accepting Class or Classes, as well as of any Classes junior to such non-accepting Classes, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.    The Debtor May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim or Equity Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection. Any Holder of a Claim or Equity Interest may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### 5.    Risk of Non-Occurrence of the Effective Date

Consummation of the Plan is subject to certain conditions as described in Article IX of the Plan. Although the Debtor believes that the Effective Date will occur shortly after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived on or before May 14, 2012, then the Plan Sponsor may terminate the Plan Sponsor Agreement, and the Confirmation Order will be vacated, in which event no distributions would be made under the Plan, the Debtor and all Holders of Claims and Equity Interests would be restored to the *status quo* as of the day immediately preceding the Confirmation Date, and the Debtor's obligations with respect to Claims and Equity Interests would remain unchanged.

6.      **Contingencies Not to Affect Votes of Impaired Classes to Accept the Plan**

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims. The occurrence of any and all such contingencies which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

## C.    FACTORS AFFECTING THE DEBTOR

The Debtor is exposed to various factors and risks which include but are not limited to the following.

1.      **Risks Related to the Creditor New Common Stock**

a.      **Transfer of the Creditor New Common Stock will be restricted.**

The Creditor New Common Stock has not been registered under the Securities Act or any state or foreign securities laws. Until holders of Creditor New Common Stock are able to freely transfer the Creditor New Common Stock pursuant to Rule 144 under the Securities Act, such holders may not offer or sell the Creditor New Common Stock in the United States or to, or for the account or benefit of, a U.S. person, as defined in Regulation S, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. It is the obligation of the holder of Creditor New Common Stock to ensure that its offers and sales of Creditor New Common Stock comply with applicable securities laws. In addition, as described above, the Reorganized Debtor's Certificate of Incorporation will contain restrictions on the transfer of Creditor New Common Stock to minimize the likelihood of any potential adverse U.S. federal income tax consequences resulting from an ownership change (as defined in section 382 of the Internal Revenue Code) in the Reorganized Debtor.

There is currently no existing trading market for the shares of Creditor New Common Stock. The Debtor does not currently intend to apply for listing of the shares of Creditor New Common Stock on any securities exchange or for quotation of such securities on any automated dealer quotation system. An active public trading market may not develop for the shares of Creditor New Common Stock and, even if one develops, such public trading market may not be maintained. If an active public trading market for the shares of Creditor New Common Stock does not develop or is not maintained, the market price and liquidity of such securities is likely to be adversely affected and holders may not be able to sell such securities at desired times and prices or at all. If any shares of Creditor New Common Stock are traded after their issuance, they may trade at a discount from the price at which such securities were acquired.

The liquidity of the trading market, if any, and future trading prices of the shares of Creditor New Common Stock will depend on and may be adversely affected by unfavorable changes in many factors, including, without limitation:

- prevailing interest rates, increases in which may have an adverse effect on the share price of the Creditor New Common Stock;

- the Debtor's business, financial condition, prospects and credit quality;

- the market for similar securities and the overall securities market; and

- general economic and financial market conditions.

Many of these factors are beyond the Debtor's control. Historically, the market for equity securities has been volatile. Market volatility could materially and adversely affect the shares of Creditor New Common Stock, regardless of the Debtor's business, financial condition, results of operations, prospects or credit quality.

The shares of Creditor New Common Stock have not been registered under the Securities Act, which could effect the liquidity and price of the Creditor New Common Stock.  The shares of Creditor New Common Stock may be transferred by holders of such shares to the extent that there is an available exemption from the registration requirements of the Securities Act and to the extent permitted by the Certificate of Incorporation, By-Laws or any other organizational document of the Reorganized Debtor.  This could substantially adversely impact both the liquidity and the share price of the Creditor New Common Stock.

## 2.  Legal Proceedings

In the normal course of business, the Debtor becomes subject to various legal proceedings and Claims.  Accordingly, although the Debtor is not currently party to any legal proceedings, the Debtor may in the future become involved in legal disputes arising from the conduct of its business.  Such legal disputes could result in large settlements and/or judgments which could materially impair the Debtor's financial condition.  Some or all of the amount the Debtor may be required to pay to defend or to satisfy a judgment or settlement of any or all of these proceedings may not be covered by insurance.

## D.  FINANCIAL INFORMATION; DISCLAIMER

Although the Debtor has used its reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement.  While the Debtor believes such financial information fairly reflects the financial condition of the Debtor, the Debtor is unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

## E.  CERTAIN TAX MATTERS

For a summary of certain U.S. federal income tax consequences of the Plan to certain Holders of Claims and to the Debtor, see Article XI below, entitled "Certain U.S. Federal Income Tax Consequences."

## F.  RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein.  The Debtor may subsequently update the information in this Disclosure Statement, but it has no duty to update this Disclosure Statement unless ordered to do so by the Court.  Finally, neither the SEC nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any exhibits thereto.

## G.  LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Debtor's Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Equity Interests and the Debtor's liquidation analysis is set forth in Article VII above.

**THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF SECTION 21E OF THE SECURITIES EXCHANGE ACT AND ARE MADE PURSUANT THE SAFE HARBOR PROVISIONS THEREOF.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY, OR OTHER FINANCING TO FUND OPERATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS,**

50

ACTIONS OF GOVERNMENTAL BODIES, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE CAUTIONED THAT THE FORWARD LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD LOOKING STATEMENTS AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

## ARTICLE X
## SECURITIES LAW MATTERS

### A.    CREDITOR NEW COMMON STOCK AND PLAN SPONSOR STOCK

The Plan provides for the Debtor to issue shares of the Creditor New Common Stock to Holders of Claims in Class 6 and the Plan Sponsor Stock to FGIC (or its designee), as the Holder of the Claim in Class 4.

The Debtor believes the shares of the Creditor New Common Stock and the Plan Sponsor Stock constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable Blue Sky Laws. The Debtor further believes the issuance of the Creditor New Common Stock and the Plan Sponsor Stock pursuant to the Plan are, and subsequent transfers of the Creditor New Common Stock and Plan Sponsor Stock by the Holders thereof, to the extent such transfers are permitted, that are not "underwriters," as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

### B.    ISSUANCE AND RESALE OF CREDITOR NEW COMMON STOCK
###       AND PLAN SPONSOR STOCK UNDER THE PLAN

#### 1.    Exemption from Registration

Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering. By virtue of section 18 of the Securities Act, section 4(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a Claim against, an interest in, or Claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a Claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

In reliance upon these exemptions, the issuance of the Creditor New Common Stock and the Plan Sponsor Stock will not be registered under the Securities Act or any state Blue Sky Law.

Until holders of Creditor New Common Stock or the Plan Sponsor Stock are able to freely transfer Creditor New Common Stock or the Plan Sponsor Stock pursuant to Rule 144 under the Securities Act, such holders may not offer or sell Creditor New Common Stock or the Plan Sponsor Stock in the United States or to, or for the account or benefit of, a U.S. person, as defined in Regulation S, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. It is the obligation of the holder of Creditor New Common Stock and the Plan Sponsor Stock to ensure that its offers and sales of Creditor New Common Stock and the Plan Sponsor Stock comply with applicable securities laws.

To the extent that the issuance of the Creditor New Common Stock and the Plan Sponsor Stock is covered by section 1145 of the Bankruptcy Code, the Creditor New Common Stock and Plan Sponsor Stock may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter"

(as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the Creditor New Common Stock and the Plan Sponsor Stock generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Therefore, recipients of the Creditor New Common Stock and the Plan Sponsor Stock are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

If the Creditor New Common Stock and Plan Sponsor Stock are not covered by section 1145 of the Bankruptcy Code, the shares of the Creditor New Common Stock and Plan Sponsor Common Stock will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act and may not be resold under the Securities Act and applicable state Blue Sky Laws absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act.  Recipients of the Creditor New Common Stock and the Plan Sponsor Stock are advised to consult with their own legal advisors as to the applicability of section 1145 to the Creditor New Common Stock and the Plan Sponsor Stock and the availability of any exemption from registration under the Securities Act and state Blue Sky Laws in the event that section 1145 is not applicable to such securities.

## 2.        Resales of Creditor New Common Stock and Plan Sponsor Stock; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or Claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such Claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resales of the Creditor New Common Stock and Plan Sponsor Stock by persons deemed to be "underwriters" (which definition includes "controlling persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, Holders of Creditor New Common Stock and Plan Sponsor Stock who are deemed to be "underwriters" may be entitled to resell such securities pursuant to the limited safe harbor resale provisions of Rule 144.  Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Debtor does not presently intend to make publicly available the requisite current information regarding the Debtor, and as a result, Rule 144 will not be available for resales of Creditor New Common Stock and Plan Sponsor Stock by persons deemed to be underwriters.  Whether any particular person would be deemed to be

an "underwriter" (including whether such person is a "controlling person") with respect to the Creditor New Common Stock and Plan Sponsor Stock would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtor expresses no view as to whether any person would be deemed an "underwriter" with respect to the Creditor New Common Stock or Plan Sponsor Stock. In view of the complex nature of the question of whether a particular person may be an "underwriter," the Debtor makes no representations concerning the right of any person to freely resell Creditor New Common Stock and Plan Sponsor Stock. Accordingly, the Debtor recommends that potential recipients of Creditor New Common Stock and Plan Sponsor Stock consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.

## C.    LISTING OF CREDITOR NEW COMMON STOCK AND PLAN SPONSOR STOCK

The Debtor shall not be obligated to list the Creditor New Common Stock or the Plan Sponsor Stock on a national securities exchange.

### ARTICLE XI
### CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

## A.    INTRODUCTION

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtor and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims who are unimpaired or otherwise entitled to payment in full in cash under the Plan. This summary is based on the Internal Revenue Code of 1986 (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtor currently does not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or to certain Holders in light of their individual circumstances, nor does it address tax issues with respect to Holders that are not "United States persons" as such term is defined in the IRC or that are otherwise subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, real estate investment trusts, persons whose functional currency is not the U.S. dollar, small business investment companies and regulated investment companies and those holding, or who will hold, Claims or Creditor New Common Stock, as part of a hedge, straddle, conversion or constructive sale transaction). Furthermore, the following summary of certain U.S. federal income tax consequences of the Plan does not purport to address alternative minimum tax or Medicare tax consequences or any aspect of state, local, estate, gift, or non-U.S. tax law. Lastly, the following discussion assumes each Holder of a Claim holds its Claim and the Creditor New Common Stock as a "capital asset" within the meaning of Section 1221 of the IRC.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE

STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## B.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTOR

### 1.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration (including Creditor New Common Stock) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to Section 108 of the IRC.  In general, tax attributes will be reduced in the following order:  (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC, though it has not been determined whether the Debtor would make this election.  In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that Holders of certain Claims will receive shares of Creditor New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the Creditor New Common Stock.  The amount of such COD Income is therefore uncertain.

### 2.    Limitation of NOL Carryforwards and Other Tax Attributes

The Debtor anticipates the FGIC Corporation Group will have significant tax attributes (in particular, NOLs) at emergence.  The amount of such tax attributes that will be available to the Reorganized Debtor at emergence is based on a number of factors and is impossible to calculate at this time.  Some of the factors that will impact the amount of available tax attributes include:  (a) the amount of tax losses incurred by the Debtor in 2012; (b) the fair market value of the Creditor New Common Stock; and (c) the amount of COD Income incurred by the Debtor in connection with consummation of the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and, in certain circumstances, its built-in losses (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation.  As discussed in greater detail herein, the Debtor anticipates that the issuance of the Creditor New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtor for these purposes, and that the Debtor's use of its Pre-Change Losses (which are anticipated to include substantial built-in losses) will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

### a.       General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (3.55% for the month of February 2012). The Section 382 Limitation may be increased in certain circumstances to the extent that the Debtor recognizes certain built-in gains in its assets during the five-year period following the ownership change, or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the Creditor New Common Stock, along with the cancellation of existing Equity Interests through the Plan, is expected to cause an ownership change with respect to the Debtor on the Effective Date. As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtor's use of any remaining Pre-Change Losses after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

### b.       Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions Claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' Claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

Most of the losses of the FGIC Corporation Group were generated by FGIC, which is not a debtor in the Chapter 11 Case. However, because FGIC's common stock is a significant asset of the Debtor's estate, pursuant to 28 U.S.C. § 1334, the Bankruptcy Court has jurisdiction over FGIC. For this reason, the applicability of the 382(l)(5) Exception and the 382(l)(6) Exception to FGIC's losses is not entirely clear. Although not entirely clear, recent IRS guidance suggests that a subsidiary in a consolidated tax group may benefit from the common parent's qualification for the 382(l)(5) Exception or the 382(l)(6) Exception even though the entire group is not in bankruptcy. Accordingly, the Debtor believes either exception should apply to all of the FGIC Corporation Group's NOLs, including those generated by FGIC. The IRS may challenge this position, but the Debtor believes it will be beneficial for it to qualify for, and utilize, the 382(1)(5) Exception. However, as mentioned above, if the Debtor does utilize the 382(l)(5) Exception and another ownership change were to occur within the two-year period after consummation, then the Debtor's Pre-Change Losses would effectively be eliminated. To prevent such a subsequent

55

ownership change, the Reorganized Debtor's certificate of incorporation will contain restrictions on transfers of the Reorganized Debtor's stock that are intended to prevent such a change. The Debtor currently does not intend to seek a ruling from the IRS as to the applicability of the 382(l)(5) Exception, the 382(l)(6) Exception, or any other of the tax consequences of the Plan discussed herein.

It is possible that the Debtor will not qualify for the 382(l)(5) Exception. In that case, the Debtor expects that its use of its NOLs thereafter will be subject to significant limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtor takes advantage of the 382(l)(5) Exception or the 382(l)(6) Exception, the Reorganized Debtor's use of its Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

### c.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for certain alternative tax NOLs generated in taxable years beginning or ending in 2008 and 2009, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change. The Debtor believes it will have a net unrealized built-in loss in its assets immediately after the ownership change and therefore could be impacted by these AMT rules.

## C.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF
## THE PLAN TO HOLDERS OF GENERAL UNSECURED CLAIMS

The following discussion assumes that the obligation underlying each allowed General Unsecured Claim is properly treated as debt (rather than equity) of the Debtor for U.S. federal income tax purposes. Pursuant to the Plan, each Holder of an allowed General Unsecured Claim shall receive such Holder's *pro rata* share of Cash and the Creditor New Common Stock (as further described in this Disclosure Statement above).

Whether a Holder of an allowed General Unsecured Claim recognizes gain or loss as a result of the exchange of its Claim for the Creditor New Common Stock depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the allowed General Unsecured Claim surrendered is treated as a "security" for the reorganization provisions of the IRC; (b) the Holder has previously included in income any accrued but unpaid interest with respect to the allowed General Unsecured Claim; (c) the Holder has Claimed a bad debt deduction or worthless security deduction with respect to such allowed General Unsecured Claim; and (d) the Holder uses the accrual or cash method of accounting for tax purposes.

### 1.    Treatment of a Debt Instrument as a "Security"

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The Debtor intends to take the position that the Senior Notes constitute a security for U.S.

federal income tax purposes.  While not free from doubt, the Debtor intends to take the position that the unsecured debt under the Credit Agreement does not constitute a security for U.S. federal income tax purposes.

  **2.**   **Treatment of a Holder of an Allowed General Unsecured Claim If the Exchange of its Claim is Treated as a Reorganization**

   If a debt instrument constituting a surrendered allowed General Unsecured Claim is treated as a "security" for U.S. federal income tax purposes, the exchange of a Holder's allowed General Unsecured Claim for the Creditor New Common Stock should be treated as a recapitalization, and therefore a reorganization, under the IRC.  A Holder of a surrendered allowed General Unsecured Claim will recognize gain, but not loss, on the exchange. Specifically, the Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of "other property" (*i.e.*, property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) received, and (b) ordinary interest income to the extent that the Creditor New Common Stock is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the allowed General Unsecured Claim (see discussion of "Accrued Interest" below).  In such case, a Holder's tax basis in its Creditor New Common Stock should be equal to the tax basis of the obligation constituting the allowed General Unsecured Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" received), and a Holder's holding period for its Creditor New Common Stock should include the holding period for the obligation constituting the surrendered allowed General Unsecured Claim; *provided* that the tax basis of any Creditor New Common Stock treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such Creditor New Common Stock should not include the holding period of the debt instrument constituting the surrendered allowed General Unsecured Claim.

  **3.**   **Treatment of a Holder of an Allowed General Unsecured Claim If the Exchange of its Claim is not Treated as a Reorganization**

   If a debt instrument constituting a surrendered allowed General Unsecured Claim is not treated as a "security" for U.S. federal income tax purposes, a Holder of such a Claim should be treated as exchanging its allowed General Unsecured Claim for the Creditor New Common Stock in a fully taxable exchange.  A Holder of an allowed General Unsecured Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the fair market value of the Creditor New Common Stock that is not allocable to accrued but untaxed interest, and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed General Unsecured Claim.  Such gain or loss should be capital gain, subject to the "market discount" rules discussed below, and should be long-term capital gain or loss if the debts constituting the surrendered allowed General Unsecured Claim were held for more than one year.  To the extent that a portion of the Creditor New Common Stock is allocable to accrued but untaxed interest, the Holder may recognize ordinary interest income (see discussion of "Accrued Interest" below).  A Holder's tax basis in the Creditor New Common Stock should equal its fair market value.  A Holder's holding period for Creditor New Common Stock received on the Effective Date should begin on the day following the Effective Date.

  **4.**   **Accrued Interest**

   To the extent that any amount received by a Holder of a surrendered allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income.  Conversely, a Holder of a surrendered allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtor.  Such loss may be ordinary, but the tax law is unclear on this point.

   The extent to which the consideration received by a Holder of a surrendered allowed Claim will be attributable to accrued interest on the debts constituting the surrendered allowed Claim is unclear.  Certain U.S. Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being

discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

### 5. Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

### 6. Consequences to Holders of Creditor New Common Stock

#### a. Dividends on Creditor New Common Stock

Any distributions made on the Creditor New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtor as determined under U.S. federal income tax principles. To the extent that a Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares. Any such distributions in excess of the Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain. Subject to certain exceptions, dividends received by non-corporate Holders prior to 2013 will be taxed under current law at a maximum rate of 15%, provided that certain holding period requirements and other requirements are met. The rate at which such income will be subject to taxation in 2013 is highly uncertain, and such rate may in fact be the same as ordinary income tax rates beginning in 2013.

Dividends paid to Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

The benefit of the dividends-received deduction to a corporate shareholder may be effectively reduced or eliminated by operation of the "extraordinary dividend" provisions of Section 1059 of the IRC, which may require

the corporate recipient to reduce its adjusted tax basis in its shares by the amount excluded from income as a result of the dividends-received deduction. The excess of the excluded amount over adjusted tax basis may be treated as gain. A dividend may be treated as "extraordinary" if (1) it equals or exceeds 10% of the Holder's adjusted tax basis in the stock (reduced for this purpose by the non-taxed portion of any prior extraordinary dividend), treating all dividends having ex-dividend dates within an 85-day period as one dividend, or (2) it exceeds 20% of the Holder's adjusted tax basis in the stock, treating all dividends having ex-dividend dates within a 365-day period as one dividend.

  **b.**  **Sale, Redemption or Repurchase of Creditor New Common Stock**

  Unless a non-recognition provision applies, subject to the "market discount" rules discussed above, Holders generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of the Creditor New Common Stock.

    **c.**  **Medicare Tax**

  Recently enacted legislation requires certain Holders that are individuals, estates or trusts to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets for taxable years beginning after December 31, 2012. Holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this legislation on their ownership and disposition of the Creditor New Common Stock.

**D.**  **WITHHOLDING AND REPORTING**

  The Debtor or the Reorganized Debtor, as applicable, will withhold all amounts required by law to be withheld from distributions under the Plan and payments of dividends, if any. The Debtor or the Reorganized Debtor, as applicable, will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim. Backup withholding of taxes, currently at a rate of 28%, will apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is timely provided to the IRS.

  In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XII
## CONCLUSION AND RECOMMENDATION

The Debtor believes the Plan is in the best interests of all creditors and urges the Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their ballots so they will be received by Garden City no later than **4:00 p.m. (prevailing Eastern Time) on April 12, 2012**.

New York, York
Dated:  March 15, 2012

FGIC Corporation

By:        */s/ John S. Dubel*
Name:    John S. Dubel
Title:      Vice Chairman and Chief Executive Officer of
              FGIC Corporation

Prepared By:

KIRKLAND & ELLIS LLP                    KIRKLAND & ELLIS LLP
Paul M. Basta                                    Patrick J. Nash Jr. (admitted *pro hac vice*)
Brian S. Lennon                                 300 North LaSalle
601 Lexington Avenue                       Chicago, Illinois 60654
New York, New York 10022

Counsel for the Debtor and Debtor in Possession

**Exhibit A**

**Chapter 11 Plan of Reorganization of FGIC Corporation**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FGIC CORPORATION,[1] | |
| Debtor. | Case No. 10-14215 (SMB) |

## CHAPTER 11 PLAN OF REORGANIZATION
## OF FGIC CORPORATION

Paul M. Basta
Brian S. Lennon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtor and Debtor in Possession*

Dated:  March 15, 2012

---

[1]    The last four digits of the Debtor's tax identification number are 6474.  The location of the Debtor's corporate headquarters is 125 Park Avenue, New York, New York 10017.

# TABLE OF CONTENTS

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS.................................................................1
    A.    Rules of Interpretation, Computation of Time, Governing Law and Controlling Document ........................................................................1
    B.    Defined Terms ........................................................................2

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ........10
    A.    Administrative Claims ........................................................10
    B.    Priority Tax Claims.............................................................12

ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS IN THE DEBTOR...............................................................................13
    A.    Summary ............................................................................13
    B.    Classification and Treatment of Claims and Equity Interests................13

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ...........................18

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN..........................18
    A.    General Settlement of Claims .............................................18
    B.    Reorganized Debtor ...........................................................19
    C.    Sources of Consideration for Plan Distributions ................19
    D.    Corporate Existence ..........................................................20
    E.    Vesting of Assets in the Reorganized Debtor ....................20
    F.    Cancellation of Securities and Agreements ........................20
    G.    Surrender of Existing Securities ........................................21
    H.    Corporate Action ...............................................................21
    I.    Certificate of Incorporation and By-Laws .........................21
    J.    Stock Trading and Ownership Restrictions ........................22
    K.    Reorganized Debtor Maintenance Amount ........................22
    L.    Directors and Officers of the Reorganized Debtors............22
    M.    Effectuating Documents; Further Transactions ..................22
    N.    Section 1146 Exemption ....................................................22
    O.    Preservation of Causes of Action.......................................23

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS.............................23
    A.    Timing and Calculation of Distributions ...........................23
    B.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.......................................................................24

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ................................................................27
    A.    Resolution of Disputed Claims ..........................................27
    B.    Disallowance of Claims .....................................................28
    C.    Amendments to Claims.......................................................29
    D.    No Distributions Pending Allowance ..................................29
    E.    Distributions After Allowance ............................................29

ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES .................................................................................................................29
    A.    Assumption and Rejection of Executory Contracts and Unexpired
Leases ....................................................................................................29
    B.    Claims on Account of the Rejection of Executory Contracts or
Unexpired Leases ..................................................................................30
    C.    Procedures for Counterparties to Executory Contracts and
Unexpired Leases Assumed Pursuant to the Plan .................................30
    D.    Survival of Corporate Indemnification Obligations .............................31

ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .............31
    A.    Conditions .............................................................................................31
    B.    Waiver of Conditions ............................................................................32
    C.    Effect of Non-Occurrence of Conditions to the Effective Date ............32

ARTICLE X. SETTLEMENT, RELEASE, INJUNCTION AND RELATED
PROVISIONS .......................................................................................................33
    A.    Compromise and Settlement .................................................................33
    B.    Subordinated Claims .............................................................................33
    C.    Discharge of Claims and Termination of Equity Interests ....................33
    D.    Release of Liens ....................................................................................34
    E.    Debtor Release ......................................................................................34
    F.    Releasing Party Release ........................................................................35
    G.    Exculpation ...........................................................................................36
    H.    Injunction ..............................................................................................36

ARTICLE XI. BINDING NATURE OF PLAN .......................................................38

ARTICLE XII. RETENTION OF JURISDICTION ................................................38

ARTICLE XIII. MISCELLANEOUS PROVISIONS ...............................................40
    A.    Modification of Plan .............................................................................40
    B.    Successors and Assigns .........................................................................41
    C.    Reservation of Rights ............................................................................41
    D.    Section 1145 Exemption .......................................................................41
    E.    Payment of Statutory Fees ....................................................................41
    F.    Post-Confirmation Date Reporting ........................................................41
    G.    Section 1125(e) Good Faith Compliance ..............................................42
    H.    Further Assurances ...............................................................................42
    I.    Severability ...........................................................................................42
    J.    Dissolution of the Creditors' Committee ..............................................42
    K.    Service of Documents ...........................................................................42
    L.    Filing of Additional Documents ...........................................................43
    M.    No Stay of Confirmation Order .............................................................44

## CHAPTER 11 PLAN OF REORGANIZATION OF FGIC CORPORATION

FGIC Corporation, as the debtor and debtor in possession in the above-captioned chapter 11 case, hereby respectfully proposes the following plan of reorganization under chapter 11 of the Bankruptcy Code.

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

*A.      Rules of Interpretation, Computation of Time, Governing Law and Controlling Document*

1.      For purposes of this document:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part, or to affect the interpretation, of the Plan; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (i) unless otherwise stated, the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation."

2.      The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

3.      Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

4.      All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into, and are a part of the Plan, as if set forth herein.

5.      In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the

Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document). The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided*, that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

B.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below:

1.    "*Administrative Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Credit Agreement.

2.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtor's estate pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date to preserve the Debtor's estate; and (b) the Allowed Claims of Professionals in the Chapter 11 Case. Any fees or charges assessed against the Debtor's estate pursuant to section 1930 of chapter 123 of title 28 of the United States Code shall be excluded from the definition of Administrative Claim and shall be paid pursuant to Article XIII.E of the Plan.

3.    "*Administrative Claims Bar Date*" means, except for Administrative Claims of Professionals, April 19, 2012 as set forth in the *Order (A) Setting an Administrative Claims Bar Date and Procedures for Filing Administrative Claim Requests, and (B) Approving the Form and Manner of Notice Thereof* [Docket No. 280].

4.    "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

5.    "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is (i) scheduled by the Debtor in a liquidated amount and not marked as disputed or contingent, and for which no conflicting proof of claim was filed or (ii) evidenced by a valid Proof of Claim and as to which the Debtor or a party in interest has not filed an objection by the Claims Objection Bar Date; or (b) a Claim that is Allowed pursuant to the Plan or any stipulation approved by, or order of, the Bankruptcy Court.

6.    "*Amended Tax Allocation Agreement*" means the Amended and Restated Income Tax Allocation Agreement by and among FGIC Corporation, FGIC, FGIC Credit Products LLC, a Delaware limited liability company, FGIC Credit Products II LLC, a Delaware limited liability company, Grand Central Assurance Corporation, a New York corporation, and GCAC Credit Products LLC, a Delaware limited liability company, substantially in the form attached as Exhibit A to this Plan.

7.    "*Bankruptcy Code*" means title 11 of the United States Code, as may be amended from time to time.

2

8. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Chapter 11 Case and, to the extent of any withdrawal of the reference under section 157 of title 28 of the United States Code and/or the General Order of the United States District Court for the Southern District of New York pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

9. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Case and the general, local and chambers rules of the Bankruptcy Court, as may be amended, modified or supplemented from time to time.

10. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

11. "*By-Laws*" means the by-laws of the Reorganized Debtor, which will be included in the Plan Supplement.

12. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

13. "*Causes of Action*" means all actions, causes of action, Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims and any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, known or unknown, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the Chapter 11 Case, including through the Effective Date.

14. "*Certain Tax Conditions*" means the conditions to the Effective Date set forth on Exhibit B to this Plan.

15. "*Certificate of Incorporation*" means the certificate of incorporation of the Reorganized Debtor, which will be included in the Plan Supplement.

16. "*Chapter 11 Case*" means the chapter 11 case commenced by the Debtor and styled *In re FGIC Corporation*, Case No. 10-14215, which is pending before the Bankruptcy Court.

17. "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

18. "*Claims Objection Bar Date*" means the deadline for objecting to Claims, which shall be on the date that is sixty (60) days after the Effective Date, unless extended by an order of the Bankruptcy Court, upon notice and a hearing.

19. "*Claims Register*" means the official register of Claims maintained by the claims

3

agent appointed in the Chapter 11 Case.

20. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III herein.

21. "*Class 6 Cash Distribution Amount*" means the Debtor's Cash on hand as of the Effective Date, *plus* the Plan Sponsor Contribution Amount, *minus* (a) the aggregate amount of Cash required to fund (i) Cash distributions to Holders of Allowed Administrative Claims and Allowed Priority Tax Claims, (ii) Cash distributions to Holders of Allowed Claims in Classes 1–5, (iii) the Professional Fee Reserve Amount, (iv) the estimated amount of legal, professional or other fees and expenses that will be incurred by the Reorganized Debtor to implement the Plan after the Effective Date, and (v) the reasonable fees and expenses to be paid to any Distribution Agent, and (b) the Reorganized Debtor Maintenance Amount.

22. "*Common Stock*" means the common stock of FGIC Corporation.

23. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case.

24. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

25. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider the Confirmation of the Plan.

26. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

27. "*Consummation*" means the occurrence of the Effective Date.

28. "*Convenience Claim*" means any Claim against the Debtor that, but for being defined as a Convenience Claim, would be a General Unsecured Claim, and either (a) is in an amount of $15,000 or less or (b) is in an amount greater than $15,000, but is subject to an irrevocable election, in accordance with Article III.B.6(e) herein, by the Holder thereof to reduce the amount of the Claim to $15,000 (or less) for the purpose of rendering the Claim a Convenience Claim.

29. "*Credit Agreement*" means that certain Revolving Credit Agreement, dated as of December 12, 2005, as may have been amended, supplemented or otherwise modified from time to time, by and among FGIC Corporation, FGIC, the lenders party thereto and JPMorgan Chase Bank, N.A. as Administrative Agent.

30. "*Creditor New Common Stock*" means the class of common stock of the Reorganized Debtor to be issued pursuant to the Plan to Holders of Allowed Class 6 Claims.

31. "*Creditors' Committee*" means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy

Code.

32.    "*Debtor*" means FGIC Corporation.

33.    "*Disclosure Statement*" means the disclosure statement relating to the Plan, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto.

34.    "*Disputed Claim*" means any Claim that is neither Allowed nor disallowed by an order of the Bankruptcy Court or any other court of competent jurisdiction.

35.    "*Distribution Agent*" means the entity or entities selected by the Debtor or the Reorganized Debtor, as applicable, to make or facilitate distributions pursuant to the Plan.

36.    "*Distribution Notification Date*" means the date that is five (5) days after the Confirmation Date.

37.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the effectiveness of this Plan set forth in Article IX hereof have been satisfied or waived in accordance with the terms thereof.

38.    "*Equity Interest*" means any share of Common Stock, preferred stock issued by the Debtor or other instrument evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in the Debtor that existed immediately prior to the Effective Date.

39.    "*Exculpated Parties*" means, collectively, the Reorganized Debtor and the Released Parties.

40.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection pursuant to section 365 or section 1123 of the Bankruptcy Code.

41.    "*Final Claims Trading Order*" means an order approving certain restrictions on trading claims entered in the Chapter 11 Case on February 28, 2012 [Docket No. 270].

42.    "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the subject matter, as entered on the docket maintained by the clerk of such court, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, seek certiorari or move for a new trial, reargument or rehearing has expired, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or as to which the request for new trial, reargument, rehearing, a motion pursuant to section 502(j) of the Bankruptcy Code, under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been denied, resulted in no modification of such order or otherwise been dismissed with prejudice.

43.    "*FGIC*" means Financial Guaranty Insurance Company, the wholly-owned subsidiary of the Debtor, which is not a debtor in the Chapter 11 Case.

44.    "*FGIC Corporation Group*" means the affiliated group of corporations within the meaning of section 1504(a) of the IRC of which the Debtor is the common parent.

45.    "*General Unsecured Claim*" means a Claim against the Debtor, other than an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Tax Claim, an Other Secured Claim, the Plan Sponsor Intercompany Claim, a Convenience Claim or a Section 510(b) Claim.

46.    "*Holder*" means any person or entity holding a Claim or an Equity Interest.

47.    "*Impaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

48.    "*Indenture Trustee*" means Wilmington Trust National Association, successor by merger to Wilmington Trust FSB, in its capacity as successor indenture trustee under the Senior Notes Indenture.

49.    "*Interim Compensation Procedures Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals*, dated August 24, 2010 [Docket No. 45] entered in the Chapter 11 Case.

50.    "*IRC*" means title 26 of the United States Code, as may be amended from time to time.

51.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

52.    "*Monitoring Fee Agreements*" means, collectively:  (a) that certain Monitoring Fee Agreement by and between the Debtor and The PMI Group, Inc., dated as of December 18, 2003, which has been assigned to Dubel & Associates, LLC; (b) that certain Monitoring Fee Agreement by and between the Debtor and Blackstone Management Partners IV LLC, dated as of December 18, 2003; (c) that certain Monitoring Fee Agreement by and between the Debtor and Cypress Advisors, Inc., dated as of December 18, 2003; and (d) that certain Monitoring Fee Agreement by and between the Debtor and CIVC Partners LP, dated as of December 18, 2003.

53.    "*New FGIC Corporation Board*" means the initial board of directors of the Reorganized Debtor.

54.    "*NYSDFS*" means the New York State Department of Financial Services.

55.    "*Other Secured Claim*" means any secured claim other than a Secured Tax Claim.

56.    "*Petition Date*" means August 3, 2010, the date on which the Debtor filed the voluntary petition commencing the Chapter 11 Case.

57.     "*Plan*" means this plan of reorganization under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified or supplemented from time to time in accordance with the terms hereof.

58.     "*Plan Sponsor*" means FGIC, together with any successors thereto.

59.     "*Plan Sponsor Agreement*" means that certain Plan Sponsor Agreement, dated as of February 3, 2012, between the Plan Sponsor and the Debtor, which is attached as Exhibit C to the Disclosure Statement.

60.     "*Plan Sponsor Contribution Amount*" means the Cash contribution to be made by the Plan Sponsor in the amount of $11,000,000 on the terms and subject to the conditions set forth in the Plan Sponsor Agreement.

61.     "*Plan Sponsor Intercompany Claim*" means the Claim held by the Plan Sponsor against the Debtor in the amount of $24,125.

62.     "*Plan Sponsor Stock*" means the class of stock of the Reorganized Debtor, which consists entirely of one authorized share, to be issued to the Plan Sponsor or its designee in accordance with the terms of Article V.C.3 hereof.

63.     "*Plan Supplement*" means the supplement(s) to the Plan containing, among other things, the Certificate of Incorporation, the By-Laws, the schedule of assumed Executory Contracts and Unexpired Leases, and certain other documents relevant to the implementation of the Plan.

64.     "*Preferred Stock*" means the preferred stock of FGIC Corporation.

65.     "*Prepetition Lenders*" means the entities that hold the unsecured debt issued under the Credit Agreement.

66.     "*Prepetition Lenders' Claim*" means the Claim of the Administrative Agent, on behalf of itself and the Prepetition Lenders, derived from and based upon the Credit Agreement and related documents.

67.     "*Prepetition Tax Allocation Agreement*" means that certain Amended and Restated Income Tax Allocation Agreement, dated as of December 18, 2003, by and between FGIC Corporation and FGIC, among others.

68.     "*Priority Non-Tax Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

69.     "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

70.     "*Professional*" means an entity retained in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be

compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code.

71.     "*Professional Claims*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by all Professionals in connection with the Chapter 11 Case, including services rendered after the Effective Date with respect to a Professional's final fee application.  To the extent there is a Final Order denying any amount of a Professional's fees or expenses, then such Professional's Claim shall be reduced by the amount such fees or expenses are reduced or denied.

72.     "*Professional Fee Reserve Account*" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtor on or before the Effective Date.

73.     "*Professional Fee Reserve Amount*" means the amount necessary to satisfy Professional Claims as estimated in accordance with Article II.A.2(c) herein.

74.     "*Proof of Claim*" means a proof of Claim filed against the Debtor in the Chapter 11 Case.

75.     "*Pro Rata*" means, with respect to any Class, the ratio of a Claim in such Class, including principal and accrued interest through the Petition Date, to the aggregate amount of all Claims in such Class, including principal and accrued interest, as of the Petition Date.

76.     "*Record Date*" means March 13, 2012, which is the date set forth in the order approving the Disclosure Statement for determining the Holders of Claims entitled to vote to accept or reject the Plan.

77.     "*Related Parties*" means an entity's directors and officers who served in any such capacity at any time from the Petition Date through the Effective Date, employees, agents, subsidiaries and such subsidiaries' directors and officers who served in any such capacity at any time from the Petition Date through the Effective Date, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, accountants and other professionals or representatives when acting in any such capacities at any time.

78.     "*Released Parties*" means, collectively:  (a) the Debtor; (b) the Plan Sponsor; (c) Dubel & Associates, LLC; (d) Blackstone Management Partners IV LLC, in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (e) Cypress Advisors, Inc., in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (f) CIVC LP, in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (g) the Creditors' Committee and its members as such committee was constituted as of February 3, 2012, each solely in its respective capacity as such, and including the Indenture Trustee, but only in its capacities as a member of the Creditors' Committee and as Indenture Trustee (and not on behalf of any other person); and (h) with respect to each of the persons named in (a)–(g) above, such entity's Related Parties.

79.     "*Releasing Parties*" means, collectively:  (a) the Plan Sponsor; (b) Dubel &

8

Associates, LLC; (c) Blackstone Management Partners IV LLC, in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (d) Cypress Advisors, Inc., in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (e) CIVC LP, in its capacities as a Holder of an Equity Interest and as a party to a Monitoring Fee Agreement with the Debtor; (f) the Creditors' Committee and its members as such committee was constituted as of February 3, 2012, each solely in its respective capacity as such, and including the Indenture Trustee, but only in its capacities as a member of the Creditors' Committee and as Indenture Trustee (and not on behalf of any other person); and (g) with respect to each of the persons named in (a)–(f) above, such entity's Related Parties.

80.     "*Reorganized Debtor*" means FGIC Corporation on or after the Effective Date.

81.     "*Reorganized Debtor Maintenance Amount*" means $400,000 in Cash, which shall be used exclusively to fund the Reorganized Debtor's anticipated reasonable operating expenses after the Effective Date.

82.     "*Schedules*" means the schedules of assets and liabilities and statement of financial affairs filed by the Debtor on the Petition Date [Docket Nos. 2 and 3] pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

83.     "*Section 510(b) Claim*" means any Claim against the Debtor arising from rescission of a purchase or sale of a security of the Debtor or an Affiliate of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

84.     "*Secured Tax Claim*" means any secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations).

85.     "*Senior Noteholders*" means the Holders of the Senior Notes.

86.     "*Senior Notes*" means the 6% Senior Notes due 2034 issued pursuant to the Senior Notes Indenture.

87.     "*Senior Notes Claim*" means the Claim held by the Indenture Trustee derived from and based upon the Senior Notes Indenture and held on behalf of the Senior Noteholders.

88.     "*Senior Notes Indenture*" means that certain Indenture, dated as of January 12, 2004, as may have been amended, supplemented or otherwise modified from time to time, between FGIC Corporation, as issuer, and The Bank of New York Mellon, as indenture trustee.

89.     "*Tax Attributes*" means any credits, losses, deductions (including foreign tax credits, alternative minimum credits, net operating loses, or net capital losses), deferred deductions, tax basis in assets or any other tax attribute of the FGIC Corporation Group or any of its members (including FGIC).

90.     "*Tax Escrow Account*" means the escrow account that may be established by the Reorganized Debtor and the Plan Sponsor pursuant to the Amended Tax Allocation Agreement for the purpose of segregating and protecting funds transferred by, for the benefit of or owing to the Plan Sponsor pursuant to the Amended Tax Allocation Agreement.

91.     "*Treasury Regulations*" means title 26 of the Code of Federal Regulations, as may be amended from time to time.

92.     "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

93.     "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

94.     "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

95.     "*Voting Deadline*" means April 12, 2012 at 4:00 p.m. Eastern Time, which is the deadline for voting to accept or reject the Plan, which deadline may be extended as set forth in the order approving the Disclosure Statement.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

*A.    Administrative Claims*

1.    <u>Payment of Administrative Claims</u>

Unless otherwise agreed to by the Holder of an Administrative Claim and the Debtor or the Reorganized Debtor, as applicable, each Holder of an Allowed Administrative Claim (other than any Professional Claim) will receive, in full and final satisfaction, settlement and release of its Administrative Claim, Cash in an amount equal to the amount of such Allowed Administrative Claim either:  (a) on the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after Effective Date; (b) if the Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, in each case without any further action by the Holder of such Allowed Administrative Claim and without any further notice to or action, order or approval of the Bankruptcy Court.

2.      Professional Claims

(a)      Final Fee Applications

All final requests for payment of Professional Claims must be filed with the Bankruptcy Court and served on the Reorganized Debtor no later than sixty (60) days after the Effective Date.    After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Case, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

(b)      Payment of Professional Claims

The amount of Professional Claims owing to the Professionals for any period prior to the Confirmation Date shall be paid in Cash to such Professionals from funds held in the Professional Fee Reserve Account when such Claims are Allowed by a Final Order.  When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Fee Reserve Account, if any, shall revert to the Distribution Agent and shall be distributed on a Pro Rata basis to Holders of Allowed Class 6 Claims.    To the extent that funds held in the Professional Fee Reserve Account are unable to satisfy the amount of Allowed Professional Claims owing to the Professionals as of the Confirmation Date, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash from Cash on hand or the Professional Fee Reserve Account the reasonable legal, professional and other fees and expenses incurred after the Confirmation Date and related to (a) implementation and Consummation of the Plan incurred by the Reorganized Debtor, and (b) the Professionals' final fee applications.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Procedures Order in seeking retention or compensation for services rendered after the Confirmation Date shall terminate and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

(c)      Professional Fee Reserve Amount

The Professionals shall provide the Debtor with estimates of (a) their unpaid Professional Claims through the Confirmation Date no later than five (5) days after the Confirmation Date. Such estimates shall not be considered an admission with respect to the fees and expenses of such Professional, and such Professionals shall not be bound to any extent by such estimates. If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional. The total amount of estimated Professional Claims shall comprise the Professional Fee Reserve Amount. To the extent the Professional Fee Reserve Amount is less than the amount needed to satisfy any Allowed Professional Claim, any affected Professional

shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A.

        (d)        Release of Previously Held Back Amounts

On the Confirmation Date, the Debtor shall be authorized to release to Professionals any amount of Allowed Professional Claims previously held back pursuant to the provisions set forth in the Interim Compensation Procedures Order.

B.     *Priority Tax Claims*

To the best of the Debtor's knowledge, there are no Priority Tax Claims against the Debtor. The Debtor has included a treatment for such Claims in this Plan out of an abundance of caution. To the extent such Claims exist, such Claims shall be treated as follows:

In accordance with section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the election of the Debtor or Reorganized Debtor (in either case, such election is subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion), one of the following treatments in exchange for full and final satisfaction, settlement, release and compromise of such Claim: (a) on the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after Effective Date, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in an amount lower than the amount of such Allowed Priority Tax Claim as may be agreed to by the Holder of such Allowed Priority Tax Claim and the Debtor or Reorganized Debtor, as applicable, or (b) commencing on the Effective Date and continuing over a period not exceeding five (5) years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under non-bankruptcy law; *provided*, that the Reorganized Debtor shall have the option to prepay the entire amount of the Allowed Priority Tax Claim, subject to the consent of the Plan Sponsor, which consent may be withheld in the Plan Sponsor's sole discretion. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Reorganized Debtor shall commence payment as described in this paragraph within thirty (30) days after the Allowed Priority Tax Claim becomes due and owing, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date. To the extent that a Priority Tax Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall commence payment as described in this paragraph within thirty (30) days after the date on which an order Allowing such Priority Tax Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date.

# ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS IN THE DEBTOR

*A.      Summary*

1.   Except for the claims addressed in Article II above (or as otherwise set forth herein), all Claims against and Equity Interests in the Debtor are placed in Classes.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims or Priority Tax Claims.

2.   Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against, and Equity Interests in, the Debtor.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.

3.   Summary of Classification and Treatment of Claims and Equity Interests

| Class | Claim | Status | Voting |
|-------|-------|--------|--------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (presumed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 4 | Plan Sponsor Intercompany Claim | Impaired | Yes |
| 5 | Convenience Claims | Unimpaired | No (presumed to accept) |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Equity Interests | Impaired | No (deemed to reject) |
| 8 | Section 510(b) Claims | Impaired | No (deemed to reject) |

*B.      Classification and Treatment of Claims and Equity Interests*

1.   Class 1—Priority Non-Tax Claims

(a)   *Classification*:  Class 1 consists of Priority Non-Tax Claims.  To the best of the Debtor's knowledge, there are no Priority Non-Tax Claims against the Debtor.  The Debtor has included a class for such Claims in the Plan out of an abundance of caution.

(b)   *Voting*:  Class 1 is Unimpaired and Holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section

13

1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

(c)  *Treatment*:  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, discharge and compromise of each and every Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall receive, at the election of the Debtor or Reorganized Debtor, as applicable (in either case, such election is subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion): (i) Cash on the Effective Date or as soon thereafter as reasonably practicable, but in no event more than five (5) business days after Effective Date, in an amount equal to such Allowed Priority Non-Tax Claim; or (ii) subject to the Holder's consent, commencing on the Effective Date and continuing over a period not exceeding five (5) years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Non-Tax Claim, together with interest at the applicable rate under non-bankruptcy law; *provided*, that the Reorganized Debtor shall have the option to prepay the entire amount of the Allowed Priority Non-Tax Claim, subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion.  If a Priority Non-Tax Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall commence payment as described herein within thirty (30) days after the date on which an order Allowing such Priority Non-Tax Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date.

2.  Class 2—Secured Tax Claims

(a)  *Classification*:  Class 2 consists of Secured Tax Claims.  To the best of the Debtor's knowledge, there are no Secured Tax Claims against the Debtor.  The Debtor has included a class for such Claims in the Plan out of an abundance of caution.

(b)  *Voting*:  Class 2 is Unimpaired and Holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

(c)  *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, discharge and compromise of each and every Allowed Secured Tax Claim, each Holder of such Allowed Secured Tax Claim shall receive Cash in the ordinary course of business in an amount equal to the amount of such Allowed Secured Tax Claim.  If a Secured Tax Claim is not Allowed as of the Effective Date, the Reorganized

14

Debtor shall commence payment as described herein within thirty (30) days after the date on which an order Allowing such Secured Tax Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date.

3.    Class 3—Other Secured Claims

(a)    *Classification*:  Class 3 consists of Other Secured Claims.  To the best of the Debtor's knowledge, there are no Other Secured Claims against the Debtor.  The Debtor has included a class for such Claims in the Plan out of an abundance of caution.

(b)    *Voting*:  Class 3 is Unimpaired and Holders of Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, discharge and compromise of each and every Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive Cash in the ordinary course of business in an amount equal to such Allowed Other Secured Claim.  If an Other Secured Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall pay such Other Secured Claim within thirty (30) days after the date on which an order Allowing such Other Secured Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date.

4.    Class 4—Plan Sponsor Intercompany Claim

(a)    *Classification*:  Class 4 consists solely of the Plan Sponsor Intercompany Claim.

(b)    *Allowance of Plan Sponsor Intercompany Claim*:  The Plan Sponsor Intercompany Claim shall be Allowed in the amount of $24,125.

(c)    *Voting*:  Class 4 is Impaired and the Holder of the Plan Sponsor Intercompany Claim is entitled to vote to accept or reject the Plan.

(d)    *Treatment*:  On the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after the Effective Date, in full and final satisfaction and discharge of and in exchange for its Allowed Plan Sponsor Intercompany Claim, the Plan Sponsor shall receive the Plan Sponsor Stock.

15

5.   Class 5—Convenience Claims

(a)   *Classification*:  Class 5 consists of Convenience Claims.

(b)   *Allowance of Dubel & Associates, LLC Claim*:  Dubel & Associates, LLC holds a Convenience Claim against the Debtor in the amount of $10,500. Such Claim shall be Allowed in the amount of $10,500.  To the best of the Debtor's knowledge, there are no other Convenience Claims against the Debtor.

(c)   *Voting*:  Class 5 is Unimpaired and the Holders of Class 5 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Convenience Claims are not entitled to vote to accept or reject the Plan.

(d)   *Treatment*:   In exchange for full and final satisfaction, settlement, discharge and compromise of each and every Convenience Claim, each Holder of an Allowed Convenience Claim shall be paid in full in Cash on the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after the Effective Date.  If a Convenience Claim is not Allowed as of the Effective Date, the Reorganized Debtor shall pay such Claim in full in Cash within thirty (30) days after the date on which an order Allowing such Convenience Claim becomes a Final Order, or as soon thereafter as reasonably practicable but in no event more than five (5) business days after such date.

6.   Class 6—General Unsecured Claims

(a)   *Classification*:  Class 6 consists of General Unsecured Claims.  To the best of the Debtor's knowledge, there are no General Unsecured Claims other than the Prepetition Lenders' Claim and the Senior Notes Claim.

(b)   *Allowance of Prepetition Lenders' Claim and Senior Notes Claim*:

(i)   On the Effective Date, the Prepetition Lenders' Claim shall be Allowed in the aggregate amount of $46,000,000 plus accrued interest and any reasonable fees and expenses owing as of the Petition Date with respect to the obligations under the Credit Agreement, which amount shall be included in the Confirmation Order.

(ii)   On the Effective Date, the Senior Notes Claim shall be Allowed in the aggregate amount of $345,000,000 (which amount includes the $63,105,000 of Senior Notes held by the Debtor) plus accrued interest and any reasonable fees and expenses owing as of the Petition Date with respect to the obligations under the Senior Notes Indenture, which amount shall be included in the Confirmation Order.  The Debtor agrees to release, discharge and waive any

16

Claim for the Senior Notes it holds in the aggregate amount of $63,105,000 plus accrued interest and all fees and expenses with respect to the obligations under the Senior Notes Indenture, and no distribution shall be made to the Debtor on account of such Senior Notes or any accrued interest or fees and expenses owing thereon as of the Petition Date.

(c)    *Voting*:  Class 6 is Impaired and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

(d)    *Treatment*:  On the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (i) the Class 6 Cash Distribution Amount and (ii) 100% of the Creditor New Common Stock.

(e)    *Convenience Claim Election Rights*:  Each Holder of an Allowed General Unsecured Claim may elect to be treated as a Holder of a Convenience Claim in Class 5 by electing to reduce its Allowed General Unsecured Claim to the amount of $15,000 or less in full and final satisfaction, release and discharge of such Allowed General Unsecured Claim.  For the avoidance of doubt, the Indenture Trustee shall be deemed to be the Holder of any and all Claims arising under the Senior Notes Indenture for the purpose of exercising Convenience Claim election rights with respect to such Claims.  Likewise, the Administrative Agent shall be deemed to be the Holder of any and all Claims arising under the Credit Agreement for the purpose of exercising Convenience Claim election rights with respect to such Claims.  Individual Holders of the Senior Notes and/or the debt owing under the Credit Agreement shall not be eligible to exercise Convenience Claim election rights on account of such holdings.  Any election must be made on the Ballot, and except as may be agreed to by the Debtor or the Reorganized Debtor, no Holder of a General Unsecured Claim can elect treatment as a Convenience Claim after the Voting Deadline.  Upon any such valid and irrevocable election, the General Unsecured Claim of such Holder shall be automatically reduced to $15,000 (or such lower amount that the Holder elects) and satisfied as a Class 5 Claim, and shall no longer be entitled to any other distribution under this Plan on account of such Claim.

7.    <u>Class 7—Equity Interests</u>

(a)    *Classification*:  Class 7 consists of all Equity Interests in the Debtor.

(b)    *Voting*:  Class 7 is Impaired and Holders of Class 7 Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g)

17

of the Bankruptcy Code. Therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

(c)     *Treatment*:  On the Effective Date, all Equity Interests in the Debtor shall be cancelled and Holders of such Equity Interests shall not receive any distribution under the Plan on account of such Equity Interests.

8.     Class 8—Section 510(b) Claims

(a)     *Classification*:  Class 8 consists of Section 510(b) Claims.  To the best of the Debtor's knowledge, there are no Section 510(b) Claims against the Debtor.  The Debtor has included a Class for such Claims in the Plan out of an abundance of caution.

(b)     *Voting*:  Class 8 is Impaired and Holders of Class 8 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

(c)     *Treatment:*  Holders of Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims.  On the Effective Date, all Section 510(b) Claims shall be discharged.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

The Debtor requests Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtor reserves the right to modify the Plan to the extent Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.     General Settlement of Claims*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. Subject to Article VI, all distributions made to Holders of Allowed Claims are intended to be, and shall be, final.

18

B.    *Reorganized Debtor*

On the Effective Date, the New FGIC Corporation Board shall be established. The Reorganized Debtor shall be authorized to adopt any agreements, documents and instruments and to take any other actions contemplated by the Plan as necessary or desirable to consummate the Plan; *provided, however*, that all such agreements, documents, instruments, and actions shall be acceptable to the Plan Sponsor in its sole discretion.

C.    *Sources of Consideration for Plan Distributions*

1.    Plan Sponsor Contribution and Cash on Hand

The Reorganized Debtor shall fund any Cash distributions to Holders of Allowed Administrative Claims, Professional Claims, Priority Tax Claims, and Claims in Classes 1–6 with the Debtor's existing Cash on hand as of the Effective Date, *plus* the Plan Sponsor Contribution Amount, *minus* the Reorganized Debtor Maintenance Amount, the Professional Fee Reserve Amount, and such amounts as may be necessary, if any, to pay emergence costs in connection with implementation of the Plan after the Effective Date.

2.    Creditor New Common Stock

The issuance of Creditor New Common Stock is authorized without the need for any further action by the Debtor or Reorganized Debtor. On the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after the Effective Date, the Reorganized Debtor shall issue and distribute 100% of the shares of Creditor New Common Stock to the Distribution Agent for the benefit of Holders of Class 6 Claims, subject to the reserve for Disputed Claims provided for in Article VI.B.8 herein.

All of the shares of Creditor New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. The distribution and issuance referred to herein shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each entity receiving such distribution or issuance.

3.    Issuance of Plan Sponsor Stock

The issuance of Plan Sponsor Stock is authorized without the need for any further action by the Debtor or Reorganized Debtor. On the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after the Effective Date, the Reorganized Debtor shall issue and distribute all of the authorized shares of Plan Sponsor Stock, which shall only be one share, to the Plan Sponsor or its designee. The Plan Sponsor Stock shall not entitle its holder to receive any distribution from the Reorganized Debtor, but shall entitle its holder to consent rights, which consent may be withheld in its sole discretion, with respect to the commencement of any subsequent insolvency or restructuring proceeding of the Reorganized Debtor.

All of the shares of Plan Sponsor Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.  The distribution and issuance referred to herein shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each entity receiving such distribution or issuance.

D.    *Corporate Existence*

Except as otherwise provided in the Plan, the Debtor shall continue to exist after the Effective Date as a corporate entity, with all the powers of a corporation, pursuant to applicable law in the jurisdiction in which the Debtor is incorporated and pursuant to the Certificate of Incorporation and By-Laws.

E.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, all property of the Debtor's estate, all Causes of Action and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Equity Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.    *Cancellation of Securities and Agreements*

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan, except as otherwise specifically provided for in the Plan:  (a) the obligations of the Debtor under the Credit Agreement, the Senior Notes Indenture and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant or other instrument or document that directly or indirectly evidences or creates any indebtedness, obligation of or ownership interest in the Debtor that gives rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents that evidence indebtedness, obligations of or ownership interests in the Debtor that are reinstated pursuant to the Plan) shall be cancelled as to the Debtor, and the Reorganized Debtor shall not have any continuing obligations thereunder; and (b) the obligations of the Debtor pursuant, relating or pertaining to any agreements, indentures, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options or other instruments or documents that evidence or create any indebtedness, obligations of or ownership interests in, the Debtor (except such agreements, certificates, notes or other instruments that evidence indebtedness, obligations of or ownership interests in the Debtor that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided*, that, notwithstanding Confirmation or Consummation of the Plan, any such indenture or agreement that governs the rights of the Holder of a Claim shall, to the extent necessary, continue in effect solely for purposes of allowing the Holders of General Unsecured Claims to receive their distributions hereunder; *provided*, *further*, that the preceding proviso shall not affect the

20

discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan and shall not result in any expense or liability to the Reorganized Debtor.

G.    *Surrender of Existing Securities*

On the Effective Date, the Senior Notes, instruments evidencing a Claim against the Debtor arising under the Credit Agreement and all securities evidencing an Equity Interest in the Debtor shall be deemed surrendered and extinguished.

H.    *Corporate Action*

As of the date that the Confirmation Order becomes a Final Order, the Debtor and Reorganized Debtor shall be authorized and directed to assume the Amended Tax Allocation Agreement.  Upon the Effective Date, all other actions contemplated by the Plan shall be deemed authorized and approved in all respects, including:  (a) distribution of Cash as provided for under the Plan; (b) adoption of the Certificate of Incorporation and By-Laws; (c) selection of the directors and officers for the Reorganized Debtor; and (d) the issuance and distribution of the Creditor New Common Stock and the Plan Sponsor Stock.

All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors or officers of the Debtor or the Reorganized Debtor.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtor and the Reorganized Debtor shall be authorized and, as applicable, directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor.  The authorizations and approvals contemplated by this Article V.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I.    *Certificate of Incorporation and By-Laws*

Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtor's Certificate of Incorporation and By-Laws shall prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtor, subject to the consent of the holder of the Plan Sponsor Stock as set forth is the next paragraph of this Article V.I, may amend and restate its Certificate of Incorporation and By-Laws as permitted by the laws of its state of incorporation and by its Certificate of Incorporation and By-Laws.

In addition, the Certificate of Incorporation, By-Laws, and other organizational documents, as appropriate, shall provide that the dissolution or commencement of any subsequent insolvency or restructuring proceeding of the Reorganized Debtor may not occur without the consent of the holder of the Plan Sponsor Stock, which consent may be withheld in its sole discretion.

The Certificate of Incorporation and By-Laws shall be filed in the Plan Supplement.

21

J.      *Stock Trading and Ownership Restrictions*

The transfer of Creditor New Common Stock shall be subject to certain transfer and ownership restrictions under the Certificate of Incorporation that are designed to protect the availability of the Tax Attributes, including net operating losses.

K.      *Reorganized Debtor Maintenance Amount*

On and after the Effective Date, the Reorganized Debtor shall use the Reorganized Debtor Maintenance Amount to fund the Reorganized Debtor's anticipated reasonable operating expenses for such a period of time as the Plan Sponsor deems appropriate in its sole discretion and may not use any such retained funds for any purpose other than its reasonable ordinary and necessary operating expenses; *provided*, *however*, that once such funds are used up by the Reorganized Debtor in its operations, the Plan Sponsor may (at its option) from time to time contribute additional funds to the Reorganized Debtor for such additional periods of time as the Plan Sponsor may request in its sole discretion, and the Reorganized Debtor shall continue to exist and operate for such periods; *provided*, that such additional funds may only be contributed with prior approval from the NYSDFS for each contribution of additional funds.

L.      *Directors and Officers of the Reorganized Debtors*

The composition of the New FGIC Corporation Board and officers of the Reorganized Debtor shall be disclosed at or prior to the Confirmation Hearing and shall be acceptable to the Plan Sponsor in its sole discretion.

M.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtor and the officers and members of the board of directors thereof, are authorized to and may issue, execute, deliver, file and record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

N.      *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, sales and use tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.  Furthermore, upon entry of the Confirmation Order, the appropriate state and local governmental officials and administrative agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.

O.      *Preservation of Causes of Action*

Pursuant to section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article X.E below), the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.   The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor.   No person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them.  The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any person, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to Article X.E below), the Reorganized Debtor reserves and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any person or entity shall vest in the Reorganized Debtor.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order or approval of, the Bankruptcy Court.  The Reorganized Debtor shall not retain any Claims or Causes of Action against the Plan Sponsor or any of its Related Parties except as otherwise provided in Article X.E hereof.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Distributions*

Unless otherwise provided in the Plan, on the Effective Date or as soon thereafter as reasonably practicable but in no event more than five (5) business days after the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, then on the date that such Claim becomes an Allowed Claim or as soon thereafter as reasonably practicable but in no event more

than five (5) business days after such date), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions provided for in the Plan for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding any provisions in the Plan to the contrary, and except as otherwise agreed to by the relevant parties, no partial payments or distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor shall establish appropriate reserves for potential payment of such Claims.

B.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Delivery of Distributions in General

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution; *provided*, that the manner of such distributions shall be determined at the discretion of the Debtor or the Reorganized Debtor, as applicable; *provided*, *further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by such Holder.

2.      Delivery of Distributions to Prepetition Lenders

The Administrative Agent shall be deemed to be the Holder of the Allowed Prepetition Lenders' Claim for purposes of the initial distribution to be made pursuant to this Plan.  The Distribution Agent shall make the initial distribution of cash and Creditor New Common Stock on account of such Claim to, or on behalf of, the Administrative Agent and the Administrative Agent shall hold or direct such distributions for the benefit of the Prepetition Lenders, as applicable.  The Administrative Agent shall be permitted to rely on the register maintained by it on behalf of the Debtor pursuant to the Credit Agreement as of the Record Date and shall be entitled to any limitation of liability to which it is entitled under the Credit Agreement with respect to such reliance.  As soon as practicable, the Administrative Agent shall arrange to deliver such distributions to, or on behalf of, such Prepetition Lenders pursuant to the Credit Agreement; *provided*, that the Administrative Agent shall retain all rights as Administrative Agent under the Credit Agreement in connection with delivery of distributions to the Prepetition Lenders.  To the extent any subsequent distributions are required to be made on account of the Prepetition Lender Claim, the Distribution Agent shall make any such subsequent distributions directly to each Prepetition Lender, and the Administrative Agent shall provide a copy of such

24

Register to facilitate such distributions.  For purposes of subsequent distributions, it will be the responsibility of each individual Prepetition Lender to apprise the Distribution Agent of any change in its holdings after the Record Date.

       3.      <u>Delivery of Distributions to Senior Noteholders</u>

       (a)      Distributions to Senior Noteholders

The Indenture Trustee shall be deemed to be the Holder of all Claims derived from and based on the Senior Notes Indenture for purposes of distributions to be made hereunder.  The Distribution Agent shall make all distributions on account of such Claims to the Indenture Trustee and the Indenture Trustee shall hold such distributions for the benefit of the Senior Noteholders, as applicable.  Notwithstanding any provision contained in this Plan to the contrary, the distribution provisions contained in the Senior Notes Indenture shall continue in effect to the extent necessary to make distributions pursuant to this Plan on account of the Senior Notes and shall terminate in full upon completion of all such distributions.  For the avoidance of doubt, any distribution on account of the Senior Notes is subject to the Indenture Trustee's right under Section 607 of the Senior Notes Indenture to assert its charging lien against such distributions.  Nothing herein shall be deemed to impair, waive, or discharge the Indenture Trustee's charging lien.  All payments to Senior Noteholders shall only be made to such Holders after the surrender by each such Holder of the certificates representing such Senior Notes, or in the event that such certificate is lost, stolen, mutilated or destroyed, upon the deemed surrender of the certificates pursuant to Article V.G above.  Upon surrender of such Senior Notes certificates, the Senior Notes shall be cancelled and destroyed.  As soon as practicable after surrender of the Senior Notes certificates, the Indenture Trustee shall distribute to the Holder thereof such Holder's Pro Rata share of the distribution; *provided*, that the Indenture Trustee shall retain all rights as Indenture Trustee under the Senior Notes Indenture in connection with delivery of distributions to the Senior Noteholders; *provided, further*, that the Debtor's obligations to make distributions in accordance with Article III shall be deemed satisfied upon delivery of distributions to the Indenture Trustee.

       (b)      Holders as of the Distribution Notification Date

As of the close of business on the Distribution Notification Date:  (1) the Claims Register will be closed; (2) the transfer books and records of the Senior Notes as maintained by the Indenture Trustee or its agent shall be closed; and (3) any transfer of any Claim based on the Senior Notes or any interest therein shall be prohibited.  The Debtor, the Reorganized Debtor and the Indenture Trustee shall have no obligation to recognize any transfer of any Claim based on the Senior Notes occurring after the close of business on the Distribution Notification Date and shall instead be entitled to recognize and deal for all purposes under this Plan with only those Holders of record as of the close of business on the Distribution Notification Date.

       4.      <u>Distributions by Distribution Agent</u>

The Debtor or the Reorganized Debtor, as applicable, shall have the authority, in its sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  As a condition to serving as a Distribution Agent, a

25

Distribution Agent must: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required hereunder; and (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required hereunder to be distributed by such Distribution Agent.

The Debtor or the Reorganized Debtor, as applicable, shall pay to the Distribution Agents reasonable and documented fees and expenses of the Distribution Agents, without the need for any further approvals, authorizations, actions or consents of the Bankruptcy Court.

5.    Minimum Distributions

Notwithstanding anything herein to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $25 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar would otherwise be called for under the Plan, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar.

6.    Fractional Shares

No fractional shares of Creditor New Common Stock shall be distributed under the Plan. When any distribution pursuant to the Plan on account of Allowed Class 6 Claims would otherwise result in the issuance of a number of shares of Creditor New Common Stock that is not a whole number, the actual distribution of shares of Creditor New Common Stock shall be rounded to the next lower whole number with no further payment or other distribution therefor. The total number of authorized shares of Creditor New Common Stock to be distributed shall be adjusted as necessary to account for the rounding provided for in this Article VI.B.6.

7.    Undeliverable Distributions

In the event that any distribution to any Holder of a Claim is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor automatically and without the need for a further order of the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be discharged and forever barred.

8.    Distributions Withheld for Disputed Claims

On the Effective Date, the Debtor shall reserve Cash and/or Creditor New Common Stock, as appropriate, in an amount equal to the distributions to which Holders of Disputed Claims would be entitled if all such Claims were to become Allowed Claims. In the event a Disputed Claim is disallowed or Allowed and satisfied in accordance with the terms hereof

26

pursuant to a Final Order, the Reorganized Debtor may reduce the amount of Cash and/or Creditor New Common Stock held in reserve accordingly.

9.  Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed by any governmental unit. All distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provisions in the Plan to the contrary, the Reorganized Debtor and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  To avoid the need to take any such actions, the Debtor shall reserve a reasonable amount of funds to satisfy its obligations on account of tax withholding and reporting requirements.

10.  Allocations

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

11.  No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim against the Debtor, and no Holder of any Claim against the Debtor shall be entitled to interest accruing on or after the Petition Date on any such Claim.

**ARTICLE VII.**

**PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS**

A.  *Resolution of Disputed Claims*

1.  Allowance of Claims

On and after the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Case allowing such Claim.  All settled Claims approved prior to the Effective Date by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019, or otherwise, shall be binding on all parties.

2.      Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date until the applicable Claims Objection Bar Date, the Reorganized Debtor, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without any further notice to, or action, order or approval of, the Bankruptcy Court.  The Reorganized Debtor shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order or approval of, the Bankruptcy Court.

3.      Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date, the Reorganized Debtor, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

4.      Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged from the Claims Register by the Reorganized Debtor and any Claim that has been amended may be adjusted thereon by the Reorganized Debtor.  The Reorganized Debtor may expunge or adjust such Claims without filing a Claims objection and without any further notice to, or action, order or approval of, the Bankruptcy Court.

5.      Deadline to File Objections to Claims

Any objections to Claims shall be filed no later than the applicable Claims Objection Bar Date.

B.      *Disallowance of Claims*

All Claims of any entity from which property is sought by the Debtor under sections 542, 543, 550 or 553 of the Bankruptcy Code, or that the Debtor or the Reorganized Debtor alleges is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549

28

or 724(a) of the Bankruptcy Code, shall be disallowed if (a) the entity, on the one hand, and the Debtor or the Reorganized Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

C.      *Amendments to Claims*

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor and, to the extent such prior authorization is not received, any such new or amended Claim shall be deemed disallowed and expunged without any further notice to, or action, order or approval of, the Bankruptcy Court.

D.      *No Distributions Pending Allowance*

No payment or distribution under the Plan shall be made on account of a Disputed Claim or any disputed portion thereof unless and until such Disputed Claim becomes an Allowed Claim or any disputed portion of such Disputed Claim becomes Allowed.

E.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions, if any, shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that any Disputed Claim becomes an Allowed Claim, the Distribution Agent shall provide to the Holder of such Allowed Claim the distribution, if any, to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

## ARTICLE VIII.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.      Assumption and Rejection of
Executory Contracts and Unexpired Leases

The Amended Tax Allocation Agreement shall be assumed as of the Effective Date.  All other Executory Contracts and Unexpired Leases shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease: (a) has been previously assumed by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (b) is the subject of a motion to assume pending as of the Effective Date; or (c) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement.

2.     Approval of Assumption and Rejection of
       Executory Contracts and Unexpired Leases

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection of Executory Contracts or Unexpired Leases described in Article VIII.A.1 pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or rejection of such Executory Contract or Unexpired Lease, including objecting to the cure amount designated by the Debtor as payable in connection with an assumption, shall be deemed to have consented to such assumption or rejection and agreed to the specified cure amount.

B.     *Claims on Account of the Rejection of*
       *Executory Contracts or Unexpired Leases*

All Proofs of Claim arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Debtor or the Reorganized Debtor, as applicable, no later than ten (10) days after the Confirmation Date.

Any entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtor or the Reorganized Debtor or their estates and property and the Debtor and the Reorganized Debtor, their estates and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. As of the Effective Date, all such Claims shall be subject to the permanent injunction set forth in Article X.H hereof.

C.     *Procedures for Counterparties to Executory Contracts*
       *and Unexpired Leases Assumed Pursuant to the Plan*

A notice of the Effective Date, including notice regarding the assumption or rejection of Executory Contracts or Unexpired Leases, shall be sent to all known Holders of Claims. For known non-Debtor parties to Executory Contracts and Unexpired Leases assumed or rejected pursuant to the Plan, such notice or separate notices will be sent on or as soon as practicable after the Effective Date notifying such counterparties that such Executory Contracts and Unexpired Leases have been assumed or rejected pursuant to the Plan.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least twenty (20) days prior to the Confirmation Hearing, where applicable, the Debtor shall provide counterparties to Executory Contracts and Unexpired Leases with notices of proposed assumptions and cure amounts as well as procedures for objecting thereto and resolution of such disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract to a proposed assumption or related cure amount must be filed, served and **actually received** by the

Debtor at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters.

In the event of a dispute regarding: (a) the amount of any payments to cure a default under an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan; (b) the ability of the Debtor or Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving any such dispute and approving the assumption. If an objection to cure is sustained by the Bankruptcy Court, the Debtor, at its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

D.    *Survival of Corporate Indemnification Obligations*

All Claims of the Debtor's officers and directors for indemnity arising under the Debtor's certificate of incorporation or by-laws, applicable state law, specific agreement or any combination of the foregoing arising in respect of actions or omissions that occurred prior to the Petition Date shall be treated as Class 6 Claims to the extent such Claims are not otherwise satisfied from the Debtor's existing directors and officers' insurance coverage.

After the Effective Date, the Reorganized Debtor shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect on the Petition Date, with respect to actions or omissions occurring prior to the Effective Date and all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.    *Conditions*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.    A Final Order shall have been entered providing that the Plan Sponsor Agreement is approved and that the Debtor and the Reorganized Debtor are directed to perform all obligations thereunder;

2.    The Confirmation Order shall provide, among other things, that (a) assumption of the Amended Tax Allocation Agreement is approved, (b) the assets that may be deposited into the Tax Escrow Account, if any, shall not be deemed property of the Debtor or the Reorganized Debtor, and (c) the Debtor and the Reorganized Debtor are authorized and directed to take all actions necessary or appropriate to consummate the Plan;

3.      The Confirmation Order shall have been entered and have become a Final Order and shall be acceptable to the Plan Sponsor in its sole discretion;

4.      All documents and agreements necessary to implement the Plan, including the Plan Sponsor Agreement, the Amended Tax Allocation Agreement, and all documents in the Plan Supplement shall (a) be acceptable to the Plan Sponsor in its sole discretion, and (b) have (i) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) been tendered for delivery; and (iii) been effected or executed;

5.      All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with and approved by applicable governmental units in accordance with applicable laws;

6.      All governmental, judicial, and third party approvals and consents, including approval (or non-disapproval, as the case may be) of the NYSDFS and the Bankruptcy Court, that are necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transaction;

7.      The Bankruptcy Court shall have entered the Final Claims Trading Order, which shall be in form and substance acceptable to the Plan Sponsor in its sole discretion, on or before entry of an order approving the adequacy of the Disclosure Statement, and the Final Claims Trading Order shall be a Final Order;

8.      The Plan qualifies under section 382(l)(5) of the IRC and the Plan Sponsor is satisfied with such qualification in its sole discretion; and

9.      The Certain Tax Conditions are satisfied.

## B.      *Waiver of Conditions*

The conditions to the Effective Date set forth in this Article may be waived only by the Plan Sponsor, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

## C.      *Effect of Non-Occurrence of Conditions to the Effective Date*

Unless otherwise agreed to by the Plan Sponsor, if the Effective Date does not occur within 180 days after the Confirmation Date, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by, Claims against or Equity Interests in, the Debtor; (b) constitute the assumption or rejection of any Executory Contract or Unexpired Lease affected by the Plan; (c) prejudice in any manner the rights of the Debtor or any Holders of Claims against or Equity Interests in the

Debtor; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtor or any Holders of Claims against or Equity Interests in the Debtor in any respect.

## ARTICLE X.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### A.    Compromise and Settlement

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, distributions, releases and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Equity Interests and controversies resolved pursuant to the Plan relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest or any distribution to be made on account of such Allowed Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its estate and Holders of Claims and Equity Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan and pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to, or action, order or approval of, the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against it and its estate and Causes of Action against other entities.

### B.    Subordinated Claims

The allowance, classification, and treatment of all Claims and Equity Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise; *provided*, that notwithstanding anything to the contrary contained in that certain Monitoring Fee Agreement by and between the Debtor and The PMI Group, Inc., dated as of December 18, 2003, Dubel & Associates, LLC, as successor to The PMI Group, Inc., shall be entitled to an Allowed Convenience Claim in the amount of $10,500, which Claim shall be paid in full in Cash as a Class 5 Convenience Claim.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to re-classify any Claim or Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto.  As provided in Article III.B of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such section 510(b) Claim.  As of the filing of this Plan, the Debtor is not aware of any Claims that merit subordination.

### C.    Discharge of Claims and Termination of Equity Interests

Pursuant to, and to the fullest extent permitted by, section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and

33

treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Equity Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against or Equity Interests in the Debtor, the Reorganized Debtor or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such Claim or Equity Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to occurrence of the Effective Date.

D.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection therewith, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III hereof, and, in the case of a Secured Tax Claim or Other Secured Claim, concurrently with satisfaction in full of the portion of the Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtor's estate shall be fully released and discharged and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.  The Debtor is not aware of any liens against property of the estate.

E.    *Debtor Release*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtor, the Reorganized Debtor and any person or entity seeking to exercise the rights of the Debtor's estate, including the Creditors' Committee, any successor to the Debtor or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall, to the maximum extent allowed by applicable law, discharge and release and shall be deemed to have provided a full release, waiver and discharge to each of the Released Parties (and each of the Released Parties shall be deemed fully released and discharged by the Debtor and Reorganized Debtor and any person or entity seeking to exercise the rights of the Debtor's estate) and their respective property from any and all claims, interests, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereafter arising, in law, at equity**

34

or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's estate, the conduct of the Debtor's business, the Chapter 11 Case, the purchase, sale or rescission of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim against the Debtor or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims against the Debtor and Equity Interests prior to or in the Chapter 11 Case  or the negotiation, formulation or preparation of the Plan Sponsor Agreement, Plan, Plan Supplement, Disclosure Statement or any related agreements, instruments or other documents, other than claims or liabilities arising out of or relating to any act or omission of such Released Party that constitutes willful misconduct or gross negligence as determined by a Final Order.

Notwithstanding anything herein to the contrary, the foregoing "Debtor Release" shall not operate to waive or release (a) any post-Effective Date obligations of any party under the Plan, the Amended Tax Allocation Agreement, the Plan Sponsor Agreement, or any other document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any Causes of Action of the Debtor that are expressly set forth in and preserved by the Plan or related documents.

F.      *Releasing Party Release*

Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party), shall, to the maximum extent allowed by applicable law, discharge and release and shall be deemed to have provided a full release, waiver and discharge to each of the Released Parties (and each of the Released Parties shall be deemed fully released and discharged by the Releasing Parties) and their respective property from any and all claims, interests, obligations, rights, debts, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereafter arising, in law, at equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's estate, the conduct of the Debtor's businesses, the Chapter 11 Case, the purchase, sale or rescission of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim against Debtor or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims against the Debtor and Equity Interests prior to or in the Chapter 11 Case or the negotiation, formulation or preparation of the Plan Sponsor Agreement, Plan, Plan Supplement, Disclosure Statement or any related agreements, instruments or other documents, other than claims or liabilities arising out of or relating to any act or omission of such Released Party that constitutes willful misconduct or gross negligence as determined by a Final Order.

35

Notwithstanding anything herein to the contrary, the foregoing "Releasing Party Release" does not release (a) any post-Effective Date obligations of any party under the Plan, the Amended Tax Allocation Agreement, the Plan Sponsor Agreement, or any other document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action that are expressly set forth in and preserved by the Plan or related documents, or (c) any obligation that the Plan Sponsor may owe to any Releasing Party (or vice versa) in connection with or relating to such Releasing Party's employment by or service for the Plan Sponsor.

G.    Exculpation

Except with respect to any acts or omissions expressly set forth in and preserved by the Plan or related documents, the Exculpated Parties shall neither have nor incur any liability to any person or entity for any act taken or omitted to be taken in connection with, arising from or relating in any way to, the Chapter 11 Case, including:  (a) formulating, negotiating, preparing, disseminating, implementing and/or effecting the Plan (including the Plan Supplement and any related contract, instrument, release or other agreement or document created or entered into in connection therewith); (c) the solicitation of votes for the Plan and the pursuit of Confirmation of the Plan; (d) the administration of the Plan and/or the property to be distributed under the Plan; and/or (e) the offer and issuance of any securities under the Plan.  In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its respective duties under, pursuant to or in connection with, the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing exculpation provisions shall (a) exculpate any person or entity from any liability resulting from any act or omission constituting willful misconduct or gross negligence as determined by a Final Order, (b) exculpate any person or entity from its obligations under the Amended Tax Allocation Agreement, the Plan Sponsor Agreement or any other document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (c) limit the liability of the professionals of the Exculpated Parties to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

H.    Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES, INCLUDING THOSE WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES, THAT (i) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN, (ii) HAVE BEEN RELEASED PURSUANT TO ARTICLE X.E OR ARTICLE X.F, (iii) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE X.G; OR (iv) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM:

36

(a)    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES, INCLUDING ON ACCOUNT OF ANY CLAIMS, EQUITY INTERESTS, CAUSES OF ACTIONS OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED);

(b)    ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES;

(c)    CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES;

(d)    ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF, SUBROGATION OR RECOUPMENT ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING ANY INDICATION IN A PROOF OF CLAIM OR EQUITY INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE;

(e)    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF THE DEBTOR, THE REORGANIZED DEBTOR OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR

WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION OR LIABILITIES RELEASED, SETTLED OR COMPROMISED PURSUANT TO THE PLAN; AND

(f)    TAKING ANY ACTION OR FAILING TO TAKE ANY ACTION THAT COULD IN ANY WAY IMPAIR THE PLAN SPONSOR'S USE OF ALL OR ANY PORTION OF THE TAX ATTRIBUTES IN ANY WAY, INCLUDING FAILING TO COMPLY WITH, TERMINATING, REJECTING OR OTHERWISE INTERFERING WITH THE AMENDED TAX ALLOCATION AGREEMENT.

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NO ENTITY SHALL BE PRECLUDED FROM OBTAINING ON ACCOUNT OF ITS ALLOWED CLAIM THE DISTRIBUTIONS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; *PROVIDED*, THAT NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, SUBSECTION (g) ABOVE SHALL NOT APPLY TO THE PLAN SPONSOR.

## ARTICLE XI.

### BINDING NATURE OF PLAN

**THIS PLAN SHALL BIND THE DEBTOR, THE REORGANIZED DEBTOR AND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER:  (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN; (B) HAS FILED A PROOF OF CLAIM OR EQUITY INTEREST IN THE CHAPTER 11 CASE OR; (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

## ARTICLE XII.

### RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain the maximum legally permissible jurisdiction over the Chapter 11 Case and all entities with respect to all matters arising out of or related to the Chapter 11 Case, the Debtor and the Plan, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan;

38

3.      resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date to add or remove Executory Contracts or Unexpired Leases from the schedule of Assumed Executory Contracts and Unexpired Leases;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date; *provided*, that the Reorganized Debtor reserves the right to commence actions in all appropriate forums and jurisdictions;

6.      enter and implement such orders as may be necessary or appropriate to implement or Consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan Sponsor Agreement, the Plan, the Plan Supplement or the Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

8.      hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

9.      issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with the Effective Date or enforcement of the Plan, the Amended Tax Allocation Agreement and the Plan Sponsor Agreement, except as otherwise provided in the Plan;

10.      resolve any cases, controversies, suits or disputes with respect to the settlements, compromises, releases, injunctions, exculpations and other provisions contained in Article X hereof and enter such orders or take such other actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

11.      enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.      resolve any other matters that may arise in connection with or relate to the Plan Sponsor Agreement, Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement;

13.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

14.     consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

15.     determine requests for the payment of Claims and Equity Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

16.     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

17.     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

18.     hear and determine matters concerning section 1145 of the Bankruptcy Code;

19.     hear and determine all disputes involving the existence, nature or scope of the releases set forth in Article X hereof;

20.     hear and determine any dispute related to the Professional Fee Reserve Account or the Professional Fee Reserve Amount;

21.     enforce all orders previously entered by the Bankruptcy Court;

22.     resolve any disputes arising under the Plan Sponsor Agreement;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order concluding or closing the Chapter 11 Case; and

25.     enforce the injunction, release and exculpation provisions set forth in Article X hereof.

Notwithstanding anything to the contrary in this Article XII, any claim, action or dispute that may arise as a result from, or be connected with, the Amended Tax Allocation Agreement shall be subject to and governed by the jurisdictional provisions set forth in the Amended Tax Allocation Agreement.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

*A.     Modification of Plan*

Subject to the next sentence, the Plan and all documents to be executed, delivered, assured and/or performed in connection with Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from

time to time prior to the Effective Date, subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion. After entry of the Confirmation Order, the Debtor or the Reorganized Debtor, as applicable, may, upon order of the Bankruptcy Court and consent of the Plan Sponsor, which consent may be withheld in its sole discretion, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission, or reconcile any inconsistency in the Plan in such a manner as may be necessary to carry out the purpose and intent of the Plan.

B.      *Successors and Assigns*

The rights, benefits and obligations of any entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

C.      *Reservation of Rights*

Except as expressly set forth herein, including with respect to votes cast to accept or reject the Plan, the Plan shall have no force or effect unless and until all conditions to the Effective Date have either been satisfied or waived, as required by Article IX hereof. Before the Effective Date, neither the filing of the Plan, any statement or provision contained herein nor the taking of any action by the Debtor or any other entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) the Debtor with respect to the Holders of Claims or Equity Interests or other entities; or (b) any Holder of a Claim or an Equity Interest or other entity.

D.      *Section 1145 Exemption*

The offering, issuance and distribution of the Creditor New Common Stock and the Plan Sponsor Stock, and any subsequent sales, resales, transfers or other distributions of any such securities, shall be exempt from any federal or state securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

E.      *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code due and payable through the Effective Date shall be paid by the Debtor on or before the Effective Date, and amounts due thereafter shall be paid by the Reorganized Debtor in the ordinary course of business until the Bankruptcy Court enters a final decree closing the Chapter 11 Case, dismisses the Chapter 11 Case or converts the Chapter 11 Case to a case under another chapter of the Bankruptcy Code. Any deadline for filing Claims in the Chapter 11 Case shall not apply to fees payable by the Debtor or the Reorganized Debtor, as applicable, pursuant to section 1930 of title 28 of the United States Code.

F.      *Post-Confirmation Date Reporting*

After the Effective Date, the Reorganized Debtor shall be responsible for compliance with all reporting requirements imposed by the Bankruptcy Code, Bankruptcy Rules and U.S. Trustee Guidelines.

41

G.    *Section 1125(e) Good Faith Compliance*

The Released Parties, the Reorganized Debtor, the Administrative Agent, and the Indenture Trustee shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code, and each is entitled to the protections afforded thereunder.

H.    *Further Assurances*

The Debtor or the Reorganized Debtor, as applicable, all Holders of Claims receiving distributions hereunder and all other entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

I.    *Severability*

If, before Confirmation, any term or provision hereof is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable.  Such term or provision then will be applicable as altered or interpreted; *provided*, that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtor and acceptable to the Plan Sponsor; *provided*, *further*, that the Debtor may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.  Notwithstanding any such order, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect.  The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

J.    *Dissolution of the Creditors' Committee*

Upon distribution of Cash to Holders of Allowed Class 6 Claims, the Creditors' Committee shall be deemed to be dissolved and its members shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to the Chapter 11 Case; *provided*, *however*, that the Creditors' Committee shall continue in existence following distribution of Cash to Holders of Allowed Class 6 Claims for the sole purpose of addressing matters concerning fees incurred in connection with the Chapter 11 Case.

K.    *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by overnight mail to:

| Debtor | Counsel to the Debtor |
| --- | --- |
| FGIC Corporation<br>125 Park Avenue<br>New York, New York  10017 | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York  10022 |

| Attn.:   John S. Dubel<br>          A. Edward Turi, III | Phone:  (212) 446 4800<br>Fax:    (212) 446-4900<br>Attn.:   Paul M. Basta<br>          Brian S. Lennon<br>          -and-<br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois  60654<br>Phone: (312) 862-2000<br>Fax:    (312) 862-2200<br>Attn.:   Patrick J. Nash, Jr. |
| **Clerk of the Bankruptcy Court** | **United States Trustee** |
| United States Bankruptcy Court<br>for the Southern District of New York<br>Alexander Hamilton Custom House<br>One Bowling Green<br>New York, New York  10004 | Office of the United States Trustee<br>for Region 2<br>33 Whitehall Street, 21st Floor<br>New York, New York  10004<br>Attn.:   Andrea B. Schwartz |
| **Counsel for the Administrative Agent** | **Indenture Trustee** |
| Morgan Lewis & Bockius LLP<br>101 Park Avenue<br>New York, New York  10178<br>Phone: (212) 309-6000<br>Fax:    (212) 309-6001<br>Attn.:   Richard S. Toder<br>          Michael A. Chapnick | Wilmington Trust FSB<br>166 Mercer Street, Suite 2-R<br>New York, New York  10012<br>Phone: (212) 941-4415<br>Fax:    (212) 343-1079<br>Attn.:   Adam Berman |
| **Counsel for the Creditors' Committee** | **Counsel for Plan Sponsor** |
| Morrison & Foerster LLP<br>1290 Avenue of the Americas<br>New York, New York  10104<br>Phone: (212) 468-8000<br>Fax:    (212) 468-7900<br>Attn.:   Anthony Princi<br>          John A. Pintarelli | Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, New York  10019<br>Phone: (212) 474-1000<br>Fax:    (212) 474-3700<br>Attn.:   Richard Levin |

L.    *Filing of Additional Documents*

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.  The Plan Supplement shall be filed no later than five (5) Business Days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court.

M.      *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.


Respectfully submitted, as of the date first set forth above,


<div style="margin-left:40%">

By:      */s/ John S. Dubel*
Name:    John S. Dubel
Title:   Chief Executive Officer,
         FGIC Corporation

</div>

**EXHIBIT A**

**AMENDED TAX ALLOCATION AGREEMENT**

**EXHIBIT B**

**CERTAIN TAX CONDITIONS**

1.      As of and prior to the Effective Date there shall not have occurred any event that, in the sole discretion of the Plan Sponsor:

    (a)      imposed or could reasonably be expected to impose a limitation under section 382 of the IRC on the Plan Sponsor's ability to utilize all or any portion of the Tax Attributes to offset income or gain of the Plan Sponsor or any of its subsidiaries; or

    (b)      resulted or could reasonably be expected to result in a deconsolidation of the Plan Sponsor from the FGIC Corporation Group for U.S. federal or any state income tax purposes.

2.      Prior to the Effective Date, the Debtor shall not have, without the prior written consent of the Plan Sponsor, which consent may be withheld in its sole discretion, taken any action that could:

    (a)      impair or otherwise interfere with the Plan Sponsor's ability to utilize all or any portion of the Tax Attributes to offset income or gain of the Plan Sponsor or any of its subsidiaries;

    (b)      result in the application of Treasury Regulation section 1.1502-36 or in any reduction or reattribution of all or any portion of the Tax Attributes under Treasury Regulation section 1.1502-36;

    (c)      result in a limitation on the Tax Attributes under section 382 of the IRC; or

    (d)      result in a deconsolidation of the Plan Sponsor from the FGIC Corporation Group for U.S. federal or any state income tax purposes.

3.      Without limiting the generality of paragraphs 1 or 2 above, prior to the Effective Date, the Debtor shall not have, directly or indirectly, without the prior written consent of the Plan Sponsor, which consent may be withheld in its sole discretion:

    (a)      sold, abandoned or transferred legal title to, a beneficial interest in, or the voting power of any capital stock or equity of, the Plan Sponsor or otherwise disposed of any capital stock or equity of the Plan Sponsor, including any "transfer" within the meaning of Treasury Regulation section 1.1502-36(f)(10) or any "disposition" within the meaning of Treasury Regulation section 1.382-2T(e)(1)(i)(A);

    (b)      made any election to reattribute Tax Attributes under Treasury Regulation section 1.1502-36 or otherwise taken any step that is intended to or could reasonably be expected to reduce or impair the ability to offset taxable

income or gain of the FGIC Corporation Group or any of its members (including FGIC) with the Tax Attributes;

(c)    claimed a worthless stock loss for U.S. federal income tax purposes in respect of any capital stock or equity of the Plan Sponsor pursuant to section 165(g) of the IRC;

(d)    issued any shares of capital stock or equity of the Debtor, other than the issuances of capital stock of the Debtor reflected on the Debtor's stock ledger as of November 15, 2011 and issuances pursuant to the exercise of the warrant or the compensatory grants referred to in paragraph (e) below, which may occur after the date hereof;

(e)    issued any options or other instruments convertible into shares of capital stock or equity of the Debtor, including an "option" as it is defined for the purposes of section 382 of the IRC or as it is defined in Treasury Regulation section 1.1504-4(d)(1), other than compensatory grants issued prior to August 3, 2010 and the warrant to purchase common stock of the Debtor dated December 13, 2003, issued to Banc of America Securities, LLC;

(f)    redeemed, accepted as a contribution to capital, or accepted (or otherwise recognized) any abandonment of any capital stock or equity of the Debtor, other than the redemption on August 3, 2010 of capital stock of the Debtor held by Dubel & Associates, LLC;

(g)    recapitalized the capital stock or equity of the Debtor, altered the rights of holders of capital stock or equity of the Debtor or, since August 3, 2010, otherwise amended the Debtor's articles of incorporation for any purpose, except as provided by amendments or restatements of the Debtor's articles of incorporation completed prior to August 3, 2010, and except as is expressly contemplated herein, and other than stock splits effected as of or prior to November 15, 2011 that are reflected on the Debtor's stock ledger as of November 15, 2011;

(h)    participated in any transaction that would or could reasonably be expected to be treated as an "equity structure shift" under Treasury Regulation section 1.382-2T(e)(2), including a reorganization within the meaning of section 368 of the IRC;

(i)    recognized any action by holders of shares of capital stock of the Debtor that would violate the Debtor's articles of incorporation; or

(j)    planned to effect a liquidation of the Reorganized Debtor following the Effective Date.

2

**Exhibit B**

**Order Approving Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| FGIC CORPORATION,[1] | ) |
|  | ) Case No. 10-14215 (SMB) |
| Debtor. | ) |
|  | ) |

**ORDER (A) APPROVING THE ADEQUACY OF THE**
**DISCLOSURE STATEMENT, (B) FIXING DATES AND DEADLINES**
**RELATING TO CONFIRMATION OF THE PLAN, (C) APPROVING CERTAIN**
**PROCEDURES FOR SOLICITING AND TABULATING THE VOTES ON, AND**
**FOR OBJECTING TO, THE PLAN AND (D) APPROVING THE MANNER AND**
**FORM OF THE VARIOUS NOTICES AND DOCUMENTS RELATING THERETO**

Upon the motion (the "Motion"), dated  August 3, 2010, of FGIC Corporation, as the

debtor and debtor in possession in the above-captioned chapter 11 case ("FGIC Corp." or

"Debtor"), seeking entry of an order (this "Solicitation Procedures Order") pursuant to sections

502, 1125 and 1126 of title 11 of the United States Code (the "Bankruptcy Code") and Rules

2002, 3001, 3017, 3018 and 3020 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"):  (a) approving the Disclosure Statement;[2] (b) establishing the Record Date;

(c) approving the Solicitation Procedures; (d) establishing the Voting and Tabulation Procedures;

(e) authorizing The Garden City Group, Inc. to be retained as voting and solicitation agent (the

"Voting and Solicitation Agent") pursuant to section 327(a) of the Bankruptcy Code;  and

(f) scheduling a hearing and establishing notice and objection procedures for confirmation of the

Plan, all as more fully set forth in the Motion; and the Debtor having filed the *Chapter 11 Plan of*

---

[1]    The last four digits of the Debtor's tax identification number are 6474.  The location of the Debtor's corporate headquarters is 125 Park Avenue, New York, New York 10017.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

*Reorganization of FGIC Corporation* [Docket No. 253] and the *Disclosure Statement for the Chapter 11 Plan of Reorganization of FGIC Corporation* [Docket No. 254] on February 3, 2012; and the Court having entered the *Order Authorizing the Debtor to Enter Into the Plan Sponsor Agreement With Financial Guaranty Insurance Company* [Docket No. 271]; and the Court having found it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found venue in this District is proper pursuant to 28 U.S.C. § 1408; and the form and manner of notice of the Motion and the Disclosure Statement Hearing being good, sufficient and appropriate under the circumstances such that no other or further notice need be provided or is necessary; and upon the record of the hearing on the Disclosure Statement and the Motion (the "Disclosure Statement Hearing"), at which all parties in interest were offered an opportunity to be heard; and the Court having considered, without limitation, (a) the Disclosure Statement and any modifications thereof and objections thereto, (b) the Motion and any modifications thereof and objections thereto and (c) arguments of counsel and evidence proffered or adduced at the Disclosure Statement Hearing; and the legal and factual bases set forth in the Motion and at the Disclosure Statement Hearing establishing just cause for the relief granted herein, including approval of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code; and the relief requested in the Motion and granted herein being in the best interests of the Debtor's estate, its creditors and other parties in interest; and the Debtor having provided adequate and appropriate notice of the Motion under the circumstances; and after due deliberation and sufficient cause appearing therefor; it is HEREBY ORDERED:

    1.      The Motion is granted to the extent provided herein.

2.      The Debtor has provided adequate notice of the time fixed for filing objections to,

and the hearing to consider approval of, the Disclosure Statement in accordance with Bankruptcy

Rules 2002 and 3017 and Local Bankruptcy Rules 2002-1 and 3017-1.

**I.      Approval of the Disclosure Statement**

3.      The Disclosure Statement is approved pursuant to section 1125(a)(1) of the

Bankruptcy Code and Bankruptcy Rule 3017(b).  To the extent any objections to the approval of

the Disclosure Statement are not withdrawn, settled or otherwise resolved, they are hereby

overruled.

4.      The Debtor is authorized to make non-material amendments to the Disclosure

Statement, the Plan and related documents (including the appendices thereto and exhibits to this

Solicitation Procedures Order) before distributing Solicitation Packages to each creditor or other

party in interest in accordance with the terms of this Solicitation Procedures Order without

further order of the Court, including amendments to correct typographical, clerical and

grammatical errors, and to make conforming amendments among the Disclosure Statement, the

Plan and related documents.

**II.      Establishment of the Record Date**

5.      **March 13, 2012, shall be the Record Date** for determining:  (a) the holders of

claims entitled to receive a Solicitation Package; (b) the holders of claims entitled to vote to

accept or reject the Plan; and (c) whether claims have been properly transferred to an assignee

pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of such claim.

6.      The proper holder of a scheduled claim shall be determined by reference to the

Voting and Solicitation Agent's claims register as may be modified by notices of transfer filed

and reflected on the Court's official docket (ECF), available at https://ecf.nysb.uscourts.gov, as

of the Record Date.  Except as otherwise provided herein, holders of claims filed after, or

3

assignees to whom claims have purportedly been transferred subsequent to, the Record Date

shall not be entitled to vote on the Plan.

### III.    Approval of the Solicitation Procedures

#### A.    Notice and Claims Agent's Expanded Duties Under Section 327(a) of the Bankruptcy Code

7.    The Debtor is authorized to employ and retain the Voting and Solicitation Agent

pursuant to section 327(a) of the Bankruptcy Code and on the terms and conditions described in

**Exhibit C** to the *Order Authorizing the Employment and Retention of The Garden City Group,*

*Inc. as Notice and Claims Agent*, as modified herein [Docket No. 19] (such exhibit the "GCG

Agreement").[3]

8.    The Voting and Solicitation Agent is authorized to represent the Debtor and to

assist the Debtor in, among other things, (a) mailing the Solicitation Packages, including the

Confirmation Hearing Notice, to holders of claims and the brokers, banks, dealers, trust

companies, agents or other nominees (the "Nominees") identified by the Voting and Solicitation

Agent as entities through which beneficial holders of the Debtor's 6% Senior Notes due 2034

(the "Senior Notes") in class 6 hold their claims as of the Record Date, (b) distributing Master

Ballots to Nominees and the Administrative Agent, (c) receiving and tabulating Ballots[4] and

(d) responding to inquiries from creditors and equity holders relating to the solicitation process,

the Ballots and matters related thereto.

9.    Subject to the terms of this Order, the Voting and Solicitation Agent will be

compensated on a monthly basis in accordance with this Court's *Order Establishing Procedures*

---

[3]     The Debtor's retention of the Notice and Claims Agent as Voting and Solicitation Agent shall be *nunc pro tunc* to the date of the GCG Agreement.

[4]     All references to Ballots contained herein shall include the Master Ballots unless otherwise noted.

4

*for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 45] (the "Interim Compensation Order").

10.     In accordance with the Interim Compensation Order, the Voting and Solicitation Agent shall file and serve monthly statements of fees and expenses for services rendered as Voting and Solicitation Agent (each, a "Monthly Statement").  Any notice of objection to a Monthly Statement shall be served upon the Voting and Solicitation Agent within fourteen (14) days of the filing of the Monthly Statement at issue.

11.     At the expiration of the fourteen (14) days period noted in paragraph 10 above, the Debtor shall promptly pay the Voting and Solicitation Agent eighty percent (80%) of the fees and one hundred percent (100%) of the expenses identified in each Monthly Statement to which no objection has been served.

12.     If the Debtor objects or receives an objection to a particular Monthly Statement, the Debtor shall withhold payment of that portion of the Monthly Statement to which the objection is directed and promptly pay the remainder of the fees and expenses in the percentages described in paragraph 11 above.

13.     If the parties to an objection resolve their dispute following the service of a notice of objection to a Monthly Statement, and proper notice is served that the objection is withdrawn (as set forth in the Interim Compensation Order), the Debtor shall promptly pay in accordance with paragraph 11 that portion of the Monthly Statement that is no longer subject to an objection.

14.     All objections that the parties do not resolve shall be preserved and presented to the Court at the hearing on the Voting and Solicitation Agent's final fee application as set forth in paragraph 16 below.

15.     The service of an objection in accordance with paragraph 10 above shall not prejudice the objecting party's right to object to the Voting and Solicitation Agent's final fee application made to the Court in accordance with the Bankruptcy Code on any ground regardless of whether the objecting party raised the ground in the objection or not. The decision by any party not to object to a Monthly Statement shall not waive or prejudice that party's right to object to the final fee application made to the Court in accordance with the Bankruptcy Code.

16.     No later than ninety (90) days after completion of the services set forth in the GCG Agreement, the Voting and Solicitation Agent shall file with the Court, in accordance with General Order M-389 (which can be found at www.nysb.uscourts.gov) and the U.S. Trustee's Guidelines an application for final Court approval and allowance pursuant to sections 330 and 331 of the Bankruptcy Code, Bankruptcy Rule 2016 and Local Rule 2016-1 of the fees and expenses requested in the Monthly Statements.

17.     Nominees and the Administrative Agent shall cooperate with the Voting and Solicitation Agent to ensure the Solicitation Packages are distributed promptly to holders of class 6 claims.  The Debtor shall, upon request, reimburse Nominees and the Administrative Agent for the reasonable mailing and handling expenses incurred by forwarding ballots and other solicitation materials to beneficial holders or loan participants, as applicable; *provided*, *however*, that no fees or commissions or other remuneration will be payable to Nominees or the Administrative Agent for soliciting ballots accepting the Plan.

**B.     Approval of the Form of Ballots**

18.     The Ballots, substantially in the forms attached hereto as **Exhibits 1-A**, **1-B**, **1–C**, **1-D**, **1-E** and **1-F**, are approved.

6

**C.     Approval of the Contents of Solicitation
Packages and Procedures for Distribution Thereof**

19.     **<u>March 15, 2012 shall be the Solicitation Deadline</u>**.   On or before the

Solicitation Deadline, or as soon as reasonably practicable thereafter, the Voting and Solicitation

Agent shall distribute the Solicitation Packages, the forms of which are hereby approved, by

first-class, postage prepaid mail to the parties set forth in the Motion.  The Solicitation Packages

shall contain a copy of the following, where applicable:

> (a)     the Confirmation Hearing Notice, substantially in the form
> attached hereto as **<u>Exhibit 2</u>**;[5]
>
> (b)     for creditors entitled to vote, a letter from the official committee of
> unsecured creditors (the "<u>Committee</u>") urging creditors to vote to
> accept the Plan (the "<u>Committee Support Letter</u>");
>
> (c)     either:
>
> > (i)     the appropriate Ballot and voting instructions for the class
> > in which the creditor is entitled to vote together with a pre-
> > addressed, postage pre-paid return envelope; or
> >
> > (ii)     in lieu of a Ballot, (A) a Notice of Non-Voting Status to
> > Holders of Unimpaired Claims, (B) a Notice of Non-Voting
> > Status to Holders of Impaired Claims, and/or (C) a
> > Contract/Lease Party Notice; and
>
> (d)     a CD-ROM containing a copy of the Disclosure Statement and all
> exhibits thereto, including this Solicitation Procedures Order
> (without exhibits) and the Plan.[6]

20.     On or before the Solicitation Deadline, the Debtor will cause the appropriate

Solicitation Packages to be distributed to (a) entities on the Master Service List and Rule 2002

---

[5]     For the avoidance of doubt, a paper copy of the Confirmation Hearing Notice shall be sent to each of the
creditors or other parties in interest listed on the Master Service List and the 2002 List.

[6]     To the extent the Debtor decides to include a cover letter explaining the solicitation process and urging parties
to vote to accept the Plan, such a letter shall only be included in Solicitation Packages distributed to holders of
claims entitled to vote on the Plan.

7

List; (b) all creditors holding scheduled claims; (c) all creditors with filed proofs of claims; and

(d) all non-debtor parties to the Debtor's executory contracts and unexpired leases.

21.    The following notices are hereby approved:

(a)    <u>Unimpaired Claims – Conclusively Presumed to Accept</u>:   the Solicitation Packages sent to holders of claims in classes 1, 2, 3 and 5 (who are conclusively presumed to accept the Plan) shall include a Notice of Non-Voting Status to Holders of Unimpaired Claims, substantially in the form attached hereto as **<u>Exhibit 3-A</u>**;

(b)    <u>Impaired Claims and Equity Interests – Deemed to Reject</u>:   the Solicitation Packages sent to holders of equity interests in class 7 and holders of claims in class 8 (who are deemed to reject the Plan) shall include a Notice of Non-Voting Status to Holders of Impaired Claims, substantially in the form attached hereto as **<u>Exhibit 3-B</u>**; and

(c)    <u>Contract/Lease Party Notice</u>:   the Solicitation Packages sent to counterparties to the Debtor's executory contracts and unexpired leases shall include a Contract/Lease Party Notice, substantially in the form attached hereto as **<u>Exhibit 4</u>**;

22.    Notwithstanding anything herein to the contrary, the Debtor need not transmit Solicitation Packages or other notices to (a) holders of claims that have already been paid in full or (b) any person to whom the Debtor mails a Disclosure Statement Hearing Notice and such notice is returned as "undeliverable."

23.    The Debtor is authorized to distribute the Disclosure Statement and all exhibits thereto, including the Plan and this Solicitation Procedures Order (without exhibits) in CD-ROM format.  For the avoidance of doubt, Ballots, notices provided in lieu of Ballots, the Confirmation Hearing Notice, the Debtor's cover letter, and the Committee Support Letter may be provided <u>only</u> in paper format.  Paper copies of the Disclosure Statement and all exhibits thereto shall be provided at the Debtor's expense upon request to the Voting and Solicitation Agent by (a) emailing <u>FGICInfo@gardencitygroup.com</u>, (b) calling Debra Wolther at 1-800-327-3667 and/or

8

(c) writing to:  The Garden City Group, Inc., Attn.: FGIC Corp., 5151 Blazer Pkwy, Suite A, Dublin, OH  43017.

## IV.    **Approval of the Voting and Tabulation Procedures**

### A.    **The Voting Deadline**

24.    For votes to be counted, holders of claims entitled to vote on the Plan must properly complete, execute and return their Ballots by (a) first class mail, (b) overnight courier or (c) hand delivery so that they are **actually** **received** by the Voting and Solicitation Agent on or before **4:00 p.m. prevailing Eastern Time on April 12, 2012** (the "Voting Deadline").

25.    For the avoidance of doubt, class 6 Ballots must be returned to Nominees and the Administrative Agent in sufficient time to ensure Nominees and the Administrative Agent have enough time to (a) validate, compile and summarize the voting and other information contained in the Ballots, (b) transcribe the requisite information onto the Master Ballots and (c) return the Master Ballots so they are **actually** **received** by the Voting and Solicitation Agent before the Voting Deadline.

26.    The Debtor is authorized, subject to the consent of the Plan Sponsor, which consent may be withheld in its sole discretion, to extend the Voting Deadline at any time or from time to time (on a daily basis, if necessary) by making a public announcement of such extension no later than the first business day following the previously announced Voting Deadline.  The Debtor shall give notice of any such extension in a manner deemed reasonable to the Debtor in its discretion.

27.    Votes cast on any ballot (a) not received by the Voting Deadline or (b) received but not duly executed or completed in accordance with the requirements herein shall not be counted.

9

### B.    Establishing Claim Amounts for Voting Purposes

28.    The following hierarchy shall determine the amount of the claim associated with each vote transmitted on a properly-executed, timely received Ballot:

(a)    the amount of the Claim settled and/or agreed upon by the Debtor, as reflected in a court pleading, stipulation, agreement or other document filed with the Court, in an order of the Court or in a document executed by the Debtor pursuant to authority granted by the Court;

(b)    the amount of the Claim listed in a timely-filed proof of claim as not contingent, not unliquidated and not disputed (except for any amounts asserted on account of interest accrued after the Petition Date), *provided*, that, to the extent any person or entity has timely filed a proof of claim reflecting a claim that is partially unliquidated and partially liquidated, only the liquidated portion of the claim shall determine the amount of the claim for voting purposes, subject to the holder's right to file a Rule 3018(a) Motion;

(c)    the amount of the claim listed in the Debtor's Schedules as not contingent, not unliquidated and not disputed as of the Record Date; and

(d)    the amount of any claim scheduled as contingent, unliquidated or disputed for which the bar date has not yet passed and as to which a proof of claim has not been filed, shall be counted in the amount of $1.00 (solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code), subject to the holder's right to file a Rule 3018(a) Motion.

29.    The amount of the claim established by the foregoing hierarchy shall control for voting purposes only and shall not constitute the allowed amount of any claim.  Nothing herein shall be construed to prevent the Debtor from objecting to (a) the amount of any claim set forth for voting purposes on a Ballot, (b) the amount otherwise agreed to by the Debtor and the applicable claimant or (c) an amount ordered by the Court, nor shall anything herein be construed to prevent the Debtor from objecting to any proof of claim on any grounds or amending and/or supplementing its Schedules.

K&E 17264095

C.   **Approval of the Tabulation Procedures**

30.   The following tabulation procedures shall apply with respect to tabulating all

votes:

(a)   <u>Votes Not Counted</u>.  Votes shall not be counted or considered for
any purpose if they are transmitted on any Ballot that is:

(i)   received by the Voting and Solicitation Agent after the
Voting Deadline;

(ii)   illegible or contains ~~s~~ **[SMB 3/14/12]**insufficient information
to permit the identification of the holder of the claim;

(iii)   cast by an entity that does not hold a claim in a class that is
entitled to vote on the Plan and is not otherwise entitled to
vote pursuant to the procedures described herein;

(iv)   sent to the Debtor, the Debtor's agents and/or
representatives (other than the Voting and Solicitation
Agent) or the Debtor's financial or legal advisors;

(v)   not signed;

(vi)   received by the Voting and Solicitation Agent by facsimile
or other means of electronic transmission; or

(vii)   not marked to accept or reject the Plan or marked both to
accept and reject the Plan.

(b)   <u>Multiple Ballots</u>.  If multiple Ballots are received from the same
holder of a claim with respect to the same claim prior to the Voting
Deadline, the latest dated valid Ballot timely received shall count
for voting purposes, subject to contrary order of the Court;
*provided*, that in instances where ambiguity exists with respect to
which Ballot was the latest dated, the Voting and Solicitation
Agent has the right to contact the respective claimant to determine
such claimant's intent and calculate the vote according thereto.

(c)   <u>No Vote Splitting</u>.  Holders of claims must vote all of their claims
within a particular class either to accept or reject the Plan and may
not split any such votes.  Accordingly, any Ballot that partially
rejects and partially accepts the Plan will not be counted.  Further,
if a holder has multiple claims within the same class, the Debtor
may, in its discretion, aggregate the claims of any particular holder
within a class for the purpose of counting votes.

K&E 17264095

(d)  <u>Ballots Signed by Representative</u>.  If a Ballot is signed by a trustee, executor, administrator, guardian, attorney in fact or other person acting in a fiduciary or representative capacity, such person shall be required to indicate such capacity when signing the Ballot.  The Debtor may request proper evidence of such representative's authority to sign the Ballot prior to accepting such Ballot.

(e)  <u>Defective Ballots</u>.  The Debtor, subject to contrary order of the Court, may waive any defects or irregularities as to any particular Ballot at any time, either before or after the Voting Deadline; *provided*, that:

(i)  any such waivers shall be documented in the Voting Report completed by the Voting and Solicitation Agent; and

(ii)  neither the Debtor, nor any other entity, will be under any duty to provide notification of such defects or irregularities other than as provided in the Voting Report prepared by the Voting and Solicitation Agent, nor will any of them incur any liability for failure to provide such notification.

(f)  <u>No Class Votes</u>.  If no votes to accept or reject the Plan are received with respect to a particular class entitled to vote on the Plan, such class shall be deemed to have voted to accept the Plan.

(g)  <u>Lack of Good Faith Designation</u>.  In the event a designation for lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected by such claim holder.

(h)  <u>Master Ballots</u>.  The following additional procedures shall apply only with respect to tabulating Master Ballots:

(i)  votes cast by holders of class 6 claims through Nominees will be applied to the applicable positions held by such Nominees as of the Record Date, as evidenced by the record and depository listings and votes submitted by a Nominee shall not be counted in excess of the amount of claims held by such Nominee as of the Record Date;

(ii)  votes cast by holders of class 6 claims through the Administrative Agent will be applied to the obligations under the Prepetition Credit Facility held by such holders as of the Record Date, as determined by the books and records of the Administrative Agent, and votes submitted by the Administrative Agent shall not be counted in excess

12

of the amount of obligations under the Prepetition Credit Facility held by all prepetition lenders thereunder as of the Record Date;

(iii)    if conflicting votes or "over-votes" are submitted by a Nominee or the Administrative Agent, the Debtor shall use reasonable efforts to reconcile discrepancies with such Nominee or the Administrative Agent, as applicable;

(iv)    if a Nominee or the Administrative Agent submit over-votes that are not reconciled prior to the preparation of the Voting Report, the Debtor shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted by the Nominee or Administrative Agent, as applicable, but only to the extent the Nominee held claims as of the Record Date and to the extent the Administrative Agent listed such claims in its books and records as of the Record Date, as applicable;

(v)    for the purposes of tabulating votes, each holder of a claim shall be deemed to have voted the principal amount of its claim although any principal amounts may be adjusted by Nominees or the Administrative Agent, as applicable, to reflect the amount of the class 6 claim the holder actually voted, including prepetition interest; and

(vi)    a single Nominee or the Administrative Agent may complete and deliver multiple Master Ballots to the Voting and Solicitation Agent, *provided*, that votes reflected on multiple Master Ballots shall be counted except to the extent they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the latest dated, validly executed Master Ballot received prior to the Voting Deadline shall, to the extent of such inconsistency, supersede and revoke prior Master Ballots.

31.    **The Voting and Solicitation Agent shall file a Voting Report with the Court on April 12, 2012** listing all instances where (a) Ballots were withdrawn, (b) votes were changed by the filing of superseding Ballots, or (c) defects or irregularities were waived as to a particular Ballot.  The Debtor shall cause the Voting Report to be served upon the Debtor, the Committee, the Plan Sponsor, and the United States Trustee for Region 2. **Not with standing anything to**

13

the contrary, a creditor or interest holder that seeks to change or withdraw a vote must comply with FRBP 3018(a). [SMB 3/14/12]

## V.     Establishment of the Confirmation Hearing Date, Notice and Objection Procedures

### A.     Confirmation Hearing Date

32.     The Confirmation Hearing will commence at **2:00 p.m. prevailing Eastern Time on April 19, 2012**, before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004.

33.     The Confirmation Hearing may be continued from time to time by the Court or the Debtor without further notice other than adjournments announced in open court and/or a notice of adjournment filed with the Court.

### B.     Approval of the Confirmation Hearing Notice

34.     The Confirmation Hearing Notice, substantially in the form attached as **Exhibit 2** hereto, is hereby approved pursuant to Bankruptcy Rules 2002 and 3017(d).  The Debtor shall cause the Confirmation Hearing Notice to be served upon all known creditors, equity holders and parties in interest in this chapter 11 case by the Solicitation Deadline.

35.     On one occasion on or prior to **March 22, 2012**, the Debtor shall publish the Confirmation Hearing Notice (modified for publication, if necessary) in the national edition of *The Wall Street Journal*.

### C.     Approval of Objection Procedures

36.     Any objection to confirmation of the Plan must (a) be in writing, (b) conform to the Bankruptcy Rules, (c) set forth the name of the objector, the nature and amount of claims or equity interests held or asserted by the objector against the Debtor, (d) detail the basis for the objection and the specific grounds therefor and (e) be filed with the Court, together with proof of

14

service thereof, and served upon and **actually received** no later than **4:00 p.m. prevailing**

**Eastern Time on April 12, 2012** by the following Notice Parties:

| Debtor | Counsel to the Debtor |
|---|---|
| FGIC Corporation<br>125 Park Avenue<br>New York, New York 10017<br>Attn.:   John S. Dubel<br>         A. Edward Turi, III | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Phone: (212) 446 4800<br>Fax:    (212) 446-4900<br>Attn.:   Paul M. Basta<br>         Brian S. Lennon<br><br>     -and-<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Phone: (312) 862-2000<br>Fax:    (312) 862-2200<br>Attn.:   Patrick J. Nash, Jr. |
| **Clerk of the Bankruptcy Court** | **United States Trustee** |
| United States Bankruptcy Court<br>for the Southern District of New York<br>Alexander Hamilton Custom House<br>One Bowling Green<br>New York, New York 10004 | Office of the United States Trustee for Region 2<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn.:  Andrea B. Schwartz |
| **Counsel for the Administrative Agent** | **Indenture Trustee** |
| Morgan Lewis & Bockius LLP<br>101 Park Avenue<br>New York, New York 10178<br>Phone:  (212) 309-6000<br>Fax:     (212) 309-6001<br>Attn.:   Michael A. Chapnick | Wilmington Trust FSB<br>166 Mercer Street, Suite 2-R<br>New York, New York 10012<br>Phone: (212) 941-4415<br>Fax:     (212) 343-1079<br>Attn.:   Adam Berman |
| **Counsel for the Committee** | **Counsel for the Plan Sponsor** |
| Morrison & Foerster LLP<br>1290 Avenue of the Americas<br>New York, NY 10104-0050<br>Phone:  (212) 468-8000<br>Fax:     (212) 468-7900<br>Attn.:   Anthony Princi<br>         John Pintarelli | Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, New York 10019<br>Phone: (212) 474-1000<br>Fax: (212) 474-3700<br>Attn: Richard Levin |

K&E 17264095

37.     Any objection to confirmation of the Plan that is not filed and served as set forth

herein will be deemed waived and will not be considered by the Court.

**VI.     Approval of the Solicitation and Plan Confirmation Timeline**

38.     The following dates and deadlines with respect to the solicitation of votes on,

objecting to, and confirmation of, the Plan are hereby approved, subject to modification as

needed:

| Event/Deadline | Date |
|---|---|
| Record Date: | March 13, 2012 |
| Solicitation Deadline: | March 15, 2012 |
| Publication Notice Deadline: | March 22, 2012 |
| Plan Supplement Filing Date: | Five business days prior to the Voting Deadline |
| Voting Deadline: | April 12, 2012 at 4:00 p.m. ET |
| Plan Objection Deadline: | April 12, 2012 at 4:00 p.m. ET |
| Voting Report Deadline: | April 12, 2012 |
| Deadline to Reply to Confirmation Objections: | April 17, 2012 at 11:59 p.m. ET |
| Confirmation Hearing: | April 19, 2012 at 2:00 p.m. ET |

39.     The Debtor and the Voting and Solicitation Agent, as applicable, are hereby

authorized and empowered to take all actions necessary to implement the relief granted in this

Solicitation Procedures Order.

40.     The Court shall retain jurisdiction with respect to any matters, claims, rights or

disputes arising from or related to this Solicitation Procedures Order.


Dated:  New York, New York
        March 14th, 2012

                                            _____
                                            /s/ STUART M. BERNSTEIN
                                            United States Bankruptcy Judge

16

**Exhibits to the Solicitation Procedures Order Intentionally Omitted**

**<u>Exhibit C</u>**

**Plan Sponsor Agreement**

# PLAN SPONSOR AGREEMENT

This PLAN SPONSOR AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of February 3, 2012, is entered into by and between FGIC Corporation, in its capacity as a debtor and debtor in possession with the exclusive right to file a chapter 11 plan (the "**Company**") and Financial Guaranty Insurance Company (together with any successor thereto, the "**Plan Sponsor**," and together with the Company, the "**Parties**").  Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan (as defined below).

**WHEREAS** on August 3, 2010, the Company commenced a voluntary case under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York, Case No. 10-14215 (SMB) (the "**Chapter 11 Case**");

**WHEREAS** the Parties have agreed to a restructuring of the Company (the "**Restructuring**") that will be implemented through a chapter 11 plan of reorganization, substantially in the form attached hereto as **Exhibit B** (the "**Plan**");

**WHEREAS** the Plan Sponsor and the Company are members of an affiliated group of corporations within the meaning of Section 1504(a) of the IRC (the "**Company Group**"), which as of the date of this Agreement file consolidated or combined tax returns for U.S. federal or any State income tax purposes;

**WHEREAS** the Plan Sponsor and the Company are parties to that certain Amended and Restated Income Tax Allocation Agreement dated as of December 18, 2003 (the "**TAA**");

**WHEREAS** the Plan Sponsor holds an Intercompany Claim in the amount of $24,125 against the Company (the "**Plan Sponsor Intercompany Claim**"); and

**WHEREAS** the Plan Sponsor is willing to make a contribution to the Company's reorganization on certain terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I - DEFINITIONS AND INTERPRETATION

**1.1**    **Certain Definitions**.  In addition to the terms defined elsewhere herein and in the Plan (which terms are used herein as so defined), the following terms have the following meanings for purposes of this Agreement:

(a)    "Agreement" has the meaning ascribed to such term in the recitals hereto.

(b)      "Amended TAA" has the meaning ascribed to such term in <u>Section 2.2</u> hereof.

(c)      "Chapter 11 Case" has the meaning ascribed to such term in the recitals hereto.

(d)      "Closing" has the meaning ascribed to such term in <u>Section 5.1</u> hereof.

(e)      "Closing Date" has the meaning ascribed to such term in <u>Section 5.1</u> hereof.

(f)      "Company" has the meaning ascribed to such term in the recitals hereto.

(g)      "Company Group" has the meaning ascribed to such term in the recitals hereto.

(h)      "Company Termination Event" has the meaning ascribed to such term in <u>Section 7.1</u> hereof.

(i)      "Competing Transaction" means any transaction that is conditioned or predicated on the transactions contemplated by this Agreement not being completed in accordance with the terms of this Agreement, the Amended TAA, and the Plan, or is intended or is reasonably expected to result in such transactions not being so completed, including a sale of any portion of the Company's assets, any alternative plan of reorganization (whether or not involving new equity ownership) under chapter 11 of the Bankruptcy Code or any liquidating plan under chapter 11 of the Bankruptcy Code.

(j)      "Contribution Amount" has the meaning ascribed to such term in <u>Section 2.1</u> hereof.

(k)      "Definitive Documents" means all motions, pleadings, agreements, exhibits, schedules, and other documents that are filed with the Bankruptcy Court in the Chapter 11 Case that relate to, or are reasonably likely to affect, the transactions contemplated by this Agreement, including the Final Claims Trading Order, the Disclosure Statement, the motion to approve the Disclosure Statement, the Plan, the Amended TAA, and the Plan Supplement.

(l)      "Documents" has the meaning ascribed to such term in <u>Section 3.1</u> hereof.

(m)      "Fiduciary Out" has the meaning ascribed to such term in <u>Section 4.7(a)</u> hereof.

(n)      "Final Claims Trading Order" means the Final Order Establishing Claims Trading Procedures for Trading in Claims Against the Debtor's Estate *Nunc Pro Tunc* to the Petition Date, a proposed form of which is attached hereto as **Exhibit C**, and which shall be in form and substance acceptable to the Plan Sponsor in its sole discretion.

(o)      "Governmental Entity" means any U.S. or foreign federal, state, local, municipal, county or other governmental, quasi-governmental, administrative, judicial,

regulatory or self-regulatory authority or organization, body, agency, court, tribunal, commission or other similar entity, including any branch, department or official thereof.

(p)  "NYSDFS" means the New York State Department of Financial Services.

(q)  "Option" has the meaning ascribed to such term in Section 5.2 hereof.

(r)  "Organizational Documents" has the meaning ascribed to such term in Section 4.4 hereof.

(s)  "Parties" has the meaning ascribed to such term in the recitals hereto.

(t)  "Plan" has the meaning ascribed to such term in the recitals hereto.

(u)  "Plan Sponsor" has the meaning ascribed to such term in the recitals hereto.

(v)  "Plan Sponsor Intercompany Claim" has the meaning ascribed to such term in the recitals hereto.

(w)  "Plan Sponsor Stock" has the meaning ascribed to such term in Section 2.3 hereof.

(x)  "Plan Sponsor Termination Event" has the meaning ascribed to such term in Section 7.2 hereof.

(y)  "Restructuring" has the meaning ascribed to such term in the recitals hereto.

(z)  "Supplemental Transaction" has the meaning ascribed to such term in Section 5.2 hereof.

(aa)  "TAA" has the meaning ascribed to such term in the recitals hereto.

(bb)  "Tax Attributes" has the meaning ascribed to such term in Section 3.2 hereof.

(cc)  "Termination Event" means Company Termination Event or Plan Sponsor Termination Event, as applicable.

**1.2  Other Definitional and Interpretive Matters**.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)  Calculation of Time Period.  When calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

3

(b)      Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(c)      Exhibits/Schedules.  All exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(d)      Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e)      Headings.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(f)      Herein.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(g)      Including.  The word "including," "includes," or "include" or any other variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h)      The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

(i)      Each Party acknowledges that it has entered into this Agreement on an arm's length basis and has been represented by counsel in connection with this Agreement and the transaction contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(j)      Prior drafts of this Agreement or any Document or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any Document shall not be used as an aide of construction or otherwise constitute evidence of the intent of the parties hereto; and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of such prior drafts.

## ARTICLE II - THE RESTRUCTURING

2.1     **Contribution**.  On the terms and subject to the conditions set forth in this Agreement, and as provided in Section 5.1 herein, the Plan Sponsor shall deliver to the Company

4

cash in an amount of $11 million (the "**Contribution Amount**"), which, together with the Company's existing cash, shall be used by the Company to fund distributions to holders of Allowed Claims in accordance with the Plan and the continued operations of the Company after the Closing Date.

2.2    **Amended TAA**.  The Company shall assume the TAA as modified in the form attached hereto as **Exhibit A** (the "**Amended TAA**") as of the Effective Date or, in the event the Option is exercised by the Plan Sponsor, on either the Closing Date or the Effective Date, as selected by the Plan Sponsor, in its sole discretion (*provided that*, in the event the Plan Sponsor selects the Closing Date, the Bankruptcy Court shall have entered an order authorizing the Company to assume the Amended TAA on or before the Closing Date), and, as a result, on such date, the TAA shall be amended and restated in its entirety by the Amended TAA, which shall thereafter be binding on the Parties.

2.3    **Plan Sponsor Stock**.  On the Effective Date, in exchange for full and final satisfaction, settlement, discharge and compromise of the Plan Sponsor Intercompany Claim, the Company shall issue to the Plan Sponsor (or to an entity designated by the Plan Sponsor) all of the authorized shares of a new class of stock of the Company, of which there shall be only one share, which stock shall entitle the Plan Sponsor (or its designee) to the rights set forth in Section 4.4 hereof (the "**Plan Sponsor Stock**").

## ARTICLE III - REPRESENTATIONS AND WARRANTIES

3.1    **Representations and Warranties of the Company and the Plan Sponsor**. Each Party, severally and not jointly, represents and warrants to the other Party the following as of the date hereof:

(a)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite power, authority and legal capacity to execute and deliver this Agreement and each other agreement, document, instrument, or certificate contemplated by this Agreement or to be executed in connection with the consummation of the transactions contemplated by this Agreement (the "**Documents**") by such Party and, subject to obtaining all necessary Bankruptcy Court and other regulatory approvals, as applicable, to perform its respective obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby;

(b)    the execution and delivery of this Agreement and the Documents to be executed and delivered by such Party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of such Party;

(c)    the execution, delivery, and performance by such Party of this Agreement and the Documents to be executed and delivered by such Party does not and will not (A) subject to obtaining all necessary Bankruptcy Court and other regulatory approvals, as applicable, violate any provision of law, rule, or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due

5

notice of time or both) a default under any material contractual obligation to which it is a party or by which its assets are bound; and

(d)    subject to obtaining all necessary Bankruptcy Court and other regulatory approvals, as applicable, this Agreement and all the Documents to be executed and delivered by such Party constitute legal, valid and binding obligations of such Party, enforceable against it in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**3.2**    **Representations and Warranties of the Company.**

(a)    The Company represents and warrants to the Plan Sponsor the following as of the date hereof:

(i)    there has not occurred any event that:

(1)    imposed (or could reasonably be expected to impose) a limitation under Section 382 of the IRC on the Plan Sponsor's ability to utilize any credits, losses, deductions (including foreign tax credits, alternative minimum credits, net operating losses, or net capital losses), deferred deductions, tax basis in assets or any other tax attribute of the Company Group or any of its members (collectively the "**Tax Attributes**") to offset income or gain of the Plan Sponsor or any of its subsidiaries; or

(2)    resulted (or could reasonably be expected to result) in a deconsolidation of the Plan Sponsor from the Company Group for U.S. federal or any state income tax purposes.

(ii)    the Company has not taken any action that has or could reasonably be expected to have:

(1)    impaired or otherwise interfered with the Plan Sponsor's ability to utilize all or any portion of the Tax Attributes to offset income or gain of the Plan Sponsor or any of its subsidiaries;

(2)    resulted in the application of Treasury Regulation Section 1.1502-36 or in any reduction or reattribution of all or any portion of the Tax Attributes under Treasury Regulation Section 1.1502-36;

(3)    resulted in a limitation on the utilization of the Tax Attributes by the Plan Sponsor or any of its subsidiaries under Section 382 of the IRC; or

(4)    resulted in a deconsolidation of the Plan Sponsor from the Company Group for U.S. federal or any state income tax purposes.

6

(iii)    without limiting the generality of the representations and warranties made pursuant to <u>Section 3.2(a)(i)</u> or <u>(ii)</u> above, the Company has not, directly or indirectly:

(1)    sold, abandoned or transferred legal title to, a beneficial interest in, or the voting power of any capital stock or equity of the Plan Sponsor (including any "transfer" within the meaning of Treasury Regulation Section 1.1502-36(f)(10) or any "disposition" within the meaning of Treasury Regulation Section 1.382-2T(e)(1)(i)(A));

(2)    made any election to reattribute Tax Attributes under Treasury Regulation Section 1.1502-36 or otherwise taken any step that is intended to or could reasonably be expected to reduce or impair the ability to offset taxable income or gain of the Company Group or any of its members with the Tax Attributes;

(3)    claimed a worthless stock loss for U.S. federal income tax purposes in respect of the capital stock or equity of the Plan Sponsor pursuant to Section 165(g) of the IRC;

(4)    issued any shares of capital stock or equity of the Company, other than issuances of capital stock of the Company reflected on the Company's stock ledger as of November 15, 2011 and issuances pursuant to the exercise of the warrant or the compensatory grants referred to in clause (5) below, which may occur after the date hereof;

(5)    issued any options or other instruments convertible into shares of capital stock or equity of the Company (including an "option" as it is defined for the purposes of Section 382 of the IRC or as it is defined in Treasury Regulation Section 1.1504-4(d)(1), but excluding any compensatory grants issued prior to the Petition Date and the warrant to purchase common stock of the Company dated December 13, 2003, issued to Banc of America Securities, LLC);

(6)    redeemed, accepted as a contribution to capital, or accepted (or otherwise recognized) any abandonment of capital stock or equity of the Company, other than the redemption of capital stock of the Company held by Dubel & Associates LLC on August 3, 2010;

(7)    recapitalized the capital stock or equity of the Company, altered the rights of holders of Company capital stock or equity of the Company or, since the Petition Date, otherwise amended the Company's articles of incorporation for any purpose, except as provided by amendments or restatements of the Company's articles of incorporation completed prior to the Petition Date, and other than stock splits effected as of or prior to November 15, 2011 that are reflected on the Company's stock ledger as of November 15, 2011;

(8)    participated in any transaction that would or could reasonably be expected to be treated as an "equity structure shift" under Treasury Regulation Section 1.382-2T(e)(2), including a reorganization within the meaning of Section 368 of the IRC;

7

    (9) recognized any action by holders of shares of capital stock of the Company that would violate its articles of incorporation;

    (10) effected a liquidation of the Company (including a liquidation as it is understood for U.S. federal income tax purposes); or

    (11) converted, directly or indirectly, the Company's corporate form from a Delaware corporation into a different entity.

### ARTICLE IV - COVENANTS

  **4.1**  <u>Transaction Support</u>.  The Company agrees to (a) take all actions to cause the Confirmation Order to (i) become effective and enforceable as soon as possible upon its entry and to have the period in which an appeal thereto must be filed commence immediately upon its entry, and, in any event, satisfy all conditions to effectiveness of the Plan and consummate the Plan as soon as possible and, subject to <u>Section 5.2</u>, in no event later than May 14, 2012, and (ii) authorize and direct the Company to perform its obligations under this Agreement on and after approval of this Agreement by the Bankruptcy Court; (b) obtain all regulatory and third-party approvals that may be necessary in connection with the Restructuring; and (c) not take any action that is inconsistent with, or is intended or is reasonably expected to interfere with, consummation of the Plan and effectiveness of the Amended TAA.

  **4.2**  <u>Final Claims Trading Order</u>.  The Company agrees to file the Final Claims Trading Order with the Bankruptcy Court by no later than February 3, 2012 and to use reasonable best efforts to obtain approval from the Bankruptcy Court of the Final Claims Trading Order by no later than the ten (10) Business Days prior to the hearing to approve the adequacy of the Disclosure Statement.

  **4.3**  <u>Disclosure Statement</u>.  The Company agrees to file the Disclosure Statement by no later than February 3, 2012 and to use reasonable best efforts to obtain approval from the Bankruptcy Court of the adequacy of the Disclosure Statement by no later than March 16, 2012.

  **4.4**  <u>Revised Organizational Documents</u>.  The Company shall amend the Company's charter, bylaws and other organization documents (collectively, "**Organizational Documents**") as of the Effective Date to include (a) restrictions on any transfers or ownership of equity of the Company or any of its direct or indirect subsidiaries that could impair the Plan Sponsor's use of all or any portion of the Tax Attributes, (b) the issuance of the Plan Sponsor Stock, and (c) the specific requirement that the commencement of any subsequent insolvency or restructuring proceeding of the Company may not occur without the consent of the holder of the Plan Sponsor Stock, which consent may be withheld in its sole discretion.  The amended Organizational Documents shall be acceptable to the Plan Sponsor in its sole discretion.

  **4.5**  <u>Board of Directors and Management of Plan Sponsor</u>.  The Company agrees not to make any changes in the board of directors or management of the Plan Sponsor for one year following the later of the Closing Date or the Effective Date.

  **4.6**  <u>Continued Operations</u>.  From and after the date of this Agreement, including after the Effective Date, the Company shall continue to operate its business in accordance with

its business judgment and in compliance with all applicable laws, rules and regulations in all material respects, and the Company shall use its reasonable best efforts to continue to maintain its good standing under the laws of the State in which it is incorporated.  On the Effective Date, the Company shall retain sufficient funds to fund the Company's anticipated reasonable operating expenses for such a period of time as the Plan Sponsor deems appropriate in its sole discretion and may not use any such retained funds for any purpose other than the payment of such operating expenses; *provided, however*, that once such funds are used up by the Company in its operations, the Plan Sponsor may (at its option) from time to time contribute additional funds to the Company to fund reasonable operating expenses of the Company for such additional periods of time as the Plan Sponsor may request in its sole discretion, and the Company shall continue to exist and operate for such periods, *provided*, that such additional funds may only be contributed with prior approval from the NYSDFS for each contribution of additional funds.

**4.7**   **Competing Transactions**.

(a)   Fiduciary Out.  Notwithstanding anything to the contrary contained herein, prior to entry of the Confirmation Order, nothing in this Agreement shall prevent the Company from terminating this Agreement pursuant to Section 7.1(c) hereof and entering into and consummating a Competing Transaction that the Company determines in an exercise of its fiduciary duties is a higher or otherwise better transaction than the transaction set forth in this Agreement; *provided*, *however*, that all required approvals for such Competing Transaction, including from NYSDFS, are received before the Company exercises the Fiduciary Out.

(b)   No Competing Transactions Post Confirmation.  The Company agrees that between entry of the Confirmation Order and the later of the Closing Date and the Effective Date, neither the Company nor any of its professionals, representatives, or agents shall, directly or indirectly:

(i)   initiate or solicit any inquiries or any proposal or offer that constitutes, or could reasonably be expected to lead to, any Competing Transaction;

(ii)   without the consent of the Plan Sponsor, which consent may be withheld in its sole discretion, encourage or respond to any inquiries or the making of any proposal or offer that constitutes, or could reasonably be expected to lead to, any Competing Transaction, or engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any non-public information or data to any person or entity relating to, any Competing Transaction;

(iii)   otherwise facilitate any effort or attempt to make a Competing Transaction; or

(iv)   enter into any Competing Transaction.

(c)   Notice.  Except as otherwise agreed to with the Plan Sponsor, in the event that, after the date hereof and notwithstanding the restrictions set forth in Section 4.7(a) and (b) hereof, the Company or any of its professionals, representatives, or agents receive any inquiries, proposals or offers with respect to a Competing Transaction, or any such information is requested from, or any discussions or negotiation regarding a Competing Transaction are sought

9

to be initiated or continued with, the Company or any of its professionals, representatives, or agents, the Company agrees that it will promptly (and, in any event, within two (2) Business Days) notify the Plan Sponsor of such, including the name of such person or entity and the material terms and conditions of any proposals or offers (including, if applicable, copies of any written requests, proposals or offers, including proposed agreements).

**4.8    Other Notices**.  The Company shall provide the Plan Sponsor notice between the date hereof and the later of the Closing Date and the Effective Date of:

(a)    the occurrence, or failure to occur, of any event of which the Company has or acquires actual knowledge, which occurrence or failure has caused or could reasonably be expected to cause (A) any representation or warranty of the Company contained in this Agreement to be untrue or inaccurate in any material respect, (B) any covenant of the Company contained in this Agreement not to be satisfied in any material respect, or (C) any condition precedent contained in the Plan or this Agreement not to occur or become impossible to satisfy;

(b)    receipt of any notice from a third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring;

(c)    receipt of any notice from any governmental body in connection with this Agreement or the transactions contemplated by the Restructuring;

(d)    receipt of any notice of any proceeding, investigation, or hearing commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the transactions contemplated by the Restructuring; and

(e)    any material failure of the Company to comply with or satisfy any covenant, condition, or agreement to be complied with or satisfied by it hereunder.

**4.9    Definitive Documents; Good Faith Cooperation; Further Assurances**.  Each Party hereby covenants and agrees to cooperate with the other Party in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation, and consummation of the Plan, as well as the negotiation, drafting, execution, and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall use its commercially reasonable efforts to take such action as may be reasonably necessary or reasonably requested by the other Party to carry out the purposes and intent of this Agreement and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.  Without limiting the generality of the foregoing, each Party shall use commercially reasonable efforts to (i) take all acts necessary to cause the conditions to the Closing to be satisfied as promptly as reasonably practicable, (ii) obtain all necessary consents of, and actions or nonactions by, any Governmental Entity or third party and make all necessary filings with, and notices to, any Governmental Entity or third party and take all reasonable steps as may be necessary to avoid a suit, action, proceeding or investigation by, any Governmental Entity or third party that is intended to, or could reasonably be expected to, prohibit, prevent or materially delay the consummation of the transactions contemplated by this Agreement or the

10

Definitive Documents, and (iii) execute and deliver any additional instruments necessary to consummate the Restructuring and the other transactions contemplated by this Agreement and the other Definitive Documents.

**4.10    Powers of Attorney**.  On or prior to the Effective Date or, in the event the Option is exercised by the Plan Sponsor, on or prior to either the Closing Date or the Effective Date, as selected by the Plan Sponsor, in its sole discretion, the Company shall, and shall cause each of its domestic subsidiaries (other than the Plan Sponsor and any subsidiary of the Plan Sponsor) to, execute and deliver to the Plan Sponsor both a power of attorney in the form attached hereto as **Exhibit D** and a U.S. Treasury Form 234.

## ARTICLE V - CLOSING

**5.1    Closing Date**.  Subject to the satisfaction of the conditions set forth in <u>Article VI</u> hereof (or the waiver thereof by the Party entitled to waive that condition) and subject to <u>Section 5.2</u> hereof, the payment of the Contribution Amount to the Company (the "**Closing**") shall take place on the Effective Date, unless another time or date, or both, are agreed to in writing by the Parties.  The date on which the Closing shall be held is referred to in this Agreement as the "**Closing Date**."

**5.2    The Option**.  The Plan Sponsor shall have the option (the "**Option**") to direct the Company to amend the Plan (which amendments shall be acceptable to the Plan Sponsor in its sole discretion) to enable the Plan Sponsor to implement a transaction, at the Plan Sponsor's sole election (the "**Supplemental Transaction**"), which may include delaying the Effective Date; *provided, however*, that the Plan Sponsor may exercise the Option only if (i) by March 1, 2012 (or such other date as the NYSDFS determines in its sole discretion), the NYSDFS has issued all necessary approvals (or appropriate non-disapprovals have occurred, as the case may be) for the Supplemental Transaction, and (ii) each holder of an Allowed Claim would, under the proposed amended Plan, receive cash distributions on account of its Allowed Claim in a form and manner no different than, in an amount no less than, and at a time no later than, such holder would have received cash distributions under the Plan had the Option not been exercised.  In the event the Plan Sponsor exercises the Option in accordance with the preceding sentence, (x) the Company shall cooperate with the Plan Sponsor to implement the Supplemental Transaction, including taking such actions, if any (at Plan Sponsor's sole expense), as are reasonably requested in writing by the Plan Sponsor to consummate such Supplemental Transaction, and (y) subject to the satisfaction or waiver of the conditions set forth in <u>Sections 6.1 and 6.3</u> hereof, the Closing shall occur upon the Confirmation Order becoming a Final Order, unless another time or date, or both, are agreed to in writing by the Parties.

## ARTICLE VI - CONDITIONS TO CLOSING

**6.1    Conditions Precedent to Obligations of Plan Sponsor**.  The obligation of the Plan Sponsor to pay the Contribution Amount as provided in this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by the Plan Sponsor in its sole discretion in whole or in part to the extent permitted by applicable law):

(a)    the representations and warranties of the Company set forth in this Agreement shall be true and correct at and as of the Closing Date (as if given as of the Closing Date), except to the extent such representations and warranties expressly relate to an earlier date in which case such representations and warranties shall be true and correct on and as of such earlier date, and the Plan Sponsor shall have received a certificate signed by a senior executive officer of the Company, dated the Closing Date, to the foregoing effect;

(b)    the Company shall have performed and complied in all material respects with all covenants, obligations and agreements required by this Agreement to be performed or complied with by the Company on or prior to the Closing Date, and the Plan Sponsor shall have received a certificate signed by a senior executive officer of the Company, dated the Closing Date, to the foregoing effect;

(c)    the Bankruptcy Court shall have entered the Final Claims Trading Order, which order shall have become a Final Order and be in form and substance acceptable to the Plan Sponsor in its sole discretion;

(d)    the Bankruptcy Court shall have approved this Agreement and authorized the Company to enter into it and perform its obligations in accordance herewith in an order which shall have become a Final Order and be in form and substance acceptable to the Plan Sponsor in its sole discretion;

(e)    the Bankruptcy Court shall have entered an order approving the Company's assumption of the Amended TAA and the Company shall have assumed the Amended TAA, in both instances in form and substance acceptable to the Plan Sponsor in its sole discretion, and such order shall have become a Final Order;

(f)    the Bankruptcy Court shall have entered the Confirmation Order that is acceptable to the Plan Sponsor in its sole discretion, and such order shall have become a Final Order; and

(g)    all other consents and approvals of, or registrations, declarations or filings with, or expirations of waiting periods imposed by, any Governmental Entity, that are necessary for consummation of the transactions contemplated hereby (including the Supplemental Transaction if the Plan Sponsor exercises the Option in accordance with Section 5.2 hereof) shall have been obtained or filed or shall have occurred, shall be in full and effect, and shall be in form and substance acceptable to the Plan Sponsor in its sole discretion.

**6.2    Conditions Precedent to Obligations of the Company**.  The obligation of the Company to assume the Amended TAA and issue the Plan Sponsor Stock as provided in this

Agreement is subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by the Company in its sole discretion in whole or in part to the extent permitted by applicable law):

(a)     the representations and warranties of the Plan Sponsor set forth in this Agreement shall be true and correct at and as of the Closing Date (as if given as of the Closing Date), except to the extent such representations and warranties expressly relate to an earlier date in which case such representations and warranties shall be true and correct on and as of such earlier date, and the Company shall have received a certificate signed by a senior executive officer of the Plan Sponsor, dated the Closing Date, to the foregoing effect;

(b)     the Plan Sponsor shall have performed and complied in all material respects with all covenants, obligations and agreements required by this Agreement to be performed or complied with by the Plan Sponsor on or prior to the Closing Date, and the Company shall have received a certificate signed by a senior executive officer of the Plan Sponsor, dated the Closing Date, to the foregoing effect;

(c)     the Bankruptcy Court shall have approved this Agreement and authorized the Company to enter into it and perform its obligations in accordance herewith in an order which shall be in form and substance acceptable to the Plan Sponsor in its sole discretion;

(d)     the Bankruptcy Court shall have entered an order approving the Company's assumption of the Amended TAA and the Company shall have assumed the Amended TAA, and such order shall be in form and substance acceptable to the Plan Sponsor in its sole discretion; and

(e)     the Bankruptcy Court shall have entered the Confirmation Order and such order shall be in form and substance acceptable to the Plan Sponsor in its sole discretion.

**6.3     Conditions Precedent to Obligations of Plan Sponsor and the Company**.  The respective obligations of the Plan Sponsor to pay the Contribution Amount as provided in this Agreement and of the Company to assume the Amended TAA and issue the Plan Sponsor Stock as provided in this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by the Plan Sponsor in its sole discretion in whole or in part to the extent permitted by applicable law):

(a)     there shall not be in effect any order by a governmental body of competent jurisdiction or other legal restraint or prohibition preventing, restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or causing the transactions contemplated by this Agreement to be rescinded following consummation; and

(b)     all conditions precedent to effectiveness of the Plan have either been satisfied or waived in accordance with the terms of the Plan; *provided, that*, any conditions precedent that are intended to occur simultaneously with the effectiveness of this Agreement shall occur simultaneously with the effectiveness of this Agreement.

**6.4     Frustration of Closing Conditions**.  Neither the Company nor the Plan Sponsor may rely on the failure of any condition set forth in Section 6.1, Section 6.2 or Section 6.3, as the

case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE VII - TERMINATION

7.1    **Termination by the Company**.  This Agreement may be terminated by the Company at any time after the occurrence of any of the following events (each, a "**Company Termination Event**") by delivering a written notice of such termination to the Plan Sponsor:

(a)    The breach by the Plan Sponsor of any covenant or any other obligation of the Plan Sponsor set forth in this Agreement in any material respect, and, to the extent subject to cure, such breach remains uncured for a period of three (3) Business Days following the Plan Sponsor's receipt from the Company of notice of such breach;

(b)    Any representation or warranty in this Agreement made by the Plan Sponsor shall have been untrue in any material respect when made or shall have become untrue in any material respect, and, to the extent subject to cure, such breach remains uncured for a period of three (3) Business Days following the Plan Sponsor's receipt from the Company of notice of such breach; or

(c)    The Company's exercise of the Fiduciary Out set forth in Section 4.7(a).

The Company may, in its sole discretion, waive any Company Termination Event.

7.2    **Termination by the Plan Sponsor**.  This Agreement may be terminated by the Plan Sponsor at any time after the occurrence of any of the following events (each, a "**Plan Sponsor Termination Event**") by delivering a written notice of such termination to the Company:

(a)    The breach by the Company of any covenant or any other obligation of the Company set forth in this Agreement in any material respect, and, to the extent subject to cure, such breach remains uncured for a period of three (3) Business Days following the Company's receipt from the Plan Sponsor of notice of such breach;

(b)    Any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, and, to the extent subject to cure, such breach remains uncured for a period of three (3) Business Days following the Company's receipt from the Plan Sponsor of notice of such breach;

(c)    Any material term or condition of any Definitive Documents that are filed with the Bankruptcy Court shall be (whether due to an order of the Bankruptcy Court or otherwise) different and adverse to the Plan Sponsor than as contemplated by this Agreement and the Amended TAA, and, to the extent subject to cure, such event remains unremedied for a period of three (3) Business Days following the Company's receipt from the Plan Sponsor of notice of such event;

14

(d)    The NYSDFS disapproves any of the transactions contemplated in this Agreement; *provided, however*, that disapproval of the Supplemental Transaction shall not be a Plan Sponsor Termination Event;

(e)    The Company agrees to enter into a Competing Transaction;

(f)    The Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Case to a case under chapter 7, or (C) dismissing the Chapter 11 Case;

(g)    The Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a chapter 11 plan;

(h)    The Company fails to file the Final Claims Trading Order with the Bankruptcy Court by February 3, 2012;

(i)    The Company fails to file the Plan with the Bankruptcy Court by February 3, 2012;

(j)    The Company fails to file the Disclosure Statement with the Bankruptcy Court by February 3, 2012;

(k)    The Company modifies, amends, revokes or withdraws the Plan without the consent of the Plan Sponsor (which consent may be withheld in the Plan Sponsor's sole discretion);

(l)    The Bankruptcy Court does not enter the Disclosure Statement Order by March 16, 2012;

(m)    The Company fails to commence solicitation of votes on the Plan by April 3, 2012;

(n)    The Bankruptcy Court does not enter the Confirmation Order by April 27, 2012; or

(o)    The earlier of the Closing Date and the Effective Date does not occur on or before May 14, 2012.

The Plan Sponsor may, in its sole discretion, waive or extend any Plan Sponsor Termination Event.

**7.3    Effect of Termination.**

(a)    In the event of termination of this Agreement pursuant to this Article VII, and except as provided in Section 8.1, this Agreement shall become void and of no further force or effect and each Party shall be immediately released from all liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether

15

with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement; *provided, however*, that in no event shall any such termination relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

(b)     If the transactions contemplated herein are not consummated following the date of termination of this Agreement, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce this Agreement.

**7.4     Automatic Stay**.  The Company acknowledges and agrees that the giving notice of termination by the Plan Sponsor pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

## ARTICLE VIII - MISCELLANEOUS

**8.1     Survival**.

(a)     None of the representations and warranties contained in this Agreement shall survive the Effective Date.

(b)     Notwithstanding the termination of this Agreement pursuant to Article VII hereof, the covenants, agreements, and obligations of the Parties set forth in this Article VIII hereof shall survive any such termination and shall be enforceable hereunder.

**8.2     Expenses**.  Each of the Company and the Plan Sponsor shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby.

**8.3     Remedies**.  The Parties agree that irreparable harm would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached and that the other Party would not have an adequate remedy at law.  It is accordingly agreed as follows:

(a)     Each Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys fees and costs) to prevent breaches and threatened breaches of this Agreement and to enforce specifically the provisions of this Agreement, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring the Company to comply promptly with any of its obligations hereunder.

(b)     The rights of each Party set forth in this Section 8.3 shall be in addition to any other rights which such Party may have at law or in equity.

16

(c)     Each Party hereby agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by such Party and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement.

8.4     **Governing Law**.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the choice of law principles of such state that would require or permit the application of the laws of another jurisdiction.

8.5     **Submission to Jurisdiction**.  The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby; *provided, however*, that any claims, actions or disputes that may arise or result from, or be connected with, the Amended TAA shall be subject to and governed by the jurisdictional provisions set forth in the Amended TAA.

8.6     **Consent to Service of Process**. Each of the Parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 8.13.

8.7     **Waiver of Right to Trial by Jury**.  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS IN THIS SECTION.

8.8     **Entire Agreement**.  This Agreement (including the schedules and exhibits hereto) represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and shall supersede all prior understandings and proposals, whether written or oral, relating to any of such matters contemplated herein.

8.9     **Amendments and Waivers**.  Except as set forth in this Agreement, this Agreement, including any schedules or exhibits hereto, may not be modified, amended, supplemented or changed, and any provision hereof may not be waived or extended, without a writing signed by both Parties.   The waiver by any Party hereto of a breach of any provision of this Agreement or a Termination Event shall not operate or be construed as a further or continuing waiver of such breach or Termination Event or as a waiver of any other or subsequent breach or Termination Event.  No failure on the part of any Party to exercise, and no delay in

17

exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

**8.10**   **Severability**.  If any provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**8.11**   **Binding Effect; Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement.  No assignment or delegation of this Agreement or of any rights or obligations hereunder may be made by either the Company or the Plan Sponsor without the prior written consent of the other Party and any attempted assignment or delegation without the required consent shall be void.  No assignment or delegation of any obligations hereunder shall relieve the Parties hereto of any such obligations.  Upon any such permitted assignment or delegation, the references in this Agreement to the Company and Plan Sponsor shall also apply to any such assignee or delegatee unless the context otherwise requires.

**8.12**   **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**8.13**   **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (with written confirmation of transmission) or (c) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other party pursuant to this provision):

If to the Company, to:

FGIC CORPORATION
125 Park Avenue
New York, NY 10017
Facsimile:  (212) 312-3093
Attention: Carolanne Gardner (carolanne.gardner@fgic.com)


With a copy (which shall not constitute notice) to:

18

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Facsimile:  (312) 862-2200
Attn.:   Patrick J. Nash, Jr., Esq.  (patrick.nash@kirkland.com)


If to the Plan Sponsor, to:

FINANCIAL GUARANTY INSURANCE COMPANY
125 Park Avenue
New York, NY 10017
Facsimile:  (212) 312-3221
Attention: A. Edward Turi, III   (edward.turi@fgic.com)


With a copy (which shall not constitute notice) to:

Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, New York,  10019
Facsimile:  (212) 474-3700
Attention:  Richard Levin (rlevin@cravath.com)


[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

FGIC CORPORATION

By: _____
     Name:  John S. Dubel
     Title:  Chief Executive Officer


FINANCIAL GUARANTY INSURANCE COMPANY

By: _____
     Name:  Nick Santoro
     Title:  Senior V.P. & Chief Financial Officer

# EXHIBIT A

**Amended TAA**

# AMENDED AND RESTATED
# INCOME TAX ALLOCATION AGREEMENT

Amended and Restated Income Tax Allocation Agreement (the "Agreement"), dated as of [ • ], 2012, by and among FGIC Corporation, a Delaware corporation ("Corp"), Financial Guaranty Insurance Company, a New York corporation ("FGIC"), FGIC Credit Products LLC, a Delaware limited liability company, FGIC Credit Products II LLC, a Delaware limited liability company, Grand Central Assurance Corporation, a New York corporation, and GCAC Credit Products LLC, a Delaware limited liability company.

WHEREAS, Corp and its direct and indirect domestic subsidiaries, including FGIC, are currently members of an Affiliated Group (as defined below), of which Corp is the common parent corporation;

WHEREAS, FGIC directly and indirectly owns substantially all of the assets related to the Affiliated Group's historic financial guaranty insurance business, which provided credit enhancement to policyholders through insurance policies issued by FGIC and other members of the FGIC Group (as defined below) in respect of public finance, structured and other financial obligations, including credit default swaps;

WHEREAS, Corp and FGIC are parties to that certain Amended and Restated Income Tax Allocation Agreement dated December 18, 2003, in effect on the date hereof (the "Existing Agreement"); and

WHEREAS, the parties desire to amend and restate the Existing Agreement in the manner set forth herein to be effective on and as of the date hereof;

NOW THEREFORE, in consideration of the premises set forth above and the terms and conditions set forth below, the parties hereto agree as follows:

**Section 1.     Definitions.**  For purposes of this Agreement, the following definitions shall apply:

(a)     "Adjustment" shall mean any proposed or final change in the Income Tax liability of a taxpayer.

(b)     "Affiliated Group" shall mean an affiliated group of corporations within the meaning of Section 1504(a) of the Code.

(c)     "Chapter 11 Case" shall mean the voluntary case Corp commenced under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York, Case No. 10-14215 (SMB).

(d)     "Charter" shall mean [ • ], as amended from time to time.

(e)     "Code" shall mean the Internal Revenue Code of 1986, as amended.

(f)    "Corp Group" shall mean Corp and its Subsidiaries, excluding, however, any member of the FGIC Group.

(g)    "Corp Affiliated Group" shall mean the Affiliated Group of which Corp is the common parent corporation and which includes at least one member of the Corp Group and at least one member of the FGIC Group.

(h)    "Escrow Account" has the meaning set forth in Section 2(e).

(i)    "Estimated Income Tax Payments" has the meaning set forth in Section 2(a).

(j)    "Existing Agreement" has the meaning set forth in the Recitals.

(k)    "FGIC Group" shall mean FGIC and its Subsidiaries.

(l)    "FGIC-Prepared Return" has the meaning set forth in Section 3.

(m)    "FGIC Shares" shall mean any and all capital stock or equity of FGIC owned by Corp.

(n)    "Final Determination" shall mean the final resolution of any Tax matter, including a closing agreement with the IRS or the relevant state, local or foreign taxing authority, a claim for refund that has been allowed, a deficiency notice with respect to which the period for filing a petition with the Tax Court or the relevant state, local or foreign tribunal has expired, or a decision of any court of competent jurisdiction that is not subject to appeal or as to which the time for appeal has expired.

(o)    "Income Taxes" shall mean all Taxes imposed on or measured in whole or in part by income, capital or net worth or a taxable base in the nature of income, capital or net worth, and shall include any addition to Tax, additional amount, interest and penalty imposed with respect to such Taxes.

(p)    "Income Tax Return" shall mean any Tax Return with respect to Income Taxes.

(q)    "IRS" shall mean the United States Internal Revenue Service or any successor thereto, including its agents, representatives, and attorneys.

(r)    "Losses" has the meaning set forth in Section 2(c).

(s)    "person" shall mean an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

(t)    "Separate Income Tax Liability" has the meaning set forth in Section 2(b).

(u)    "Straddle Period" has the meaning set forth in Section 2(a).

2

(v)     "Subsidiary" shall mean, with respect to any person, any corporation or other organization, whether incorporated or unincorporated, of which (i) such person or any Subsidiary of such person is a general partner or (ii) at least 50% of the securities or other interests having by their terms ordinary voting power to elect a majority of the Board of Directors or others performing similar functions with respect to such corporation or other organization or at least 50% of the value of the outstanding equity is directly or indirectly owned or controlled by such person or by any one or more of its Subsidiaries, or by such person and one or more of its Subsidiaries.

(w)     "Taxes" shall mean all federal, state, local, foreign or other governmental taxes, assessments, duties, fees, levies or similar charges of any kind, including all income, profits, franchise, excise, property, use, intangibles, sales, value-added, ad valorem, payroll, employment, withholding, estimated and other taxes of any kind whatsoever whether disputed or not, and including all additions to tax, additional amounts, interest and penalties imposed with respect to such amounts.

(x)     "Tax Attribute" shall mean Losses, deferred deductions, tax basis in assets and any other tax attribute.

(y)     "Tax Benefit" shall mean a reduction in the Tax liability of a taxpayer (or of the Affiliated Group of which it is a member) for any Taxable Period (computed on a with-and-without basis).

(z)     "Tax Benefit Realization Payment" has the meaning set forth in Section 2(c).

(aa)     "Tax Controversy" shall mean any examination, audit, claim, dispute, litigation, proposed settlement, proposed Adjustment or related matter with respect to Income Taxes.

(bb)     "Taxable Period" shall mean any taxable year or portion thereof.

(cc)     "Tax Return" shall mean any return, report, form or other information filed or required to be filed with any taxing authority with respect to Taxes.

**Section 2.     Tax Payments**

(a)     Estimated Income Tax Payments.  If any member of the FGIC Group joins any member of the Corp Group in filing an Income Tax Return on a consolidated, combined or unitary basis for any Taxable Period ending after the date hereof, FGIC shall pay, or cause to be paid, to Corp the lesser of (i) the amount of estimated Income Taxes incurred and owing by the Corp Affiliated Group (or, if applicable, any comparable group for state or local Income Tax purposes) in respect of any such Tax Return, and (ii) the amount of estimated Income Taxes that would have been incurred by the FGIC Group and its members had the FGIC Group and its members not filed any such Tax Return on a consolidated, combined or unitary basis with the Corp Group during such period (such payments by FGIC, "Estimated Income Tax Payments"). For any Taxable Period that begins prior to and ends after the date hereof (a "Straddle Period"), the parties' obligations under this Section 2 shall be determined based on the assumption that this

3

Agreement was in effect for the entire Straddle Period, and payments to and from the parties shall be adjusted to account for payments made, if any, prior to the date hereof.  For purposes of determining the amount of a member of the FGIC Group's Estimated Income Tax Payments, to the extent that such member would be entitled to file an Income Tax Return on a consolidated, combined or unitary basis with any other member of the FGIC Group, Estimated Income Tax Payments are determined as though such members filed on a consolidated, combined or unitary basis.

(b)     Additional Income Tax Payments.  For each Taxable Period ending after the date hereof, if the amount of Income Taxes incurred and owing by the Corp Affiliated Group (or, if applicable, any comparable group for state or local Income Tax purposes) in respect of any Income Tax Return that the Corp Group and its members filed on a consolidated, combined or unitary basis with the FGIC Group and its members exceeds the aggregate amount of payments made by FGIC to Corp pursuant to Section 2(a), FGIC shall pay the amount of such excess to Corp; provided that, the amount paid pursuant to this Section 2(b) shall in no event exceed the amount determined by subtracting (i) the aggregate amount of payments made by FGIC to Corp pursuant to Section 2(a) for such period from (ii) the amount of Income Taxes that would have been incurred by the FGIC Group and its members for such period had the FGIC Group and its members not filed any Income Tax Return on a consolidated, combined or unitary basis with the Corp Group during all relevant periods (the liability under this clause (ii), "Separate Income Tax Liability").  For purposes of determining the amount of a member of the FGIC Group's Separate Income Tax Liability, to the extent that such member would be entitled to file an Income Tax Return on a consolidated, combined or unitary basis with any other member of the FGIC Group, the Separate Income Tax Liability is determined as though such members filed on a consolidated, combined or unitary basis.

(c)     Corp Reimbursement to FGIC.  To the extent that the Corp Group utilizes for any Taxable Period any credits, losses or deductions (including foreign tax credits, alternative minimum tax credits, net operating losses or net capital losses) (collectively, "Losses") that were generated (at any time, including prior to such Taxable Period) by, derive from or are attributable to a member of the FGIC Group (other than any such Losses that are reduced under Treasury Regulation Section 1.1502-28 as a result of cancellation of indebtedness income generated as a result of the chapter 11 plan that is implemented in connection with the Chapter 11 Case), and such utilization results in a Tax Benefit being realized by the Corp Group (treating any Tax Attributes generated by, deriving from or attributable to the FGIC Group as utilized prior to the utilization of any Tax Attributes generated by, deriving from or attributable to the Corp Group), then Corp shall pay to FGIC the amount of such Tax Benefit at the time of filing of the Tax Return reflecting the realization of the Tax Benefit ("Tax Benefit Realization Payment") and such Losses for which Corp has paid FGIC shall not be treated as utilizable by any member of the FGIC Group for purposes of computing such member's Estimated Income Tax Payments or Separate Income Tax Liability.  Furthermore, to the extent that the aggregate amount of payments made by FGIC to Corp pursuant to Section 2(a) for a Taxable Period exceeds the FGIC Group's and any of its member's Separate Income Tax Liability for such period, Corp shall pay to FGIC the amount of any such excess.

(d)     Reports, Payments and Procedures.  For each Taxable Period ending after the date hereof, including any Straddle Period, FGIC shall prepare and deliver to Corp a schedule

4

showing in reasonable detail FGIC's calculation of any Estimated Income Tax Payments or Separate Income Tax Liability, as the case may be, and, subject to Section 8, (i) FGIC shall pay to Corp the amount of any Estimated Income Tax Payments shown on such schedule no later than five (5) days before the date that the corresponding estimated Income Tax payments would have been due and payable had the member of the FGIC Group with respect to which such Estimated Income Tax Payments are determined not filed an Income Tax Return on a consolidated, combined or unitary basis with any member of the Corp Group, and (ii) payments between Corp and FGIC required pursuant to Section 2(b) or (c) hereof (other than Tax Benefit Realization Payments, which are subject to Section 2(c) above) shall be made, based on such schedule, no later than five (5) days before the due date of the Income Tax Return for the Taxable Period for which such payments are due.  Except as otherwise provided herein, all indemnification or other payments to be made pursuant to this Agreement shall be made within fifteen (15) days after written notice of a request for indemnification or payment by the indemnified party, which notice shall be accompanied by evidence and a computation of the amount due.

(e)    Escrow Account.  Prior to the earlier of Corp's receipt of any payment from FGIC pursuant to this Agreement or Corp's receipt of any refund of Income Taxes, the parties shall establish an escrow account for the purpose of segregating and protecting funds transferred by, for the benefit of, or owing to FGIC pursuant to this Agreement (the "Escrow Account").  Any payment received by Corp from FGIC pursuant to this Agreement or as a refund of Income Taxes from a taxing authority shall be deposited directly into the Escrow Account.  Funds so deposited in the Escrow Account shall be held in trust for the benefit of FGIC and must remain on deposit within such account, and shall not be accessed by or available generally for use by Corp or its creditors or shareholders.  Notwithstanding the previous sentence, Corp shall use such funds to make payments (i) as required hereunder directly to such taxing authority but only to the extent necessary to satisfy an Income Tax Liability reported on an Income Tax Return of Corp that is filed on a consolidated, combined or unitary basis and that includes a member of the FGIC Group or (ii) to FGIC pursuant to Corp's obligations hereunder.

(f)    Late Payments.  If any payments required to be made pursuant to this Agreement (including Estimated Income Tax Payments) are not made when due, such payments shall bear interest at the prevailing federal short-term interest rate as determined under Section 6621 of the Code.

(g)    Adjustments.  If there is an Adjustment as a result of a Final Determination that would have the effect of increasing or decreasing a member of the FGIC Group's Separate Income Tax Liability for any Taxable Period ending after the date hereof (including a Straddle Period), then FGIC shall pay to Corp the amount of any such increase in Separate Income Tax Liability, capped however at an amount equal to the increased Income Tax Liability incurred and owing by the Corp Affiliated Group as a result of such Adjustment, and Corp shall pay to FGIC the amount of any such decrease in Separate Income Tax Liability.  If, as a result of a Final Determination, there is an Adjustment to any Loss generated by, deriving from or attributable to the FGIC Group that resulted in a payment of a Tax Benefit Realization Payment by Corp to FGIC pursuant to Section 2(c) of this Agreement, and such Adjustment, if it had been taken into account when the amount of such payment had been calculated, would have had the effect of increasing or decreasing the amount of such Tax Benefit Realization Payment

5

(as applicable), then FGIC shall pay to Corp the amount of any such decrease in such Tax Benefit Realization Payment and Corp shall pay to FGIC the amount of any such increase in such Tax Benefit Realization Payment, in each case, net of any reasonable out of pocket costs incurred by the recipient of such payment.

        (h)      <u>FGIC Group Losses and Refunds</u>.  The parties acknowledge and agree that, as of the date hereof, the members of the FGIC Group have generated net operating losses for U.S. federal Income Tax purposes in the amount of $[ • ] and alternative minimum tax net operating losses for U.S. federal Income Tax purposes in the amount of $[ • ], and such losses are attributable, and properly allocable in their entirety, to the FGIC Group under the Code and applicable regulations.  Such net operating losses and any other Tax Attributes generated (whether prior to, on or after the date hereof) by, deriving from or attributable to any member of the FGIC Group shall be and will remain the sole property of such member.  Any refund of Income Tax received or receivable (or any Income Tax credit in lieu thereof) from a taxing authority by any member of the Corp Group with respect to any Income Tax Return of such member shall be the sole property of FGIC to the extent such refund (or credit) is attributable to a Tax Attribute generated by, deriving from or attributable to a member of the FGIC Group (treating any Tax Attributes generated by, deriving from or attributable to the FGIC Group as utilized prior to the utilization of any Tax Attributes generated by, deriving from or attributable to the Corp Group), and shall not be property of any member of the Corp Group (regardless of whether the FGIC Group paid the Income Tax to be refunded or whether the FGIC Group generated the income related to the Income Tax to be refunded).  Any member of the Corp Group that receives such a refund of Income Tax shall be treated as receiving such refund of Income Tax as an agent of FGIC (as principal) and shall as promptly as practicable pay such refund over to FGIC as the owner thereof, and nothing in this Agreement shall be deemed to create a debtor-creditor relationship between the parties in respect of any such refund of Income Tax.

**Section 3.**      <u>**Return Preparation**</u>

Without limiting the generality of Section 6(c), FGIC shall prepare or cause to be prepared, and FGIC shall file, cause to be filed or, if requested by FGIC, Corp shall file, on behalf of the Corp Group and at FGIC's expense (or at Corp's expense to the extent that such expense is attributable to the preparation and filing of a separate Income Tax Return of a member of the Corp Group), any Income Tax Return, amended Income Tax Return or request for a refund of Income Tax (in each case with respect to any Taxable Period) (i) required to be filed by any member of the Corp Group or (ii) that FGIC otherwise deems appropriate for any member of the Corp Group to file (any such return or request described in clause (i) or (ii), a "<u>FGIC-Prepared Return</u>").  As directed by FGIC, Corp shall promptly execute and file, or cause to be executed and filed, any FGIC-Prepared Return submitted by FGIC to Corp for execution and filing.  Corp shall not file any Income Tax Return or amended Income Tax Return, or request any refund of Income Tax for any Taxable Period, without FGIC's prior written consent (which consent may be withheld in its sole discretion).

### Section 4.    <u>Audits</u>

If Corp receives notice from a taxing authority of any Tax Controversy (irrespective of whether such Tax Controversy is expected to affect any member of the FGIC Group's liability for Income Taxes by operation of law or pursuant to this Agreement), Corp shall notify FGIC in writing within two (2) business days following receipt of such notice.  FGIC shall, at FGIC's expense (or at Corp's expense to the extent that such expense is attributable to a Tax Controversy regarding a separate Income Tax Return of a member of the Corp Group), have the sole right to control, conduct, compromise and settle any such Tax Controversy.

### Section 5.    <u>Negative Covenants</u>

(a)    Notwithstanding anything in this Agreement to the contrary, Corp shall not, without the prior written consent of FGIC (which consent may be withheld in FGIC's sole discretion), take any action that could (as determined by FGIC in its sole discretion):

- impair or otherwise interfere with the ability to utilize all or any portion of the Tax Attributes generated by, deriving from or attributable to any member of the Corp Affiliated Group to offset income or gain of FGIC or any member of the FGIC Group;
- result in the application of Treasury Regulation Section 1.1502-36 or in any reduction or reattribution of all or any portion of the Tax Attributes generated by, deriving from or attributable to any member of the Corp Affiliated Group under Treasury Regulation Section 1.1502-36;
- result in a limitation on all or any portion of the Tax Attributes generated by, deriving from or attributable to any member of the Corp Affiliated Group under Section 382 of the Code; or
- result in a deconsolidation of FGIC from the Corp Affiliated Group for U.S. federal or any state or local Income Tax purposes.

(b)    Without limiting the generality of Section 5(a), Corp shall not, directly or indirectly, without the prior written consent of FGIC (which consent may be withheld in its sole discretion), do or seek to do any of the following:

- sell, abandon or transfer legal title to, a beneficial interest in, or the voting power of any FGIC Shares or otherwise dispose of any FGIC Shares (including any "transfer" within the meaning of Treasury Regulation Section 1.1502-36(f)(10) or any "disposition" within the meaning of Treasury Regulation Section 1.382-2T(e)(1)(i)(A));
- make any election to reattribute all or any portion of the Tax Attributes generated by, deriving from or attributable to any member of the Corp Affiliated Group under Treasury Regulation Section 1.1502-36 or otherwise take any step that could reduce or impair the ability to offset taxable income or gain of the FGIC Group or any of its members with such Tax Attributes;
- claim a worthless stock loss for U.S. federal Income Tax purposes in respect of the FGIC Shares pursuant to Section 165(g) of the Code;
- issue any shares of capital stock, equity or other securities of Corp;
- issue any options or other instruments convertible into shares of capital stock or equity of Corp (including an "option" as it is defined for the purposes of Section 382 of the Code or as it is defined in Treasury Regulation Section 1.1504-4(d)(1));

7

- redeem, accept as a contribution to capital, or accept (or otherwise recognize) any abandonment of capital stock or equity of Corp;
- recapitalize the capital stock or equity of Corp, alter the rights of holders of Corp capital stock or equity or otherwise amend the Charter for any purpose;
- participate in any transaction that could be treated as an "equity structure shift" under Treasury Regulation Section 1.382-2T(e)(2), including a reorganization within the meaning of Section 368 of the Code;
- recognize any action by holders of shares of capital stock of Corp that would violate the Charter;
- effect a liquidation of Corp (including a liquidation as it is understood for U.S. federal Income Tax purposes); or
- convert, directly or indirectly, Corp into a different entity.

**Section 6.**     **Cooperation**

(a)     Tax Information.

(1)     Corp shall, and shall cause each member of the Corp Group to, cooperate with FGIC in the filing of any FGIC-Prepared Return or in the conduct of any Tax Controversy by maintaining its books and records and providing on a timely basis any information as may be necessary or useful in the filing of such Tax Returns or the conduct of such Tax Controversies and executing any documents (including any power of attorney or IRS Form 8302), providing any further information, and taking any actions that FGIC may request in connection therewith.

(2)     If any member of the Corp Group fails to provide any information requested pursuant to this Section 6 on a timely basis, then FGIC shall have the right to engage an independent certified public accountant of its choice to gather such information.  Corp agrees to permit (and to cause the other members of the Corp Group to permit) any such independent certified public accountant full access to all Income Tax Return and other relevant information in the possession of any member of the Corp Group during reasonable business hours, and to reimburse or pay directly all reasonable costs and expenses incurred in connection with the engagement of such independent certified public accountant.

(3)     If any member of the Corp Group supplies information to a member of the FGIC Group in connection with the preparation of any FGIC-Prepared Tax Return or in connection with the conduct of any Tax Controversy and an officer of the requesting party signs a statement or other document under penalties of perjury in reliance upon the accuracy of such information, then a duly authorized officer of the party supplying such information shall certify, under penalties of perjury, the accuracy and completeness of the information so supplied.  Corp shall indemnify and hold harmless each member of the FGIC Group and its respective officers and employees, and FGIC shall indemnify and hold harmless each member of the Corp Group and its respective officers and employees, against any cost, fine, penalty, or other expenses of any kind attributable to a member of the Corp Group supplying a member of the FGIC Group, or a member of the FGIC Group supplying a member of the Corp Group, as the case may be, with inaccurate or incomplete information in connection with the

8

preparation of any FGIC-Prepared Return or in connection with the conduct of any Tax Controversy.

      (b)    <u>Other Cooperation</u>.

      (1)    Whenever any member of the Corp Group or the FGIC Group learns of a breach or a violation of any obligation or provision contained in this Agreement, or receives in writing from any taxing authority notice of an Adjustment that may give rise to a payment under this Agreement, Corp shall give written notice to FGIC, or FGIC shall give written notice to Corp, as applicable, within two (2) days of becoming aware of such breach, violation, or receipt, but if a response to the IRS or any other taxing authority is required in connection with any such event described above, notice shall be given no less than ten (10) days before such response is required (if earlier than two (2) days after becoming aware).

      (2)    FGIC may consult with Corp, and Corp agrees to cooperate with FGIC in the negotiation, settlement, or litigation of any liability for Income Taxes of any member of the FGIC Group.

      (c)    <u>Agent</u>.

Each member of the Corp Group hereby appoints FGIC for any Taxable Period as its agent for the purpose of preparing and filing any Income Tax Return of such member (whether or not such Income Tax Return is filed on a consolidated, combined or unitary basis with any member of the FGIC Group), for the purpose of representing such member in the course of any Tax Controversy as set forth in Section 4, and for making any election or application or taking any action in connection with any of the foregoing on behalf of any member of the Corp Group.  Each member of the Corp Group hereby consents to the preparation and filing of such FGIC-Prepared Return and to the making of any elections and applications as set forth above.  Any election made by any member of the FGIC Group with respect to an Income Tax Return of such member filed on a consolidated, combined or unitary basis with any member of the Corp Group shall govern the determination of the Separate Income Tax Liability and Estimated Income Tax Payments of the relevant members of the FGIC Group.

### Section 7.   <u>Retention of Records</u>

      (a)    Corp and FGIC agree to retain, and to cause each member of the Corp Group and the FGIC Group to retain, any records that may affect the determination of the Separate Income Tax Liability of any member of the FGIC Group, or the Income Tax liability of any member of the FGIC Group that files on a consolidated, combined or unitary basis with any member of the Corp Group, until the earlier of (i) such time as there has been a Final Determination with respect thereto or (ii) the expiration of the applicable statute of limitations (taking into account any extensions or tolling thereof).

      (b)    Any member of the Corp Group or FGIC Group intending to destroy any materials, records, or documents relating to, or that could reasonably be expected to affect in any manner, Income Taxes of any member of the Corp Affiliated Group shall provide FGIC or Corp, respectively, with ninety (90) days advance notice and the opportunity to copy or take possession of such materials, records and documents.

### Section 8.    Resolution of Disputes

Any dispute concerning the calculation or basis of determination of any payment provided for hereunder shall be resolved by the independent certified public accountants for FGIC, whose judgment shall be conclusive and binding upon the parties.

### Section 9.    Miscellaneous

(a)    Term of the Agreement.  This Agreement shall become effective as of the date of its execution and shall continue in full force and effect indefinitely.

(b)    Specific Performance.  The parties hereto agree that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties hereto shall be entitled to equitable relief, including in the form of an injunction or injunctions, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in an appropriate court of competent jurisdiction, this being in addition to any other remedy to which any party is entitled at law or in equity.  The parties hereto further agree (i) to cooperate fully in any attempt by the other party in obtaining any such equitable remedy, (ii) to waive any requirement for the security or posting of any bond in connection with any such equitable remedy and (iii) not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to law or inequitable for any reason, or to assert that a remedy of monetary damages would provide an adequate remedy.  The parties hereto acknowledge and agree that the right of specific enforcement is an integral part of the transactions contemplated by this Agreement and without that right, the parties hereto would not have entered into this Agreement.

(c)    Severability.  If any term, provision, covenant, or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the terms, provisions, covenants, and restrictions set forth herein shall remain in full force and effect, and shall in no way be affected, impaired, or invalidated.  It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants, and restrictions without including any of such which may be hereafter declared invalid, void, or unenforceable.  In the event that any such term, provision, covenant, or restriction is held to be invalid, void, or unenforceable, or performance of any provision of this Agreement or any transaction contemplated hereby becomes impracticable or impossible due to a change in applicable law, its interpretation by any court of law or other governing body or otherwise, the parties hereto shall use their best efforts to find and employ an alternate means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant, restriction, or provision.

(d)    Assignment.  This Agreement shall not be assignable, in whole or in part, directly or indirectly, by any party hereto without the advance written consent of the other parties (which consent may be withheld in their respective sole discretion); and any attempt to assign any rights or obligations arising under this Agreement without such consent shall be void; provided, however, that the provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns.

(e)    <u>Further Assurances</u>.  Subject to the provisions hereof, the parties hereto shall make, execute, acknowledge, and deliver such other instruments and documents, and take all such other actions, as may be reasonably required in order to effectuate the purposes of this Agreement and to consummate the transactions contemplated hereby.  Subject to the provisions hereof, each of the parties shall, in connection with entering into this Agreement, performing its obligations hereunder and taking any and all actions relating hereto, comply with all applicable laws, regulations, orders, and decrees, obtain all required consents and approvals and make all required filings with any governmental agency, other regulatory or administrative agency, commission or similar authority, and promptly provide the other parties with all such information as they may reasonably request in order to be able to comply with the provisions of this sentence.

(f)    <u>Parties in Interest</u>.  Except as herein otherwise specifically provided, nothing in this Agreement expressed or implied is intended to confer any right or benefit upon any person, firm, or corporation other than the parties hereto, their respective successors and permitted assigns, and any entity that subsequently becomes a member of the Corp Group or the FGIC Group, as the case may be.

(g)    <u>Waivers, Etc</u>.  No failure or delay on the part of the parties in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  No modification or waiver of any provision of this Agreement nor consent to any departure by the parties therefrom shall in any event be effective unless the same shall be in writing, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(h)    <u>Setoff</u>.  All payments to be made by any party under this Agreement shall be made without setoff, counterclaim, or withholding, all of which are expressly waived.

(i)    <u>Confidentiality</u>.  Subject to any contrary requirement of law and the right of each party to enforce its rights hereunder in any arbitration or legal action, each party agrees that it shall keep strictly confidential, and shall cause its employees and agents to keep strictly confidential, any information that it or any of its employees or agents may acquire pursuant to, or in the course of performing its obligations under, any provision of this Agreement.

(j)    <u>Headings</u>.  Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

(k)    <u>Counterparts</u>.  For the convenience of the parties, any number of counterparts of this Agreement may be executed by the parties hereto, and each such executed counterpart shall be, and shall be deemed to be, an original instrument.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile, email or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Agreement.

(l)    <u>Notices</u>.  All notices, consents, requests, instructions, approvals, and other communications provided for herein shall be validly given, made, or served, if in writing and delivered personally, sent by registered mail, postage prepaid, or by facsimile transmission to:

11

Corp at: FGIC Corporation
[ • ]
Attn: [ • ]

FGIC at: Financial Guaranty Insurance Company
[ • ]
Attn: [ • ]

FGIC Credit Products LLC
[ • ]
Attn: [ • ]

FGIC Credit Products II LLC
[ • ]
Attn: [ • ]

Grand Central Assurance Corporation
[ • ]
Attn: [ • ]

GCAC Credit Products LLC
[ • ]
Attn: [ • ]

or to such other address as any party may, from time to time, designate in a written notice given in a like manner.  Notice given by mail as set out above shall be deemed delivered five (5) calendar days after the date the same is mailed.  Notice given by facsimile transmission shall be deemed delivered on the day of transmission provided telephone confirmation of receipt is obtained promptly after completion of transmission.

(m)    Costs and Expenses.  Except to the extent otherwise specifically provided herein, each party agrees to pay its own costs and expenses resulting from the exercise of its respective rights or the fulfillment of its respective obligations hereunder.

(n)    Rules of Construction.  Unless otherwise indicated, any reference in this Agreement to any Section or clause, shall be to the Sections and clauses of this Agreement.  The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation."  Any reference to the masculine, feminine or neuter gender shall include each other gender and any reference to the singular or plural shall include the other, in each case unless the context otherwise requires.  All references in this Agreement to amounts of money expressed in dollars are references to United States dollars, unless otherwise indicated.  The words "herein", "hereto", "hereby", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof.  In the event of an ambiguity or a question of intent or interpretation, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or

12

disfavoring any party by virtue of the authorship of any provisions of this Agreement.  Further, prior drafts of this Agreement hereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement shall not be used as an aide of construction or otherwise constitute evidence of the intent of the parties hereto; and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of such prior drafts.

        (o)    <u>Entire Agreement</u>.  This Agreement and the Plan Sponsor Agreement, dated [    ], by and between Corp and FGIC contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter (including the Existing Agreement).

        (p)    <u>Submission to Jurisdiction</u>.  The parties hereto hereby irrevocably submit to the exclusive jurisdiction of any federal or state court located within the State of New York that is selected by FGIC in its sole discretion to hear any dispute arising out of or relating to this Agreement, and each party hereby irrevocably agrees that all claims in respect of such dispute or any action related thereto may be heard and determined in such courts.  The parties hereto hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

### Section 10.    <u>Applicable Law</u>

This Agreement and all claims arising therefrom or with respect thereto shall be governed by and construed and enforced in accordance with the domestic substantive laws of the State of New York without regard to any choice or conflict of laws, rules, or provisions that would cause the application of the domestic substantive laws of any other jurisdiction.

        IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed by their respective officers, each of whom is duly authorized, all as of the day and year first above written.


FGIC Corporation
By: _____
Title: [ • ]



Financial Guaranty Insurance Company
By:_____
Title: [ • ]

FGIC Credit Products LLC

By:_____

Title: [ • ]

FGIC Credit Products II LLC

By:_____

Title: [ • ]

Grand Central Assurance Corporation

By:_____

Title: [ • ]

GCAC Credit Products LLC

By:_____

Title: [ • ]

14

**<u>Exhibit D</u>**

**Creditors' Committee Support Letter**



FGIC Corporation
125 Park Avenue
New York, NY 10017
T  212-312-3399
F  212-312-3221
john.dubel@fgic.com

John S. Dubel
Vice Chairman and Chief Executive Officer


February 3, 2012


Anthony Princi
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104


**Re:**    **Support of Official Committee of Unsecured Creditors for the Chapter 11**
          **Reorganization Plan of FGIC Corporation**

Dear Mr. Princi:

I refer to a proposal by Financial Guaranty Insurance Company ("FGIC") to sponsor a Chapter 11 plan for FGIC Corporation ("Corp") in which FGIC would contribute $11,000,000 to Corp on the terms and conditions set forth in the Plan Sponsor Agreement, dated February 2, 2012, between FGIC and Corp (the "Plan Sponsor Agreement"), which has previously been shared with you.

By signing this letter below in your capacity as an authorized representative of the Official Committee of Unsecured Creditors (the "Committee") appointed in Corp's Chapter 11 case and returning it to me, you acknowledge that the Committee has agreed to support a Chapter 11 plan for Corp that provides for a contribution by FGIC to Corp in the amount of $11,000,000 on the terms and conditions set forth in the Plan Sponsor Agreement and that, subject to the Bankruptcy Court's approval of a Disclosure Statement for Corp's Chapter 11 plan that is an exhibit to and is filed and implemented in accordance with the Plan Sponsor Agreement, Corp may include in the solicitation materials for votes to accept Corp's Chapter 11 plan a letter of support from you on behalf of the Committee in the form attached to this letter agreement.

Very truly yours,


John S. Dubel


Agreed and acknowledged as of the
date first above written:

The Official Committee of Unsecured Creditors of FGIC Corporation

By: _____
      Anthony Princi
      Attorney for the Official Committee of Unsecured Creditors of FGIC Corporation

**DRAFT**
**2/3/2012**

## OFFICIAL COMMITTEE OF UNSECURED
## CREDITORS OF FGIC CORPORATION
Chapter 11 Case No. 10-14215 (SMB)

c/o Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 468-8000

_____ \_\_, 2012

TO:    **ALL CLASS 6 GENERAL UNSECURED CREDITORS OF FGIC
       CORPORATION**

---

This letter is written to you on behalf of the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") of FGIC Corporation (the "**Company**"). The Creditors' Committee was appointed by the United States Trustee to represent the interests of all unsecured creditors of the Company in the above-referenced chapter 11 case. We write to advise you of the Creditors' Committee's position regarding the Debtors' First Modified Chapter 11 Plan of Reorganization of FGIC Corporation (the "**Plan**"). The Plan is described in, and is attached as **Exhibit A** to, the accompanying disclosure statement relating to the Plan (the "**Disclosure Statement**"). All capitalized terms not defined herein have the meaning ascribed to them in the Plan.

Pursuant to the Plan, holders of Allowed General Unsecured Claims in Class 6 will receive their (i) Pro Rata share of distributable cash (which the Company estimates to be approximately 5.5% to 6.0% of each Allowed General Unsecured Claim in Class 6), and (ii) Pro Rata share of 100% of the Creditor New Common Stock of the reorganized Company. The Creditors' Committee and the Company believe that the Plan is fair and equitable to all parties in interest and is in the best interests of general unsecured creditors. **ACCORDINGLY, THE CREDITORS' COMMITTEE RECOMMENDS AND URGES ALL GENERAL UNSECURED CREDITORS IN CLASS 6 TO ACCEPT THE PLAN.**

*The foregoing description is not intended as a substitute for the Disclosure Statement, [which has been approved by the Court]. You should read the Disclosure Statement and the Plan in their entireties, and then make your own respective independent decisions as to whether the Plan is acceptable. We believe, however, that once you review the enclosed documents, you will reach the same conclusion as the Creditors' Committee about the benefits of the Plan to general unsecured creditors.*

The Company has provided you with a Ballot to vote to accept or reject the Plan. In order to have your vote counted, you must complete and return the ballot in accordance with the procedures set forth therein and in the accompanying Disclosure Statement. PLEASE READ THE DIRECTIONS ON THE BALLOT CAREFULLY AND COMPLETE YOUR BALLOT IN ITS ENTIRETY BEFORE RETURNING IT TO THE COMPANY'S BALLOTING AGENT.

Your timely vote is important, as only those holders of claims in Class 6 (General Unsecured Claims) that timely and actually vote on the Plan will have their votes counted for purposes of determining whether the Plan has been accepted by Class 6.

IN CONCLUSION, THE CREDITORS' COMMITTEE SUPPORTS APPROVAL OF THE PLAN AND RECOMMENDS THAT YOU TIMELY VOTE TO ACCEPT THE PLAN IN ACCORDANCE WITH THE PROCEDURES THAT HAVE BEEN ESTABLISHED BY THE BANKRUPTCY COURT.

Very truly yours,

Attorneys for the Official Committee of Unsecured Creditors of FGIC Corporation

MORRISON & FOERSTER LLP

By: _____
        Anthony Princi